# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA
# TAMPA DIVISION

|  |  |
|---|---|
| GAWAIN BAXTER, LAURA BAXTER and VALESKA PARIS, | CIVIL ACTION |
| Plaintiffs, |  |
| v. | NO. _____ |
| DAVID MISCAVIGE; CHURCH OF SCIENTOLOGY INTERNATIONAL, INC.; RELIGIOUS TECHNOLOGY CENTER, INC.; IAS ADMINISTRATIONS, INC.; CHURCH OF SCIENTOLOGY FLAG SERVICE ORGANIZATION, INC.; and CHURCH OF SCIENTOLOGY FLAG SHIP SERVICE ORGANIZATION, INC., |  |
| Defendants. |  |

# COMPLAINT
# AND DEMAND FOR JURY TRIAL

**TABLE OF CONTENTS**

I.     INTRODUCTION ............................................................... 1

II.    JURISDICTION AND VENUE ............................................ 4

III.   THE PARTIES .................................................................. 4

       A.    The Plaintiffs .......................................................... 4

       B.    The Defendants ....................................................... 5

IV.    FACTUAL BACKGROUND ................................................. 9

       A.    SCIENTOLOGY ...................................................... 9

             1.    Defendants' Organization and Management ...................... 9

             2.    The Freewinds ................................................... 15

             3.    Psychological Theory ........................................... 18

             4.    Membership ...................................................... 20

             5.    Coercive Control ................................................ 20

                   a.    Auditing ................................................... 20

                   b.    Isolation of Children ................................... 24

                   c.    Crime and Punishment ................................ 27

             6.    The Consequences of Defecting ............................ 32

             7.    The Abusive Formal Process for Leaving Scientology ....... 37

       C.    FACTS SPECIFIC TO PLAINTIFFS ......................... 40

             1.    Plaintiff Gawain Baxter ..................................... 40

             2.    Plaintiff Laura Baxter ....................................... 48

             3.    Plaintiffs Gawain Baxter and Laura Baxter Meet and Marry .......... 52

             4.    Plaintiff Valeska Paris ...................................... 57

V.     CLAIMS FOR RELIEF ....................................................... 78

VI.    DEMAND FOR JURY TRIAL ............................................. 85

VII.   PRAYER FOR RELIEF ...................................................... 85

i

## I.   __INTRODUCTION__

1.     Plaintiffs bring this action against Defendants pursuant to the Trafficking Victims Protection Reauthorization Act ("TVPRA"), 18 U.S.C. §§1581-1597.  As children, all three Plaintiffs grew up in, and were raised by Scientology.[1]  This was not a peaceful or loving environment; instead, it was a world filled with abuse, violence, intimidation, and fear. Defendants considered Plaintiffs to be possessions, void of any rights, whose sole purpose was to serve Defendants.  Plaintiffs were placed on a ship they could not leave and routinely punished by being humiliated, interrogated, and imprisoned, for the sole purpose of ensuring Plaintiffs would continue to perform back breaking free labor for the Defendants.

2.     Defendants in this action are David Miscavige, Church of Scientology International, Inc., Religious Technology Center, Inc., IAS Administrations, Inc., Church of Scientology Flag Service Organization, Inc., and Church of Scientology Flag Ship Service Organization, Inc. (together, "Defendants").  Plaintiffs allege Defendants violated the TVPRA by committing, attempting, and conspiring to commit, and/or by participating in

[1] "Scientology" and "Church of Scientology" are umbrella terms used to refer to the entire universe of entities and organizations affiliated with Defendants.  "Scientologist" refers to any person who is a member of any constituent entity or organization of Scientology, including members of Sea Org.  Scientologists who are not members of Sea Org are often referred to as "public" members.

a trafficking venture that committed, attempted, and conspired to commit,
forced labor and other human trafficking offenses against Plaintiffs in
violation of Chapter 77 of Title 18 of the United States Code. Defendants
directly and through the venture coerced persons, including Plaintiffs, to join
the Defendants' "Sea Org" and provide unpaid labor and services for a decade
or longer on Defendants' ocean going cruise ship vessel, the "Freewinds."[2]
Defendants knowingly obtained valuable benefits, including but not limited
to financial enrichment, and free labor and services, like construction work,
landscaping, and food preparation at "Flag Base," in Clearwater, Florida, and
aboard the Freewinds. The receipt of money and unpaid labor also enabled
David Miscavige to maintain a façade of legitimacy, a luxurious lifestyle,
power over every aspect of the organization's global operations, and influence
over members, including celebrities who joined and promoted Scientology
publicly. Persons working under Miscavige also benefitted from their
participation, financially and/or by obtaining the enhanced status, power, and
authority that he bestowed on them.  As a result, all Defendants knew or
should have known about the venture's offenses, and all participants in the
venture are jointly and severally liable for the physical, emotional,
psychological, and economic harm caused to the Plaintiffs.

---

[2] All Scientology-affiliated entities and organizations alleged herein are
managed and controlled exclusively by members of Sea Org.

3.     This action concerns abusive practices within Defendants' Sea Org and its subsidiary organization for young children known as "Cadet Org."[3]  Through the highly-regimented Cadet Org and Sea Org, children raised in Scientology are indoctrinated, manipulated, and pressured into coercive circumstances from a young age, in which they are compelled to provide age-inappropriate labor and services to Defendants with little or no preparation or training, safety precautions, or compensation, and from which there are no reasonable means of escape.  Because Scientology's distinction between children and adults is fuzzy, at best, children are informed that they are considered adults and that they must behave and expect to be treated as adults.  There is thus no acknowledged transition from childhood to adulthood; rather, minors transition from Cadet Org to Sea Org in their mid-teens and continue to labor away in Defendants' coercive environment without ever comprehending that they may have a legal right to their own agency.

4.     Plaintiffs seek compensatory and punitive damages against Defendants under 18 U.S.C. §1595(a) for the injuries inflicted upon them by Defendants, directly and through their venture, in violation of 18 U.S.C. §§1581, 1589 and 1590.

---

[3] Unless otherwise specified, references to Sea Org herein include Cadet Org.

## II.   <u>JURISDICTION AND VENUE</u>

5.     The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §1331 and 18 U.S.C. §1595(a).

6.     Venue is proper in this Judicial District pursuant 28 U.S.C. §§1391(b)(2) or (3).  A substantial part of the events or omissions giving rise to the claims alleged herein occurred in this District, and Defendants are subject to personal jurisdiction in this District.

## III.   <u>THE PARTIES</u>

### A.   <u>The Plaintiffs</u>

7.     Plaintiff, Gawain Baxter, is a citizen and resident of Australia. In 1982, when Gawain was only a few weeks old, his family moved from Australia to the Scientology "Flag Base" in Clearwater, Florida.  Gawain was raised within Scientology.

8.     Plaintiff, Laura Baxter, is a citizen of Germany and current resident of Australia.  Laura was raised within Scientology.

9.     Plaintiff, Valeska Paris, is a citizen of France and Switzerland and a resident of Australia.  In 1984, when Valeska was only six years old, she signed a Sea Org contract and joined Cadet Org in England. Valeska was separated from her family and lived communally with other Sea Org members in England.  In 1992, Valeska moved from England to the

Scientology "Flag Base" in Clearwater, Florida. Valeska was raised within Scientology.

B.   **The Defendants**

10.    Defendant David Miscavige is an individual who resides in or near Clearwater, Florida.  At all times relevant hereto, Miscavige controlled and directed the activities of all Defendant entities herein.  Among other things, Miscavige personally directed and continues to direct the management and operations of Defendants Church of Scientology International, Inc., Religious Technology Center, Inc., IAS Administrations, Inc., Church of Scientology Flag Service Organization, Inc., and Church of Scientology Flag Ship Service Organization, Inc., including the practices and conduct alleged herein.

11.    Defendant Religious Technology Center, Inc. ("RTC") is incorporated in California and is the principal management, security, and enforcement operation for Scientology.  Pursuant to an assignment agreement with Scientology founder L. Ron Hubbard, RTC owns, administers and enforces certain intellectual property ("IP") rights, including Scientology's trademarks and rights in its so-called "advanced tech," and it receives licensing fees paid for the exploitation of those rights, including their use in Scientology courses and course materials.  Operating under Defendant

Miscavige's direction, senior RTC officers, including those in RTC's Office of Inspector General ("OIG"), oversaw and directed the management of Scientology-affiliated entities and organizations, including Defendant entities herein. RTC and Miscavige also oversaw and directed Defendants' sprawling and pervasive investigative and policing operations, monitored members' behavior, and handled matters concerning discipline and punishment of members throughout all Scientology-affiliated entities, groups, and organizations.

12. Defendant Church of Scientology International ("CSI") is a California nonprofit corporation, with headquarters in Los Angeles, California. CSI is controlled and directed by Defendant Miscavige, directly and through RTC's officers and others who report to him. CSI is the licensee of Scientology's IP, including trademarks and other IP owned and administered by Defendant RTC.[4] CSI licenses Scientology's IP to numerous Scientology-affiliated entities and organizations, which pay CSI licensing fees that it passes through to the owners of the IP, including Defendant RTC. CSI conducted substantial business at its "spiritual headquarters" in Clearwater, Florida, known as Flag Base, which includes the 172,000 square foot Oak

---

[4] While RTC owns Scientology's trademarks and "advanced tech," copyrights in its other literature are owned by Scientology-affiliated Church of Spiritual Technology ("CST") and licensed to CSI.

Cove, the 267,000 square foot Fort Harrison, and the centerpiece of Flag

Base, the 377,000 square foot Flag Building.  CSI and Miscavige control a

number of trusts, including Flag Ship Trust, which among other things owns

the company that owns the Scientology ship, Freewinds.

13.     Defendant Church of Scientology Flag Service Organization, Inc.

("FSO"), is a licensee of CSI, incorporated and headquartered in Florida.

Through RTC, CSI, and individuals reporting to him, Defendant Miscavige

controls and directs the management of FSO.  FSO's operations include two

primary functions: management and administration of Scientology's auditing

process (described in detail below), and ownership, management and

operation of Flag Base, Scientology's substantial real property holdings in

Clearwater, Florida.  Flag Base is Scientology's global hub of operations and

its largest source of revenues, providing (among other things) temporary

quarters for visiting Scientologists, facilities for classes and auditing

sessions, dining and meeting facilities, and the center where Defendants host

large gatherings, including CSI's annual gala.  As with the other Defendant

entities, Flag Base is staffed by members of Cadet Org and Sea Org, who live

in dormitories at Flag Base.

14.     Defendant Church of Scientology Flag Ship Service Organization,

Inc., ("FSSO, Inc.") is a not-for-profit corporation with its principal place of

business in Clearwater, Florida.  FSSO, Inc., operates the Freewinds.  It also
recruits and employs Sea Org members to work on its crew, and it collects
fees from members of the International Association of Scientologists ("IAS")
for courses, services, and programs they participate in on the ship. FSSO,
Inc., is controlled and directed by Defendant Miscavige, through RTC, CSI,
and individuals who report to him.

15.     Defendant International Association of Scientologists
Administrations, Inc. ("IASA") is a Delaware corporation headquartered in
Los Angeles, California, with offices and operations in Clearwater, Florida, at
Defendants' Flag Base.  Defendant Miscavige exclusively directs all
operations of IASA.  IASA is the operating entity for the International
Association of Scientologists ("IAS"), an unincorporated membership
association that all persons who participate in Scientology are required to
join.  All Scientologists are members of IAS and are required to pay annual
dues to IASA, which administers and transfers those funds (and other
payments solicited by IAS) under the exclusive direction of Defendant
Miscavige, for his personal enrichment and benefit and for the benefit of
Defendants CSI, RTC, FSO, and FSSO, Inc., as well as the Freewinds and
other Scientology-affiliated entities, organizations, properties, and
enterprises.  IASA finances Defendant Miscavige's "war chest," a

discretionary fund he and other Defendants' most senior officers utilize to support intelligence gathering and retaliation campaigns against defectors and critics of Defendants.

16.     While all Scientologists are required to pay annual membership dues, CSI has no members and receives no membership dues or donations. Annual dues and donations are funneled into Defendant IASA and several CSI-controlled trusts, through which IASA conducts Scientology's financial affairs, including the acquisition and development of its vast portfolio of real estate holdings and the ship Freewinds.

