UNITED STATES DISTRICT COURT MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

GAWAIN BAXTER, LAURA BAXTER
and VALESKA PARIS,

     Plaintiffs,

v.                         Case No.: 8:22-cv-00986-TPB-JSS

DAVID MISCAVIGE; CHURCH OF
SCIENTOLOGY INTERNATIONAL, INC.;
RELIGIOUS TECHNOLOGY CENTER, INC.;
IAS ADMINISTRATIONS, INC.; CHURCH
OF SCIENTOLOGY FLAG SERVICE
ORGANIZATION, INC.; CHURCH OF
SCIENTOLOGY FLAG SHIP SERVICE
ORGANIZATION, INC.,

     Defendants.

_____/

### DEFENDANT CHURCH OF SCIENTOLOGY FLAG SHIP SERVICE ORGANIZATION, INC.'S MOTION TO COMPEL ARBITRATION, OR IN THE ALTERNATIVE, TO DISMISS THE COMPLAINT

Defendant, Church of Scientology Flag Ship Service Organization, Inc., ("FSSO"), through undersigned counsel, respectfully moves this Court to compel arbitration pursuant to the Plaintiffs' binding arbitration agreements[1] or, in the alternative, to dismiss all claims pursuant to Federal Rules of Civil Procedure 12(b)(6). In support, FSSO states:

---

[1] "Plaintiffs" refers collectively to Plaintiffs Gawain Baxter ("G. Baxter"), Laura Baxter ("L. Baxter") and Valeska Paris ("Paris"). G. Baxter and L. Baxter, together, will be referred to as the "Baxters."

**INTRODUCTION**

Plaintiffs each served for over a decade as members of the Sea Organization ("Sea Org"), a religious order within the Scientology religion, and time and again they agreed to submit "any" disputes they might have regarding such service to Scientology internal ethics and justice procedures, up to and including binding religious arbitration. They executed those agreements to arbitrate under Scientology ecclesiastical law and justice procedures and to waive civil recourse as an express condition for serving as members in Scientology's religious order. Plaintiffs executed agreements to arbitrate while some of the conduct they now complain of allegedly was occurring. They executed agreements to arbitrate upon leaving the Sea Org, and thus *after* the causes of action in their complaint accrued. There is no question that FSSO and Plaintiffs expressly agreed to arbitrate the claims Plaintiffs now assert, which concern nothing but their service in the Sea Org.

As there can be no credible dispute that the parties agreed to arbitrate the very claims Plaintiffs now raise, the binding authority of this Circuit dictates that the Court must enforce the agreements. In *Garcia v. Church of Scientology Flag Srvc. Org., Inc.*, No. 18-13452, 2021 WL 5074465 at *15 (11th Cir. Nov. 2, 2021) ("*Garcia*"), the Eleventh Circuit enforced the identical arbitration agreements that Plaintiffs here signed. *Garcia* held that the Scientology arbitration agreements "disclosed adequate procedures" and were "sufficiently definite." *Garcia* also held that the First Amendment barred plaintiffs' arguments that certain Scientology religious doctrine (such as the

requirement that the arbitrators be Scientologists in good standing) rendered the agreements substantively unconscionable. *Id.*, at 23.

While *Garcia* is sufficient to enforce the agreements to arbitrate, additional facts discussed herein require the conclusion that this case must be arbitrated. In *Garcia*, the plaintiffs were lay parishioners and brought claims for refunds of donations. Here, however, Plaintiffs were ***members of Scientology's religious order*** and their claims concern the circumstances of their service to the Church.

Under the Free Exercise and Establishment Clause of the U.S. Constitution, the Church may establish its own rules governing its relationship with religious workers, exempt from civil law. ***The Church's ecclesiastical arbitration is a condition of service in the Sea Org.*** The Constitution prohibits this Court from using the civil law to rewrite the terms of joining and serving in a religious order. The Church arbitration agreements, as written and agreed to by Plaintiffs, must be enforced.

In the event the Court declines to compel arbitration, Plaintiffs' claims must be dismissed pursuant to Rule 12(b)(6) for the reasons set forth in Defendant FSO's motion to dismiss.

## FACTUAL BACKGROUND

### I.   Relevant Scientology Beliefs and Practices

The Scientology religion was founded by L. Ron Hubbard. A central tenet of the Scientology religion is that both parishioners and Scientology churches *must* raise and resolve all disputes between each other exclusively through the Scientology

internal Ethics and Justice system developed by Mr. Hubbard. (Declaration of Sarah Heller attached as Exhibit "1" ("Heller Decl."), ¶¶ 5, 11; *see also id.* ¶¶ 8-13.) All Scientologists and staff members in accepting posts or membership agree to abide by Scientology religious Justice codes (*id.* ¶ 11; *see also id.* ¶¶ 9, 13), and the Scientology jurisprudence system must be used in all matters relating to Scientology organizations, groups, and concerns. (*Id.* ¶ 9.) Many issues that may arise in disputes between Scientology members, or between members and the Church, will require application of Scientology doctrine, including the Church's ethical code of conduct. Only Scientologists would have the background in Scientology necessary to understand and apply those doctrines. (*Id.* ¶ 12.) Mr. Hubbard demanded that Scientologists *must* use Scientology justice in all their affairs. (*Id.* ¶ 11; *see also id.* ¶¶ 12-14, 16, 23.)

