UNITED STATES DISTRICT COURT MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

GAWAIN BAXTER, LAURA BAXTER
and VALESKA PARIS,

      Plaintiffs,

v.                              Case No.: 8:22-cv-00986-TPB-JSS

DAVID MISCAVIGE; CHURCH OF
SCIENTOLOGY INTERNATIONAL, INC.;
RELIGIOUS TECHNOLOGY CENTER, INC.;
IAS ADMINISTRATIONS, INC.; CHURCH
OF SCIENTOLOGY FLAG SERVICE
ORGANIZATION, INC.; CHURCH OF
SCIENTOLOGY FLAG SHIP SERVICE
ORGANIZATION, INC.,

      Defendants.

_____/

### DEFENDANT CHURCH OF SCIENTOLOGY FLAG SERVICE ORGANIZATION, INC.'S MOTION TO COMPEL ARBITRATION; OR IN THE ALTERNATIVE, TO DISMISS PURSUANT TO RULE 12(b)(6)

Defendant, Church of Scientology Flag Service Organization, Inc. ("FSO"), by and through undersigned counsel, respectfully moves this Court to compel arbitration of all claims against it brought by Plaintiffs[1] in their Complaint, or in the alternative, moves to dismiss all claims against FSO pursuant to Federal Rule of Civil Procedure 12(b)(6).  In support, FSO states:

---

[1] "Plaintiffs" refers collectively to Plaintiffs Gawain Baxter ("G. Baxter"), Laura Baxter ("L. Baxter"), and Valeska Paris ("Paris"). G. Baxter and L. Baxter, together, will be referred to as the "Baxters."

**INTRODUCTION**

Plaintiffs each served for over a decade as members of the Sea Organization ("Sea Org"), an unincorporated religious order composed of clergypersons who have committed their lives to advancing Scientology. Sea Org members form the dedicated core of the Scientology religion and dedicate themselves to the Sea Org for a billion years. This term reflects both their dedication to their religion and their awareness of themselves as immortal spiritual beings who have lived countless lives and who will live again and again. Although Plaintiffs voluntarily joined and remained with the Sea Org for over a decade, they now assert that their participation in this religious order violated the federal slavery and human trafficking statute, the Trafficking Victims Protection Reauthorization Act ("TVPRA"), 18 U.S.C. §§ 1581-1597. There are multiple, insurmountable bars to Plaintiffs' effort to recast their spiritual devotion to their faith into a federal trafficking crime:

*Plaintiffs must arbitrate their claims.* As required by Scientology religious doctrine, and as a required condition of serving as a member of the Sea Org, each Plaintiff agreed in multiple written agreements to resolve, through ecclesiastical justice procedures, disputes that might arise between them and FSO. For the sake of brevity, FSO incorporates and joins in the argument compelling arbitration raised in Defendant, Church of Scientology Flag Ship Service Organization, Inc.'s, ("FSSO") Motion to Compel Arbitration served simultaneously herewith. All of the Plaintiffs entered into arbitration agreements with FSSO. And the arguments raised by FSSO as to those agreements apply to FSO because it is an intended third-party beneficiary of

such agreements. Additionally, the claims brought by Paris are further subject to arbitration because Paris entered into an enforceable arbitration agreement directly with FSO. Accordingly, all of Plaintiffs' claims against FSO should be arbitrated because FSO is either the direct or third-party beneficiary of enforceable arbitration agreements with Plaintiffs.

*__The Complaint Does Not and Cannot State a Claim Against FSO.__*  In the event the Court determines that Plaintiffs' claims are not subject to arbitration, the Complaint still cannot proceed as it fails to state a claim against FSO. The claims fail for three reasons:

First: Plaintiffs allege TVPRA violations going back decades, but no civil remedy existed under the statute until Congress amended it in 2003. Further, these amendments were not retroactive. As such, the Court must dismiss all claims involving *pre*-2003 violations. Additionally, the alleged *post*-2003 violations should also be dismissed because they all occurred on the Freewinds, which the Complaint admits never entered US waters. The TVPRA's civil provisions do not apply to extraterritorial conduct. Thus, the Court must dismiss all *post*-2003 violations as well.

Second: To the extent Plaintiffs can bring a civil action under TVPRA, even assuming Plaintiffs' allegations are true, there was still no violation of the TVPRA. Plaintiffs' trafficking claims under 18 U.S.C. §§ 1589 and 1590 require allegations of forced labor. However, here, Plaintiffs admit that they were free to leave the Sea Org at any time, either by going through the "routing out" process or by simply leaving. They alleged that they might be declared a "suppressive person" by the Church if they

left without going through the "routing out" process, but courts have held such a consequence does not equate to forced labor. For similar reasons, Plaintiffs' peonage claims under § 1581 fail. Indeed, these claims require an allegation that Plaintiffs were working to earn their freedom to satisfy an existing debt. However, Plaintiffs have not pled such an arrangement as they could leave at any time and were not paying off existing debts.

Third: Paris' claims fail because they are time-barred. The TVPRA provides a ten-year statute of limitations, but Paris left the Sea Org—and began publicly complaining about her time in the religious order—more than ten years before she filed suit as she expressly alleges in the Complaint. Therefore, these same claims that apparently existed prior to the statute of limitations period should be summarily dismissed.

