UNITED STATES DISTRICT COURT MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

GAWAIN BAXTER, LAURA BAXTER
and VALESKA PARIS,

     Plaintiffs,

v.                         Case No.: 8:22-cv-00986-TPB-JSS

DAVID MISCAVIGE; CHURCH OF
SCIENTOLOGY INTERNATIONAL, INC.;
RELIGIOUS TECHNOLOGY CENTER,
INC.; IAS ADMINISTRATIONS, INC.;
CHURCH OF SCIENTOLOGY FLAG
SERVICE ORGANIZATION, INC.;
CHURCH OF SCIENTOLOGY FLAG SHIP
SERVICE ORGANIZATION, INC.,

     Defendants.

_____/

**DEFENDANT CHURCH OF SCIENTOLOGY FLAG SERVICE
ORGANIZATION, INC.'S MOTION TO COMPEL ARBITRATION; OR IN
THE ALTERNATIVE, TO DISMISS PLAINTIFFS' FIRST AMENDED
COMPLAINT PURSUANT TO RULE 12(b)(6)**

     Defendant, Church of Scientology Flag Service Organization, Inc. ("FSO"), by

and through undersigned counsel, respectfully moves this Court to compel arbitration of

all claims against it brought by Plaintiffs[1] in their First Amended Complaint ("FAC")

(ECF No. 79), or in the alternative, moves to dismiss all claims against FSO pursuant to

Federal Rule of Civil Procedure 12(b)(6).  In support, FSO states:

## INTRODUCTION

     Plaintiffs each served for over a decade as members of the Sea Organization ("Sea

Org"), an unincorporated religious order composed of clergypersons who have

---

[1] "Plaintiffs" refers collectively to Plaintiffs Gawain Baxter ("G. Baxter"), Laura Baxter ("L. Baxter"), and Valeska Paris ("Paris"). G. Baxter and L. Baxter, together, will be referred to as the "Baxters."

committed their lives to advancing Scientology. Sea Org members form the dedicated core of the Scientology religion and dedicate themselves to the Sea Org for a billion years. This term reflects both their dedication to the religion and their awareness of themselves as immortal spiritual beings who have lived countless lives and who will live again and again. Although Plaintiffs voluntarily joined and remained with the Sea Org for over a decade, they now assert that their participation in this religious order violated the federal slavery and human trafficking statute, the Trafficking Victims Protection Reauthorization Act ("TVPRA"), 18 U.S.C. §§ 1581-1597. There are multiple, insurmountable bars to Plaintiffs' effort to recast their spiritual devotion to their faith into a federal trafficking crime. FSO noted these bars in its Motion to Compel Arbitration; or in the Alternative, to Dismiss Plaintiffs' Complaint Pursuant to Rule 12(b)(6). (ECF No. 68). That Motion was directed at Plaintiffs' initial Complaint. (ECF No. 1). Plaintiffs filed the FAC as an attempt to address the issues raised by FSO in its initial Motion. Plaintiffs efforts, however, failed and the same problems with the Complaint still exist in the FAC. Further, Plaintiffs' substantial revisions to paragraphs 159 – 213 of the FAC have not been incorporated into any of the specific counts and, per case law on point, cannot be considered in response to this Motion to Dismiss.

*Plaintiffs must arbitrate their claims.* As required by Scientology religious doctrine, and as a condition of serving as a member of the Sea Org, each Plaintiff agreed in multiple written agreements to resolve, through ecclesiastical justice procedures, disputes that may arise between them and FSO. FSO incorporates and joins in the argument compelling arbitration raised in Defendant, Church of Scientology Flag Ship Service Organization,

Inc.'s, ("FSSO") Amended Motion to Compel Arbitration served herewith. (ECF No. 84). The arguments raised by FSSO as to the agreement with Plaintiffs apply to FSO because it is an intended third-party beneficiary of such agreements. Further, the claims brought by Paris against FSO are also subject to arbitration because she entered into an enforceable arbitration agreement directly with FSO. Accordingly, Plaintiffs' claims against FSO should be arbitrated because FSO is either a direct or third-party beneficiary of enforceable arbitration agreements with Plaintiffs.

*The FAC Does Not and Cannot State a Claim Against FSO.* If the Court determines that Plaintiffs' claims are not arbitrable, the FAC still cannot proceed as it fails to state a claim against FSO for three additional reasons. First: Plaintiffs allege TVPRA violations going back decades, but no civil remedy existed under the statute until 2003 and such amendments are not retroactive. As such, the Court must dismiss all claims involving *pre*-2003 violations. Additionally, the alleged *post*-2003 violations should be dismissed because they occurred on the *Freewinds*, a foreign-flagged vessel which never entered US waters, or elsewhere overseas. The TVPRA's civil provisions do not apply to extraterritorial conduct. Thus, the Court must dismiss the *post*-2003 violations as well.

Second: To the extent Plaintiffs can bring a civil action under the TVPRA, even assuming Plaintiffs' allegations are true, there was still no violation of the TVPRA. Plaintiffs' trafficking claims under 18 U.S.C. §§ 1589, 1590 require allegations of forced labor. However, here, Plaintiffs admit that they were free to leave the Sea Org at any time, either by going through the "routing out" process or by simply leaving. They alleged that they might be declared a "suppressive person" by the Church if they left

3

without going through the "routing out" process, but, even under strikingly similar factual scenarios, courts have held such a consequence does not equate to forced labor. For similar reasons, Plaintiffs' peonage claims under § 1581 fail. These claims require an allegation that Plaintiffs were working to earn their freedom to satisfy an *existing* debt. However, Plaintiffs have not pled such an arrangement.