## IV.   FACTUAL BACKGROUND

### A.   SCIENTOLOGY

#### 1.   Defendants' Organization and Management

17.     Scientology is organized and operates through a global network of corporations, trusts, and unincorporated associations and organizations. This structure creates the appearance of a group of affiliated but decentralized and independently managed establishments operating pursuant to general authority bestowed upon them by the "Mother Church," CSI.

18.     While ostensibly decentralized, Scientology's management is fully top-down, with all principal entities and organizations, including Defendant entities herein, controlled and managed under the direction of one man,

Defendant Miscavige, whose authority is absolute.  Miscavige receives daily reports on and directs the operations of each Scientology-affiliated entity and organization through "command channels," with built-in redundancies to ensure he receives complete and timely information about all aspects of Defendants' operations, and that his directives are fully carried out without any variance.  Through RTC and other command channels, Miscavige controls the management of Scientology, including by directing the implementation and enforcement of all policies, practices, and procedures for every Scientology-affiliated entity and organization, including each Defendant entity herein.

19.    RTC is directly controlled by Defendant Miscavige, who holds the title of Chairman of the Board of RTC.  RTC officers are continually present at and monitor, control, and direct the management of Defendants CSI, FSO, and FSSO, Inc., as well as all Rehabilitation Project Force sites, the ship Freewinds, primary Scientology sites such as Saint Hill in the United Kingdom,[5] and Defendant's International Base in California, among many others.  RTC officers answer only to Miscavige, and they hold command authority in each organization and at each site to which they are assigned.

---

[5] Such primary sites are sometimes referred to by Scientology as "Ideal Orgs."

20.     Management oversight for Scientology-affiliated entities and operations is, on paper, vested in a Watchdog Committee consisting of upper-echelon individuals situated within CSI.  This body was under the direct control of Miscavige's predecessor, Scientology founder L. Ron Hubbard, and it continued to operate under Miscavige's control after Hubbard's passing.  However, the Watchdog Committee and other purported senior managerial structures and functions are a fiction: through a series of purges and personnel actions beginning in the early 2000s, Miscavige collapsed those committees and organizations, placing all managerial oversight and supervision – and thus the management of other Scientology-affiliated entities – directly under his control.  The entire upper echelon of Scientology's management, including within RTC and CSI, as well as the senior officers and managers of other entities such as FSO, FSSO, Inc., and IASA, serve at Miscavige's pleasure and he alone has sole discretion to fire and replace those persons at will, which he has done on a number of occasions.

21.     CSI's Office of Special Affairs ("OSA") handles Scientology's internal security and outside legal affairs, and serves as Scientology's intelligence and spying operation.  Through its operatives and agents, OSA tracks, monitors, and directs retaliation campaigns and ruinous litigation against defectors and critics of Scientology.  The head of OSA and other OSA

11

officers report to and take direction exclusively from Miscavige and his senior RTC officers.

22.  The Commodore's Messenger Organization ("CMO") is a group controlled and directed solely by Miscavige that operates outside of the structure and management of Scientology-affiliated entities.  CMO's primary function is to enforce Defendants' policies pursuant to Miscavige's direction, monitoring the management of all Scientology operations, providing reports to Miscavige and his senior officers, and relaying and enforcing directives from them to operational managers.  For each of Defendants' operations there is a corresponding CMO unit supervised by a Commanding Officer, including at Flag Base and on the Freewinds.

23.  RTC and CMO are the two command channels through which Miscavige exercises his authority and directs Defendants' operations.  CMO members possess and exercise substantial power and authority over management in each entity and at each of Defendants' operations, subordinate only to RTC officers.  Both RTC and CMO officers are superior to senior managers in Defendants' operations, including in the operations of Defendants FSO and FSSO, Inc.  All senior managers and their subordinates are required to report to and take direction from the RTC and CMO agents assigned by Miscavige to their respective organizations.  Because any

directive issued by an RTC or CMO agent is on the authority of Miscavige, even the most senior officers and directors of Scientology-affiliated entities have no power to override those commands.  No decision of any consequence is made, and no directive is issued, outside of Miscavige's command channels.

24.    These two primary command channels are designed to maximize Miscavige's control, in part by providing redundancy: both RTC and CMO officers monitor and report on management and operations and ruthlessly carry out the directives they are given.  This enables an extremely high level of control, ensuring that accurate and complete information is always reported up through the command channels and directives executed without fail.

25.    All so-called ethics and justice policies, which rigidly govern every aspect of the behavior and discipline of Sea Org members (including managers), are enforced through these same mutually reinforcing command channels, the overall effect of which is highly oppressive and coercive.  This system operates as a one-way ratchet, rewarding senior personnel who rigidly enforce policies and directives, including through severe mistreatment and punishment of subordinates, and penalizing those who provide or permit any lenience or laxity in their operations, including RTC and CMO officers who are subject to extremely harsh punishment by Defendant Miscavige for

13

anything he perceives as inconsistent with his expectations in the operations under their command.

26.    All persons who are deemed to be potential sources of trouble, including Sea Org members whose behavior deviates from Defendants' rigid policies, defectors who are perceived to present any risk of speaking or taking action against Defendants, and critics of Scientology, are reported to Miscavige on a daily basis by his senior RTC, CMO, and OSA officers. Miscavige then issues directions to RTC, CMO, and OSA for handling, punishing, and controlling each purported offender.  Policing and enforcement of Defendants' policies are further enhanced by rules obligating all Sea Org members to report violations of policies by other Sea Org members through written "Knowledge Reports."  These reports are submitted to operational managers who provide them to RTC and/or CMO officers, who submit them through the command channels for determination of appropriate punishments.  Any Sea Org member who is aware of misconduct and fails to write it up and submit it in a Knowledge Report is subject to harsh consequences.

27.    This paranoid and fear-based environment is further reinforced through Defendants' policy obligating every Sea Org member to self-report deviant thoughts and behavior, including prior failures to self-report.  This

process, known as writing up "overts and withholds", is imposed on members starting at a very young age while they are in Cadet Org, so that by the time they are assigned to posts in Sea Org, voluntarily writing up these self-reports or readily doing so when instructed by a superior becomes second nature.

### 2.   **The Freewinds**

28.   Freewinds is owned by San Donato Properties S.A., a Panama corporation, which is wholly owned by Flag Ship Trust, a trust controlled by Defendants Miscavige and CSI.  The most senior officers and authorities on the Freewinds report to and take direction from Defendant David Miscavige, who is the ultimate authority in the ship's chain of command.  Under the direction of Miscavige and the corporate Defendants, Plaintiffs were forced to work for years on the Freewinds under highly dangerous and abusive conditions.

29.   The Freewinds' home port is in Curacao, an island nation in the South Caribbean.  All Sea Org members assigned to work on the Freewinds crew are transported to Curacao, where they board the ship.  According to both the U.S. State Department and Central Intelligence Agency, Curacao has a significant human trafficking problem, including labor trafficking of undocumented foreign nationals. The Freewinds frequently sails to the other

15

two "ABC islands" of the Antilles, Aruba and Bonaire, where anti-trafficking measures are also weak.

30.     Consistent with Defendants' longstanding policies, the Freewinds never docks at any U.S. port, and it never enters the territorial waters of the United States.

31.     At all times relevant hereto, RTC's senior executive on the Freewinds, Lurie Belotti, reported directly to David Miscavige.  As Miscavige's representative and an RTC executive, Belotti was the ultimate authority on the ship, communicating frequently with Miscavige about the ship's operations, including matters concerning crew work assignments, behavior, and discipline.  Three other officers on the ship had principal responsibility for day-to-day operations, including carrying out Miscavige's and Belotti's directives. Sue Price, a director of Defendant FSSO, Inc., served as Commanding Officer of CMO on the ship, reporting to both Belotti and Miscavige.  Sharron Weber was President of FSSO, Inc., and served as Commanding Officer of the FSSO organization on the ship, reporting to Belotti and Price.  The ship's Captain, Mike Napier, had operational command of the Freewinds Service Organization ("FWSO") and he also reported to Belotti and Price.

16

32.    FWSO and FSSO are both operations of Defendant FSSO, Inc., organized into two groups to delineate and separate those operations that are managed day-to-day by the ship's captain from all other operations on the ship. FWSO is responsible for accommodations, food preparation and dining facilities, cleaning, maintenance and engineering, and the ship's medical office. Security also operates within FWSO, including the personnel charged with confiscating crew documents, preventing crew from unauthorized departures from the ship, maintaining surveillance of crew members subject to disciplinary actions, and recovering defectors who escape from the ship.

33.    FSSO's organization includes the ship's recruitment, personnel, ethics, and discipline operations, as well as operations for auditing ship crew and correction of crew auditors.  FSSO also provides all services and courses to the public Scientologists who are guests on the ship, including Scientology's highest level (and most expensive) course, OT VIII.

34.    IASA's operation on the ship is limited and largely public-facing. IASA staff are tasked with promoting Freewinds programs and signing up IAS members for those programs.  While IASA signs up members for programs on the ship, FSSO provides auditing services and courses to guests on the ship and FSSO collects the fees for those services.  When new guests board the ship, however, IAS staff are required to solicit additional,

17

sometimes very large donations, which are paid into IASA's coffers.  Among many other things, when Miscavige hosts celebrity guests on the ship, he uses IASA funds to provide them (and himself) with lavish treatment and luxuries not provided to other guests.  Indeed, he occasionally uses the Freewinds as his private yacht, including hosting celebrities when the ship is not occupied by other public members.

### 3.   **Psychological Theory**

35.   Scientology rests almost entirely upon the writings of L. Ron Hubbard, a science fiction author who wrote *Dianetics: The Modern Science of Mental Health* (1950), which was for a time a popular volume in the self-help, "human potential" genre. The basic theory of Dianetics is that the human mind can be separated into two spheres: an emotionally reactive mind and an unemotional, analytic mind. Dianetics teaches that the analytic mind is a computer, incapable of error.  Human misjudgments, on the other hand, which create social problems and much individual suffering, are attributed to the emotionally reactive mind, which is made up of patterns imprinted on the nervous system in moments of pain or stress. These imprinted patterns may be triggered by stimuli associated by the emotional mind with the original imprinting, which may, in turn, produce unconscious or conditioned behavior which is harmful or irrational.

18

36.     This psychological theory, which is unquestioningly accepted and applied in Scientology, is not considered to be limited to a description of the mind, but to also offer a basis for a practical science which purportedly can cure many individual and societal problems. Scientology labels ordinary persons, encumbered by their reactive minds, 'preclears,' whose mental computers contain errant code that needs to be deleted. The goal of Dianetics is to render people 'clear' of this errant, emotional code, thereby permitting their unemotional, analytical minds to govern their behavior. Among other things, Dianetics teaches that all mental disorders are caused by these imprinted patterns in the reactive mind, which can be erased, curing the mental illness. This concept is extremely broad and permits Scientology to consider every behavior, feeling or thought that an individual may have, and which is deemed by Scientology to be aberrant or deviant, to have been a result of some error in their reactive mind that can be erased.

37.     This theory is used by Scientology to justify the application of highly abusive, destructive methods that enable it to manipulate, break down and subsequently gain nearly complete coercive control over its subjects, resulting in long-term emotional, psychological, and even physical injuries. This theory is also used to justify odious forms of child abuse and the

covering up of such abuses, including those inflicted upon the Plaintiffs alleged herein.

### 4.   **Membership**

38.   So-called "public members" of Scientology typically live in their own homes, earn livings working for businesses not owned by Scientology, and pay annual membership fees to IAS and purchase materials and services such as auditing at a local Scientology center.  In contrast, Sea Org members are required to sign billion-year service contracts, become increasingly indebted to Defendants, live in residences on Scientology bases, and work for low and even no pay as staff members in the various Defendant entities and other Scientology-controlled entities and organizations.

### 5.   **Coercive Control**

#### a.   **Auditing**

39.   Defendants employ a manipulative process referred to as "auditing," which enables them to attain and exert control over members, including Plaintiffs.  Auditing is conducted by Defendant FSO's operations at Scientology centers around the world, which are required to provide facilities for the procedure.  Pursuant to Defendants' policies, all members, including children, are required to submit to auditing on a regular basis.