**A.**    ***The Baxters' Arbitration Agreements***

The Baxters executed enrollment applications expressing their commitment to Scientology as a condition for participating in the Sea Org and in Scientology religious services. Each promised to resolve disputes with the Church, related entities, and officers, directors, or staff of such entities exclusively through ecclesiastical arbitration by use of the Scientology Ethics and Justice system and waived any right to sue in civil courts.

The "Religious Services Enrollment Application, Agreement and General Release," executed by G. Baxter in 2003 and L. Baxter in 2004 (collectively with the agreement signed by Paris discussed below, "Enrollment Agreements"), contained the following language:

[6.] a. My freely given consent to **be bound exclusively by the discipline, faith, internal organization, and ecclesiastical rule, custom, and law of the Scientology religion in all matters relating to Scientology Religious Services, in all my dealings of any nature with the Church, and in all my dealings of any nature with any other Scientology church or organization which espouses, presents, propagates or practices the Scientology religion means that I am forever abandoning, surrendering, waiving, and relinquishing my right to sue, or otherwise seek legal recourse with respect to any dispute, claim or controversy** against the Church, all other Scientology churches, all other organizations which espouse, present, propagate or practice the Scientology religion, and all persons employed by any such entity both in their personal and any official or representational capacities, regardless of the nature of the dispute, claim or controversy.

(Declaration of Kenneth Weber attached as Exhibit "2" ("Weber Decl."), ¶¶ 7-8; *id.* Ex. A (G. Baxter Enrollment Agreement) at ¶ 6.a. and Ex. B (L. Baxter Enrollment Agreement) at ¶ 6.a. (emphasis added).)

The Baxters agreed in the Enrollment Agreements that "any dispute" they may have with any Scientology organization must be resolved through Scientology Ethics and Justice procedures, including, if necessary, binding religious arbitration:

[6.] d. In accordance with the discipline, faith, internal organization, and ecclesiastical rule, custom, and law of the Scientology religion, and in accordance with the constitutional prohibitions which forbid governmental interference with religious services or dispute resolution procedures, **should any dispute, claim or controversy arise between me and the Church**, any other Scientology church, any other organization which espouses, presents, propagates or practices the Scientology religion, or any person employed by any such entity, which cannot be resolved informally by direct communication, I will pursue **resolution of that dispute, claim or controversy solely and exclusively through Scientology's internal Ethics, Justice and binding religious arbitration procedures**, which include application to senior ecclesiastical

> bodies, including, as necessary, final submission of the dispute to the International Justice Chief of the Mother Church of the Scientology religion, Church of Scientology International ("IJC") or his or her designee.

(*Id.*, Exs. A and B at ¶ 6.d. (emphasis added).) To effectuate a religious arbitration, the Baxters agreed to submit a request for arbitration to the IJC and designate one arbitrator to hear and resolve the matter. (*Id.* ¶ 6.e.i, ii.) The adverse party would then designate a second arbitrator, and the two designated arbitrators would select a third. (*Id.* at ¶ 6.e.iii, iv.)

As part of their Covenants with the Sea Org, the Baxters affirmed that Scientology dispute procedures would apply to any dispute "arising out of this Covenant" – *i.e.*, their service as members of the Sea Org. (Weber Decl. Exs. C and D at p. 2, ¶ 9 (G. Baxter and L. Baxter Covenants).) The Church, "in reliance on" the Baxters' "promises and covenants," agreed to let them serve in the Sea Org. (Weber Decl. Exs. C and D at p. 6.)

**B.    *When the Baxters Leave the Sea Org, They Each Reaffirm their Agreements to Arbitrate***

The Complaint alleges that the Baxters signed "a series of documents" before they left the Sea Org and the Freewinds. (Compl. ¶ 111.) Those documents include a "Staff Departure Release Agreement" ("Departure Agreements"), "Religious Covenant of Non-Disparagement" and a "Religious Covenant of Confidentiality and Silence." (Weber Decl. Exs. E, F, G, H, I and J.) In the Departure Agreements, the Baxters reaffirmed their prior assent to ecclesiastic dispute resolution, to wit:

> [6.]C. I further agree that arbitration pursuant to the Scientology system of Ethics and Justice shall be my sole and exclusive remedy for resolving any problem or dispute I may have concerning my experiences as a member of the Sea Org or as [a] voluntary religious worker for the Church or any Scientology Entity, or concerning my participation in Scientology religious services, or concerning any matter of church governance, organization, or discipline, and that I will not seek to resolve any such problem or dispute in any other way, including the filing of a lawsuit in a secular court of law.

(Weber Decl. Exs. E and F at p. 6, ¶ 6.C.) The procedures for convening and conducting arbitration are in previous Agreements that the Baxters signed, which they reaffirmed in the Departure Agreements. (*Id.* Exs. E and F at p. 7, ¶ 7.E.)