## <u>ARGUMENT</u>

### I.     Plaintiffs Must Arbitrate Their Claims Against FSO

The Court should compel arbitration on all claims against FSO. This issue is addressed at length in FSSO's Motion to Compel Arbitration. (*See* ECF No. 67).[2] In short, Plaintiffs signed valid arbitration agreements with FSO and FSSO, and those agreements should be enforced.

As to Plaintiffs' agreements with FSSO, FSO was an intended third-party beneficiary of such agreements. Indeed, those agreements provide for arbitration of

---

[2] The Declarations of Kenneth Weber ("Weber Decl.") and Sarah Heller ("Heller Decl.") filed in support of FSSO's Motion to Compel Arbitration are also fully incorporated by reference into this Motion.

any claims Plaintiffs may have with "*any* [] Scientology church or organization which espouses, presents, propagates or practices the Scientology religion," or other similar language applying to all Scientology churches worldwide. (Weber Decl. Exs. A, B and K at ¶ 6; *see also* Exs. E and F at ¶ 6.C; *see also* Exs. L and M at ¶ 7.A, 2.A). Therefore, these agreements clearly apply to FSO. *See Robinson v. NBC Universal Cable,* No. 17-CV-81324, 2018 WL 8620154, at *4 (S.D. Fla. Apr. 23, 2018) (compelling arbitration under "third-party beneficiary theories" where defendants were not signatories to the agreement but were clearly intended to benefit from the arbitration provision therein). As such, and for the reasons explained further in FSSO's Motion to Compel Arbitration, which FSO joins and fully incorporates herein, all of Plaintiffs' claims should be arbitrated. Additionally, all claims brought by Paris are further subject to arbitration because she directly entered into at least one agreement with FSO agreeing to resolve disputes through Scientology ecclesiastical justice procedures. (Heller Decl. Ex. A at p. 3). Therefore, all claims against FSO should be arbitrated as FSO is either the direct or third-party beneficiary of all of Plaintiffs' various arbitration agreements.

## II.    Plaintiffs' Claims Against FSO Fail to State a Claim

### A.    Legal Standard Under Rule 12(b)(6)

When analyzing a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a court will take "all factual allegations in the complaint as true and construe them in the light most favorable to the plaintiff." *Doe #1 v. Red Roof Inns*, 21 F.4th 714, 723 (11th Cir. 2021) (internal quote omitted). However, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not

suffice." *Id.* (quote omitted). "Instead, a plaintiff must allege sufficient facts that, accepted as true, state a claim to relief that is plausible on its face." *Id.* (quote omitted).

### B.    Plaintiffs' Claims Fail in Whole or in Part Because They Seek Retroactive Application of the TVPRA

Plaintiffs allege conduct from several decades ago. Additionally, Plaintiffs' claims are primarily extraterritorial, with purported violations occurring in Europe, Australia and the Caribbean. Plaintiffs alleged only limited activity—all predating this century—in the United States. The TVPRA does not apply to this activity.

#### 1.    *No Civil Liability for Pre-2003 Conduct*

Congress enacted the TVPRA in 2000, but the statute did not provide for civil liability until December 2003, when § 1595 was added. *Velez v. Sanchez*, 693 F.3d 308, 324 (2d Cir. 2012). However, § 1595 is not retroactive. Thus, FSO cannot be found civilly liable for any alleged violations predating the 2003 amendment. *Velez*, 693 F.3d at 324; *see also Ditullio v. Boehm*, 662 F.3d 1091, 1099 (9th Cir. 2011) (TVPRA "cannot be applied retroactively to create liability for conduct that occurred before December 19, 2003").

Nearly all of Plaintiffs' claims concern conduct predating these amendments in December 2003. For example:

- G. Baxter alleges TVPRA violations going back at least ten years before he boarded the Freewinds in about 1998.[3] (Compl. ¶¶ 7, 83, 85). He alleges

---

[3] Plaintiffs allege that G. Baxter was born in 1982 or late 1981 (Compl. ¶ 7), that he considered leaving the Sea Org at age 15 (*id.* ¶ 83), and that he traveled to the Freewinds about "eight months later." (*Id.* ¶ 85). Thus, G. Baxter boarded the Freewinds when he was 16, in about 1998.

further violations during the years he was aboard the Freewinds, but prior to the 2003 amendment.

- L. Baxter alleges TVPRA violations going back at least ten years before she first boarded the Freewinds no later than 2002.[4] (*Id.* ¶¶ 94-99). She alleges further violations after she boarded the Freewinds, but before the 2003 amendment. (*Id.* ¶¶ 97, 99-105).

- Paris alleges TVPRA violations going back at least fourteen years before she boarded the Freewinds in 1996.[5] (*Id.* ¶¶ 9, 115-133). She alleges further violations during the years she was aboard the Freewinds, but before the 2003 amendment.

FSO cannot be civilly liable for any of these alleged violations occurring prior to the 2003 amendments to the TVPRA. The Court should thus dismiss Plaintiffs' claims to the extent they depend on this pre-2003 conduct. *See Ditullio*, 662 F.3d at 1102; *see also Doe v. Siddig*, 810 F. Supp. 2d 127, 136 (D.D.C. 2011) (dismissing "insofar as those claims are predicated on acts predating December 19, 2003").