Third: Paris' claims fail because they are time-barred. The TVPRA provides a ten-year statute of limitations, but Paris left the Sea Org—and began publicly complaining about her time in the religious order—more than ten years before she filed suit as she expressly alleges in the FAC. Therefore, these same claims that apparently existed prior to the statute of limitations period should be summarily dismissed.[2]

## ARGUMENT

### I.      Plaintiffs Must Arbitrate Their Claims Against FSO

The Court should compel arbitration on all claims against FSO. This issue is addressed at length in FSSO's Amended Motion to Compel Arbitration. (ECF No. 84).[3] In short, Plaintiffs signed valid arbitration agreements with FSO and FSSO, and those agreements should be enforced.

As to Plaintiffs' agreements with FSSO, FSO was an intended third-party beneficiary of such contracts, which provide for arbitration of any claims Plaintiffs may

---

[2] Plaintiffs also failed to incorporate many of their general allegations into Counts I-VI. There are 213 general allegations in the FAC, but only paragraphs 1-158 are incorporated into Counts I-VI. (FAC ¶¶ 214, 221, 228, 235, 242, 250). Any portions of Counts I-VI relying on general allegations made by Plaintiffs in paragraphs 159-213 should be disregarded.

[3] The Declarations of Kenneth Weber ("Weber Decl.") and Sarah Heller ("Heller Decl.") filed in support of FSSO's Motion are also fully incorporated by reference herein.

have with "***any*** [] Scientology church or organization which espouses, presents, propagates or practices the Scientology religion," or other similar language applying to all Scientology churches worldwide. (Weber Decl. Exs. A, B, and K at ¶ 6; *see also* Exs. E and F at ¶ 6.C; *see also* Exs. L and M at ¶ 7.A, 2.A). These agreements clearly apply to FSO. *See Robinson v. NBC Universal Cable,* No. 17- CV-81324, 2018 WL 8620154, at *4 (S.D. Fla. Apr. 23, 2018) (compelling arbitration under "third-party beneficiary theories" where defendants were not signatories to the agreement but were clearly intended to benefit from the arbitration provision therein). As such, and for the reasons explained in FSSO's Motion, which FSO joins and fully incorporates herein, all of Plaintiffs' claims should be arbitrated. Additionally, all claims brought by Paris in the FAC are further subject to arbitration because she directly entered into at least one agreement with FSO agreeing to resolve disputes through Scientology ecclesiastical justice procedures. (Heller Decl. Ex. A at p. 3). Therefore, all claims against FSO should be arbitrated as it is either the direct or third-party beneficiary of all of Plaintiffs' various arbitration agreements.

## II.    Plaintiffs' Fail to State a Claim Against FSO[4]

### A.    Legal Standard Under Rule 12(b)(6)

When analyzing a motion to dismiss under Rule 12(b)(6), a court will take "all factual allegations in the complaint as true and construe them in the light most favorable to the plaintiff." *Doe #1 v. Red Roof Inns*, 21 F.4th 714, 723 (11th Cir. 2021) (internal quote omitted). However, "[t]hreadbare recitals of the elements of a cause of action,

---

[4] If the Court denies the Motion to Compel Arbitration, FSO and all other parties joining in said Motion would have the right to an immediate interlocutory appeal before consideration by the Court of the 12(b)(6) Motion to Dismiss. FSO moves under 12(b)(6) now so as not to waive the motion.

supported by mere conclusory statements, do not suffice." *Id.* (quotation omitted). "Instead, a plaintiff must allege sufficient facts that, accepted as true, state a claim to relief that is plausible on its face." *Id.* (quotation omitted).

**B.   Plaintiffs' Claims Fail in Whole or in Part Because They Seek Retroactive Application of the TVPRA**

The vast majority of Plaintiffs allegations concern conduct from several decades ago. Further, Plaintiffs' claims are primarily extraterritorial, with purported violations occurring in Europe, Australia, and the Caribbean. Plaintiffs alleged only limited activity—either predating this century or which are irrelevant to the claims at issue—in the United States. The TVPRA does not apply to this activity.

**1.   *No Civil Liability for Pre-December 2003 Conduct***

Congress enacted the TVPRA in 2000, but it did not provide for civil liability until December 2003, when § 1595 was added. *Velez v. Sanchez*, 693 F.3d 308, 324 (2d Cir. 2012). However, § 1595 is not retroactive. Thus, FSO cannot be found civilly liable for alleged violations predating 2003. *Velez*, 693 F.3d at 324; *see also Ditullio v. Boehm*, 662 F.3d 1091, 1099 (9th Cir. 2011) (TVPRA "cannot be applied retroactively to create liability for conduct that occurred before December 19, 2003"). Many of Plaintiffs' claims concern conduct predating these amendments in December 2003.

For example, G. Baxter alleges TVPRA violations going back many years before he boarded the *Freewinds* in about 1998.[5] The majority of G. Baxter's additional

---

[5] Plaintiffs allege that G. Baxter was born in 1982 (FAC ¶ 13), that he was transferred to Sea Org when he was 14 (*id* ¶ 92), that he considered leaving the Sea Org at age 15 (*id.* ¶ 93), and that he traveled to the *Freewinds* about "eight months later." (*Id.* ¶ 95). Thus, G. Baxter boarded the *Freewinds* when he was 16, in about 1998.

allegations of violations by Defendants occurred during the years he was aboard the *Freewinds*, but prior to the 2003 amendment. L. Baxter also alleges TVPRA violations going back multiple years prior to when she first boarded the *Freewinds* in 2002 at the latest.[6] Many of L. Baxter's additional allegations of violations by Defendants occurred during the years she was aboard the *Freewinds*, but prior to the December 2003 amendment. Paris alleges TVPRA violations going back at least fourteen years before she boarded the *Freewinds* in 1996.[7] (FAC ¶¶ 15, 145-163). She also alleges further violations during the years she was aboard the *Freewinds*, but before the 2003 amendment.

FSO cannot be civilly liable for any of these alleged violations which occurred prior to the 2003 amendments to the TVPRA. The Court should thus dismiss Plaintiffs' claims to the extent they depend on this pre-2003 conduct. *See Ditullio*, 662 F.3d at 1102; *see also Doe v. Siddig*, 810 F. Supp. 2d 127, 136 (D.D.C. 2011) (dismissing "insofar as those claims are predicated on acts predating December 19, 2003").