40.     The auditing process is conducted by an "auditor," who is trained to lead the subject through interrogation sessions that can last hours. All audit sessions are thoroughly documented in auditors' notes and audio or video recordings of the sessions, which are compiled in permanent dossiers for each member known as Pre Clear or "PC" folders that are maintained in the ordinary course of Defendants' operations.  FSO Case Supervisors review PC folders and provide "correction" to auditors who do not achieve expected results.  PC folders are also available to and reviewed by CMO and RTC officers, who enforce Defendants' exacting requirements for how auditors conduct the sessions and monitor members' compliance with their obligations to submit to the process.  RTC's OIG agents and CSI's OSA agents also access and review PC folders to monitor members' behavior and to obtain information that can be used as leverage to control errant members and defectors.

41.     Nothing is out-of-bounds in an auditing session.  Every memory of past experiences, and each thought and aspect of the subject's behavior is explored in minute detail as the auditor repeatedly questions the subject until the auditor is satisfied with the subject's answers.

42.     In an auditing session, the auditor seeks to establish a relationship of trust with the subject. The auditor has absolute authority to

guide the questioning, extract desired responses, and decide when the session may be concluded.  Subjects are not permitted to leave the room until the auditor declares the session over.  To reduce subjects' resistance and lower their guards, auditors are trained to remain low-key in their questioning and to avoid reacting to what subjects disclose. Subjects are required to fully answer all their auditors' questions, including deeply personal and compromising information that, if disclosed to others, would embarrass, humiliate, and inflict personal costs on the subject (and, often, the subject's family). Through repeated interrogations of subjects, auditors identify and document vulnerabilities that are used to manipulate, pressure, and coerce members.  Subjects are instructed to suppress feelings and emotions connected to the information they are conveying, even when recounting details of past traumas, which they are repeatedly told by their auditors are the subjects' own fault. This induces experiences of dissociation, which is intended to normalize the extremely abusive superior-subordinate dynamic that is central to Defendants' operations.

43.    Skilled auditors lead their subjects to admit having errant thoughts or behaviors, or the withholding of such information in prior sessions, which are thus known as "overts and withholds."  If a subject does not admit to something sufficiently compromising, she or he is coerced into

22

giving a false confession.  Because failing to provide every detail of every thought or experience to an auditor, or failing to self-report errant conduct, is considered serious misconduct, auditors can trip up their subjects using information gleaned from PC folders to identify some gap or missing detail, or to elicit a response to a question that might be characterized as inconsistent with a statement in a prior session.  The subject is then required to admit to intentionally withholding information, regardless of whether there was any omission or if it was intentional.  One way or another, once an auditor begins to steer a session towards the objective of extracting admissions of wrongdoing, it is pointless for the subject to resist, even if it means admitting to things they never thought or did.  Once a subject's overts and withholds have been documented, they are weaponized, the threat of disclosure held over the subject's head throughout their lives.

44.   Auditing sessions can have a highly sexualized component, even when the subjects are minors.  Children are interrogated about sexual thoughts and experiences that the children may not comprehend or have experienced, and they often find that the only way out of an auditing session (during which they may be locked inside a room with their auditor) is to provide a false confession, making up stories about sexual conduct based upon leading questions asked by their auditor.

23

45.     The auditing process thus lays the foundation for Defendants to subjugate and control a large workforce.  Along with the perpetual fear of open disclosure of personal and damaging information, Sea Org members internalize feelings of self-doubt, self-blame, guilt, and shame.  When a senior officer deems a Sea Org member to be insufficiently obedient or in need of corrective discipline, they do not even need to send the member for auditing: they can simply instruct the member to sit and write up their overts and withholds, true or false, which have been routinized.  They can verbally abuse members in private or more open settings, knowing that they will trigger a dissociative process that is useful in breaking members' resistance and will.  And the interrogation-admission cycle becomes fully normalized, generating expectations of punishment and acceptance of even more extreme forms of the process whenever RTC or CMO officers impose it.

### b.     Isolation of Children

46.     The children of Sea Org members are separated from their parents when they are infants. Children under six years old are cared for, disciplined, and groomed for the "Cadet Org" by Sea Org members who hold no qualifications to raise children. These Sea Org members discipline and indoctrinate the children into Scientology. When their children are as young as six years old, parents relinquish custody to Cadet Org, which prepares

24

them for a lifetime of servitude under Defendants' control.  Once their

children are in Cadet Org, parents are stripped of their parental rights and

responsibilities; they do not make any decisions with respect to their

children's living conditions, how their children are educated, what work

assignments they are given, or even how they are disciplined.

47.    Scientology does not permit children of Sea Org parents to have

the kinds of early experiences, relationships, and activities that are critical

for healthy development. Scientology largely does not differentiate between

children and adults.   Instead, children over six years old are considered to be

and are frequently told that they are adults, and that they should act and

expect to be treated as adults.  They are not even called children; rather, they

must be referred to as "Cadets."  They are required to work jobs and immerse

themselves in Scientology's indoctrination process, which takes priority over

their education, playtime, rest, and all other activities.  Children are

considered a resource and personnel asset, required to complete various work

projects referred to as "Cadet Missions."

48.    Cadet Org is run by a Cadet Coordinator, a senior member of Sea

Org who reports to and takes direction from senior RTC and CMO officers.

To prevent parents from interfering with children in Cadet Org, except

during very limited "family time," parents are not permitted to communicate with their children directly.

49.   Family time for Cadets is limited to one visit per week, which can be cancelled if either the child or parent is being punished for some alleged transgression, or if the parent is assigned to a Scientology position at another base. Children can be punished and deprived of contact with their parents for offenses as minor as failing a "white glove" inspection of their living quarters (where, if the white glove picks up any dust, the child fails the test).

50.   Children raised in Defendants' Cadet Org do not have any contact with anyone in the outside world, and they are taught from a very young age to distrust outsiders and all outside institutions. They are frightened into believing that they will perish or suffer if they leave, and stories of Sea Org members who have died or struggled outside the community are held out as examples of this. From childhood, Sea Org members must refer frequently to written Scientology materials, which explain that people who leave or speak out against Defendants often become sick or die.

51.   Children who grow up in Defendants' Cadet Org are deprived of any meaningful education so that they are easier to manipulate and retain.

Members often have no high school diploma or work experience outside of Scientology to pursue other jobs and earn a living independently.

### c.   Crime and Punishment

52.   All transgressions, no matter how minor, are considered "crimes" against the entire community for which various punishments are meted out. Senior RTC, OSA, and CMO officers regularly meet and communicate with Defendant Miscavige, report in detail on Sea Org members who are in poor standing, or who have left Sea Org, or who have spoken out against Defendants, and receive detailed instructions from Miscavige on how to quiet or punish these individuals.

53.   Defendants' ethics policies strictly forbid any Sea Org member from taking or instigating any legal action against Defendants, any Sea Org member, or any other Scientologist, including filing lawsuits or reporting abuse, assault, or other serious matters to law enforcement or child protective services.  This is done to protect Defendants and their leadership from legal consequences and negative publicity.

54.   A common punishment for what are often vaguely or arbitrarily categorized as crimes is to assign an offending member the status of being in a "lower condition."  In those circumstances, the member is required to confess his or her crime, write up detailed overts and withholds, and make

27

amends to the member(s) with whom he or she has a conflict, the entire

group that they are posted to, and to the supervisors of that group.  While in

lower conditions, members are physically isolated, subjected to continual

surveillance, and prohibited from having contact with anyone else in the

organization until they have been deemed rehabilitated and can be

readmitted to the organization.

55.    Members put in lower conditions often have their sensitive

personal information, derived from auditing sessions, written overts and

withholds, or other processes, posted in common areas where all Sea Org staff

on site can see it.  This tactic is employed by Defendants' officers to

encourage other Sea Org members to shun persons in lower conditions and to

subject them to humiliation and scorn.

56.    Speaking negatively about or criticizing Defendants and their

officers, even in a private conversation with a fellow Sea Org member, is

considered a serious violation of Defendants' "ethics" policies.  Expressing a

desire to leave is an even more serious offense.  Reporting mistreatment by

another Sea Org member results in a rapid response from RTC or CMO

officers, who coerce the reporting member into (falsely) admitting to having

fabricated the matter, which then results in severe punishment.

57.    Defendants' abusive, punitive system is intended to and frequently results in absolute obedience and silence.  Lower ranking members, including children, quickly learn that reporting mistreatment by higher ranking members will result in punishment.  If someone – including a child – reports having been aggrieved or harmed by another Sea Org member, no matter how severe the harm, the complaining individual is pressured into accepting responsibility.

58.    Sea Org members who violate Defendants' ethics policies are punished with "ethics handlings," during which they are severely interrogated, scolded, verbally abused, and systematically debased and broken down until they accept responsibility for the problem and write a confession of their "crimes."  Detailed records of ethics handlings are maintained in ethics folders that are kept along with PC folders for every member who has been subjected to a "handling."  The information and confessionals in those folders are utilized by Defendants' officers to exert pressure on and coerce members (and former members) into submitting to and complying with Defendants' demands. Ethics handlings can last many hours, and offenders can be subjected to days or even weeks of handlings, until RTC or CMO officers deem the member to have been rendered adequately submissive.

29

59.     A more severe form of punishment, usually reserved for those who have been subjected to lower conditions, ethics handlings, and other abusive treatment and who still do not perfectly comply with all the demands placed upon them, is to be transferred to one of Defendants' Rehabilitation Project Force ("RPF") sites.  RPF sites are labor camps, heavily guarded, often with fenced perimeters. Sea Org members may be sent to an RPF site for a defined period, but more typically assignment to an RPF site is for an indefinite period that can last months or even years, where members are held and subjected to brutal conditions until Defendants deem them sufficiently "rehabilitated" to return to their former post or be placed in a new post.

60.     In addition, Cadet Org and Sea Org members can be forced to submit to lengthy, intensive, scripted interrogations called "security checks." Ostensibly intended to ferret out individuals who may pose a risk to the integrity of the organizations, security checks are highly abusive sessions of indeterminate length in which subjects are repeatedly interrogated about their thoughts and conduct, including about their sex and sexuality, purported criminality, contacts with law enforcement and other government agencies, and other thoughts and behaviors deemed errant by Defendants.

61.     The design and effect of these sessions is to break the members' will and achieve absolute compliance by altering their perception of their

thoughts and experiences, instilling deep feelings of guilt, shame, self-doubt, and fear, even for things they have never really thought or done.  Security checks also reinforce Defendants' demands for absolute secrecy regarding all internal matters.  For example, the security check script for children includes, among its 99 questions, the following: "Have you ever spoiled things for somebody?" "Who have you made feel guilty?" "Have you ever tried to make others believe that your parents, or teachers, were cruel to you?" "Have you ever offered as an excuse for something you have done wrong that you are only a child, or that you haven't grown up yet?" "Have you ever been a coward?" "Have you ever made too much fuss over a little hurt?" "Have you ever made out that you were more badly damaged than you were in order to make someone stop picking on you?"  These hours-long sessions, in which interrogators focus repeatedly on the same question until they get the answer they want, are designed to establish complete dominance over members, including children.

62.    Years of intensive auditing, ethics handlings, security checks, and the many other punishments meted out for alleged "crimes" cause serious psychological harm.  Having to live day-to-day in fear of punishment for the often-false confessions members are coerced into providing is itself traumatic. Existing in this intentionally fear-inducing environment throughout their

childhoods and formative years leaves them broken, unable to fend for themselves, or defend against the continued abuses inflicted on them even after they reach adulthood.  That deep, primal fear is Defendants' objective, and it never dissipates.  Believing the world to be even more dangerous than Sea Org, many members accept their subjugation and continue to acquiesce to even the most outrageous and unreasonable demands.  Even those who leave cannot escape the pervasive fear of consequences for anything Defendants consider to be in violation of their extremely coercive policies.