While the Complaint alleges the Baxters were "traumatized" by their experiences in the Sea Org, in reality, they each remained practicing Scientologists for years after they left the Sea Org. In December 2015, for instance, each executed an "Introductory Scientology Courses Enrolment Application and General Release Deed" ("Deed") stating their desire to participate in additional Scientology courses. (Declaration of Sei Kato attached as Exhibit "3" ("Kato Decl."), Exs. A and B.) In each Deed, executed years after they had left the Freewinds, the Baxters again agreed to resolve disputes through Scientology ecclesiastical procedures. (*Id.*, Exs. A and B at p. 2, ¶ 5.)

### C.   *Paris' Arbitration Agreements*

Like the Baxters, Paris signed multiple agreements confirming her commitment to arbitrate disputes that may arise with the Church. In 2003, for instance, when Paris was in her mid-20s, she executed an Enrollment Agreement which contained the

identical arbitration terms as those signed by the Baxters. (Weber Decl. Ex. K (Paris Enrollment Agreement) at ¶ 6.e.) Just like the Baxters, Paris also signed a Religious Covenant agreement. (Heller Decl. Ex. A (Paris Covenant).)

In December 2007, Paris departed from her service on the Freewinds. At that time, she executed an Agreement and General Release (the "2007 Release Agreement"). (Weber Decl. ¶ 14 and Ex. L). In the 2007 Release Agreement, Paris recommitted to resolve "*any* dispute with *any* of the Releasees [defined to include Defendants] through *binding* Scientology ecclesiastical arbitration under the authority of the International Justice Chief." (Weber Decl. Ex. L, ¶¶ 7.A., 2.A (emphases added).) Again in 2009, when Paris was over thirty (30) years old, she executed a series of agreements memorializing her departure from the Sea Org. Among the agreements was an Agreement and General Release ("2009 Release Agreement"). (Weber Decl. ¶ 15, Ex. M (Paris Agreement and General Release).) In her 2009 Release Agreement, Paris recommitted to resolve "any dispute . . . solely and exclusively through Scientology's internal Ethics and Justice procedures," including the arbitration provisions she accepted in the Enrollment Agreement. (Weber Decl. Ex. M ¶ 7.A.)

## ARGUMENT AND MEMORANDUM OF LAW

### I.   Plaintiffs Must Arbitrate Their Claims Against Defendants

#### A.   *The Agreements Are Enforceable under the Federal Arbitration Act ("FAA")*

"The Federal Arbitration Act requires a federal court to stay or dismiss a lawsuit and compel arbitration if 'the plaintiff entered into a written arbitration agreement that

is enforceable under ordinary state-law contract principles' and 'the claims before the court fall within the scope of that agreement.'" *Garcia*, 2021 WL 5074465 at *15 (citing *Lambert v. Austin Ind.*, 544 F.3d 1192, 1195 (11th Cir. 2008)). The FAA applies to any "contract evidencing a transaction involving commerce" that contains an arbitration provision. 9 U.S.C. § 2; *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 139 S. Ct. 524, 529 (2019).

The "term 'involving commerce' in the FAA is the functional equivalent of the more familiar term 'affecting commerce'—words of art that ordinarily signal the broadest permissible exercise of Congress' Commerce Clause power." *Citizens Bank v. Alafabco, Inc.*, 539 U.S. 52, 56 (2003). "The 'business' or 'commerce' of a church involves the solicitation and receipt of donations, and the provision of spiritual, social, community, educational (religious or non-religious) and other charitable services." *U.S. v. Rayborn*, 312 F.3d 229, 233 (6th Cir. 2002); *Camps Newfound/Owatonna v. Town of Harrison*, 520 U.S. 564, 584-85 (1997) (commerce clause applies to non-profit entities)*. The FAA thus governs religious arbitration agreements. *Graves v. George Fox University*, No. CV-06-395-S-EJL, 2007 WL 2363372 *4 (D. Idaho, Aug. 16, 2007) (FAA applies to agreement calling for use of Christian Conciliation Procedures). This reflects both the FAA's policy of enforcing valid agreements to arbitrate, and the freedom of religious adherents and institutions to resolve their disputes in the forum of their choosing. Thus, when a religious organization seeks arbitration, a court should ask *only* "whether the parties have an enforceable agreement to arbitrate and, if so,

9

whether the underlying dispute between the parties falls within the scope of the agreement." *Meshel v. Ohev Sholom Talmud Torah*, 869 A.2d 343, 347 (D.C. 2005).

Plaintiffs' Enrollment Agreements, the Baxters' Departure Agreements and Paris' Release Agreements—all of which contain arbitration provisions—affect interstate commerce within the meaning of the FAA. The signatories to the agreements are Plaintiffs and FSSO, but each expressly applies to all Scientology churches throughout the world and the other named defendants in this dispute: (a) Defendant, Church of Scientology International, Inc. ("CSI"), which is headquartered in California and is responsible for the overall ecclesiastical dissemination, propagation and defense of the Scientology religion, (Declaration of Lynn R. Farny filed in support of CSI's Motion to Dismiss, ¶¶ 4, 7); (b) Defendant Religious Technology Center, Inc. ("RTC"), also headquartered in California and which is responsible to ensure adherence to the standard application of Mr. Hubbard's Scriptures (Declaration of Warren McShane filed in support of RTC's Motion to Dismiss, ¶¶ 4-5); (c) FSO located in Clearwater, Florida and which serves as the worldwide spiritual headquarters to Scientology and ministers to Scientologists throughout the world who come to Clearwater for Scientology services, including services available only at that Church (*see* Heller Decl. ¶ 2); and (d) Defendant IAS Administrations, Inc. ("IASA"), a Delaware corporation with its headquarters in California, serving Scientology's membership Association. (Declaration of Mislav Raos filed in support of IASA's Motion to Dismiss, ¶¶ 2, 4, 5.)