---

[4] Plaintiffs allege that L. Baxter served aboard the Freewinds twice, that her first stint ended when she was seventeen, and that her second stint began two years later, when she was nineteen. (Compl. ¶¶ 98-99). Plaintiffs also allege that she was aboard the Freewinds during her second stint in 2004. (*Id.* ¶ 101). Thus, the Complaint insinuates that L. Baxter was born no later than 1985 and that she first boarded the Freewinds no later than 2002.

[5] Plaintiffs allege that Paris was born in 1978 (Compl. ¶ 9) and that she boarded the Freewinds when she was 18 (*i.e.* in approximately 1996). (*Id.* ¶ 133).

## 2. *Limited Civil Liability for Pre-2008 Conduct*

Even after Congress added civil liability to the TVPRA in 2003, the statute still did not cover most of FSO's alleged violations. Instead, the statute could not apply until Congress amended the statute again, effective December 23, 2008. Plaintiffs, however, do not allege *any* TVPRA violations after that date. Although not entirely clear because of the dearth of relevant dates pled in the Complaint, Plaintiffs appear to allege improper conduct prior to the 2008 amendment. As such, the remaining claims should be dismissed for four reasons.

***First***, Plaintiffs' post-2003 allegations concern conduct exclusively outside the United States.[6] Indeed, Plaintiffs allege these events took place: (a) aboard the Freewinds, which Plaintiffs boarded in Curacao no later than 2002 and which never docked at a United States port or entered United States waters (*id.* ¶¶ 29-30, 85-92, 97-112, 133-147); (b) in Copenhagen, where L. Baxter lived after her first stint on the Freewinds (*i.e.*, after 2002) (*id.* ¶ 98) and (c) in Australia, where Paris lived after she left the Freewinds. (*Id.* ¶¶ 148-51). However, the TVPRA had no extraterritorial reach until Congress amended § 1596 in 2008. *Adhikari v. Kellogg Brown & Root, Inc.*, 845 F.3d 184, 201 (5th Cir. 2017).[7] And that amendment is not retroactive. *Id.* at 206. Thus,

---

[6] Plaintiffs do not allege any domestic conduct that occurred after Congress established a private right of action in 2003. The only domestic conduct alleged in the Complaint concerns (a) G. Baxter and Paris' alleged experiences in the Sea Org at Flag Base in Florida before 2000 (Compl. ¶¶ 78-84, 125-133) and (b) L. Baxter's alleged layover in Miami during a flight from England to Curacao to board the Freewinds before 2002. (*Id.* ¶ 97). All this conduct predates the 2003 amendment adding civil liability to the TVPRA, and thus is not actionable. *See supra* § II.B.1.

[7] As noted below (*see infra* § II.C), Plaintiffs' extraterritorial claims also fail because the 2008 amendment expanded the extraterritorial jurisdiction only for criminal prosecutions, not civil claims. *See Apple Inc.*, 2021 WL 5774224, at *15 (D.D.C. Nov. 2, 2021).

Plaintiffs' pre-December 23, 2008 claims—which appear to be all, if not the vast majority, of Plaintiffs' claims—are not actionable.

*Second,* in Counts I, III and V, Plaintiffs seek to hold FSO liable for violating the TVPRA under a beneficiary theory. (Compl. ¶¶ 162, 176, 191). But the statute did not apply to beneficiary liability until Congress amended § 1595(a) in 2008. *Nestle USA, Inc. v. Doe*, 141 S. Ct. 1931, 1939 (2021) (Thomas, J., writing for Gorsuch, J. and Kavanaugh, J.) ("in 2008, Congress created the present private right of action, allowing plaintiffs to sue defendants who are involved indirectly with slavery"); *see also H.G. v. Inter-Cont'l Hotels Corp.,* 489 F. Supp. 3d 697, 710 (E.D. Mich. 2020). As Justice Thomas explained, when Congress amended the TVPRA in 2008, it "chose not to write a retroactive statute." *Nestle USA*, 141 S. Ct. at 1939; *see also H.G.*, 489 F. Supp. 3d at 710 (beneficiary amendment not retroactive); *E.S. v. Best W. Int'l, Inc.*, 510 F. Supp. 3d 420, 431 (N.D. Tex. 2021) (same); *Elat v. Ngoubene*, 993 F. Supp. 2d 497, 522 (D. Md. 2014) (same). Thus, the beneficiary claims in Counts I, III and V are barred.

*Third*, Counts II, IV and VI allege a conspiracy to violate the TVPRA. (Compl. ¶¶ 169, 183, 198). However, Congress did not add conspiracy liability to the TVPRA until it amended § 1596 in 2008. *Roe v. Howard*, 917 F.3d 229, 245 (4th Cir. 2019). Therefore, this amendment is not retroactive either. *See, e.g., Saraswat v. Jayaraman*, 799 F. App'x 85, 87 (2d Cir. 2020) (no 2008 amendments to TVPRA are retroactive). These claims should be dismissed as well.

*Fourth*, Counts V and VI claim violations of the peonage prohibitions in § 1581. (Compl. ¶¶ 189, 198). But, again, the TVPRA imposed no civil liability for peonage until 2008, *Ditullio*, 662 F.3d at 1094 n.1, and this amendment is not retroactive. *Saraswat*, 799 F. App'x at 87; *Nestle USA*, 141 S. Ct. at 1939. Counts V and VI should be dismissed accordingly.