### 2.     *No Civil Liability for Pre-December 2008 Conduct*

Even after Congress added civil liability to the TVPRA in 2003, the statute still did not cover FSO's alleged violations. Instead, the statute could not apply until Congress amended the statute again, effective December 23, 2008.

First, most of Plaintiffs' post-2003 allegations concern activity exclusively outside

---

[6] Plaintiffs allege that L. Baxter served aboard the *Freewinds* twice, that her first stint ended when she was seventeen, and that her second stint began two years later, when she was nineteen. (FAC ¶¶ 116-118). Plaintiffs also allege that she was aboard the *Freewinds* during her second stint in 2004. (*Id.* ¶ 120). Thus, L. Baxter was born no later than 1985 and she first boarded the *Freewinds* no later than 2002.

[7] Plaintiffs allege that Paris was born in 1978 (FAC ¶ 15) and that she boarded the *Freewinds* when she was 18 (i.e. in approximately 1996). (*Id.* ¶ 163).

the United States.[8] They allege these events took place: (a) aboard the *Freewinds*, which Plaintiffs boarded in Curacao no later than 2002 and which never docked at a United States port or entered United States waters (FAC ¶ 41); (b) in Copenhagen, where L. Baxter lived after her first stint on the *Freewinds* (*i.e.*, after 2002) (*id.* ¶ 117), (c) in Germany or Australia, where the Baxters lived after they left the *Freewinds*. (*Id.* ¶¶ 134-140), or (d) in Australia, where Paris lived after she left the *Freewinds*. (*Id.* ¶¶ 177-199; 201-206). **However, the TVPRA had no extraterritorial reach until Congress amended § 1596 in 2008**. *Adhikari v. Kellogg Brown & Root, Inc.*, 845 F.3d 184, 201 (5th Cir. 2017).[9] And that amendment is not retroactive. *Id.* at 206. Thus, Plaintiffs' pre-December 23, 2008 claims—which are the vast majority of Plaintiffs' claims—are not actionable and the Court should dismiss those claims.

Moreover, the minimal amount of domestic, post-2003 allegations Plaintiffs added to the FAC should be rejected because, even if true, they are not actionable under the TVPRA. Plaintiffs initial Complaint contained no post-2003 conduct by Defendants in the United States. As a clear attempt to side-step this bar to their claims, Plaintiffs included a small number of domestic, post-2003 allegations to the FAC, but none of those allegations concern "forced" labor, or any labor for that matter. (FAC ¶ 141) (alleging that the Baxters' parents have called them to dispute the allegations of trafficking); (FAC ¶ 200) (alleging that Paris was supposedly under surveillance in

---

[8] The majority of domestic conduct alleged in the FAC concerns (a) G. Baxter and Paris' alleged experiences in the Sea Org at Flag Base in Florida before 2000 (FAC ¶¶ 15, 88-93, 155-163) and (b) L. Baxter's alleged layover in Miami during a flight from England to Curacao to board the *Freewinds* before 2002. (*Id.* ¶ 116). This conduct predates the 2003 amendment adding civil liability to the TVPRA, and thus is not actionable. *See supra* § II.B.1.

[9] As noted below, *infra* § I.C, Plaintiffs' extraterritorial claims also fail because the 2008 amendment expanded the extraterritorial jurisdiction only for criminal prosecutions, not civil claims. *Doe I v. Apple Inc.*, No. 1:19-CV-03737 (CJN), 2021 WL 5774224, at *15 (D.D.C. Nov. 2, 2021).

Florida *after* she left the *Freewinds* and the Church). Those allegations do not even state garden variety torts, let alone violations of the TVPRA.[10]

Additionally, none of the other 2008 amendments are retroactive either, which bars more of Plaintiffs' claims. For example, in Counts I, III, and V, Plaintiffs seek to hold FSO liable for violating the TVPRA under a beneficiary theory. (*Id.* ¶¶ 217, 231, 246). But the statute did not add beneficiary liability until Congress amended § 1595(a) on December 23, 2008. *Nestle USA, Inc. v. Doe*, 141 S. Ct. 1931, 1939 (2021) (Thomas, J., writing for Gorsuch, J. and Kavanaugh, J.) ("in 2008, Congress created the present private right of action, allowing plaintiffs to sue defendants who are involved indirectly with slavery"); *see also H.G. v. Inter-Cont'l Hotels Corp.,* 489 F. Supp. 3d 697, 710 (E.D. Mich. 2020). As Justice Thomas explained, when Congress amended the TVPRA in 2008, it "chose not to write a retroactive statute." *Nestle USA*, 141 S. Ct. at 1939; *see also H.G.*, 489 F. Supp. 3d at 710 (beneficiary amendment not retroactive); *E.S. v. Best W. Int'l, Inc.*, 510 F. Supp. 3d 420, 431 (N.D. Tex. 2021) (same); *Elat v. Ngoubene*, 993 F. Supp. 2d 497, 522 (D. Md. 2014) (same). Thus, the beneficiary claims in Counts I, III and V are barred for all pre-2009 allegations.

Similarly, Counts II, IV, and VI allege a conspiracy to violate the TVPRA. (FAC ¶¶ 223, 237, 252). However, Congress did not add conspiracy liability to the TVPRA until it amended § 1596 in 2008. *Roe v. Howard*, 917 F.3d 229, 245 (4th Cir. 2019). Therefore, this amendment is not retroactive either. *See, e.g., Saraswat v. Jayaraman*, 799 F. App'x 85, 87 (2d Cir. 2020). These claims should be dismissed as well for all pre-2009 allegations.

---

[10] *See infra* §§ E-F for additional discussion on the type of conduct that is actionable under the TVPRA.