### 6.    The Consequences of Defecting

63.    Miscavige and high-ranking RTC and CMO officers direct the enforcement and implementation of the stringent and abusive policies dictating how Sea Org members may leave the organization. All Defendants are aware of the aforementioned policies and support their implementation and use. The result is that very few members are able to safely leave. Among other things, defecting from Scientology can mean being declared a "Suppressive Person" and cut off from all contact with family members, friends, and employers, because anyone within Scientology who maintains any contact with a Suppressive Person is deemed guilty of a crime and subject to punishment.  For people who have been raised in Scientology, being shunned is devastating and untenable; it means being completely cut

off from the only community they have known, including in many cases their family, as well as their source of meals, housing and necessities.

64.     Miscavige and the corporate Defendants, through RTC, OSA, and CMO, closely monitor defectors and persons they have declared to be Suppressive Persons, and frequently harass, intimidate, and terrorize them, should they criticize Defendants in any manner.  OSA is, among other things, Defendants' intelligence and black ops arm, coordinating spying on and retaliating against Sea Org defectors and other purported enemies of Defendants.  In addition to the detailed information already possessed by Defendants in defectors' PC and ethics folders, investigators working for Defendants go through defectors' garbage looking for "dirt," monitor their movements and communications, and dig into the backgrounds of defectors' relatives, friends, and co-workers, searching for vulnerabilities that can be used to pressure and manipulate defectors.

65.     In one widely reported case, a private investigator working for Defendants was arrested near a defector's house after a neighbor reported a suspicious person loitering and looking into the window of a house.  A search of his vehicle turned up multiple firearms, large amounts of ammunition, an illegal silencer, GPS tracking devices, cameras, and other surveillance equipment.  The investigator admitted to the police that he and his son had

been working for Defendants for two years, tracking the defector's every move, listening in on his conversations, and even recruiting persons to befriend the defector to monitor him more closely. He told police that he was required to report hourly to one of Defendants' agents on the defector's moves, every person the defector met, and every conversation that the defector had if anything was said that might be of interest to Defendants. When the police informed the defector and checked his car, they found a GPS tracking device that the investigator had planted.

66.     Similar to the redundant structure of RTC and CMO, Defendants have even employed investigators to monitor the investigators tracking defectors.

67.     In addition to being spied on, defectors can face harsh retaliation that can preclude building and maintaining a life outside of Scientology. For example, Defendants direct the creation of defamatory websites using the defector's name, thus ensuring that a Google search of the defector brings up the site. These websites accuse defectors of lying about their experiences in Scientology, post photos of the defector smiling and the positive testimonials she or he made during coercive auditing sessions prior to their escape from Scientology, as well as declarations of other members attesting to the positive experience the defector had. Defendants, through their members, maintain

such a website targeting Plaintiff Valeska Paris:

http://www.valeskaparis.com/.

68.     Defendants' retaliation tactics can escalate, aiming to damage defectors' reputations; agents of Defendants will picket defectors' places of employment, residences, and neighborhoods with posters falsely accusing the defector of crimes of moral turpitude, such as child molestation, to humiliate and destroy the lives of those defectors.  Defendants' agents have confronted defectors outside their homes, workplaces and even in airports, yelling and accusing them of wrongdoing.  These tactics are well known among members of Sea Org as part of the arsenal of weapons Defendants can deploy, and that knowledge alone intimidates many Sea Org members from ever leaving.

69.     Additionally, Defendants' leaders and most zealous adherents proclaim that "Suppressive Persons," are "fair game," meaning that there are no limits to the magnitude of retaliation visited upon that person. Defendants' policy on "Counter-Attack Tactics" dictates that defectors' post-Scientology employment is a particularly significant vulnerability and that retaliation should aim to cause the defector to lose his or her job.  If the job is not perceived as being sufficiently valuable to the defector, or if Defendants through their members fail to cause the person to lose their job, anything important to that defector should be targeted.

70.     Defectors who have taken legal action against Defendants and their members have been subjected to extreme forms of retaliation.  Very recently, several defectors who had reported rapes and subsequent coverups, and at least one person close to them, have accused Defendants of poisoning their pets, breaking into their homes, fraudulently re-registering one of their vehicles and reporting it stolen, and even arson.  After filing a lawsuit against Defendants for these acts, they suffered additional retaliation.

71.     There are also consequences for the family members of a defector who are still in Scientology; if a defector is declared a Suppressive Person, the remaining family may be deemed "Potential Trouble Sources," which can result in around-the-clock surveillance, traumatic ethics handlings and security checks to satisfy Defendants that these persons are fully disengaged from any contact with the defector.

72.     These tactics and events are well-known to people who leave Scientology.  As a result, many defectors go into hiding or even change their names.  Most struggle for years before they can summon the strength and courage necessary to seek medical services, mental health counseling, or to speak with attorneys or law enforcement about what they experienced while living in Scientology.  Many struggle silently for the remainder of their lives,

36

fearful of the consequences they will face if they take any action against Defendants.

### 7.     The Abusive Formal Process for Leaving Scientology

73.     The only way to leave Sea Org without immediately exposing oneself and one's family to the consequences of being declared a Suppressive Person is to suffer a litany of abuses in a process called "routing out," which includes weeks or months of auditing sessions, ethics handlings and security checks to stamp out any thoughts or designs counter to Scientology.  During this period, the subject is isolated and placed under twenty-four-hour surveillance.  At Flag Base, individuals who express the desire or intent to leave, and those who have attempted to leave without routing out, are detained in a bare room in a parking garage, where they are guarded around the clock and permitted to leave the area only with an escort to attend hours-long ethics handling and security check sessions.  The routing out process is not intended to provide a means for departure, it is intended to break a member's will to depart and to agree to submit to rehabilitation, often at one of Defendants' RPF sites.

74.     Members who manage to resist this coercion are only permitted to complete the process once they have been psychologically broken and physically weakened.  The last step in routing out is for the member to be

placed in a room where high-ranking officers compel him or her to sign documents.  No explanation is provided concerning the contents of the documents, and the member has no opportunity to review them, seek advice from any outside persons or even keep copies of the documents.

75.     Departing Sea Org members who grew up in Scientology have little ability to understand the documents or the consequences of signing them.  Having endured a lifetime of abuse and weeks or months of routing out mistreatment designed to break their will, departing members have no meaningful choice other than to sign the documents in order to be permitted to leave the room and leave Scientology.

76.     Sea Org members know that if they leave without permission, Scientology security will comb airports, train stations, bus stations, and hotels, track their credit cards, and scour their PC and ethics folders for clues as to where the person who escaped might be found.  Security will then force the person to return to their base for routing out. People confined to the Freewinds have an additional obstacle: security confiscates their passports when they board the ship, so even if they escape from the ship, they are unable to travel freely.  Security has been known to chase down people who escape the Freewinds, force them to return to the ship, confine, and place them under constant surveillance.

77.     For an individual who grew up in Scientology and who is impoverished, in debt, and without meaningful education or life skills, it is nearly impossible to simply walk away. Many members linger for years, accumulating trauma on top of trauma, until finally mustering the courage to slowly, and very quietly, allow for some distance between themselves and Scientology. This process can take years. When children who grew up in Sea Org find the strength and courage to quietly leave, they are still operating under a set of beliefs inculcated in them since childhood, including that anything done to them or wrong with them is their fault. Because they are raised to believe that psychology and psychiatry are the most dangerous elements in society, it can be years before they understand that they have been traumatized and require mental health counseling or therapy. Due to their deep distrust of authorities and the legal system, and no understanding at all of the concept of legal rights, it can also take years for survivors to appreciate that Defendants caused injuries warranting the seeking of legal advice or reporting to authorities. Defendants' possession of each person's voluminous PC and ethics folders gives them added leverage, because those files contain coerced "confessions," as well as valuable information regarding each person's fears and vulnerabilities. The ever-present threat of retaliation

is almost always sufficient to prevent defectors from ever taking any action against Defendants.

### C. FACTS SPECIFIC TO PLAINTIFFS

#### 1. Plaintiff Gawain Baxter

78.     At two months-old, Gawain Baxter's parents placed him in Cadet Org nursery in Clearwater, Florida. At age six, Gawain became a member of Cadet Org and was required to sign a contract pledging to serve Sea Org, in essence the Defendants, for one-billion years.  As a member of Cadet Org, Gawain had minimal schooling; time most children spend in school learning reading, writing, arithmetic, critical thinking, civics, and developing basic life skills was instead devoted to providing labor and services for various Scientology-affiliated groups, organizations, and entities, including Defendants.

79.     Gawain was separated from his parents, and forced to live in a dormitory, a repurposed Quality Inn, with around one hundred other children, sleeping on bunk beds in crowded shared rooms. Cadet Org was overseen by Cadet Coordinator, Rusty Hilton, who reported to Victor Sanchez, the FSO senior executive on Flag Base in charge of Flag Crew and Flag Service Organization operations. Initially, Gawain was permitted to visit his parents every evening at dinner.  But at approximately ten years old,

Gawain was permitted to visit his parents only once a week for about three hours and was often limited to a single monthly visit if he was in "lower conditions," such as after a negative cleanliness inspection or if he had tried to overstay his allotted time with his parents on a previous visit.   Sea Org parents lived in quarters approximately twenty to thirty minutes' drive from Cadet Org dormitory.  Children were bussed to and from parents' quarters and had no means to independently visit their parents outside of this highly controlled system.

80.    From the ages of six to fourteen, Gawain was not permitted to attend any accredited public or private school.  Instead, schoolwork consisted of two to three hours per day of basic reading, writing, and math in a classroom of thirty other children, under the supervision of Linda Hilton, Cadet Coordinator's spouse.  Beginning when Gawain was ten years old, he was required to spend one to two hours daily in Scientology indoctrination courses as well.  The cost of each course was recorded as a debt that Gawain was told he would owe if he ever left Cadet Org or Sea Org.  As he grew up, and throughout his life in Scientology, he was regularly reminded that he would be responsible for paying this mounting debt should he ever leave Sea Org.

81. Following daily schoolwork and Scientology indoctrination, Gawain was forced to provide five to ten hours a day of unpaid work at Flag Base, including food preparation, trash removal, landscaping, and clerical work. During staff shortages, Gawain was made to work full-time and skip his schoolwork entirely.  At age thirteen, Gawain was provided a stipend of eight dollars per week, which was contingent on his completing his training courses and performing his work to the satisfaction of Cadet Coordinator. Gawain used this paltry amount to purchase necessities, including his toiletries and shoes.

82. When Gawain was fourteen, he was transferred from Cadet Org to Sea Org.  A prerequisite to joining Sea Org was the completion of the Estates Project Force ("EPF"), a bootcamp at Flag Base.  Without informing the Cadets about where they were going, or the purpose, Jim Sedeko, Cadet Coordinator at the time, put Gawain and a group of other children on a bus from their dormitory to Flag Base, where Victor Sanchez and another individual filled out an intake form and demanded that Gawain sign it and start working on the EPF.  Gawain did not want to join the EPF but had no choice, because if he resisted or disagreed, he would be punished with lengthy and abusive security checks, ethics handlings, and possible expulsion and homelessness. He was also aware that his parents would be punished for his

42

resistance, as was common practice in Sea Org. For the three-month period that he was on the EPF, Gawain was required to perform physical labor, including renovating a building, cleaning other facilities, and landscaping for twelve or more hours per day, and to spend an additional five hours each day immersed in Defendants' indoctrination programs. During this entire period, Gawain was sleep-deprived, given inadequate time to eat, and verbally abused by his adult supervisors, including the senior officer in charge of EPF, Dave Englehart, the Commanding Officer of Flag Crew, Laurie Englehart, and the CMO Commanding Officer, Angie Blankenship.

83.     After three months working on EPF, Gawain transitioned to Sea Org.  Shortly thereafter, Gawain wrote a letter to Javier Martinez, a senior RTC officer at Flag Base, requesting permission to leave Sea Org because he was continually subjected to verbal abuse and intolerable living conditions. Shortly thereafter, Danny Light, a high-ranking IASA officer from the Freewinds who was at the time located at Flag Base, verbally abused and screamed at Gawain for having sent the letter and demanded that he call Martinez and falsely confess to fabricating the allegations of mistreatment in the letter.  Gawain was frightened by threats of serious punishment and complied.  Light and others thereafter punished Gawain for writing to Martinez, forcing him to write up confessions to "crimes," make amends to

those about whom he wrote his letter by doing work for them, and complete intensive security checks. Gawain wanted to leave Sea Org, but he knew he would be punished and possibly put out on the street, so he had no meaningful choice but to stay.  At only fifteen years old, with little education, no money or support system, the belief he owed Defendants a substantial sum of money, and no life skills, Gawain knew he could be declared a Suppressive Person and permanently separated from his family (who would also be punished for his alleged transgressions) and from the Scientology world, which was all he knew, to be cast into a frightening world in which he had been long taught that former Sea Org members met awful fates, including death.