Among other things, the Enrollment Agreements govern religious donations used, in part, to help fund the Church's ministry throughout the United States and globally. (Weber Decl. Exs. A, B and K ¶¶ 5.c.i-iv.) The Baxters' Departure Agreements and Paris' Release Agreements also contain provisions involving interstate commerce. They concern Plaintiffs' time in the Sea Org in service of the worldwide Church, acknowledge Plaintiffs' strict confidentiality obligations about the location of Church facilities, Church security information, attorney-client communications, and personal information about Scientology staff members and parishioners, among other information. (Weber Decl. ¶¶ 17-18, Exs. E and F at ¶ 1.B; *id.*, Exs. L and M at ¶¶ 5.D, 6.A-C.) They release any claims against any Scientology church worldwide. (*Id.* ¶ 18, Exs. E and F at ¶¶ 3.A-D; *id.* Exs. L and M at ¶ 2.A.) The Departure Agreements and Release Agreements all contain liquidated damages provisions, by which each Plaintiff agreed to pay the Church various sums for any violation of the Departure Agreements. (*Id.* ¶ 19, Exs. E and F at ¶ 5.C; *id.*, Ex. M at ¶ 7.D.) The "involvement" of and effect on commerce is irrefutable. Although Defendants are nonprofit religious organizations, their "solicitation and receipt of donations, and the provisions of spiritual, social, community, educational (religious or non-religious) and other charitable services" all involves commerce. *U.S. v. Rayborn*, 312 F.3d 229, 233 (6th Cir. 2002); *see also Camps Newfound/Owatonna*, 520 U.S. at 584-85.

Plaintiffs may argue that, because the FAA does not extend to "contracts for the employment of seamen" (9 U.S.C. § 1), their arbitration agreements are not

enforceable. That argument fails. First, the agreements are not "contracts for the employment of seaman." They do not mention the Freewinds or Plaintiffs' service aboard the vessel. They instead address Plaintiffs' entire relationship with the Church and the Scientology religion.[2] (Enrollment Agreements, Weber Decl. Exs. A, B and K, ¶ 6.d.; Departure Agreements, Weber Decl. Exs. E and F at p. 1; Release Agreements, Weber Decl. Exs. L and M page 1.) Second, the FAA exception for "seamen" does not apply to arbitration agreements executed after the alleged injury has occurred. *Terrebone v. K-sea Trans. Corp.*, et al., 477 F.3d 271 (5th Cir. 2007). Because Plaintiffs admit that they entered into the Departure Agreements at the end of their time on the Freewinds, the exception for seamen does not apply. (Compl. ¶ 111.)

Even if the FAA does not apply, however, analogous federal law still requires enforcement of Plaintiffs' arbitration agreements. The Convention on Enforcement of Foreign Arbitral Awards ("CEFAA"), 9 U.S.C. Section 201 *et seq.*, applies to arbitration agreements if "(1) there is a written agreement to arbitrate the matter; (2) the agreement provides for arbitration in a Convention signatory nation; (3) the agreement arises out of a commercial legal relationship; and (4) a party to the agreement is not an American citizen." *Francisco v. Stolt Achievement MT*, 293 F.3d 270, 274 (5th Cir.), *cert. denied* 537 U.S. 1030 (2002). Here, Plaintiffs executed written

---

[2] The Covenants also acknowledge that the Plaintiffs may "from time to time be transferred from one Church or related organization to another pursuant to ecclesiastical policy and need." (Covenants, Weber Decl. Exs. C and D at p. 4, ¶ 8.)

arbitration agreements that provide for arbitration in a signatory nation (the United States), and the Plaintiffs are all citizens and residents of foreign countries. (Compl. ¶¶ 7-9.) Because Plaintiffs unquestionably served as seamen, the arbitration agreements are enforceable under CEFAA. *Id.* at 274; *see also Freudensprung v. Offshore Tech. Services*, 379 F.3d 327, 339 (5th Cir. 2004). Finally, even if the FAA and the CEFAA did not apply, the arbitration agreements would be enforceable under parallel state laws governing the enforcement of agreements to arbitrate. *See* note 3, *infra.*

**B.** ***The Arbitration Agreements Are Valid and Encompass the Disputes, and Therefore Must be Enforced***

The FAA provides that an agreement to arbitrate a dispute is "valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. The FAA reflects an "emphatic" and "liberal" federal policy in favor of arbitration. *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333 (2011). Any "doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 US 614, 626 (1985) (quote omitted); *Hearn v. Comcast Cable Commc'ns, LLC*, 992 F.3d 1209, 1213 (11th Cir. 2021) (same). "The Federal Arbitration Act requires a federal court to stay or dismiss a lawsuit and compel arbitration if 'the plaintiff entered into a written arbitration agreement that is enforceable under ordinary state law contract principles' and 'the claims before the court fall within the scope of that agreement.'" *Lambert v. Austin Ind.*, 544 F.3d 1192, 1195 (11th Cir. 2008) (internal quotation marks omitted) (citing 9 U.S.C. §§ 2–4).