Because FSO "should not have to defend conduct that was not actionable when it occurred," *Druding v. Care Alternatives, Inc.*, 164 F. Supp. 3d 621, 634 (D.N.J. 2016), the Court should dismiss all of the claims against it for the reasons discussed above. *See Siddig*, 810 F. Supp. 2d at 135 (dismissing § 1595 civil claim "insofar as it is predicated on acts predating December 23, 2008"); *E.S.*, 510 F. Supp. 3d at 432 (collecting cases reaching same conclusion); *H.G.*, 489 F. Supp. 3d at 710. Further, because Plaintiffs cannot plead around this retroactivity bar, FSO requests that these dismissals should be with prejudice.

## C.    All Claims Fail Because the TVPRA Does Not Provide a Civil Cause of Action for Extraterritorial Conduct

Plaintiffs' claims also fail because the TVPRA does not extend civil liability to extraterritorial conduct. "It is a 'longstanding principle of American law that legislation of Congress, unless a contrary intent appears, is meant to apply only within the territorial jurisdiction of the United States.'" *Morrison v. Nat. Australia Bank Ltd.*, 561 U.S. 247, 255 (2010) (internal quotation omitted). Plaintiffs can only overcome this presumption by either (a) showing that "the statute gives a clear, affirmative indication that it applies extraterritorially" or (b) establishing that "the case involves a

domestic application of the statute." *RJR Nabisco, Inc. v. European Cmty.*, 579 U.S. 325, 337 (2016). In other words, if the statute "does not apply extraterritorially, plaintiffs must establish that the conduct relevant to the statute's focus occurred in the United States." *Nestle USA*, 141 S. Ct. at 1936 (internal quotation omitted).

A recent DC district court decision should be dispositive on this issue. It found that Congress did not give a clear and affirmative statement that the TVPRA's *civil* liability provision applied to extraterritorial conduct when it enacted § 1596 to create extraterritorial jurisdiction *Apple Inc.*, 2021 WL 5774224, at *14. In *Apple*, plaintiffs represented a class of child cobalt miners in the Democratic Republic of Congo. *Id.* at *1. They sued under the TVPRA against multiple American companies. *Id.* at *4. In considering the application of the TVPRA to extraterritorial claims, the DC district court stated that it must "presume that a statute applies only domestically" and that a plaintiff can rebut that presumption only if the statute "gives a clear, affirmative indication" that it covers foreign conduct. *Id.* at *14 (*citing Nestle USA*, 141 S. Ct. at 1936). However, § 1595 of the TVPRA, **the provision which creates civil liability**, is silent on extraterritorial conduct. *Id.* Moreover, the substantive sections of the TVPRA—§§ 1589 and 1590—were similarly silent on extraterritorial application.[8] *Id.*

In short, when Congress enacted § 1596 to permit extraterritorial jurisdiction over "any offense (or any attempt or conspiracy to commit an offence) under §§ 1581,

---

[8] The *Apple* plaintiffs did not allege a violation of § 1581, as Plaintiffs do here. However, that section says nothing about extraterritorial application for civil claims either. 18 U.S.C. § 1581.

1583, 1584, 1589, 1590, or 1591, its omission of § 1595 was not mistaken, but an intentional decision not to extend extraterritorially the reach of the statute's *civil* component." *Apple*, 2021 WL 5774224, at \*16; *see also Collins v. Yellen*, 141 S. Ct. 1761, 1782 (2021) ("when Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion").

The problem—for Plaintiffs—is the only alleged domestic conduct occurred *before* the establishment of a private right of action under the TVPRA in 2003. *See supra* § II.B.1. All of the post-2003 allegedly actionable conduct happened outside of the United States. (G. Baxter boarded the Freewinds in around 1998 (Compl. ¶¶ 7, 83-85); L. Baxter first boarded the Freewinds no later than 2002 (*id.* ¶¶ 97-100); and Paris boarded the Freewinds in approximately 1996, and then left for Australia (*id.* ¶¶ 9, 133, 147-151)). Accordingly, this case cannot proceed because Plaintiffs admit that the only alleged conduct that occurred after the TVPRA created a private right of action occurred outside of the United States, and there is no private right of action for that extraterritorial conduct.

### D.    Allegations about the Freewinds are Barred by the Foreign Vessel Internal Affairs Doctrine

Plaintiffs' claims should also be dismissed because of the Foreign Vessel Internal Affairs Doctrine. "[T]he well-established rule of international law that the law of the flag state ordinarily governs the internal affairs of a ship." *McCulloch v. Sociedad Nacional de Marineros de Honduras*, 372 U.S. 10, 20 (1963). Under this rule, absent "a

clear statement of congressional intent, general statutes may not apply to foreign-flag vessels insofar as they regulate matters that involve only the internal order and discipline of the vessel." *Lobo v. Celebrity Cruises, Inc.*, 704 F.3d 882, 888 (11th Cir. 2013) (*quoting Spector v. Norwegian Cruise Line Ltd.*, 545 U.S. 119, 130 (2005)). This is a "separate and different presumption" than those relating to retroactivity and extraterritoriality discussed above. *Schultz v. Royal Caribbean Cruises, Ltd.*, 465 F. Supp. 3d 1232, 1246-47 (S.D. Fla. 2020) (*quoting Stevens v. Premier Cruises, Inc.*, 215 F.3d 1237, 1242 (11th Cir. 2000)). Internal ship affairs include employment disputes between a foreign-flag vessel and its crew. *Id.*