Finally, Counts V and VI claim violations of the peonage prohibitions in § 1581. (FAC ¶¶ 244, 253). But, the TVPRA imposed no civil liability for peonage until 2008, *Ditullio*, 662 F.3d at 1094 n.1, and this amendment is not retroactive. *Saraswat*, 799 F. App'x at 87; *Nestle USA*, 141 S. Ct. at 1939. So, Counts V and VI should be dismissed for all pre-2009 allegations as well.

Because FSO "should not have to defend conduct that was not actionable when it occurred," *Druding v. Care Alternatives, Inc.*, 164 F. Supp. 3d 621, 634 (D.N.J. 2016), the Court should dismiss all of the claims against it for the reasons discussed above. *See Siddig*, 810 F. Supp. 2d at 135 (dismissing § 1595 civil claim "insofar as it is predicated on acts predating December 23, 2008"); *E.S.*, 510 F. Supp. 3d at 432 (collecting cases reaching same conclusion); *H.G.*, 489 F. Supp. 3d at 710. Further, because Plaintiffs cannot plead around this retroactivity bar, these dismissals should be with prejudice.

## C.    All Claims Fail Because the TVPRA Does Not Provide a Civil Cause of Action for Extraterritorial Conduct

Plaintiffs' claims also fail as the TVPRA does not extend civil liability to extraterritorial conduct. "It is a longstanding principle of American law that legislation of Congress, unless a contrary intent appears, is meant to apply only within the territorial jurisdiction of the United States." *Morrison v. Nat. Australia Bank Ltd.*, 561 U.S. 247, 255 (2010) (quotation omitted). Plaintiffs can only overcome this if they (a) show that "the statute gives a clear, affirmative indication that it applies extraterritorially" or (b) establish that "the case involves a domestic application of the statute." *RJR Nabisco, Inc. v. European Cmty.*, 579 U.S. 325, 337 (2016). Thus, if the statute "does not apply

10

extraterritorially, plaintiffs must establish that the conduct relevant to the statute's focus occurred in the United States." *Nestle USA*, 141 S. Ct. at 1936 (quotation omitted).

A recent DC district court decision should be dispositive on this issue. It found that Congress did not give a clear and affirmative statement that the TVPRA's *civil* liability provision applied to extraterritorial conduct when it enacted § 1596 to create extraterritorial jurisdiction *Apple Inc.*, 2021 WL 5774224, at \*14. In *Apple*, plaintiffs represented a class of child cobalt miners in the Democratic Republic of Congo. *Id.* at \*1. They sued under the TVPRA against multiple American companies. *Id.* at \*4. In considering the application of the TVPRA to extraterritorial claims, the DC District Court stated that it must "presume that a statute applies only domestically" and that a plaintiff can rebut that presumption only if the statute "gives a clear, affirmative indication" that it covers foreign conduct. *Id.* at \*14 (*citing Nestle USA*, 141 S. Ct. at 1936). However, § 1595 of the TVPRA, **the provision which creates civil liability**, is silent on extraterritorial conduct. *Id.* Moreover, the substantive sections of the TVPRA—§§ 1589 and 1590—were similarly silent on extraterritorial application.[11] *Id.*

In short, when Congress enacted § 1596 to permit extraterritorial jurisdiction over "any offense (or any attempt or conspiracy to commit an offence) under §§ 1581, 1583, 1584, 1589, 1590, or 1591, its omission of § 1595 was not mistaken, but an intentional decision not to extend extraterritorially the reach of the statute's *civil* component." *Apple*, 2021 WL 5774224, at \*16; *see also Collins v. Yellen*, 141 S. Ct. 1761, 1782 (2021) ("when

---

[11] The *Apple* plaintiffs did not allege a violation of § 1581, as Plaintiffs do here. However, that section says nothing about extraterritorial application for civil claims either. 18 U.S.C. § 1581.

Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion").

The problem—for Plaintiffs—is the majority of alleged domestic conduct occurred *before* the establishment of a private right of action under the TVPRA in 2003. *Supra* § II.B.1. And all post-2003 purported conduct happened outside of the United States or is not actionable under the TVPRA. *Supra* § II.B.2. Accordingly, the FAC must be dismissed because, even under Plaintiffs' version of the facts, the only actionable conduct that occurred after the TVPRA created a private right of action took place outside of the United States, and there is no private right of action for that extraterritorial conduct.

**D.    Allegations about the *Freewinds* are Barred by the Foreign Vessel Internal Affairs Doctrine**

Plaintiffs' claims should also be dismissed because of the Foreign Vessel Internal Affairs Doctrine. "[T]he well-established rule of international law that the law of the flag state ordinarily governs the internal affairs of a ship." *McCulloch v. Sociedad Nacional de Marineros de Honduras*, 372 U.S. 10, 20 (1963). Under this rule, absent "a clear statement of congressional intent, general statutes may not apply to foreign-flag vessels insofar as they regulate matters that involve only the internal order and discipline of the vessel." *Lobo v. Celebrity Cruises, Inc.*, 704 F.3d 882, 888 (11th Cir. 2013) (*quoting Spector v. Norwegian Cruise Line Ltd.*, 545 U.S. 119, 130 (2005)). This is a "separate and different presumption" than those relating to retroactivity and extraterritoriality discussed above. *Schultz v. Royal Caribbean Cruises, Ltd.*, 465 F. Supp. 3d 1232, 1246-47 (S.D. Fla. 2020)

(*quoting Stevens v. Premier Cruises, Inc.*, 215 F.3d 1237, 1242 (11th Cir. 2000)). Internal ship affairs include employment disputes between a foreign-flag vessel and its crew. *Id.*

All significant portions of the allegations in the FAC took place on the *Freewinds*, which is flagged in Panama. (FSO's Request for Judicial Notice ("RJN"), ¶ 4, Ex. 1; Weber Decl. ¶ 21, Ex. J). Plaintiffs allege that they were crew members on the *Freewinds*, where they performed "free labor or services." (FAC ¶¶ 2, 94, 115, 163). They complain that they worked long hours on the *Freewinds* and that said labor was "arduous," "menial," and "dangerous." (*Id.* ¶¶ 39, 97, 99, 114, 128, 165). They assert that they performed maintenance on the ship without proper safety equipment, and that they suffered physical injury as a result. (*Id.* ¶¶ 3, 107, 125, 139, 149, 169, 213). They also state that their pay was insufficient or improperly withheld. (*Id.* ¶¶ 111, 114, 116-17, 124, 157). Finally, Plaintiffs contend that the discipline they faced for violating the ship's rules was improper. (*Id.* ¶¶ 121, 127, 167, 170, 175-76, 192).