84.    After Gawain completed his punishments for writing the letter, he was informed that he would be assigned to work on the Freewinds.  As a prerequisite to being sent to the Freewinds, Defendants subjected Gawain to additional highly abusive security checks.  During the sessions, an FSO officer, Natalie Galbiatti, and another individual, interrogated Gawain about every aspect of his life, including explicit questions about his sexual experiences, affiliations with intelligence and law enforcement agencies, past criminal behavior, and drug use. In each session, his interrogator prohibited him from leaving the room until he provided answers to his interrogator's

44

satisfaction.  Even though Gawain had engaged in absolutely none of the

conduct he was being questioned about, Moxin and Galbiatti required him to

undergo dozens of these interrogations, each of which lasted for up to twelve

hours.

85.     Eight months later, after completing the security checks and the

EPF program to the satisfaction of the EPF senior officer, Dave Englehart,

Gawain was transported from Clearwater to Tampa and then flown to

Curacao, where he was forced onto the Freewinds.  Once aboard, Freewinds'

security confiscated Gawain's passport, immigration documents, and

identification documents to prevent him from escaping and to force him to

provide free labor and services.

86.     During his time on the ship, Gawain was forced to perform

arduous physical labor and menial tasks and punished for any failure to fully

comply with the commands of higher-ranking Sea Org members.  Gawain

suffered from sleep deprivation and was always anxious and fearful that

anything he said or asked might be interpreted as rebellious and result in

physical or mental punishment.

87.     On the ship, Gawain worked between sixteen and twenty-four

hours per day, including manual labor such as repainting pipes, cleaning the

45

ship's deck, preparing food in the kitchens, and serving as a steward for the crew, as well as administrative work for Defendant IASA.

88.   Work assignments on the Freewinds were often dangerous. In Gawain's first year on the ship, Janet McLaughlin, the senior most IASA officer on the ship, ordered him to squeeze into fuel tanks and clean them by lantern in the dark, without a respirator or other protection from fumes.  The tanks were a meter high by a meter wide and a meter deep, and Gawain had to crawl from tank to tank.

89.   Around eight months after boarding the Freewinds, Gawain again expressed a desire to leave Sea Org (and thus the ship).  In response, Ewa Ronnquist, a senior officer on the ship, placed him under severe restrictions on Janet McLaughlin's orders.  Officers now considered him a security risk and did not allow him on any part of the Freewinds that was not monitored by cameras.

90.   Around ten years after Defendants first forced Gawain into service on the ship, the Freewinds underwent extensive renovations.  During this time, Gawain worked more than eighteen hours per day and was exposed to blue asbestos[6] and concrete dust. He soon became ill, coughing up blood.

---

[6] "Crocidolite asbestos, also known as blue asbestos, is considered the most hazardous type of asbestos in the amphibole family. Crocidolite is made up of extremely fine sharp fibers that are particularly easy to inhale. Studies show that crocidolite is so hazardous, it may be responsible for more illnesses and

Gawain was not provided with a mask or any protective equipment, and they did not permit Gawain to see a doctor or seek medical care.  Gawain was granted a brief rest period and ordered to resume working once he ceased coughing up blood.  Gawain knew that any additional time he spent on bedrest meant that other Sea Org members would have to make up for his work in his absence.  At this time, numerous other Sea Org members were also sick and on bedrest.

91.    Gawain's supervisors also physically abused him.  For instance, Raymond Feneck ("Feneck"), the kitchen manager, struck Gawain hard on both sides of his head.  When Gawain reported the assault, Feneck wrote a negative report about Gawain, resulting in Gawain being assigned to lower conditions and required to write a confession of his "crimes," including taking responsibility for causing Feneck to assault him.

92.    For all of this, Gawain was supposed to be paid fifty dollars per week, out of which he purchased his toiletries and other personal items.  Gawain was often denied full pay, at times going weeks without compensation, sometimes because his shipmates had failed to meet their own performance targets.

---

deaths than any other type of asbestos."
https://www.pennmedicine.org/cancer/types-of-cancer/mesothelioma/asbestos-cancer/types-of-asbestos

### 2.   **Plaintiff Laura Baxter**

93.   Laura Baxter grew up in Scientology, serving on the staff of a local Scientology organization in Germany.  At age seven, when she first learned to read and write, Laura's mother signed her up to take Scientology courses for up to three hours per course, twice a week.  At age fifteen, Laura became a staff member at Defendants' local organization in Stuttgart. As a condition of being on staff, Laura was required to undergo auditing and other checks.

94.   When Laura was sixteen, she was manipulated, pressured, and coerced by a FSSO Sea Org recruitment officer to sign a contract pledging to serve Scientology for life within Sea Org.

95.   Laura was forced to travel to the United Kingdom to start the EPF as a prerequisite to joining Sea Org.  Because she was a minor, Laura's mother signed over guardianship of Laura to Freddie Hunkeler, a Sea Org member and senior IASA officer at the UK site where Laura was sent.  For the period that Laura was on the EPF, she was required to spend eight to ten hours per day performing arduous physical labor, including digging trenches, cleaning toilets and dumpsters, and landscaping under the supervision of the senior officer in charge of EPF.  Laura was paid the equivalent of twenty-five

dollars per week.  During this time, Laura was denied adequate time to eat proper meals or take breaks.

96.     After one-month, Laura transitioned from the EPF to Sea Org and she was told she would work for Defendant IASA on the Freewinds under IAS President Janet McLaughlin.  As a prerequisite to being sent to the Freewinds, Laura was subjected to a series of intense, manipulative, and emotionally abusive security checks.  During these interrogation sessions, Laura was repeatedly asked a series of sexually explicit questions, as well as questions about her affiliations with law enforcement or intelligence agencies, past criminal behavior, and drug use.  Laura was forced to undergo dozens of these interrogations, each of which lasted for up to twelve hours during which she could not leave the room except to eat or use the bathroom.

97.     Accompanied by her IASA guardian, Hunkeler, Laura was then transported from England to Miami, Florida, and then to Curacao, where she boarded and began working on the Freewinds in IASA files administration. She was forced to work long hours, was given no days off, and was paid twenty-five dollars per week.

98.     At age seventeen, Laura was told her experience in Sea Org was inadequate and that she required more training.  She was removed from the Freewinds and sent to Defendants' European Base in Copenhagen as a

member of the IASA staff.  Laura was forced to work as many as eighteen hours a day, cleaning offices, making travel arrangements for staff members, soliciting recruits for staff, and soliciting donations to the IASA.  Laura was paid the equivalent of fifty dollars per week.

99.     After approximately two years, Laura was informed she would be transferred back to the Freewinds.  Prior to her transfer, although Laura was a healthy weight, she was forced to overeat until she gained seven kilograms (more than ten percent of her normal weight) in a short period of time.  Once she was returned to the ship, security confiscated Laura's passport, immigration documents, and identification documents for the purposes of eliminating any ability to escape and coercing Laura into providing labor and services.

100.    Once aboard the ship, Laura was required to work between twelve to fifteen hours per day as a files administrator.

101.    In 2004, a celebrity actor celebrated his birthday aboard the Freewinds at Miscavige's invitation.  Janet McLaughlin (who knew Laura had been instructed by other officers to be present at the gathering) falsely accused Laura of trying to monopolize the actor's attention and ordered a senior officer, Ken Pirak, to take her into a small room where MacLaughlin, Pirak, and two other IASA officers, Lise Cohee and Karleen De Simone,

screamed abusively at her.  Laura was then confined to the extremely hot
engine room for three days, allowed to leave for only a few minutes at a time
for meals and to return to her room for a few hours of sleep.

102.   As a result of the alleged incident at the party, for the next two
months, Laura was subjected to handling sessions, assigned to a lower
condition, forced to confess to alleged crimes against Scientology, and to make
amends.  During this period, Laura was not allowed to receive pay and was
confined to an office during the day and to her room at night, under twenty-
four-hour surveillance, and only permitted to leave her room for
interrogations or when she was accompanied by another Sea Org member.
Laura was not permitted to leave her room unaccompanied even to use the
bathroom. On one occasion, she was forced to urinate into a trash can for fear
of being punished if she went to the bathroom unaccompanied.  Additionally,
Laura was forbidden from communicating with anyone except the specific
Sea Org members who were her handlers at the time, including Ken Pirak.
For the following four months, Laura was confined to her room and only
permitted to leave to study Defendants' ethics policies for up to 14 hours per
day, with fifteen-minute meal breaks and bathroom breaks.

103.   Following this period of punishment, Laura was deemed unfit to
work in IASA, and she was demoted to a position as crew steward in the

FWSO, where she was forced to work twelve to eighteen hours per day unloading deliveries of food to the ship, organizing and cleaning the food storage rooms and walk-in fridge and freezer, preparing food, and cleaning the kitchens.

104.    During Laura's time on the ship, she suffered from sleep deprivation and was constantly fearful that anything she said might result in punishment.  Laura was paid fifty dollars per week for her labor, out of which (if she was lucky enough to receive her full pay), she purchased clothing and other personal items.  Laura rarely saw her full pay and often went weeks without compensation, which her superiors justified by claiming that she was guilty of unnamed and unsubstantiated transgressions, or that her shipmates failed to generate a required level of revenues.

105.    During renovations of the Freewinds, Laura was exposed to blue asbestos and concrete dust, but she was not provided with a respirator or any other protective equipment.  Sea Org members were afraid to say anything to any officers on the ship, because even raising the concern would have been a "high crime" for which they would have been severely punished.

### 3.    Plaintiffs Gawain Baxter and Laura Baxter Meet and Marry

106.    Gawain met Laura on the Freewinds, and they wanted to have a relationship, but ship officers, including Janet McLaughlin, Colm

McLaughlin, Melissa Deness, Rob Napier, Ken Pirak, Lucia Keating, and even ship Captain Mike Napier systematically interfered. So long as they were single, Gawain and Laura were easy targets for manipulation and could be kept apart for significant periods through changes in job assignments, restrictions, and punishments for purported transgressions.  Knowing that married staff were far less likely to experience such interference, Gawain and Laura eventually decided to get married.  Ship staff are not permitted to marry without the permission of the Captain of the Freewinds.  Obtaining permission typically took one to two weeks.  But when they informed senior officers that they wanted to get married, Gawain and Laura were forced to wait three months before being given consideration and, when they were finally allowed to marry, they were prohibited from living together for another six months.

107.   After marrying Laura, Gawain began to consider the possibility of a different and better life in the world that Scientology had taught him to distrust.  But escaping was not an option: Defendants considered even communicating the intent to leave Sea Org a high crime, punishable by the most severe repercussions, including assignment to arduous physical labor, confinement to the engine room, and even possible rendition to an RPF site for "rehabilitation."   Eventually Gawain discussed this with Laura, and they

53

decided they wanted to leave the ship and Sea Org.  But they needed to figure out a way to accomplish this departure without enduring the tremendous consequences they would suffer if they attempted to leave without the Defendants' permission.

108.   Laura and Gawain eventually came up with a plan. Defendants had enacted a ban on Sea Org members having children, and pregnant Sea Org members were being coerced into terminating their pregnancies. However, this forced abortion policy was also beginning to receive negative media attention. Gawain and Laura decided that the only way they could leave, if at all, without suffering dire consequences, would be for Laura to become pregnant in advance of Defendant Miscavige's next visit to the Freewinds.  A pregnant Sea Org member would cause Miscavige to direct his wrath towards the senior Sea Org officers.  They concluded that, if it were known to senior officers on the ship that Laura Baxter was pregnant and would not terminate her pregnancy, they would be required to leave the ship and Sea Org.