The same public policy favoring enforcement applies generally to matters implicating the CEFAA, *see Bautista v. Star Cruises*, 396 F.3d 1289, 1299 (11th Cir. 2005) ("The FAA applies residually to supplement the provisions of the Convention Act . . . Congress gave the treaty-implementing statutes primacy in their fields, with FAA provisions applying only where they did not conflict"); *see also Martinez v. Carnival Corp.*, 744 F.3d 1240. 1244 n. 1 (11th Cir. 2014), and relevant state law having a heavy presumption in favor of arbitrability,[3] *see Erickson v. Aetna Health Plans of Calif.*, 71 Cal. App. 4th 649, 655 (1999) ("Thus, even in non-FAA cases, courts 'are guided by the rule that, contractual arbitration being a favored method of resolving disputes, every intendment will be indulged to give effect to such proceedings.'"); *Maguire v. King*, 917 So. 2d 263, 266 (Fla. 5th DCA 2005) ("Florida public policy favors resolving disputes through arbitration when the parties have agreed to arbitrate.").[4] Thus, all "doubts regarding the scope of an arbitration agreement must be resolved in favor of arbitration." *See Maguire*, 917 So. 2d at 266.[5]

---

[3] The Departure Agreements and Release Agreements are enforceable under Florida venue law and California state law (per the Departure Agreements) and, thus, are cited as parallel authority. (Departure Agreements, Weber Decl. Exs. E and F at p. 7, ¶ 7.C; Release Agreements, Weber Decl. Exs. L and M at ¶ 10.) As with the FAA and CEFAA, the California Arbitration Act and Florida Arbitration Code both enforce valid arbitration agreements except under limited circumstances. *See* C.C.P. § 1281.2 (b); Fla. Stat. Ann. § 682.02.

[4] *Vivas v. Safra Nat'l Bank of New York*, NO. 1:10-CV-21811-ASG, 2010 WL 11602462 at *10 (S.D. Fla. 2010) ("For these reasons and in keeping with the strong policy in favor of arbitration, I find that the arbitration clause here covers all the causes of action raised by the Plaintiffs") (citing Maguire, 917 So.2d at 266)); *Seifert v. U.S. Home Corp.*, 750 So.2d 633, 636 (Fla. 1999) ("Today, arbitration provisions are common, and their use generally favored by the courts.").

[5] *Qubty v. Nagda*, 817 So.2d 952, 956 (Fla. 5th DCA 2002) (stating that under both federal statutory provisions and Florida's Arbitration Code, "[a]ll doubts regarding the scope of an arbitration agreement, as well as any questions about waiver, should be construed in favor of arbitration rather

### i.   The Agreements Are Valid

A party seeking to compel arbitration meets its burden by "proving the existence of a valid arbitration agreement by the preponderance of the evidence[.]" *Engalla v. Permanente Med. Grp., Inc.*, 15 Cal. 4th 951, 972 (1997); *see also Avery v. Integrated Healthcare Holdings, Inc.*, 218 Cal. App. 4th 50, 59 (2013) (analyzing issue under both the FAA and CAA); *Shotts v. OP Winter Haven, Inc.*, 86 So. 3d 456, 464 (Fla. 2011). A party satisfies this burden by "submitting a copy of the [arbitration agreement] as an exhibit" and "the court is only required to make a finding of the agreement's existence, not an evidentiary determination of its validity." *Molecular Analytical Sys. v. Ciphergen Biosystems*, 186 Cal. App. 4th 696, 710 (2010).

In light of Plaintiffs' admissions in the Complaint, and FSSO's own evidence, FSSO has met its burden of establishing the existence of valid arbitration agreements, executed by Plaintiffs and FSSO.[6] (Weber Decl. ¶¶ 7-15, Exs. A, B, E, F, K, L, M.)

### ii.   The Dispute Falls Within the Agreements to Arbitrate

Plaintiffs agreed in their Enrollment Agreements to arbitrate "***any*** dispute between [Plaintiff] and the Church, any other Scientology church" and related entities or persons. (Weber Decl. Exs. A, B and K ¶ 6.d (emphasis added).) Thus, all Plaintiffs' claims—whether arising from common law or statute—against the Church must be arbitrated. Such "[b]road arbitration clauses" "are consistently interpreted as applying

---

than against it"), *accord Rath v. Network Marketing, L.C.*, 790 So.2d 461, 463 (Fla. 4th DCA 2001); *Breckenridge v. Farber*, 640 So.2d 208, 210 (Fla. 4th DCA 1994).