Many of the allegations in the Complaint took place on the Freewinds, which is flagged in Panama. (FSO's Request for Judicial Notice ("RJN"), Ex. 1; Weber Decl. ¶ 21, Ex. N). For instance, Plaintiffs allege that they were crew members on the Freewinds, where they "performed labor or services." (Compl. ¶¶ 86, 161, 190). They complain that they worked long hours on the Freewinds and that said labor was "arduous" and "menial[.]" (*Id.* ¶¶ 86-87, 100-103, 134-135). Further, Plaintiffs allege that they performed dangerous maintenance on the ship without proper safety equipment, and that they suffered physical injury as a result. (*Id.* ¶¶ 88-90, 105, 113, 134-35, 137, 139, 145-46). They also complain that their pay was insufficient and/or improperly withheld. (*Id.* ¶¶ 92, 104, 136). Finally, Plaintiffs contend that the discipline they faced for violating the ship's rules was improper. (*Id.* ¶¶ 102, 106, 137, 140, 145). These are just a few examples of alleged events that occurred aboard the Freewinds;

all of which (and in fact, the entirety of Plaintiffs' allegations) concerned the "internal order and discipline of the vessel."

As such, Plaintiffs are not entitled to any relief under the TVPRA absent a "clear statement of congressional intent" that the statute applies to foreign vessels, like the Freewinds. The TVPRA provisions at issue in this action do not contain this intent as none of them discuss their application to any vessel—much less a foreign-flag vessel.[9]

Congress has clearly imposed vessel liability to certain statutes; therefore, it undeniably could have done so here. Nevertheless, it chose not to. Consequently, the Court must presume that this omission was intentional, and that Congress did not intend to extend TVPRA liability to the shipboard conduct alleged here. *Collins*, 141 S. Ct. at 1782.  For these reasons, the Court should dismiss Plaintiffs' claims to the extent they depend on events aboard the Freewinds.

### E.   Counts I-IV Fail to Allege Forced Labor

Counts I and II allege that FSO obtained Plaintiffs' labor through "serious harm or threats of serious harm," "physical restraint or threats of physical restraint," or a "scheme, plan, or pattern intended to cause Plaintiffs to believe that" they or someone

---

[9] On the other hand, § 1591, the TVPRA provision forbidding sex trafficking of children, expressly *does* apply to vessels under some circumstances. Indeed, in 2003, when Congress amended the TVPRA to add civil liability to the statute, it also expanded § 1591's reach to include child sex trafficking conducted "within the special maritime and territorial jurisdiction of the United States," a term that includes certain vessels. *See, e.g.*, 18 U.S.C. § 7(1), (2) and (8). Moreover, other provisions in Chapter 77 of Title 18—the Chapter which includes the TVPRA—extend liability to certain conduct on or relating to vessels. *See* 18 U.S.C. §§ 1582-1583 and 1585-1588. These provisions had been on the books for decades when Congress passed (and later amended) the TVPRA, yet Congress explicitly opted *not to* add similar language to the sections at issue here.

else "would suffer serious harm or physical restraint." (Compl. ¶¶ 160-161 (citing 18 U.S.C. § 1589)). But these conclusory allegations do not amount to pleading *facts* showing the force or threat of force used to extract labor for three reasons:

First, fear of being "declared a Suppressive Person" or of "routing out" is not actionable under the TVPRA. The primary "threat" alleged in the Complaint is Plaintiffs' fear that if they did leave *without* permission they would be "declared" as "Suppressive Persons" under Scientology law, or that if they stated that they wanted to leave *with* permission they would be subject to the Sea Org's rigorous "routing out" process. (Compl. ¶¶ 63-64, 69, 71, 73-76, 83, 142, 147). But neither of these fears or conditions of departure are actionable under the TVPRA. *Headley v. Church of Scientology Int'l*, 687 F.3d 1173, 1180 (9th Cir. 2012) ("*Headley*"). In *Headley*,[10] a married couple brought § 1595 claims against various organizations affiliated with the Church of Scientology complaining about their treatment while serving in the Sea Org. The Headleys, just like Plaintiffs here, asserted that the routing out process prevented them from freely leaving the Sea Org due to its many requirements. (Compl. ¶¶ 73, 147). The Ninth Circuit, however, considered the same process in *Headley*:

> A member may formally withdraw his vows and leave the ministry [of the Sea Org] through a process called 'routing out.' Routing out allows a member to remain a Scientologist in good standing. The process involves filling out a form and normally includes participating in Scientology ethics programs. Routing out can take weeks or months. During that time members are excused from their posts but are

---

[10] *Headley* has been cited approvingly in the Middle District of Florida and the Eleventh Circuit. *See Roman v. Tyco Simplex Grinnell*, No. 8:16-CV-3449-T-33AEP, 2017 WL 3394295, at *5 (M.D. Fla. Aug. 8, 2017), *aff'd*, 732 F. App'x 813 (11th Cir. 2018).

> expected to continue serving the Church by performing chores.

*Headley,* 687 F.3d at 1175. The Ninth Circuit held: "The requirement to leave the ministry only by routing out" is "religiously motivated" and thus protected under the First Amendment. *Id.* at 1181. As such, Plaintiffs' assertions about routing out, including that it takes too long or involves activities related to their religious vows does not rise to the level to state a claim under the TVPRA. Further, despite Plaintiffs' complaints about the routing out process, they admit that each of them went through the process and successfully left the Sea Org. (Compl. ¶¶ 111-12, 151-52).