These are just a few examples of alleged events that occurred aboard the *Freewinds*; all of which clearly concerned the "internal order and discipline of the vessel." As such, Plaintiffs are not entitled to any relief under the TVPRA absent a "clear statement of congressional intent" that the statute applies to foreign vessels, like the *Freewinds*. The TVPRA provisions at issue in this action do not contain this intent as none of them discuss their application to any vessel—much less a foreign-flag vessel.[12] Congress has

---

[12] On the other hand, § 1591, the TVPRA provision forbidding sex trafficking of children, expressly *does* apply to vessels under some circumstances. Indeed, in 2003, when Congress amended the TVPRA to add civil liability, it expanded § 1591's reach to include child sex trafficking conducted "within the special maritime and territorial jurisdiction of the United States," a term that includes certain vessels. *See, e.g.,* 18 U.S.C. § 7(1), (2) and (8). Moreover, other provisions in Chapter 77 of Title 18—the Chapter

clearly imposed vessel liability to certain statutes; thus, it could have done so here. But, it did not. As such, the Court must presume that this omission was intentional, and Congress did not intend to extend TVPRA liability to the shipboard conduct alleged here. *Collins*, 141 S. Ct. at 1782. For these reasons, the Court should dismiss Plaintiffs' claims to the extent they depend on events aboard the *Freewinds*.[13]

### E. All Claims Fail Because Plaintiffs' Compliance with the Discipline of the Sea Org and Concern for Their Status within the Sea Org Are Not Actionable.

Counts I and II assert violations of 18 U.S.C. § 1589, "Forced Labor," and Counts III and IV also depend on violations of § 1589, which imposes criminal liability on anyone who "knowingly provides or obtains the labor or services of a person" by means of (1) "force, threats of force, physical restraint, or threats of physical restraint" (2) "serious harm or threats of serious harm" (3) the abuse or threatened abuse of law or legal process; or (4) by means of any scheme, plan, or pattern intended to cause the person to believe that, if that person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint."

The FAC does not identify which of these four methods FSO used to "obtain labor" from Plaintiffs, but several can be eliminated. Indeed, there is no allegation that FSO ever threatened Plaintiffs with legal process. And the FAC, despite its lurid details,

---

including the TVPRA—extend liability to certain conduct on or relating to vessels. *See Id.* §§ 1582-1583 and 1585-1588. These provisions had been on the books for decades when Congress passed (and later amended) the TVPRA, yet Congress explicitly opted *not to* add similar language to the sections at issue.
[13] The entirety of the Baxters' post—2003 claims allegedly occurred on the *Freewinds*. Paris alleges some post-2003 conduct that occurred in Australia in addition to on the *Freewinds*.

does not describe a use or threat of "force" or "physical restraint" to obtain labor.[14] Plaintiffs allege instead that they were "assigned" unpleasant tasks, "confined" to rooms for disobedience (*see e.g.* FAC ¶ 128) or "required" to perform undesirable tasks (*id.* ¶ 188), but these passively-voiced descriptions omit any detail of any use, or threatened use of, physical force upon Plaintiffs to effectuate work assignments or confinement.

This leaves use or threat of "serious harm" as the remaining vehicle for extracting labor from Plaintiffs under § 1589. "Serious harm" is "harm, whether physical or nonphysical, including psychological, financial, or reputational harm, that is sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing labor or services in order to avoid incurring that harm." 18 U.S.C. § 1589(c)(2).

The issue here, for Plaintiffs, is that a "reasonable person of the *same background and in the same circumstances*" would be a member of the Sea Org religious order. The FAC describes how integral Plaintiffs' upbringing and psychology as Sea Org members is to understanding how Plaintiffs supposedly were "forced" to obey the orders on the *Freewinds*. But the FAC's central theory of "control" is its undoing. This is because the threat of "serious harm" is purely a function of Plaintiffs' distress over their status in a religion, much like a priest would feel "serious harm" at a threat of being defrocked or of damnation for violation of holy orders. Doctrines rooted in the First Amendment bar

---

[14] G. Baxter complains that a worker in the kitchen once struck him in the head. (FAC ¶ 105). He does not allege, however, that this incident had anything to do with extracting labor from him. Paris alleges that an individual at a Scientology facility in Australia tried to "drag" her to clean out a garbage can, but then a security officer intervened and she did not clean out the garbage. (*Id.* ¶ 189).

TVPRA claims based on a plaintiff's decision to submit to religious orders and discipline out of a fear of religious consequences or due to other religious motivations.

The lead case on application of the TVPRA to religious orders is *Headley v. Church of Scientology Intl.,* 687 F.3d 1173, 1180 (9th Cir. 2012), where the Ninth Circuit held that former members of the Sea Org could not maintain trafficking claims based on alleged fear of being declared "Suppressive Persons" for leaving the Sea Org without permission:

> The one adverse consequence the Headleys could have faced, had they taken any of their many opportunities before 2005 to leave the Sea Org, was to have been declared 'suppressive persons' and thus potentially to have lost contact with family, friends, or each other. But that consequence is not 'serious harm'—and warning of such a consequence is not a 'threat'—under the [TVPRA]. In applying the Act, we must distinguish between 'Improper threats or coercion and permissible warnings of adverse but legitimate consequences.'. . . A church is entitled to stop associating with someone who abandons it . . . A church may also warn that it will stop associating with members who do not act in accordance with church doctrine. The former is a legitimate consequence, the latter a legitimate warning . . . Neither supports a forced-labor claim.