109.   Thus, Laura deliberately became pregnant.  Because ship crew did not have access to pregnancy tests, and wanting to reduce the chance of being forced to terminate her pregnancy, Laura waited several months to see Marjorie Laughlin, the ship's medical officer, who confirmed the pregnancy

and reported it to senior officers on the ship, including the ship's RTC executive, Lurie Belotti, the commanding officer of CMO, Sue Price, a senior FSSO officer, Max DeGroot, Paolo Coccodo, Bill Bragg, and Captain Mike Napier.

110.   Max Degroot and another officer then attempted to pressure Laura and Gawain into agreeing to terminate the pregnancy.  Laura and Gawain refused to terminate the pregnancy and were required to undergo ethics handlings and security checks as punishment.  In drawn out interrogation sessions, a ship officer, Jodie Zagary, berated Gawain for getting his wife pregnant and for not forcing her to terminate her pregnancy. In addition to undergoing this series of severe "handlings," Laura and Gawain were isolated from the ship's staff and put under full-time surveillance under the supervision of ship security, including Peter Ramaker.

111.   After weeks of punishments and isolation, with Defendant Miscavige's visit approaching, it became clear to the ship's officers that Laura was not going to terminate her pregnancy, and Max DeGroot told Laura and Gawain that they would be leaving the ship.  However, before returning Laura and Gawain's passports and identification documents, Krister Nilsson, an officer working under the direction of Ludwig Alpers, the Freewinds Port Captain, compelled Laura and Gawain to sign a series of documents while

55

being videotaped. This was a policy and process developed, implemented, and supported by Defendants to create the facade of a voluntary, informed, and consensual process. Laura and Gawain were not given an opportunity to examine the documents, make copies, or find anyone to help them review and understand them. If Laura and Gawain refused to sign the documents, they would have been required to undergo additional punitive ethics handlings and security checks and would have been denied their travel and identity documents. They were trapped on the ship, and the only way off was to submit to the demands of the Defendants and sign the documents.

112. Before permitting them to leave, Peter Ramaker, ship security, also confiscated Gawain's computer and deleted photos from the hard drive documenting his time on the ship, because they considered those photos a threat to Defendants.

113. Laura and Gawain Baxter were traumatized as a result of their experiences in Sea Org and aboard the Freewinds and suffer emotional harm on an ongoing and continuing basis. Gawain also continues to suffer from the physical injuries he incurred while on the ship.

114. Laura and Gawain are regularly intimidated by phone calls from Scientologists, purportedly seeking to confirm their contact information and soliciting them to resume participation in Scientology, including auditing.

These calls are intended to remind them that Defendants continue to monitor them and test the extent to which they pose a risk to Defendants. Laura and Gawain exercise an abundance of caution when responding to these callers because they fear telling them to stop will result in severer forms of harassment.  Blocking these callers is not useful, because they call from different numbers.

### 4.   **Plaintiff Valeska Paris**

115.   Valeska Paris's parents were members of Scientology.  From the age of four years old, Valeska was subjected to a Scientology training routine during which she was screamed at, verbally abused, and forced to listen to graphic descriptions of sexual content for hours at a time to condition her not to be upset or show any visible reaction and retain her composure in the face of verbal assault.  This abuse continued throughout her childhood and teenage years.  Once she learned to write, she was often forced to write up false confessions of Scientology crimes, which would be used against her throughout her time in Scientology.

116.   At age six, Valeska's father became a member of Sea Org and her parents enrolled her in Cadet Org.  She was required to sign a contract pledging to serve Sea Org, and thus the Defendants, for one-billion years. When Valeska's parents divorced, Valeska's father was granted sole custody

of her and her siblings. Valeska was separated from her mother, who was taken from the family by two Sea Org members and not permitted to say goodbye to her children or tell them when they would see her again.  Initially, Valeska was permitted to visit her father for an hour every evening at dinner.  Beginning when Valeska was nine or ten years old, Valeska was only rarely permitted to see her father.  Shortly thereafter, Defendants implemented a policy cancelling family time altogether.

117.   Valeska was one of about one hundred children, ranging in age from newborn to fourteen, who lived in the dormitories at Stonelands, in England, near Scientology's UK base, Saint Hill. Valeska spoke only French and felt isolated from the other children and adults who spoke only English, until she learned to speak English.  Valeska was distraught at being separated from her mother, but adult Sea Org members responsible for Cadet Org reprimanded her for being "dramatic" and punished her by forcibly dragging her to the galley and making her wash pots and pans.  Children in Cadet Org were supervised by Dominique Feldmester, Cadet Coordinator, along with other senior personnel including Dominique's husband, Jeremy Feldmester.

118.   As a member of Cadet Org in England, Valeska had minimal schooling; she attended Greenfields, a Scientology run school where the only

curriculum is a Scientology check sheet used to apply Scientology indoctrination techniques such as "word clearing."[7] Valeska was also regularly disciplined using Scientology punishments including writing up all of the alleged wrongs and crimes she had been led to believe she committed. Following school, Valeska was required to devote two hours a day to the study of Scientology.  The cost of each course was recorded as a debt that she was told she would owe if she ever defected from Sea Org.  As she grew up, and throughout her life in Scientology, she was regularly reminded that she would be responsible for paying this mounting debt should she ever leave.

119.   Every day, Valeska and the other Cadet Org children performed five hours of unpaid work for Scientology-affiliated entities, including cleaning the premises with harmful chemicals, landscaping, washing dishes and providing childcare for the newborn babies. Defendants' policy was to permit children one day off every two weeks, and only if they were not in

---

[7] Word clearing is the method Scientology schools employ to teach children reading skills.  Children work independently with assigned material, including portions culled from Scientology teachings and the writings of L. Ron Hubbard.  They are required to look up and memorize definitions of the words in a given selection, and to recite definitions of words on demand by an instructor.  When a child can provide a definition for any word in a selection, she or he is said to have "cleared the words," and moves on to another selection.  Unlike traditional, accepted teaching methods, Scientology schools do not teach grammar, writing, reading comprehension, critical thinking, or other analytical skills necessary to do more than perform rote tasks.

lower conditions. Valeska was not trained or provided any protective equipment, resulting in physical injuries.

120.   Defendants' policy was to routinely deny children in Cadet Org proper medical care; if they became sick, they were excused from working that day and isolated in their dormitory. Valeska was denied medical treatment when she contracted the mumps, per Defendants' policies.

121.   Physical violence and sexual abuse were commonplace in Cadet Org.  On one occasion, Valeska walked in on an adult Sea Org member, who was responsible for the children, masturbating on a boy's bed. Valeska reported the incident to Dominique Feldmester, who reprimanded **her** for making the report.

122.   When Valeska was eleven years old, a twenty-year-old male Sea Org member told her that he was trying to hide from Sea Org staff and demanded that she lie on top of him in her bed to conceal him. Valeska, who had been trained to obey the commands of Sea Org members, complied. When Valeska reported the incident, she was taken to Saint Hill Manor, the former home of Hubbard in England, where a CMO officer, Tony Langley, interrogated her about the incident for four hours without a break and then accused her of having sexual intercourse with the man.  Cadet Coordinator, Dominque Feldmester, and Paula Cronin then punished Valeska by

assigning her a lower condition and requiring her to falsely confess to having sex with the man.

123.   When Valeska was twelve years old, Jeremy Feldmester ordered her into a room with him to confess to "crimes" she committed, or alleged sexual acts and thoughts she had, while he stood over her menacingly. When Valeska called Jeremy Feldmester a pervert, Dominque Feldmester put Valeska in lower conditions for a period of six months.  Valeska later learned that Jeremy Feldmester was a sexual predator who had installed cameras in the rooms at Stonelands, so that he could watch female children undress.

124.   When Valeska was thirteen, Janine, the commanding officer, told her that she had accumulated substantial freeloader debt for the courses and auditing she had gone through, and threatened to kick Valeska out of where she lived if she did not join Sea Org.

125.   When Valeska was fourteen years old, she traveled to Flag Base, in Clearwater, Florida.  There, she joined Sea Org, with which, she was reminded, she had signed a lifetime service contract when she was six years old.  Among other things, as is Defendants' policy, she was threatened that if she did not re-sign Defendants' billion-year service contract and join Sea Org, she would be kicked out of Cadet Org and would become homeless.

126.   A prerequisite to joining Sea Org was the completion of the EPF. Valeska did not want to join the EPF but knew if she resisted, she would be punished with security checks, ethics handlings, or, worse, expulsion and homelessness.  This caused Valeska to experience deep fear because she had experienced sexual abuses as a child and had heard many stories of children who fled or were kicked out and then experienced physical and/or sexual abuse.  She was also afraid that Defendants would punish her parents for her "crime" of refusing the assignment to EPF, as it was common for family to be punished for the alleged misdeeds of other family members.

127.   When Valeska arrived at the EPF building in Clearwater, Florida, her passport and identification documents were confiscated.  From age fourteen onward, Valeska did not have any schooling.  During the three months that Valeska was on the EPF, Defendants made her clean the premises for twelve to eighteen hours per day, including requiring her to climb into and scrub garbage dumpsters with toxic chemicals without protective gear.  She was usually paid fifteen dollars per week, out of which she purchased her toiletries and other personal items.  After her work shifts ended, Valeska was required to spend an additional five hours immersed in Defendants' indoctrination programs.  During this period, Valeska was sleep-deprived, poorly fed, and consistently verbally abused by adult supervisors.

Furthermore, she had to live in a cockroach-infested room and use communal bathrooms covered in mold and mildew.

128.   While Valeska was on the EPF, Jacob, a nineteen-year-old Scientologist who was also on the EPF, sexually assaulted her.  He pushed her against the wall in a swimming pool and rubbed his penis against her vagina, putting his hands down her swimming top and rubbing her breasts. Valeska had been conditioned not to report incidents of abuse because she would be made to take responsibility for causing them, labelled a potential trouble source, and be punished.

129.   At age fifteen, upon completing Sea Org EPF, Defendants posted Valeska to the Commodore's Messenger Org (CMO) EPF at Flag Base, where for six months she worked sixteen-hour days preparing food, doing laundry, cleaning offices, and serving as a personal assistant to Scientology executives, including Defendant David Miscavige.  As part of their pattern of manipulation and coercion, Defendants would arbitrarily declare Valeska's work performance or behavior inadequate and place her on lower conditions for extended periods.

130.   Even after moving from England to Florida, Valeska was forced to relive her experiences with sexual abuse in an exceptionally humiliating manner.  During numerous auditing sessions with an adult male

63

interrogator, Valeska was required to remove her pants and sit with a towel on her lap.  Her interrogator then asked Valeska explicit questions about her accounts of sexual abuse that she had described in the reports that she had written about the individuals who sexually assaulted her.  In these sessions, Valeska would be required to work out how she had "caused" the abuse and accept responsibility for causing it.  In each session, her interrogator prohibited her from leaving the room until she provided answers to his or her satisfaction.  During her time in the CMO EPF, Valeska was required to undergo dozens of these interrogations, each of which lasted hours.

131.   During this period, Tyronne Webb ("Webb"), a senior Sea Org member and CMO officer, frequently sexually assaulted her by lifting her from behind and rubbing his erect penis against her genitals.  Valeska was a minor at the time.  Initially, Valeska did not report Webb to anyone in Scientology because she was afraid of being interrogated and punished. She was also aware that Defendants would record any report of abuse or assault in her PC folder and ethics folder, and she was afraid of being labelled a Potential Trouble Source.  After three months, however, Valeska could no longer withstand the abuse and, upon learning that another girl had reported abuse by Webb, Valeska reported it to Defendants' ethics officer, Tina Fugen, who in turn reported it to Elizabeth Miscavige, David Miscavige's sister-in-

law, who was part of Miscavige's highest echelon of senior officers. As she had feared, instead of punishing Webb, Julie Ginge-Neilson, Valeska's CMO supervisor, along with her husband Mark Ginge-Nielson, chastised and punished Valeska for causing the abuse. Valeska was even required to continue doing Webb's laundry. As a result, the abuse continued. On one occasion, Webb pushed Valeska onto a couch and rubbed his erect penis against her, only stopping when another staff member walked into the room. After her previous experience reporting Webb, Valeska stayed silent about the incident for fear of punishment. It did not even occur to Valeska to report Webb to the police not only because she did not understand that this was criminal sexual abuse, but also because it was a high crime to report another Sea Org member to law enforcement.