[6] For the reasons stated in their respective submissions, each Defendant entity is an intended third-party beneficiary of the arbitration agreements and may also enforce the agreements.

to extra-contractual disputes between the contracting parties." *Khalatian*, 237 Cal. App. 4th at 660. Similarly, "contractual arbitration agreements are equally applicable to statutory claims as to other types of common law claims." *Meyer v. T-Mobile USA Inc.*, 836 F.Supp. 2d 994, 1004 (N.D. Cal. 2011); *Vanacore Constr., Inc. v. Osborn*, 260 So. 3d 527, 531 (Fla. 5th DCA 2018) (same).

The Baxters also agreed in their Departure Agreements that Scientology arbitration would be their "sole and exclusive remedy for resolving any problem or dispute" they may have "concerning" their experiences in the Sea Org or any matter of church governance, organization, or discipline, without limitation to party. (Departure Agreements, Weber Decl. Exs. E and F at p. 6, ¶ 6.C.) Paris, likewise, reaffirmed her agreement to arbitrate "any dispute" between her and "any other Scientology church," including disputes concerning her "involvement as a Church staff member or her participation in any Scientology Religious Service" in her Release Agreements. (Weber Decl. Ex. M at ¶ 7.A.) An agreement requiring arbitration of any controversy arising out of the subject matter of a contract also applies to tort claims that "have roots in the relationship between the parties which was created by the contract." *Izzi v. Mesquite Country Club*, 186 Cal. App. 3d 1314, 1315-1316 (1986); *Ciphergen*, 186 Cal. App. 4th at 713; *Vanacore Constr.*, 260 So. 3d at 531. Because all of Plaintiffs' causes of action concern their participation in and experiences in the Sea Org, they fall within the scope of the arbitration agreements and are enforceable. *See Lambert*, 544 F.3d at 1195.

### iii.   The Eleventh Circuit Enforced this Same Arbitration Agreement in *Garcia*

Plaintiffs may assert that the agreements at issue are procedurally and substantively unconscionable, but that is a different inquiry from whether an arbitration provision is "valid." Plaintiffs must prove an arbitration agreement is both procedurally and substantively unconscionable. *Garcia*, 2021 WL 5074465 at *15; *see also Avery*, 218 Cal. App. 4th at 59; *Gainesville Health Care Ctr., Inc. v. Weston*, 857 So. 2d 278, 288 (Fla. 1st DCA 2003) (same). In *Garcia*, former Church parishioners sought refunds of donations and payments they had made to FSO and FSSO. *Garcia*, 2021 WL 5074465, at *1. The Eleventh Circuit held that the same arbitration agreements at issue are not unconscionable and affirmed the Middle District of Florida's orders (1) compelling Scientology religious arbitration and (2) denying a motion to vacate the resulting arbitration award.

As here, the Garcias' agreements required arbitration of "'any dispute, claim or controversy' between the Garcias and 'the Church, any other Scientology church, any other organization which espouses, presents, propagates or practices the Scientology religion, or any person employed by any such entity,'" through "'binding religious arbitration in accordance with the arbitration procedures of Church of Scientology International.'" *Id.*, at *2. "[T]he agreements provided that the arbitration would 'be conducted in accordance with Scientology principles' and that all arbitrators would be 'Scientologists in good standing with the Mother Church.'" *Id.* The district court

enforced the agreements according to their terms and compelled religious arbitration of the former parishioners' claims. The Eleventh Circuit affirmed. The Court rejected the argument that the arbitration agreements were procedurally unconscionable and held that the Garcia agreements—identical to the arbitration provisions in Plaintiffs' Enrollment Agreements in this case—were "sufficiently definite," to give the plaintiffs "some idea of the matters to be arbitrated and to provide some procedure to effect arbitration." *Id.*, at \*17-\*18.

*Garcia* also rejected the plaintiffs' argument that having "Scientologists in good standing" serve as arbitrators was substantively unconscionable. The Eleventh Circuit held that "the district court correctly ruled that the First Amendment prevented it from entertaining the argument that Scientology doctrine rendered the arbitration agreements substantively unconscionable." *Id.*, at \*23. To do so would have required the district court to decide whether the Garcias or the Church "more correctly perceived the commands of the [Scientology religion]," which is an exercise the First Amendment prohibits courts from engaging in. *Id.* (quoting *Thomas v. Rev. Bd. of Indiana Emp. Sec. Div.*, 450 U.S. 707, 716 (1981)).

*Garcia* was not the first—or only—case to enforce a religious arbitration agreement. "The 'presumption in favor of arbitration' applies with equal force to "private religious arbitration, which is exceedingly common in our pluralistic society." *Spivey v. Teen Challenge of Fla., Inc.*, 122 So.3d 986, 992 (Fla. 3d DCA 2013). Courts routinely enforce those agreements, even where non-believers make objections. *See Spivey*, 122 So. 3d at 992 (religious arbitration agreement enforced over objections of

non-believer procedures required participation in a Christian prayer); *see also Elmora Hebrew Ctr., Inc. v. Fishman*, 125 N.J. 404, 416-178 (1991) (New Jersey Supreme Court rejecting challenge to the religious nature of the arbitral forum, the party's consent to the tribunal precludes such a challenge); *Encore Prods., Inc. v. Promise Keepers*, 53 F.Supp.2d 1101, 1113 (D. Col. 1999) (Compelling religious arbitration over non-believer's objection: "It may not be proper for a district court to refer civil issues to a religious tribunal in the first instance, [but] if the parties agree to do so, it is proper for a district court to enforce their contract").[7]