Plaintiffs also state that they could have left the Sea Org without going through the routing out process; however, the consequence for doing so is being declared a "Suppressive Person."[11] (*Id.* ¶¶ 73, 147). The Ninth Circuit stated that the risk of being declared a "suppressive person" is also not "serious harm" for purposes of the TVPRA. *Headley*, 687 F.3d at 1177. "A church may . . . warn that it will stop associating with members who do not act in accordance with church doctrine. The former is a legitimate consequence, the latter a legitimate warning . . . Neither supports a forced-labor claim." *Id.* at 1180.

**Second,** the alleged withholding of passports and other travel documents is not actionable under these circumstances. In addition to the fears of being "declared a

---

[11] Plaintiffs also allege that they "know" that if a Sea Org member left "without permission," then "security" will "force the person to return to their base for routing out," or, if they left the Freewinds, security will "force them to return to the ship, confine, and place them under constant surveillance." (Compl. ¶ 76). However, Plaintiffs do not allege that anyone ever used or threatened "force" to make them return to the Sea Org or to make them stay on the Freewinds.

Suppressive Person" or "routing out," the other specific allegation that Plaintiffs rely on for their theory of force or threat of force is the Freewinds' practice of holding the passports of all passengers and staff—a standard practice of passenger ships.[12] (Compl. ¶ 85 (G. Baxter's passport "confiscated" to "prevent him from escaping and to force him to provide free labor and services"; ¶ 99 (L. Baxter, same); ¶ 133 (Paris, same); *id.* ¶¶ 161, 169 (alleging "retention of passports") as grounds for Counts I and II)). But the statutory scheme of the TVPRA makes clear that retention of passports is only actionable when it occurs within the United States. The TVPRA at 18 U.S.C. § 1597 provides that the retention of a passport to obtain labor is a trafficking offense in itself, apart from trafficking by force or threat of force under 18 U.S.C. § 1589. But retaining a passport to obtain labor *outside* of the United States *is not even subject to criminal prosecution under the TVPRA* (much less civil liability). This is because 18 U.S.C. § 1596 identifies the sections of the TVPRA that are subject to extraterritorial enforcement and does *not* mention § 1597—the passport section—as part of the extraterritorial enforcement scheme. The alleged retention of the passports, which Plaintiffs mention a dozen times in the Complaint, cannot support their trafficking allegations as a matter of law.

On top of that, the allegations about being "forced" to work and remain on the Freewinds because passports were withheld do not even make sense. While Plaintiffs complain that they were somehow imprisoned on the Freewinds for ten years, they

---

[12] Weber Decl. ¶¶ 22; *id.* Ex. O at pp. 16, 18; *id.* Ex. P at p. 9.

each allege only one instance of requesting their passports—and in that instance they were, in fact, given their passports. (Compl. ¶¶ 111, 147). It is standard practice for a passenger ship to hold the passports of its crew members and passengers. (Weber Decl. ¶ 24; *id.* Ex. O at pp. 16, 18; *id.* Ex. P at p. 9). The Complaint recites that Plaintiffs believed that they had to sign certain documents in order to obtain their passports (*id.*), but does not actually allege that anyone ever made a threat to them that their passports would be withheld if they did not execute certain documents.

***Third,*** the other allegations of "force" or "threat of force" are vague and conclusory. The remaining allegations of force or threat of force in connection with obtaining labor are notably evasive on key factual details. Plaintiffs make generic allegations of "force" in connection with various activities or duties, or "confinement" in certain quarters, but they never do what the TVPRA requires of them—plead instances where "force" or "threat of force" were used to obtain labor from them. Plaintiffs never actually say what force applied to them and how. For instance, they allege that they were "assigned" unpleasant tasks to them—tasks that need to be performed on any oceangoing vessel; that they could be subject to be "assigned" to more undesirable tasks if they did not comply; and even that they could be "confined" to rooms if they disobeyed. (Compl. ¶ 107). But being "assigned" to the boiler room of a ship is not trafficking—it is a job, and one that many people have. Being demoted to an even less desirable work assignment for poor performance is an everyday event. "Confinement" could mean anything in the context of a voluntary religious order.

Obeying an "order" to go to a cabin and remain "confined" there is ultimately a voluntary act when taken to remain part of a religious community.

Notably, despite the Complaint's lurid details, Plaintiffs never allege that they were *locked* in a cabin for not working and held there against their will, that they were threatened with violence to get them to work, or that they were beaten to drive them to work. The Complaint is replete with the word "force"—it appears over 50 times. But the detail of *how* the Defendants applied force or threats of force is never spelled out, except in connection with 1) retention of passports (Compl. ¶¶ 85, 99, 161, 169); 2) "routing out" (*id.* ¶¶ 73-76); and 3) being "declared" a "Suppressive Person." (*Id.* ¶¶ 63, 83). None of that conduct is actionable as force or threat of force in this matter.

Because Counts I and II fail to allege *actionable* conduct, the derivative Counts III and IV fail as well. "Plaintiffs have failed to adequately allege a violation of § 1589, their § 1590 claim must fail, too." *Apple*, 2021 WL 5774224 at *14.