*Id.* (internal citations omitted).

In addition to *Headley*, well-established authority prohibits courts from interfering with the internal governance of churches, and from litigating doctrinal issues. *See, e.g., Presbyterian Church in the United States v. Mary Elizabeth Blue Hull Mem'l Presbyterian Church* (1969) 393 U.S. 440, 450 (the First Amendment "forbids" courts from "determin[ing] matters at the very core of a religion—the interpretation of particular church doctrines and the importance of those doctrines to the religion."); *Serbian E. Orthodox Diocese for U. S. of Am. & Canada v. Milivojevich*, 426 U.S. 696, 713, 717 (1976) (holding that secular courts may not consider "matters of discipline, faith, internal organization, or ecclesiastical rule, custom, or law," including "questions of church discipline."). At

bottom, secular courts may not supervise the terms on which a church accepts its members and on which members chose to remain within the church. *Watson v. Jones*, 80 U.S. 679, 729-31 (1871) ("We cannot decide who ought to be members of the church. [W]hen [plaintiffs] became members *they did so upon the condition of continuing or not as they and their churches might determine*, and they thereby submit to the ecclesiastical power and cannot now invoke the supervisory power of the civil tribunals.") (emphasis added). In light of this clear authority, the bases for Plaintiffs' claims of forced labor by "serious harm" fails, because the alleged harm is nothing more than fear of *religious* consequences pursuant to *religious* doctrine as part of the conditions of serving in a *religious* order.[15]

The FAC incorporates assertions of psychological control into each cause of action as well. It also links Plaintiffs' obedience to orders within the Sea Org to this same alleged mental control. Plaintiffs repeatedly state that they were threatened with "lower conditions" or placed in "lower conditions" in connection with their service in the Sea Org. (FAC ¶ 105). The FAC describes "lower conditions" as a reduced status and act of isolation <u>within a religious order</u>. (*Id.* at ¶ 64). These allegations can also not support a claim of "serious harm" for the same reasons discussed above.

Finally, as the FAC makes clear, Plaintiffs remained in the Sea Org because of threat of being "declared a Suppressive Person" if they left without completing the

---

[15] The FAC does not contain the word "religion," but that does not change the facts. Namely, Scientology is a religion, and the Sea Org is a religious order within Scientology. *See* Decision of Administrative Appeals Division, United States Citizenship and Immigration Services, No. WAC 03 26354028 (February 21, 2006), at 4 (https://www.uscis.gov/sites/default/files/err/C1%20-%20Immigrant%20Religious%20Workers/Decisions_Issued_in_2006/Feb212006_01C1101.pdf) (holding "the Sea Organization qualifies as a religious order, and that its members practice a religious vocation."); *see also* https://www.scientologyreligion.org/landmark-decisions/church-of-scientology-irs-tax-exemption.html.

"routing out" process of the Sea Org. (FAC ¶ 103 (as to G. Baxter); ¶ 138 (as to both of the Baxters), ¶ 177 (as to Paris)). But, fear of being declared a "suppressive person" is plainly not actionable under *Headley*.

Further, adjudication of these claims would require the trier of fact to determine that fear of religious or spiritual consequences, feelings of religiously-based "guilt and shame," (*id.* ¶ 55), and obedience in the face of excommunication, shunning, or "lower orders," are actionable "psychological" harms under 18 U.S.C. § 1589. It would interfere with a church's constitutional right to determine the conditions of joining and serving, and imperil any number religious practices by which it could be said labor is obtained, such as requiring that monks, priests, or other ministers live in seclusion or take vows of poverty. It would further require an impermissible and unconstitutional trial of whether the practices and beliefs that the FAC has injected into this case are "religious" – as FSO maintains – or purely secular, as the FAC seems to suggest. *Presbyterian Church in the United States, supra*, at 450 (forbidding secular courts from adjudicating matters of religious doctrine). By citing the beliefs and practices of the Scientology religion as the means of psychological control, the FAC has made this case impermissible trial on religious belief and practice itself. *United States v. Ballard,* 322 U.S. 78, 93 (1944). As such, Counts I-IV should be dismissed.

This problem is not limited to the claims based on violations of 18 U.S.C. § 1589 (Counts I-IV), though; it also precludes Plaintiffs' claims of forced labor under a threat of "debt peonage." (Counts V-VI). Plaintiffs assert that the alleged debt is "freeloader debt" Plaintiffs incurred by accepting Scientology services. (FAC ¶ 154). However,

Plaintiffs do not assert that they were threatened with legal action if they did not repay the debt, but with "lower conditions" within the Scientology religion. (*Id.* ¶¶ 133-135). Paris does not allege that she ever repaid her "debt," and the Baxters admit that after they left the Sea Org they paid a debt so as to "complete their program of lower conditions and begin to receive Scientology services again" and be "in good standing" with the Church. (*Id.* ¶ 135). Just as other religions requiring tithing to remain a valued member of the religion, Plaintiffs understood that Scientology expected Plaintiffs to make good on their debt to remain members in good standing of the Church.