132. When Valeska was seventeen, her mother fled Scientology without authorization and traveled to Switzerland. Defendants believed Valeska's mother intended to testify against them in a legal proceeding, and Annie Morra, a senior officer in OSA, placed Valeska on twenty-four hour watch, requiring her to spend each day in OSA's offices under strict supervision. Each day during this period, while Morra was poring over Valeska's mother's PC folders, searching for compromising information that might be used to manipulate her, Valeska was brought into the office of the

65

senior case supervisor at Flag Base, Allen Kardazinski, where she was required under his and Morra's supervision to call her mother, read her Defendants' ethics policies and try to persuade her to return to Flag Base. When the effort failed to secure her mother's agreement to return to Flag Base, Valeska was kicked out of CMO, labelled a Potential Trouble Source, and placed under twenty-four-hour surveillance, after which she was shamed and scorned by her peers and friends in CMO, who refused to ever speak with her again.  Valeska was then assigned lower conditions and put to work in the crew dining room for up to twenty-one hours a day, seven days a week for the next six months.

133.   When Valeska was eighteen, her mother returned to the United States and was observed by Flag Base security driving by the location where Valeska was living. As a result, a commanding officer deemed Valeska subversive, moved her to a different dormitory and again placed her under twenty-four-hour surveillance. Several days later, Annie Morra informed Valeska that David Miscavige, who was staying at Flag Base at the time, had ordered Valeska to be sent to the Freewinds.  At 6:30 the next morning, Morra came into the room where Valeska was sleeping, ordered Valeska to throw some things in a bag, and placed her in the custody of a security officer, who took Valeska to the airport, boarded a flight with her to Curacao,

66

escorted her onto the ship and handed the ship's security officer Valeska's passport (which Defendants maintained custody of the entire time she was at Flag Base).  Valeska was also required to surrender her other forms of identification.

134.   Valeska was assigned to work in the restaurant on board the ship that served members of Scientology who were not on staff.  Upon telling Mike Napier, the Captain of the Freewinds, Sharron Weber, the FSSO commanding officer, and Jenny Alpers, a senior CMO officer, that she wished to return to Flag Base, Sharron Weber sent her to the engine room as punishment, where she was required to climb under the deck plates into a claustrophobic space between the pipes and clean them with a rag.  After cleaning those areas, Valeska was covered in grease, and the only cleaning agent she was given to remove the grease was diesel fuel.  She was only permitted fifteen-minute meal breaks in the engine room.  Freewinds staff and the ship's Captain regularly verbally abused Valeska.

135.   During her time on the ship, Defendants required Valeska to perform arduous physical labor and menial tasks and punished her for any failure to fully comply with the commands of higher-ranking Sea Org members. Valeska suffered from sleep deprivation and was always fearful

that anything she said might be interpreted as rebellious and result in mental or physical punishment.

136.   For all of this, Valeska was paid fifty dollars per week, out of which (if she was lucky enough to even receive her full pay), she purchased her toiletries, and other personal items from the ship's commissary.

137.   For a prolonged period, Valeska was made to clean the ship and wash dishes for 16 hours per day with only 15-minute meal breaks permitted. Defendants also assigned her lower conditions, forcing her to confess to her alleged "crimes" against Scientology, make amends for her supposed transgressions, and undergo auditing to the satisfaction of her auditor. During this period, she was not permitted to talk to anyone or make phone calls, and she remained under twenty-four-hour surveillance.  Valeska wrote a letter to Shelly Miscavige, the wife of David Miscavige, describing the abuses and stating that she wanted to leave the Freewinds, but Sharon Weber found the letter, tore it up and sent Valeska to the engine room as punishment until she accepted her fate.  Six months later, Valeska wrote a second letter to Shelly Miscavige requesting permission to temporarily leave the ship, but Shelly Miscavige reported the letter to security and instructed them to tell her that her request had been denied.

138.   During a visit to the Freewinds, Defendant Miscavige asked Valeska how she liked being aboard the ship. In response, Valeska said she did not like it and matter-of-factly reminded him that he personally had issued the order that she be put to work on the Freewinds, a fact he acknowledged.

139.   At one point, the ship was undergoing some renovation work and Valeska was assigned to sweep up dust and debris without any protective equipment.  Unbeknownst to Valeska, the dust was blue asbestos, causing her to have a persistent cough for many years.

140.   After some time on the ship, Valeska began a romantic relationship with Carlos, the ship's Security Chief.  Defendants prohibited intimate relationships between unmarried members of Scientology. When Carlos confessed to superiors that he was in the relationship with Valeska, CMO officers Amber O'Sullivan and Kerry Ibert, and a third officer, John Salas, locked Valeska in a room and screamed at her repeatedly to confess what she had done.  Salas and Pilar Saldarriaga, a senior CMO officer, then locked Valeska alone in a room for 5 hours until she prepared a legible, handwritten confession providing graphic detail of sexual acts she had performed with Carlos. A summary of the confession extracted from Valeska was then posted on the ship's notice board for the entire crew to read,

69

humiliating Valeska and causing her to be subjected to shame and scorn from the crew.  Saldarriaga also threatened to put Valeska in an RPF program on the ship for betraying Miscavige.

141.   After Carlos and Valeska broke up, Carlos began to harass her, accosting her and verbally threatening her.  Valeska could not avoid him because they were assigned to work in the same area of the ship.  When Valeska reported Carlos, she was again punished and humiliated.  She was assigned lower conditions for five months. Another time, Carlos poured a gallon of bleach on the floor of the room where Valeska was sleeping, filling the room with noxious fumes.  When she reported him, she was verbally abused for causing it, forced to clean it up, audited, and assigned to additional lower conditions.

142.   In response to Valeska's reporting Carlos's abusive behavior, Saldarriaga issued a "non-enturbulation" order, which essentially meant that Valeska was close to being declared a Suppressive Person.  The order, which also summarized Defendants' policy on Suppressive Persons, was then read in front of the entire ship staff and posted on the notice board, causing Valeska to be subjected to additional shaming and scorn.

143.   In another incident, the captain's son, Sean Napier, sexually assaulted Valeska. He locked her in a room and rubbed his erect penis

against her until he ejaculated. Valeska reported the incident and Isabel McLernen, a senior ethics officer, screamed at and verbally abused Valeska for allegedly causing Napier to sexually assault her, and she required Valeska to write up her alleged crimes.

144.   Defendants' control over every aspect of Valeska's life was relentless and merciless. Valeska eventually married Roberto Toppi, a member of Sea Org and an IASA officer, whose job on the ship was fundraising for IASA, but it was not a good relationship and Valeska decided to divorce him.  This supposedly caused Toppi to become less productive, for which Valeska was once again assigned lower conditions. When another Sea Org member expressed a romantic interest in Valeska, she was blamed for seducing him and she was interrogated continuously for forty-eight hours. Lurie Belotti and Sue Price ordered Valeska to be confined to the engine room and not have further contact with the man, and humiliated her by posting the order on the ship's notice board.  Two officers on the ship, Isabel McLernen and Paolo Cocodo, then mandated that Sea Org members report Valeska's alleged crimes.  Sea Org members dutifully wrote numerous reports of Valeska's alleged infractions and Valeska was punished each time.

145.   For one such punishment, Valeska was confined in the engine room for forty-eight hours.  The temperature was over one hundred degrees.

71

Valeska suffered a panic attack, went numb, and was unable to move or call for help.  When an engineer discovered her an hour later, he carried her to the control room where she was deprived of medical treatment.  Paolo Cocodo berated Valeska for overreacting and sent her back to the engine room.  Two weeks later, when she was again confined as punishment and fell unconscious, she did not seek medical care from the ship's medical officer for fear of being verbally abused and punished again.

146.   Valeska could no longer withstand the abuse and decided she needed to leave the ship and Sea Org.  Valeska confided in another Sea Org member that she wanted to leave, which was considered Scientology's highest crime.  Upon learning of this, Isabel McLernen placed Valeska under twenty-four-hour surveillance and again forced her to work in the engine room and undergo intensive auditing for the next three months.

147.   Valeska contemplated suicide.  She was desperate to get off the ship.  She knew she would not survive if she stayed.  Lurie Belotti and Sue Price then presented Valeska with a choice: return to the engine room or be sent to an RPF site where she could be "rehabilitated."  Knowing she would not survive continued confinement to the engine room, Valeska acquiesced and was sent to an RPF forced labor site in Australia, far from any family or friends.  Before leaving the ship, Ludwig Alpers, the Port Captain and a

corporate officer of FSSO, and Fabian Marty, ship security, instructed

Valeska to put on some makeup and meet them in a room on the ship, where

she was instructed to sit at a table and sign documents in front of a video

camera.  She did not understand what the documents were and was given no

time to review them.  Nor did she have any choice; she knew that if she did

not sign the documents, she would be sent right back to the engine room.

Once she signed the documents, she was given her passport and identity

papers, and Marty warned her that if she tried to escape while enroute to the

RPF, she would be declared a Suppressive Person.

148.   On arrival at the RPF site in Australia, security again

confiscated Valeska's passport and identification documents.  For the next

eleven months, Valeska was made to wear black to signify her low status,

prohibited from talking to anyone without permission, and forced to perform

arduous physical labor for ten hours per day followed by five hours of security

checks.

149.   Even after completing her rehabilitation program, Valeska was

still considered to be in Sea Org.  Defendants still had her passport and

identity documents, and she lived in a Sea Org dormitory at the RPF site

while working in an administrative office.  Valeska married another Sea Org

member, Chris Guider, without Defendants' permission.  Valeska was forced

73

to clean garbage cans as punishment.  But that was not all.  Sue Price sent Valeska a message: Defendants had allegedly not found a replacement to do Valeska's work on the ship, and they were considering sending her back to the ship's engine room until a suitable replacement was found.  Alarmed at this prospect, Valeska wrote a report to Defendant David Miscavige about the conditions on the ship.  Lurie Belotti and Sue Price then threatened to send her to the RPF in Los Angeles.  It was becoming increasingly clear to Valeska that Defendants were not going to let her leave.

150.   Valeska then wrote a letter to Eran Bucci, a senior Sea Org officer, saying she wanted to leave Sea Org.  Another senior officer then screamed at Valeska, telling her she would get cancer and die if she left, and reminding her that she would have to repay all her freeloader debt.  Valeska was aware that Sea Org members are not permitted to have children, so she purposely became pregnant and refused demands that she terminate her pregnancy. After six weeks, Valeska miscarried but continued to pretend to be pregnant so that she would be forced to leave Sea Org.  During this period, Defendants were also pressuring Chris to leave Valeska.  One day, Chris did not return to their quarters in Sea Org housing when she expected, and she could not find him.  Eran Bucci told Valeska that Chris had decided to stay in Sea Org and divorce Valeska, which Valeska knew was not true.  This caused

Valeska to panic, because she did not know where Chris was or whether Defendants had removed him from the location. She returned to their quarters and was sorting through her possessions, believing at this point that she had to flee, when Chris returned. Seeing his wife in such a panicked state, he suggested they go for a walk to help her calm down. When they returned, their quarters had been ransacked and most of their possessions had been seized.

151. Vicky Dunstan, the Commanding Officer for Australia in Defendants' OSA, then informed Valeska that they would permit her to leave Sea Org once she had completed security checks to their satisfaction, which became a four-month ordeal. Before returning Valeska's passport and identification documents, pursuant to Defendants' longstanding policies and standard practices, she was required to sign more documents. Consistent with these policies and practices, she was not given an opportunity to examine the documents, make copies, or find anyone to review them with her. She did not understand what she was signing, because, as a product of Defendants' intense, lifelong indoctrination and her lack of adequate education, she had no understanding of her rights or the law.

152. Just because Valeska had finally managed to leave Sea Org did not mean she was in a position to start a new life. When she left Scientology,

she had no money, no official identification, and no ability even to open a bank account because she was not legally in the country in which Defendants had sent her for punishment.  Further, Defendants watched her and maintained a menacing presence, reminding her that if she did or said anything critical of Defendants, she would be subjected to swift and fierce retaliation.  Marion Pouw, who worked directly for Miscavige and had the job of attempting to "recover" people who he considered to present some risk if they were free, called Valeska every day, reading to her reports written at Defendants' direction by her brother that accused Valeska of engaging in "suppressive acts" and insisting that Valeska travel to LA to undergo ethics handlings and additional security checks.  Valeska understood that she faced a very real threat of retaliation by Defendants if she took any action against them.