### C. *The First Amendment Prohibits the Court from Abrogating the Terms of Plaintiffs' Commitment to the Church*

The facts here present an even more compelling case for arbitration than does *Garcia*, where the plaintiffs were former *lay members* of Scientology who had brought an action for a refund of monetary donations to the Church. Here, Plaintiffs were voluntary members of the Church's most elevated religious order. The Complaint concerns the discipline and conditions they were subject to as members of that order. They joined and remained in the Sea Org on the condition of subjecting themselves to the discipline and stricture of the Sea Org and to be governed by Scientology justice and ethics procedures in all disputes. They departed from the Sea Org in good standing within the Scientology religion by reaffirming their pledge to be bound by Scientology

---

[7] *See also Dial 800 v. Fesbinder*, 118 Cal.App.4th 32, 50 (2004) (affirming enforceability of judgment to be rendered in religious arbitration where arbitrators were rabbis and decision would be based on Jewish law, notwithstanding objections from plaintiff that religious arbitration violated the First Amendment).

justice and ethics procedures in all disputes. Well-established precedent prohibits this Court from interfering with the terms on which the Church accepts, supervises, disciplines and laicizes members of its religious order.

A religion's right to determine who may join it, and on what terms, is the heart of its creed. The Supreme Court in *Watson v. Jones*, 80 U.S. 679, 729-31 (1871), explained that civil courts may not exercise supervision over how a church chooses to admit and govern its relations with members:

> All who unite themselves to [a church] do so with an implied consent to [its] government, and are bound to submit to it. We cannot decide who ought to be members of the church. [W]hen they became members they did so upon the condition of continuing or not as they and their churches might determine, and they thereby submit to the ecclesiastical power and cannot now invoke the supervisory power of the civil tribunals.

*Watson* at 731; *see also Kedroff v. Saint Nicholas Cathedral of Russian Orthodox Church in N. Am.,* 344 U.S. 94, 116 (1952) (religious organizations are entitled to "an independence from secular control or manipulation—in short, power to decide for themselves, free from state interference, matters of church government as well as issues of faith and doctrine.").[8]

Similarly, in *Hosanna Tabor v. Equal Emp. Opportunity Comm'n*, 565 U.S. 171 (2012), the Supreme Court recognized the long history of the "ministerial exception,"

---

[8] As the Eleventh Circuit noted in *Church of Scientology Flag Serv. Org., Inc. v. City of Clearwater*, 2 F.3d 1514, 1544 (11th Cir. 1993), "[i]f they remain dissatisfied with the church's voluntarily assumed disclosure policy then they may attempt to reform that policy from within, they may acquiesce in the policy despite their objections or they may leave the church" but may not seek to have the courts or other civil authority intrude or abrogate church policy for them. *Id.* (citing *Watson*, 80 U.S. at 731).

derived from the Free Exercise and Establishment clauses of the First Amendment, holding that civil laws could not govern the relations between a church and its "ministers," *i.e.*, those who serve a church by "conveying the Church's message and carrying out its mission." *Id.*, 565 U.S. at 192 (applying the "ministerial exception" to bar a teacher's ADA action to challenge the church's decision to terminate because her suit "interferes with the internal governance of the church, depriving the church of control over the selection of those who will personify its beliefs.")[9]; *see also Alcazar v. Corp. of Catholic Archbishop of Seattle*, 627 F.3d 1288, 1293 (9th Cir. 2010) ("The ministerial exception applies notwithstanding the assignment of some secular responsibilities.")[10]

Many religious workers perform important religious duties, must meet specific religious qualifications or criteria to hold their positions, or both. Principles of governmental and judicial non-interference in matters of ecclesiastical administration apply to the relationship of churches with such religious workers to the same extent as it does with the more traditional concept of "ministers." *Rweyemamu v. Cote*, 520 F.3d 198, 206 (2d Cir. 2008) ("The ministerial exception protects more than just

---

[9] Allowing the state to intrude into such matters "results in excessive entanglement with religion in violation of the establishment clause," and "violate[s] the free exercise clause" because "'churches . . . must have power to decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine.'" *Silo v. CHW Med. Found.*, 27 Cal. 4th 1097, 1106 (2002). "A minister's working conditions . . . *are* part of the minister's employment relationship with the church." *Werft*, 377 F.3d at 1101 (emphasis in original); *Headley v. Church of Scientology Int'l.*, No. 09-3986-DSF, 2010 WL 3157064 at *5 (C.D. Cal. Aug. 5, 2010).

[10] The U.S. Government recognizes that members of religious orders are exempt from employment laws. U.S. Department of Labor, Field Operations Handbook § 10b03 (b).