### F.    Counts V and VI Fail to Allege Peonage

Next, in Counts V and VI, Plaintiffs allege that FSO violated § 1581, which prohibits holding or returning a person to "a condition of peonage in violation of 18 U.S.C. § 1581." (Compl. ¶¶ 189, 197). These counts fail for two reasons.

***First***, to establish peonage, Plaintiffs must allege that FSO "intentionally held [each plaintiff] against his or her will and coerced that person to work in order to satisfy a debt by (1) physical restraint or force, (2) legal coercion, or (3) threats of legal coercion or physical force." *United States v. Farrell*, 563 F.3d 364, 372 (8th Cir. 2009).

Plaintiffs, however, have not alleged that FSO held them against their will. Conversely, as explained at length *supra*, Plaintiffs state that they were free to leave the Sea Org at any time by complying with the routing out process (Compl. ¶ 73), which is exactly what each Plaintiff did here. (*Id.* ¶¶ 111-12, 151-52). Moreover, Plaintiffs even admit that they could have left the Sea Org without routing out, but they might be declared a "Suppressive Person" for doing so. (*Id.* ¶¶ 73, 147). However, as noted *supra*, such a consequence (or threatened consequence) is not actionable under the TVPRA. *Headley*, 687 F.3d at 1177.

**Second**, Plaintiffs fail to allege that they were working to satisfy a debt, which is required to state a claim under § 1581. "Peonage is a status or condition of compulsory service or involuntary servitude based upon a real or alleged indebtedness." *Treadway v. Otero*, No. 2:19-CV-244, 2020 WL 5960681, at *3 (S.D. Tex. Oct. 8, 2020) (*quoting Pierce v. United States*, 146 F.2d 84, 86 (5th Cir. 1944)). "The basal fact [of peonage] is indebtedness," *Clyatt v. United States*, 197 U.S. 207, 215 (1905), and thus its defining characteristic is that the "peon can release himself therefrom . . . by the payment of the debt." *Treadway,* 2020 WL 5960681, at *3 (quote omitted); *see also United States v. Reynolds*, 235 U.S. 133, 144 (1914) (a peonage claim requires the court to "determine whether the [plaintiff] was in reality working for a debt which he owed the [defendant]"); *Stein v. World-Wide Plumbing Supply Inc.*, 71 F. Supp. 3d 320, 327 (E.D.N.Y. 2014) (collecting cases).

Peonage differs from other involuntary servitude because it "involves the additional element that the involuntary servitude is tied to the discharge of an indebtedness." *Chen v. Cai*, 2022 WL 917575, at *4 (S.D.N.Y. Mar. 28, 2022) (quote omitted). Therefore, when a plaintiff alleges no debt to the employer, a claim of peonage must fail. *Id.* (determining that this failure "is fatal to this claim"); *Jenkins v. Trustees of Sandhills Cmty. Coll.*, 259 F. Supp. 2d 432, 445 (M.D.N.C. 2003); *Dolla v. Unicast Co.*, 930 F. Supp. 202, 205 (E.D. Pa. 1996); *Reynolds*, 235 U.S. 133, 144 (1914).

Plaintiffs allege that FSO held them "against their will and forced them to perform labor to pay off purported Scientology debts." (Compl. ¶ 190). But Plaintiffs fail to allege any *facts* supporting any debt owed to FSO or that Plaintiffs were working to pay off that debt while in the Sea Org. G. Baxter and Paris attempt to side-step this requirement by stating that they would have been responsible for a debt *after they left the Sea Org.* (*See, e.g.*, Compl. ¶ 80 (G. Baxter alleging that "he would be responsible for paying this mounting debt should he ever leave Sea Org"); ¶ 118 (Paris alleging that "she would be responsible for paying this mounting debt should she ever leave"); ¶ 150 (same)).[13]

However, allegations of a *potential future* debt cannot state a claim for peonage. Plaintiffs must allege a debt that existed *while they were working* and that their labor was *to repay that existing debt*, so that they can secure their release from labor "by the

---

[13] L. Baxter fails to allege *any* facts about a debt owed by her, even one that would develop after leaving the Sea Org.

21

payment of the debt." *Treadway,* 2020 WL 5960681, at *3. Accordingly, for various reasons, Plaintiffs failed to state a claim of peonage in Counts V and VI and the Court should dismiss these counts accordingly.

### G.  The Statute of Limitations Bars Paris' Claims

Paris' TVPRA claims are time-barred. TVPRA requires plaintiffs to commence suit before the later of "10 years after the cause of action arose" or "10 years after the victim reaches 18 years of age, if the victim was a minor at the time of the alleged offense." 18 U.S.C. § 1595(c). Paris was born in about 1978 and thus turned 18 in about 1996. (Compl. ¶ 9). As such, this suit, filed twenty-six years later, is untimely under the second prong for minors and the 10-year statute of limitations from when the cause of action arose applies. The Complaint was filed on April 28, 2022. Thus, Plaintiffs' claims are untimely if they accrued before April 28, 2012.

Paris admits that she spoke with "an investigator from the Australian government's labor authority" in May 2011 about these same claims *after* she left the Sea Org. (Compl. ¶¶ 152-153).[14] Thus, Paris judicially admitted that she left the Sea Org before May 2011, which establishes that her claims necessarily accrued more than ten years before she filed her Complaint on April 28, 2022.