Plaintiffs' assertions that they were threatened with "serious harm" to extract labor from them depend in large part, if not entirely, on their concern for their standing within the religion. Their decision to obey religious commands and to accept punishment as religious discipline – rather than just leaving the Church – cannot serve as the basis for a violation of the TVPRA. *Headley*, *supra*, 687 F.3d at 1180.[16]

### F.   Counts V and VI Fail to Allege Peonage

Counts V and VI should also be dismissed as Plaintiffs fail to sufficiently allege that FSO violated § 1581, which prohibits holding or returning a person to "a condition of peonage in violation of 18 U.S.C. § 1581." (FAC ¶¶ 244, 253). In addition to all of the

---

[16] Plaintiffs also cite the *Freewinds*' practice of holding passports of passengers and staff – a recognized best practice of all cruise ships – as a use of "force." (FAC, ¶¶ 216, 224). It is a standard practice for passenger ships to hold the passports of its passengers and crew. (Weber Decl., ¶¶ 22-23, Exs. K and L). But the statutory scheme of the TVPRA makes clear that retention of passports is only actionable when it occurs *within* the United States. 18 U.S.C. § 1597 provides that the retention of a passport to obtain labor is a trafficking offense apart from trafficking by force or threat of force under 18 U.S.C. § 1589. But 18 U.S.C. § 1596 identifies the sections of the TVPRA that are subject to extraterritorial enforcement and does *not* mention § 1597 – the passport section – as part of the extraterritorial enforcement scheme. The alleged retention of the passports, which Plaintiffs mention a dozen times in the FAC occurred *outside* of the United States, and cannot support their trafficking allegations as a matter of law.

arguments above, Counts V-VI fail because Plaintiffs do not allege that they were working to satisfy a debt, which is required to state a claim under § 1581. "Peonage is a status or condition of compulsory service or involuntary servitude based upon a real or alleged indebtedness." *Treadway v. Otero*, No. 2:19-CV-244, 2020 WL 5960681, at *3 (S.D. Tex. Oct. 8, 2020) (*quoting Pierce v. United States*, 146 F.2d 84, 86 (5th Cir. 1944)). "The basal fact [of peonage] is indebtedness," *Clyatt v. United States*, 197 U.S. 207, 215 (1905), and thus its defining characteristic is that the "peon can release himself therefrom . . . by the payment of the debt." *Treadway,* 2020 WL 5960681, at *3 (quote omitted); *see also United States v. Reynolds*, 235 U.S. 133, 144 (1914) (a peonage claim requires the court to "determine whether the [plaintiff] was in reality working for a debt which he owed the [defendant]"); *Stein v. World-Wide Plumbing Supply Inc.*, 71 F. Supp. 3d 320, 327 (E.D.N.Y. 2014) (collecting cases). Peonage differs from other involuntary servitude because it "involves the additional element that the involuntary servitude is tied to the discharge of an indebtedness." *Chen v. Cai*, 2022 WL 917575, at *4 (S.D.N.Y. Mar. 28, 2022) (quote omitted). Thus, when a plaintiff alleges no debt to the employer, a claim of peonage must fail. *Id.* (holding that this failure "is fatal to this claim"); *Jenkins v. Trustees of Sandhills Cmty. Coll.*, 259 F. Supp. 2d 432, 445 (M.D.N.C. 2003); *Dolla v. Unicast Co.*, 930 F. Supp. 202, 205 (E.D. Pa. 1996); *Reynolds*, 235 U.S. 133, 144 (1914).

Plaintiffs fail to allege sufficient *facts* supporting any debt owed to FSO or that Plaintiffs were working to pay off that debt while in the Sea Org. Plaintiffs attempt to plead around this requirement by stating that they would have been responsible for a debt *after they left the Sea Org*. (FAC ¶ 90, 177, 192). But, allegations of a *future* debt cannot

state a claim for peonage. Plaintiffs may argue that they alleged a current debt when G. Baxter and L. Baxter were purportedly reminded of a $12,000 debt they owed at the time they left the *Freewinds* and Sea Org. (*Id.* ¶ 133). However, in their own words, this alleged debt was owed "because they were leaving the ship and Sea Org[.]" (*Id.*). If the debt was owed because they were leaving, payment of that amount was not required to secure their release from labor. To sufficiently state a claim for peonage, Plaintiffs must allege a debt that existed *while they were working* and that their labor was *to repay that existing debt*, so that they can secure their release from labor "by the payment of the debt." *Treadway,* 2020 WL 5960681, at *3. Such allegations do not exist in the FAC.

### G.  The Statute of Limitations Bars Paris' Claims

The FAC attempts to revise and add numerous allegations in paragraphs 159 – 213.  These allegations relate specifically to Paris and attempt to correct numerous pleading defects in the original Complaint. None of those paragraphs, however, have been incorporated into any of the six specific causes of action. Accordingly, her claims fail in their entirety as the FAC does not include any facts as to Paris in pleading the causes of action. *Blanchard v. Merck & Co., Inc.*, 5:18-CV-38-OC-30PRL, 2018 WL 8244569, at *1 (M.D. Fla. July 20, 2018) (granting a motion to dismiss for failure to state a claim and noting that perhaps plaintiff would have been able to sufficiently state a cause of action, "Had Plaintiff incorporated the general allegations into this count").

In any event, Paris' TVPRA claims are time-barred. The TVPRA requires plaintiffs to commence suit before the later of "10 years after the cause of action arose" or "10 years after the victim reaches 18 years of age, if the victim was a minor at the time

of the alleged offense." 18 U.S.C. § 1595(c). Paris was born in about 1978 and thus turned 18 in about 1996. (FAC ¶ 15). As such, this suit, filed twenty-six years later, is untimely under the second prong for minors and the 10-year statute of limitations from when the cause of action arose applies. The initial Complaint was filed on April 28, 2022. Thus, Plaintiffs' claims are untimely if they accrued before April 28, 2012.

Paris admits that she spoke with "a prominent Scientology defector" and "[i]n or around the summer of 2011 . . . an investigator from the Australian government" about the claims made in the initial Complaint and FAC. (*Id.* ¶¶ 201-02). Importantly, both of these conversations took place *after* she left the Sea Org. (*Id.*).[17] Thus, Paris judicially admitted that she left the Sea Org before the summer of 2011, which establishes that the vast majority of her claims necessarily accrued more than ten years before she filed her initial Complaint on April 28, 2022.