153.   In May 2011, an investigator from the Australian government's labor authority contacted and interviewed her about inadequate compensation at Defendants' RPF site in Australia. The interview was very narrowly focused on the issue of compensation and, knowing there would be serious repercussions from Defendants if she went any further than was required, Valeska did not discuss the Freewinds or any of her prior mistreatment.

154.   In late 2011, Defendants threatened to take action against Valeska if she (among other things) aided or assisted any person or entity hostile to Defendants or Scientology.  This terrified and effectively silenced Valeska, who had long heard stories of the lengths to which Defendants would go in destroying their perceived enemies.

155.   A few years later, Valeska made public statements critical of Scientology.  Defendants quickly directed the purchase of the domain name http://www.valeskaparis.com/, so that an online search for "Valeska Paris" brought up the website in the search results.  The website contains a photo identifying Valeska and accuses her of lying about her time in Sea Org. It contains testimonials from other Sea Org members supporting this accusation and publishes letters that Valeska was forced to send family and friends while aboard the ship in order to assuage their concerns about her safety and wellbeing.

156.   The website with Valeska's name and photos remains on the internet and turns up when someone uses a search engine to search her name. Valeska has lived in continual fear that the website could damage job prospects and personal relationships, and that it could likewise cause her children (who have never been part of Scientology) to experience difficulties as well. The inescapable presence of the website has also constantly served to remind

Valeska of the potential for even more serious forms of retaliation if she were ever to violate Defendant's absolute prohibition on initiating any criminal or civil legal action against them.

157.   Defendants' threats, intimidation and retaliation caused Valeska to refrain for years from seeking legal counsel or taking any legal action against Defendants.

158.   Valeska continues to suffer from the traumas and injuries she experienced in Scientology, including persistent nightmares about being trapped in Sea Org and unable to escape the Freewinds.

## V.   CLAIMS FOR RELIEF

### COUNT I

**Forced Labor and Attempted Forced Labor in Violation of the Trafficking Victims Protection Reauthorization Act ("TVPRA"), 18 U.S.C. §§1589 and 1594(a) (All Defendants)**

159.   Plaintiffs reallege and incorporate by reference the allegations in paragraphs 1 through 158, as though fully set forth herein.

160.   Plaintiffs bring this claim pursuant to 18 U.S.C. §1595(a).

161.   Defendants knowingly provided or obtained, or attempted to provide or obtain, Plaintiffs' labor or services in violation of 18 U.S.C. §1589 by means of (i) serious harm or threats of serious harm to Plaintiffs or others; (ii) physical restraint or threats of physical restraint to Plaintiffs through

78

retention of their passports, threats of isolation, and other affirmative acts; or (iii) a scheme, plan, or pattern intended to cause Plaintiffs to believe that if they did not perform labor or services for Defendants, that they or others would suffer serious harm or physical restraint.

162.   Defendants knowingly benefitted, financially or by receiving anything of value from participation in a venture which Defendants knew or should have known had engaged in acts in violation of the TVPRA, including violations of 18 U.S.C. §1589.

163.   Defendants also attempted to violate 18 U.S.C. §1589 in violation of 18 U.S.C. §1594(a).

164.   As a direct and proximate result of Defendants' conduct, Plaintiffs have been harmed.

165.   Plaintiffs are therefore entitled to recover damages in an amount to be proven at trial, including compensatory and punitive damages, attorneys' fees, costs, and other relief that the Court may deem proper.

## <u>COUNT II</u>

### Conspiracy to Obtain Forced Labor in Violation of the TVPRA, 18 U.S.C. §§1589 and 1594(b) (All Defendants)

166.   Plaintiffs reallege and incorporate by reference the allegations in paragraphs 1 through 158, as though fully set forth herein.

167.   Plaintiffs brings this claim pursuant to 18 U.S.C. §1595(a).

168.   Defendants conspired to violate 18 U.S.C. §1589 in violation of 18 U.S.C. §1594(b).

169.   Defendants intentionally entered into an agreement to obtain Plaintiffs' labor or services in violation of 18 U.S.C. §1589 by means of (i) serious harm or threats of serious harm to Plaintiffs or others; (ii) physical restraint or threats of physical restraint to Plaintiffs through retention of their passports, threats of isolation, and other affirmative acts; or (iii) a scheme, plan, or pattern intended to cause Plaintiffs to believe that if they did not perform labor or services for Defendants, Plaintiffs or others would suffer serious harm or physical restraint.

170.   At least one Defendant committed at least one overt act in furtherance of their conspiracy.

171.   As a direct and proximate result of Defendants' actions, Plaintiffs have been harmed.

172.   Plaintiffs are therefore entitled to recover damages in an amount to be proven at trial, including compensatory and punitive damages, attorneys' fees, costs, and other relief that the Court may deem proper.

## COUNT III

### Trafficking and Attempted Trafficking with
### Respect to Forced Labor in Violation of the TVPRA,
### 18 U.S.C. §§1590 and 1594(a)
### (All Defendants)

173.   Plaintiffs reallege and incorporate by reference the allegations in paragraphs 1 through 158, as though fully set forth herein.

174.   Plaintiffs bring this claim pursuant to 18 U.S.C. §1595(a).

175.   Defendants knowingly recruited, harbored, transported, provided, or obtained, or attempted to recruit, harbor, transport, provide or obtain, Plaintiffs for labor or services in violation of provisions of the TVPRA, including 18 U.S.C. §1589, as alleged herein, thereby violating 18 U.S.C. §1590.

176.   Defendants knowingly benefitted, financially or by receiving anything of value from participation in a venture which Defendants knew or should have known had engaged in acts in violation the TVPRA, including violations of 18 U.S.C. §1590.

177.   Defendants also attempted to violate 18 U.S.C. §1590 in violation of 18 U.S.C. §1594(a).

178.   As a direct and proximate result of Defendants' actions, Plaintiffs have been harmed.

81

179.   Plaintiffs are therefore entitled to recover damages in an amount to be proven at trial, including compensatory and punitive damages, attorneys' fees, costs, and other relief that the Court may deem proper.

## COUNT IV

### Conspiracy to Traffic with Respect to Forced Labor in Violation of the TVPRA, 18 U.S.C. §§1590 and 1594(b) (All Defendants)

180.   Plaintiffs reallege and incorporate by reference the allegations in paragraphs 1 through 158, as though fully set forth herein.

181.   Plaintiffs bring this claim pursuant to 18 U.S.C. §1595(a).

182.   Defendants conspired to violate 18 U.S.C. §1590 in violation of 18 U.S.C. §1594(b).

183.   Defendants intentionally entered into an agreement to recruit, harbor, transport, provide, or obtain Plaintiffs for labor or services in violation of 18 U.S.C. §1590, as alleged herein.

184.   At least one Defendant committed at least one overt act in furtherance of their conspiracy.

185.   As a direct and proximate result of Defendants' actions, Plaintiffs have been harmed.

186.   Plaintiffs are therefore entitled to recover damages in an amount to be proven at trial, including compensatory and punitive damages, attorneys' fees, costs, and other relief that the Court may deem proper.

## COUNT V

### Peonage and Attempted Peonage
### in Violation of the TVPRA, 18 U.S.C. §§1581 and 1594(a)
### (All Defendants)

187.   Plaintiffs reallege and incorporate by reference the allegations in paragraphs 1 through 158, as though fully set forth herein.

188.   Plaintiffs bring this claim pursuant to 18 U.S.C. §1595(a).

189.   Defendants held or returned Plaintiffs to a condition of peonage in violation of 18 U.S.C. §1581, as alleged herein.

190.   Specifically, Defendants held Plaintiffs against their will and forced them to perform labor to pay off purported Scientology debts.

191.   Defendants knowingly benefitted, financially or by receiving anything of value from participation in a venture which Defendants knew or should have known had engaged in acts of peonage in violation of 18 U.S.C. §1581.

192.   Defendants also attempted to violate 18 U.S.C. §1581 in violation of 18 U.S.C. §1594(a).

193.   As a direct and proximate result of Defendants' actions, Plaintiffs have been harmed.

194.   Plaintiffs are therefore entitled to recover damages in an amount to be proven at trial, including compensatory and punitive damages, attorneys' fees, costs, and other relief that the Court may deem proper.

## COUNT VI

### Conspiracy to Commit Peonage
### in Violation of the TVPRA, 18 U.S.C. §§1581 and 1594(b)
### (All Defendants)

195.   Plaintiffs reallege and incorporate by reference the allegations in paragraphs 1 through 158, as though fully set forth herein.

196.   Plaintiffs bring this claim pursuant to 18 U.S.C. §1595(a).

197.   Defendants conspired to violate 18 U.S.C. §1581, in violation of 18 U.S.C. §1594(b).

198.   Defendants intentionally entered into an agreement to hold or return Plaintiffs to a condition of peonage, in violation of 18 U.S.C. §1581.

199.   At least one Defendant committed at least one overt act in furtherance of their conspiracy.

200.   As a direct and proximate result of Defendants' actions, Plaintiffs have been harmed.

201.   Plaintiffs are therefore entitled to recover damages in an amount to be proven at trial, including compensatory and punitive damages, attorneys' fees, costs, and other relief that the Court may deem proper.

## VI.   <u>DEMAND FOR JURY TRIAL</u>

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury of all issues so triable.

## VII.   <u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiffs pray that the Court:

1.   Find the Defendants liable on all Counts of the Complaint applicable to them and that judgment be entered in favor of Plaintiffs and against Defendants, jointly and severally, on all Counts;

2.   Award Plaintiffs compensatory damages in amounts to be ascertained at trial;

3.   Award Plaintiffs punitive damages in amounts to be ascertained at trial;

4.   Award Plaintiffs attorneys' fees and costs of suit; and

5.   Award such other and further relief as the Court deems proper.

Dated:  April 28, 2022

/s/ Warren A. Zimmerman
Warren A. Zimmerman
(Fla. Bar No. 652040)
WARREN A. ZIMMERMAN, P.A.
4114 Sparrow Ct
Lutz, FL  33558-2727
(813) 230-1465
warren@wzimmermanlaw.com

Joseph C. Kohn
(pro hac application to be filed)
Neil L. Glazer
(pro hac application to be filed)
Zahra R. Dean
(pro hac application to be filed)
Aarthi Manohar
(pro hac application to be filed)
Elias A. Kohn
(pro hac application to be filed)
KOHN, SWIFT & GRAF, P.C.
1600 Market Street, Suite 2500
Philadelphia, PA 19103
(215) 238-1700
jkohn@kohnswift.com
nglazer@kohnswift.com
zdean@kohnswift.com
amanohar@kohnswift.com
ekohn@kohnswift.com

Gregory P. Hansel
(Fla. Bar No. 607101)
Shana M. Solomon
(pro hac application to be filed)
Elizabeth F. Quinby
(pro hac application to be filed)
Katherine L. Oaks
(pro hac application to be filed)
PRETI FLAHERTY BELIVEAU
   & PACHIOS, CHARTERED, LLP
One City Center
P.O. Box 9546
Portland, ME 04112-9546
(207) 791-3000
ghansel@preti.com
ssolomon@preti.com
equinby@preti.com
koaks@preti.com

Theodore Leopold
(Fla. Bar No. 705608)
Manuel J. Dominguez
(Fla. Bar No. 0054798)
COHEN MILSTEIN SELLERS
   & TOLL PLLC
11780 U.S. Highway One
Suite N500
Palm Beach Gardens, FL 33408
Telephone: (561) 515-1400
tleopold@cohenmilstien.com
jdominguez@cohenmilstein.com

Agnieszka M. Fryszman
(Fla. Bar No. 459208)
Brendan Schneiderman
(pro hac application to be filed)
COHEN MILSTEIN SELLERS
   & TOLL PLLC
1100 New York Ave., N.W., 5th Floor
Washington, DC 20005

(202) 408-4600
afryszman@cohenmilstein.com
bschneiderman@cohenmilstein.com