'ministers.'"). "Congress does not want courts to interfere in the internal affairs of churches, . . . That is why the 'minister's exception' is better termed the 'internal affairs' doctrine." *Schleicher v. Salvation Army*, 518 F.3d 472, 475 (7th Cir. 2008). Thus, any test cannot focus on a mechanical calculation of how much time a minister devotes to his or her religious duties.[11] *Hosanna-Tabor*, 565 U.S. at 193*; see also Alcazar*, 627 F.3d at 1292 (minister in training spent most of his time performing manual labor). The ultimate question is whether the employee's work "is important to the spiritual and pastoral mission of the church." *Hope Int'l Univ.*, 119 Cal. App. 4th at 734.[12]

Plaintiffs' service in the Sea Org fell within the ministerial exception. As mentioned above, Plaintiffs signed Covenants with the Sea Org that recited a "pledge of eternal service to the Scientology religion and its goals." (Covenants, Weber Decl. Exs. C and D at p. 1, ¶ 1.) Each of the Baxters acknowledged a covenant that "binds [them] to follow the ecclesiastical, moral and ethical policies, rules, norms and practices of the Scientology religion as a member of a religious order and to follow the administrative policies and procedures of the Church." (*Id.* at p. 1, ¶ 2.) They each

---

[11] *Our Lady of Guadalupe School v. Morrissey-Berru* 140 S. Ct. 2049 (2020) (dismissing ADA and ADEA actions by two teachers at Catholic elementary schools though the teachers in question were not titled "ministers," had "limited religious training," did not hold themselves out to the public "as a minister or religious leader" because the teachers served a role as "messenger" of the religious faith and thus "judicial intervention into disputes between the school and the teacher threatens the school's independence in a way that the First Amendment does not allow.")

[12] *See Sterlinski v. Catholic Bishop of Chicago*, 924 F.3d 968 (7th Cir. 2019) (affirming that church organist was subject to ministerial exception); *Fratello v. Archdiocese of New York*, 863 F.3d 190, 203 (2d Cir. 2017) (principal of parochial school's claim barred by ministerial exception); *Ross v. Metro. Church of God*, 471 F. Supp. 2d 1306, 1310 (N.D. Ga. 2007) (collecting cases applying exception to musical director, organist, choir director, resident in hospital program, religion teacher, nun, kosher food supervisor and director of religious education).

understood their service to be a "religious commitment to spiritual awareness, to the Scientology religion and to create a better world." Thus, they each agreed to "serve pursuant to their religious obligations and not in contemplation of receiving any monetary gain or for other traditional commercial or financial motives or incentives whatsoever." (*Id.* at p. 1, ¶¶ 3, 4.) Plaintiff Paris' Covenant contained similar acknowledgments of her understanding of her religious role and obligations in the Sea Org. (Heller Decl. Ex. A, p. 2.) The Covenants reflected the reality of each Plaintiff's service to advance their religion.

Finally, the Freewinds is not a "cruise ship," as Plaintiffs allege, open to believers and non-believers; it is a floating church and only members in the Sea Org may serve as its crew. Parishioners come from all over the world to participate in Scientology services on the Freewinds. (Weber Decl. ¶ 6.) The Freewinds also carries out a charitable and humanitarian mission throughout the Caribbean. (*Id.*) Plaintiffs' service in operating the Freewinds directly assisted and advanced the Scientology ministry to parishioners and the proselytization of Scientology. *Headley,* 2010 WL 3157064, at *6 (dismissing claims of a member in the Sea Org working at a Scientology video production facility because adjudicating a member's claim in the Sea Org "would also require the Court to analyze the criteria Defendant uses to choose ministers and the reasonableness of the methods used to enforce church policy.")

For all of the foregoing reasons, Plaintiffs agreed to submit all claims and disputes to Scientology internal ethics and justice procedures, up to and including

binding ecclesiastical arbitration.  All claims must be compelled to arbitration under those procedures.

## II.   Alternatively, Plaintiffs' Claims Must be Dismissed Under Rule 12(b)(6)

Subject to and without waiving FSSO's enforceable arbitration rights discussed above, should the Court determine that Plaintiffs' claims should not be compelled to arbitration, FSSO alternatively states that all of Plaintiffs' claims must be dismissed under Fed. R. Civ. P. 12(b)(6) for the reasons set forth in Defendant FSO's Motion to Dismiss, which FSSO joins in and incorporates by reference in its entirety.

### Local Rule 3.01(g) Certification

The undersigned counsel hereby certifies that the undersigned conferred with Plaintiffs' counsel, **Neil Glazer and Zahra Dean of Kohn Swift & Graf, PC, Gregory Hansel of Preti Flaherty Beliveau & Pachios, Chartered LLP, and Manuel J. (John) Dominguez of Cohen Milstein Sellers & Toll PLLC** who does not agree to the relief sought in this motion. Counsel further certifies that this motion is brought in good faith and not for any improper purpose.

*/s/ Charles M. Harris, Jr.*
CHARLES M. HARRIS, FBN 967459
BRIGID A. MERENDA, FBN 320500
Trenam Law
200 Central Avenue, Suite 1600
St. Petersburg, FL 33701
Tel: 727.896.7171
Fax: 727.822.8048 (Facsimile)
charris@trenam.com
bamerenda@trenam.com
gkesinger@trenam.com
ranctil@trenam.com
*Attorneys for Defendants, FSSO and FSO*

## **CERTIFICATE OF SERVICE**

I certify that on July 12, 2022, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system, which will send a true and correct copy to all counsel of record.

/s/ *Charles M. Harris, Jr.*
Attorney