Paris may contend that the statute of limitations should be equitably tolled because she feared retaliation by the Church if she sued or spoke out against the Church. (*See* Compl. ¶¶ 152-157). "The doctrine of equitable tolling allows a court to

---

[14] As discussed, *infra,* Paris made similar complaints to at least four other publications around this same time as well. (*See* RJN, Exs. 2-5).

toll the statute of limitations until such a time that the court determines would have been fair for the statute of limitations to begin running on the plaintiff's claims." *Dotson v. United States*, 30 F.4th 1259, 1268 (11th Cir. 2022) (internal quotations and citations omitted). But, "[e]quitable tolling is inappropriate when a plaintiff did not file an action promptly or failed to act with due diligence" and it is therefore "an extraordinary remedy which should be extended only sparingly." *Bost v. Fed. Express Corp.*, 372 F.3d 1233, 1242 (11th Cir. 2004) (internal quotations and citations omitted).

Thus, Paris must establish that her untimely filing was "because of *extraordinary circumstances* that are both beyond [her] control and unavoidable even with diligence." *Dotson*, 30 F.4th at 1268 (internal quotations and citations omitted) (emphasis in original). Paris apparently contends that tolling is warranted here because her *alleged* fear of "retaliation" prevented her from timely pursuing her civil remedies. (Compl. ¶¶ 152-157). But these conclusory allegations are negated by the documents attached to FSO's RJN showing that she had no problem speaking out against the Defendants or filing administrative actions against them. (RJN Exs. 2-5). Paris' false allegations of fear do not warrant judicial blindness to her actual conduct after leaving the Church.

Each year after her departure from the Sea Org in 2009 (*see* RJN, Ex. 5), Paris was completely outside of the control of the Defendants. She was free to travel anywhere in the world. She had the physical freedom to seek legal advice and assistance. She also had the freedom to speak out against Defendants. Indeed, her Complaint admits that after leaving the Church, she filed a formal, publicly available complaint in 2011 about Defendants to "an investigator from the Australian

government's labor authority." (Compl. ¶ 153). Prior thereto, in June of 2010, approximately twelve years before filing her Complaint, Paris made her "first in a series of postings" to an online website where she alleged substantially similar facts as she did in the Complaint. (*Compare* RJN Ex. 5 *with* Compl. ¶¶ 116, 127, 133, 147-149, 151, 161, 169). Similarly, during an interview with an Australian news outlet, she claimed that "the Church of Scientology imprisoned her on its cruise ship The Freewinds." (RJN, Ex. 3). This article was posted and most recently updated on November 29, 2011. (*Id.*). Also on November 29, 2011, Paris sat for an interview with the Village Voice and made claims analogous to ones made in the Complaint, including receiving only $50 in pay each week, (*compare* RJN Ex. 4 *with* Compl. ¶ 136), alleging that she had cleaned up asbestos, (*compare* RJN Ex. 4 *with* Compl. ¶ 139), and complaining about papers she claims she was forced to sign upon leaving the Freewinds. (*Compare* RJN Ex. 4 *with* Compl. ¶ 147). Many of these allegations were published in a *New Idea* magazine article dated December 19, 2011 as well. (*See generally*, RJN Ex. 2).

Paris' alleged fear of retaliation did not prevent her from reporting Defendants for alleged unfair labor practices or complaining to the press and law enforcement about the exact allegations described in her Complaint. As stated by the court in another TVPRA case, *Abarca v. Little*, 54 F. Supp. 3d 1064, 1069–70 (D. Minn. 2014), "these acts evince a sophistication and courage that undermine [Plaintiff's] argument that extraordinary circumstances rendered him incapable of filing suit until six years

after he severed his relationship with defendants." As such, the doctrine of equitable tolling does not apply to these circumstances as a matter of law.

## CONCLUSION

WHEREFORE Defendant, Church of Scientology Flag Service Organization, Inc., respectfully asks this Court to enter an order compelling arbitration of all claims brought by Plaintiffs, or in the alternative, dismissing all claims pursuant to Fed. Rule 12(b)(6) for Plaintiffs' failure to state a claim.

### Local Rule 3.01(g) Certification

The undersigned counsel hereby certifies that the undersigned conferred with Plaintiffs' counsel, **Neil Glazer and Zahra Dean of Kohn Swift & Graf, PC, Gregory Hansel of Preti Flaherty Beliveau & Pachios, Chartered LLP, and Manuel J. (John) Dominguez of Cohen Milstein Sellers & Toll PLLC** who does not agree to the relief sought in this motion.  Counsel further certifies that this motion is brought in good faith and not for any improper purpose.

/s/ *Charles M. Harris, Jr.*
CHARLES M. HARRIS, FBN 967459
BRIGID A. MERENDA, FBN 320500
Trenam Law
200 Central Avenue, Suite 1600
St. Petersburg, FL 33701
Tel: 727.896.7171
Fax: 727.822.8048 (Facsimile)
charris@trenam.com
bamerenda@trenam.com
gkesinger@trenam.com
ranctil@trenam.com
*Attorneys for Defendants, Church of Scientology*
*Flag Service Organization, Inc. and Church*
*of Scientology Flag Ship Service Organization, Inc.*

## **CERTIFICATE OF SERVICE**

I certify that on July 12, 2022, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system, which will send a true and correct copy to all counsel of record.

/s/ *Charles M. Harris, Jr.*
Attorney