Paris appears to insinuate that the statute of limitations should be equitably tolled because she feared retaliation by Defendants if she sued or spoke out against them. (*Id.* ¶ 202). "The doctrine of equitable tolling allows a court to toll the statute of limitations until such a time that the court determines would have been fair for the statute of limitations to begin running on the plaintiff's claims." *Dotson v. United States*, 30 F.4th 1259, 1268 (11th Cir. 2022) (internal quotations and citations omitted). But, "[e]quitable tolling is inappropriate when a plaintiff did not file an action promptly or failed to act with due diligence" and it is therefore "an extraordinary remedy which should be extended only

---

[17] As discussed, *infra*, Paris made similar complaints to other publications around this time as well. (*See* RJN, Exs. 2-5).

sparingly." *Bost v. Fed. Express Corp.*, 372 F.3d 1233, 1242 (11th Cir. 2004) (internal quotations and citations omitted). Thus, Paris must establish that her untimely filing was "because of *extraordinary circumstances* that are both beyond [her] control and unavoidable even with diligence." *Dotson*, 30 F.4th at 1268 (internal quotations and citations omitted) (emphasis in original). Paris apparently contends that tolling is warranted here because her *alleged* fear of "retaliation" prevented her from timely pursuing her civil remedies. (FAC ¶ 200). But these allegations are negated by allegations in the Complaint, FAC, and documents attached to FSO's RJN showing that she had no problem speaking out against the Defendants around this time. (RJN Exs. 2-5). Paris' false allegations of fear do not warrant judicial blindness to her actual conduct after leaving the Sea Org.

The FAC admits that after leaving the Church, Paris wrote about her experiences in the Sea Org and allowed the same to be published in a blog. (FAC ¶ 201). She also admits to speaking with an investigator from the Australian government about her time in the Sea Org in summer of 2011 (after she left the Sea Org). (*Id.* ¶ 202). She appears to argue that her conversation with this investigator would not preclude an equitable tolling argument because she "had not filed any complaint and had not contacted them, and she did not want to be part of the investigation, but she reluctantly spoke to the investigator, and she was afraid. She also understood it to be a confidential investigation and interview." (*Id.*). This is a fiction, and belied by the facts. Paris knew the blog posts about her time in Sea Org were not confidential and she agreed to have those published. (*Id.* ¶ 201). Further, Paris gave other public interviews to media sources around this same time. For example, in June of 2010, approximately twelve years before filing the initial Complaint, Paris made her

"first in a series of postings" to an online website where she alleged substantially similar facts as she did in the initial Complaint and the FAC. (*Compare* RJN Ex. 5 *with* Compl. ¶¶ 116, 127, 133, 147-149, 151, 161, 169 *and* FAC ¶¶ 146, 157, 163, 197, 216, 224).[18] In an interview with an Australian news outlet posted and most recently updated on November 29, 2011, she claimed that "the Church of Scientology imprisoned her on its cruise ship The Freewinds." (RJN, Ex. 3). Also on November 29, 2011, she sat for an interview with the Village Voice and made claims analogous to ones made in the initial Complaint and FAC, including receiving only $50 in pay each week, (*compare* RJN Ex. 4 *with* Compl. ¶ 136 *and* FAC ¶ 166), alleging that she had cleaned up asbestos, (*compare* RJN Ex. 4 *with* Compl. ¶ 139 *and* FAC ¶ 169), and complaining about papers she claims she was forced to sign upon leaving the *Freewinds*. (*Compare* RJN Ex. 4 *with* Compl. ¶ 147 and FAC ¶ 177). Many of these allegations were published in a *New Idea* magazine article dated December 19, 2011 as well. (*See generally*, RJN Ex. 2).

Whenever a microphone was nearby, Paris spoke openly and repeatedly about her hatred of Scientology and the alleged unfair labor practices set forth (inadequately) in the FAC. As stated by the court in another TVPRA case, *Abarca v. Little*, 54 F. Supp. 3d 1064, 1069–70 (D. Minn. 2014), "these acts evince a sophistication and courage that undermine [Plaintiff's] argument that extraordinary circumstances rendered him incapable of filing suit until six years after he severed his relationship with defendants." Thus, the doctrine of equitable tolling does not apply to these circumstances as a matter of law.

---

[18] It is unclear whether this is the same blog referred to in FAC ¶ 201. In either event, it contradicts Paris' allegation that she was too scared to speak out against Defendants prior to April 28, 2012.

## CONCLUSION

WHEREFORE Defendant, Church of Scientology Flag Service Organization, Inc., respectfully asks this Court to enter an order compelling arbitration of all claims brought by Plaintiffs, or in the alternative, dismissing all claims pursuant to Fed. Rule 12(b)(6) for Plaintiffs' failure to state a claim.

### Local Rule 3.01(g) Certification

The undersigned counsel hereby certifies that the undersigned conferred with Plaintiffs' counsel, **Neil Glazer and Zahra Dean of Kohn Swift & Graf, PC, Gregory Hansel of Preti Flaherty Beliveau & Pachios, Chartered LLP, and Manuel J. (John) Dominguez of Cohen Milstein Sellers & Toll PLLC** who does not agree to the relief sought in this motion. Counsel further certifies that this motion is brought in good faith and not for any improper purpose.

/s/ *Charles M. Harris, Jr.*
CHARLES M. HARRIS, FBN 967459
BRIGID A. MERENDA, FBN 320500
Trenam Law
200 Central Avenue, Suite 1600
St. Petersburg, FL 33701
Tel: 727.896.7171
Fax: 727.822.8048 (Facsimile)
charris@trenam.com
bamerenda@trenam.com
gkesinger@trenam.com
ranctil@trenam.com
*Attorneys for Defendants, Church of Scientology*
*Flag Service Organization, Inc. and Church*
*of Scientology Flag Ship Service Organization, Inc.*

### CERTIFICATE OF SERVICE

I certify that on August 23, 2022, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system, which will send a true and correct copy to all counsel of record.

/s/ *Charles M. Harris, Jr.*
                    Attorney