## UNITED STATES DISTRICT COURT MIDDLE DISTRICT OF FLORIDA TAMPA DIVISION

|  |  |  |
|---|---|---|
| | ) | |
| GAWAIN BAXTER et al | ) | |
| Plaintiffs, | ) | |
| vs. | ) | |
| | ) | Case No. 8:22-cv-00986 -TPB-JSS |
| DAVID MISCAVIGE et al | ) | |
| Defendants. | ) | |
| _____ | ) | |

## PLAINTIFFS' RESPONSE TO DEFENDANT CHURCH OF SCIENTOLOGY FLAG SERVICE ORGANIZATION'S MOTION, DKT. 85

Plaintiffs more than adequately state a plausible claim for relief under the Trafficking Victim Protection Act (TVPRA) for forced labor, peonage, and trafficking. These claims are not subject to arbitration. Defendant FSO's motion to dismiss for failure to state a claim under Rule 12(b)(6) and motion to compel arbitration should be denied.

## I. STANDARD OF REVIEW

A complaint need only contain enough facts to state a claim that is plausible on its face. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

## II. RELEVANT FACTS

Plaintiffs were children when their parents handed them over to Scientology. FAC ¶¶88, 112, 145 (age four). The children were separated from their parents (and rarely permitted to see them), placed in dormitories, and groomed for a lifetime of labor. ¶¶56- 59, 89, 146-147. The children received minimal schooling; they were not permitted to attend accredited public or private schools. ¶¶61, 88, 90, 148, 157. At a young age, the children were forced to perform physical labor for many hours a day,

often skipping school. ¶¶91, 114, 149. The children were denied medical treatment. ¶150. They were subjected to "security checks," abusive interrogation sessions designed to break the subject's will and "achieve absolute compliance by altering their perception of their thoughts and experiences, instilling deep feelings of guilt, shame, self-doubt, and fear." ¶¶70-72, 115, 152, 160 (auditing sessions focused on sexual abuse, Valeska forced to take off pants). FSO in particular was responsible for these punishments. ¶¶20, 49-55, 94.

The Plaintiffs were also subjected to repeated physical abuse and, in Valeska's case, repeated sexual abuse. ¶¶101, 105, 123, 158, 161. Plaintiffs were raised without contact with the outside world, taught to distrust all outsiders and outside institutions, and repeatedly told that those who leave Scientology struggle, become sick, or die. ¶ 60, 104, 192. Their passports and other identity documents were confiscated. ¶96, 118, 157. When Plaintiffs complained or sought to leave, they were severely punished, including by being locked in a dark, hot engine room for days. ¶¶93, 100-105, 120-21, 164-165, 175; see also ¶¶ 62-72, 83. Valeska contemplated suicide. ¶177.

From 2008 to 2012, Plaintiffs Laura and Gawain Baxter labored on the Freewinds. ¶¶ 107, 123, 129. The Freewinds was used to host potential donors, including celebrities, and to raise funds for Defendants. ¶45. Valeska Paris also labored on the Freewinds and was later sent to Australia where she was put to hard labor under Defendants' custody and control through August 2009. ¶¶ 178, 180-183. She was constantly monitored, and not permitted a phone or internet time. ¶190. The Plaintiffs performed hard manual labor for between 12 and 24 hours a day. ¶¶98, 119, 122, 181

(Valeska sanded floors by hand), 183, 188. They often worked without safety equipment, suffering long lasting health damage. ¶¶99, 107 (exposed to asbestos), 125 (same),169, 181. If Valeska failed to finish her assigned tasks, she was forced to run laps. ¶181. After long days performing manual labor, Plaintiffs were forced to make cold calls to sell Scientology books to raise funds for Defendants. ¶¶108, 126, 188. They were also forced to purchase the books. ¶108. Plaintiffs were punished for failing to meet sales quotas. ¶126.

During this time, Plaintiffs were punished for any failure to comply. ¶¶97,182 Gawain in particular was punished by being sent to the engine room, an extremely hot, dirty, very loud room so small it was difficult to stand up. ¶¶101, 109. Laura was also repeatedly punished, including time in the engine room, and was further punished whenever Gawain was punished. ¶¶123, 126. In Australia, punishment included being confined to a basement space with a ceiling so low a person could not stand up straight. ¶182. Plaintiffs also witnessed others being punished, including a high ranking Scientologist who was confined to the engine room for attempting leave the Freewinds. ¶¶110, 182 (a notice board listed names of those punished). The severity of this punishment deterred Gawain from attempting to leave. ¶110. Laura constantly feared that anything she did or said might result in additional punishment. ¶123, 125.

The Plaintiffs were chronically sleep deprived and often were so exhausted they fell asleep while working. ¶¶108 (Gawain slept only two hours per night), 188. Some nights Plaintiffs were not permitted to sleep at all. ¶108. Valeska slept in crowded triple decker bunk, sharing a bed with other shift workers. ¶183. Valeska's food was

inadequate; she was allowed just minutes to eat and for personal hygiene. ¶¶183,185.

Plaintiffs were promised a pittance ($50 per week) for their round the clock labor, but were rarely paid. ¶¶111, 166, 184 (Valeska not paid, could not even afford tampons). From early childhood, Plaintiffs were repeatedly told they were indebted to Defendants and that they could not leave without repaying the debt. ¶¶4, 87, 90, 93, 154, 192. Plaintiffs believed they had to repay this debt. ¶¶93, 192. Plaintiffs were also deterred from leaving by the "routing" process, an abusive process that they feared, and the threats of assignment to a "rehabilitation" site. ¶¶83-87, 128, 197.

Finally, to escape, Plaintiffs settled on a desperate plan, they determined to become pregnant, hide their pregnancies long enough to evade Defendants' forced abortion policy, and finally be permitted to depart. ¶¶129,195. Due to the hard labor and inadequate food, Valeska miscarried, but pretended she was still pregnant. ¶196.

Defendant FSO was responsible for "auditing," which served as a punishment and threat that kept Plaintiffs in line, an essential part of keeping the Plaintiffs in forced labor. ¶20, 49-55, 95. Like the other Defendants, FSO benefited from the essential free labor provided by Plaintiffs, as well as from the book sales. ¶¶25, 45, 108.

## III. ARGUMENT

### A.    Plaintiffs' Claims Against FSO are not subject to Arbitration

FSO states that the arguments for arbitration "are addressed at length" in FSSO's brief. FSO at 4. Likewise, Plaintiffs' response is contained in their response to FSSO filed concurrently.

### B.    Plaintiffs have stated claims under the TVPRA

1.    **The TVPRA Civil Remedy is expressly extraterritorial**

Courts that have considered the question of whether the TVPRA is extraterritorial have, with just one exception, uniformly concluded that the statue's remedy provisions apply to extraterritorial conduct. *See, e.g., Roe v. Howard*, 917 F.3d 229, 241-242 (4th Cir. 2019) (§ 1595 civil remedy for domestic servitude in Yemen); *Adhikari v. Kellogg Brown & Root, Inc.*, 845 F.3d 184, 204 (5th Cir. 2017) (§ 1595 civil remedy for forced labor at Iraqi bases); *United States v. Baston*, 818 F.3d 651, 666-71 (11th Cir. 2016) (§ 1593 restitution for trafficking in Australia).[1] Defendants, without acknowledging the overwhelming contrary authority, assert that the sole outlier case holding otherwise "should be dispositive." FSO at 11. The one outlier opinion, *Doe v. Apple*, 2021 WL 5774224, at *16 (D.D.C. 2021), conceded the question was "a close call" and is now on appeal. An amicus brief filed by twelve prominent professors of civil procedure argued that the *Apple* court erred when it became the first federal court to find that the TVPRA civil remedy did not extend to extraterritorial conduct. Br. of Legal Scholars as Amicus Curiae in Support of Plaintiffs-Appellants, *John Doe I v. Apple Inc.*, No. 21-7135 (D.C. Cir. 2022) (Dkt. 1959413). The amicus explained that the lower court not only failed to apply the proper two-part test but that its decision conflicted with the Supreme Court's extraterritoriality jurisprudence. *Id.*

---

[1] *See also Abafita v. Aldukhan*, 2019 WL6735148, at *5 (S.D.N.Y 2019) (a civil claim under the TVPRA can be brought for extraterritorial violations: "the TVPRA has extraterritorial effect"); *United States ex rel. Fadlalla* v. *DynCorp Int'l LLC*, 402 F.Supp.3d 162, 198-99 (D. Md. 2019); *Aguilera v. Aegis Commc'ns Grp., LLC*, 72 F. Supp. 3d 975, 979 (W.D. Mo. 2014) (§ 1595 remedy for forced labor in India); *cf. Plaintiff A v. Schair*, 2014 WL 12495639, at *6 (N.D. Ga. 2014) (plaintiffs trafficked in Brazil could salvage their civil claim "if section 1596 could be retroactively applied.").

To determine if a statute applies extraterritorially, courts use a two-step inquiry. *RJR Nabisco v. European Community*, 579 U.S. 325, 337 (2016).[2]

Here, step one is satisfied because the TVPRA civil remedy contains a clear affirmative indication of extraterritorial application: it directly incorporates extraterritorial predicate crimes. Courts have described this structure as "the most obvious textual clue" that Congress intended a statute to apply extraterritorially (to the extent the predicates alleged in a particular case themselves are extraterritorial). *Howard*, 917 F.3d at 241 (citing *RJR Nabisco*, 579 U.S. at 338-39). Thus, it is unnecessary to reach step two. But to the extent the Court proceeds to step two and considers the "focus" of the claims that Defendants benefitted from trafficking or forced labor, the focus of the "benefit" prong of the statute is plainly on "benefitting." Where the benefit is obtained in the United States, the application of the statute is not extraterritorial at all.

In the TVPRA, Congress crafted a statutory scheme of interlocking provisions within Chapter 77 of the U.S. Code. In addition to pre-existing prohibitions on peonage and servitude, Congress defined the crimes of forced labor and human

---

[2] At the first step, the court must determine if the statute gives a clear affirmative indication that it applies extraterritorially. *Id.*; *Morrison v. Nat'l Austl. Bank*, 561 U.S. 247, 255 (2010). This requirement is not a clear statement rule. *See RJR*, 579 US. at 340; *Morrison*, 561 U.S. at 265 (statute need not state 'this law applies abroad'). To the contrary, "[a]ssuredly context can be consulted as well." *RJR*, 579 U.S. at 340; *Morrison*, 561 U.S. at 265. If the first step is not satisfied, a court moves on to step two. *RJR*, 579 U.S. at 337. At step two, courts look to the statute's "focus": "If the conduct relevant to the statute's focus occurred in the United States, then the case involves a permissible domestic application even if other conduct occurred abroad." *Id.* It is unnecessary to reach step two if the court finds the statute applies extraterritorially at step one. *Id.* at 337, 342.

trafficking. *See, e.g.*, 18 U.S.C. §§ 1581, 1584, 1598, 1590. In 2004, Congress added a private civil action coterminous with the specific criminal prohibitions established by the TVPRA, providing victims of those criminal violations with a civil remedy that directly incorporated and is coextensive with these predicate criminal prohibitions. *See* 18 U.S.C. § 1595*.* Congress reauthorized the TVPRA again in 2005 and 2008. In both reauthorizations, Congress extended extraterritorial jurisdiction, first over all Chapter 77 offenses if committed by a federal government employee and, second, over six specified trafficking offenses when committed by a United States national. See 18 U.S.C. § 3271, § 1596. Plaintiffs allege violations of three expressly extraterritorial offenses: peonage (§ 1581), forced labor (§ 1589) and trafficking (§ 1590).

Defendants complain that the civil remedy and the substantive criminal predicates are themselves "silent" on extraterritorial application. FSO at 11. But as the Supreme Court has explained, "Congress, even in a jurisdictional provision, can indicate that it intends federal law to apply to conduct occurring abroad." *Kiobel v. Royal Dutch Petroleum Co.*, 133 S. Ct. 1659, 1665 (2013); *see also Adhikari,* 845 F.3d at 204 ("The 2008 Amendment [§ 1596], although jurisdictional in nature, alters a party's substantive rights under the TVPRA … After § 1596's enactment, a TVPRA defendant in a civil suit could no longer rely on a previously available defense: the presumption against extraterritoriality."). The TVPRA is not silent on extraterritoriality.[3]

---

[3] Congress did not "omit" the civil remedy (§ 1595) from the criminal offenses listed in the statute's jurisdictional provision (§ 1596): all that Congress needed to do to ensure the civil remedy applied to extraterritorial conduct was to provide for extraterritorial jurisdiction over the underlying conduct. That is, once a court has jurisdiction over, for example, forced

After evaluating the TVPRA's text and structure, both the Fourth and Fifth Circuits found the presumption against extraterritoriality to be rebutted at step one of the two-part test. Both Courts of Appeal held that the TVPRA civil remedy contains a clear affirmative indication of extraterritorial application because it incorporates extraterritorial predicates. *Howard*, 917 F.3d at 242 ("we are satisfied that § 1595 reflects congressional intent that it applies extraterritorially to the extent that a plaintiff seeks redress for a predicate offense 'that is itself extraterritorial.'"); *Adhikari*, 845 F.3d at 204 (The 2008 TVPRA amendment "permits private parties to pursue a civil remedy under the TVPRA for extraterritorial violations"). The Eleventh Circuit similarly looked to the predicate act structure of the TVPRA when it held that Congress had required "international sex traffickers to pay restitution to their victims even when the sex trafficking occurs exclusively in another country." *Baston*, 818 F.3d at 671. The vast majority of lower courts agree and no Circuit has concluded otherwise.

Although additional analysis is unnecessary in light of the clear affirmative indication of extraterritorial application in the TVPRA's text and structure, further indication that Congress did not legislate with just domestic concerns in mind comes from the statute's context, purpose, and history. "This is, in short, a situation in which Congress was clearly concerned with international rather than purely domestic

---

labor, the statute's civil remedy provision (as well as provisions for mandatory restitution (§1593) and forfeiture (§1594)) attach. It would have been illogical to add § 1595 to § 1596's list of predicate offenses because § 1595 does not define the underlying violation, it provides a civil remedy for offenses that are defined elsewhere. In addition, because § 1595 already provides a civil remedy coextensive with the TVPRA's predicate criminal provisions, it is redundant to include § 1595 in § 1596.

matters." *Howard*, 917 F.3d at 242; *see also id*. (TVPRA's stated purpose and findings demonstrate Congress sought to combat human trafficking "throughout the world" and consistently expanded the statute to reach additional categories of foreign conduct, reinforcing the conclusion that limiting its scope "risks frustrating its animating purpose" (internal citations omitted)).[4]

Because the TVPRA is extraterritorial at step one, the analysis ends. But even if this court proceeds to the second step and considers "focus," the "focus" of the "benefit" claims is domestic. The TVPRA imposes liability on "whoever knowingly benefits financially or by receiving anything of value," from violations of Chapter 77. 18 U.S.C. §§ 1589(b); FAC ¶ 217. When that benefit is in the United States, application of the statute is domestic, even if the underlying forced labor took place overseas. *RJR Nabisco*, 579 U.S. at 337 ("then the case involves a permissible domestic application even if other conduct occurred abroad."); *see also Rodriguez v. Pan Am. Health Org.*, 29 F.4th 706, 716 (D.C. Cir. 2022) ("The 'financial benefit' that violates § 1589(b) is itself 'wrongful conduct' and occurred in the United States."). The TVPRA civil remedy applies to the conduct alleged in this case.

### 2.    The Foreign Vessel Internal Affairs Doctrine Is Inapplicable

Casting Plaintiffs' serious allegations of forced labor and peonage as a mere "employment dispute[,]" FSO argues that the FAC should be dismissed  under the

---

[4] For additional background on the legislative history, *see* Br. for Senator Menendez, Senator Marco Rubio, Senator Rick Scott et al, as Amicus Curiae, 2021 WL 3403786, *Rodriguez, et al., v. Pan American Health Organization*, 29 F.4th 706 (D.C Cir. 2022).

"Foreign Vessel Internal Affairs Doctrine." FSO at 12. But the narrow internal affairs doctrine applies only within U.S. territorial waters, does not preclude claims arising under an expressly extraterritorial statute like the TVPRA, and the Supreme Court rejected the "clear statement" rule advocated by FSO.

"The general rule that United States statutes apply to foreign-flag ships in United States territory is subject only to a narrow exception." *Spector v. Norwegian Cruise Line, Ltd.*, 545 U.S. 119, 130 (2005). The internal affairs doctrine concerns "the application of American law to the 'internal management and affairs' of a foreign-flag ship *in United States waters.*" *Stevens v. Premier Cruises, Inc.*, 215 F.3d 1237, 1242 (11th Cir. 2000) (emph. added).[5] Indeed, there has never been a case in which a court has invoked the doctrine to preclude application of an expressly extraterritorial statute.

Both *Spector* and *Stevens* concerned the question of whether the internal affairs doctrine precluded enforcement of Title III of the Americans with Disabilities Act ("ADA") with respect to foreign-flag ships in U.S. waters. In *Stevens*, the Eleventh Circuit held that even though there was no clear congressional statement of intent to apply the ADA to foreign vessels (or any ships at all), the breadth of the statute and the interests it was intended to protect led the court to conclude that the doctrine did not exempt foreign-flag ships in U.S. waters from the law. 215 F.3d at 1242-43. In *Spector*, the Fifth Circuit arrived at the opposite conclusion, holding that "absent a clear

---

[5] Every case cited by Defendants concerns application of U.S. laws to foreign vessels in U.S. waters. FSO at 12-13. None support the proposition that the TVPRA cannot be applied to trafficking offenses on foreign ships beyond U.S. territorial waters.

indication of congressional intent, general statutes do not apply to foreign-flag ships." 545 U.S. at 125. The Supreme Court had no trouble rejecting the Fifth Circuit's categorical rule and finding the ADA applicable, even though the ADA "has no clear statement." *Id.* at 129; *id.* at 312 ("A clear statement rule with this sweeping application is unlikely to reflect congressional intent."). Here, where Congress extended extraterritorial jurisdiction, the doctrine does not apply. There is no exemption in the TVPRA for the kind of conduct at issue here no matter where in the world it occurred, on land or sea, and none can be read into the statute by recasting Plaintiffs' allegations as mere "matters of order and discipline."

### 3. The Plaintiffs allege violations of the TVPRA

The FAC adequately states a claim for relief under the TVPRA because it alleges that each Defendant either actively participated in or knowingly benefitted from a venture that involved forced labor, peonage or trafficking. Plaintiffs also allege that Defendants attempted and conspired to commit these crimes. E.g., FAC ¶2. The FAC alleges in detail how Defendants worked together to perpetrate these offenses. *Supra* Pt. II. Specifically, FSO served as the enforcer, meting out the punishment, including "auditing" and "routing out" that kept Plaintiffs in a state of fear and prevented them from leaving. *Supra* p.2, 4. FSO also benefitted financially from Plaintiffs' labor. *Supra* p.3.[6]

---

[6] Defendants ask the Court to dismiss because Plaintiffs inadvertently failed to update the paragraph numbers in the First Amended Complaint. FSO at 4, 21. Plaintiffs respectfully request the Court allow them to interlineate paragraphs 214, 221, 228, 235, 242, and 250 to incorporate

Congress enacted the TVPRA to "encompass more subtle forms of psychological abuse and nonviolent coercion than those previously required to hold perpetrators accountable." *Bistline v. Parker*, 918 F.3d 849, 871 (10th Cir. 2019); Ex. A., Decl. of Florence Burke. The methods used here are typical of TVPRA cases across many contexts, whether domestic servants in a home or migrant workers on a ranch.

**Counts I & II, forced labor (§ 1589)**: For liability under § 1589, Plaintiff may show their labor was obtained by threat of serious harm; abuse or threatened abuse of the law or legal process; or a scheme, plan, or pattern intended to cause a person to believe he or another person would suffer serious harm. 18 U.S.C § 1589. "Serious harm" is defined to include "any harm, whether physical or nonphysical, including psychological, financial, or reputational harm." 18 U.S.C. §1589(a)(2)-(4) & (c)(2).

From 2008 through 2012, Plaintiffs Laura and Gawain were held against their will on the Freewinds and forced to labor up to 24 hours a day. *Supra* p.3. From 2008 to August, 2009, Plaintiff Valeska Paris performed hard, manual labor under Defendants' custody and control at an isolated facility in Australia. *Supra* p.2.[7]

Recently, the Tenth Circuit upheld human trafficking claims against defendants, including leaders of the Fundamentalist Church of Jesus Christ of Latter-Day Saints and the Church's law firm, for forced labor based on allegations similar to

---

paragraphs 1 to 213 (rather than 1 to 158) by reference. *See Villarino v. Pacesetter Pers. Servs.*, 481 F. Supp. 3d 1252, 1255 (S.D. Fla. 2020) (proper remedy is amendment by interlineation, not dismissal).

[7] During this time, the TVPRA was in effect and covered extraterritorial conduct. Plaintiffs do not seek retroactive application of the TVPRA, contrary to FSO's contention. FSO at 6

this case, including allegations that "when FLDS members were 'ordered' to do something they had no choice but to comply" due to Defendant Jeffs' "control over every aspect of their lives" and punishments including "intense and prolonged forced labor for underage workers and adults alike … in which safety precautions were regularly ignored." *Bistline*, 918 F.3d at 871-72. Another case found that a former member stated a claim against a religious group leader and his business organizations for forced labor because

> Defendants' intimidation tactics led plaintiff to believe that serious harm would come to her if she left the "safety" of UNOI. Defendants subjected plaintiff to humiliating and degrading treatment and obstructed her communications with her friends and family. They subjected plaintiff to physical and emotional abuse and controlled her living situations by forcibly moving her around the United States. Defendants denied plaintiff basic creature comforts, causing her to become severely malnourished. And she never could seek any health insurance or medical care outside of UNOI. Similarly, defendants prohibited plaintiff from receiving any education other than UNOI's education system after the age of 15.

*Ross v. Jenkins*, 325 F.Supp.3d 1141, 1164 (D.Kan. 2018). The allegations in this case are similar, *supra* pp.1-4. Moreover, here Plaintiffs asked to leave but were refused permission to quit their jobs and be released, and were furthermore punished for making the requests. *Supra* p.4. Asking to leave is not a requirement, but certainly indicates that the TVPRA claim is established. *Lagasan v. Al-Ghasel*, 92 F. Supp. 3d 445, 453 (E.D.Va. 2015); *Adhikari*, 697 F. Supp. 2d at 684. To escape, Plaintiffs went to great lengths: intentionally getting pregnant, hiding their pregnancies long enough to avoid Defendants' forced abortion policy and, in Valeska's case, hiding her miscarriage. *Supra* p.4. That is a strong indication their labor was not voluntary.

The complaint is replete with allegations that courts have traditionally found constitute coercion and forced labor. Physical punishment and witnessing other workers being punished for attempting to leave is strong evidence of coercion. E.g., *Aragon v. Che Ku*, 277 F. Supp. 3d 1055, 1070 (D. Minn. 2017) (plaintiffs alleged that one or more of the corporate defendants locked them in parts of Defendants' grocery stores, including freezers, on multiple occasions); *see also U.S. v. Warren*, 772 F.2d 827 (11th Cir. 1985) (pre-TVPRA case holding prior acts of violence a factor in discouraging workers from leaving camp). Here Plaintiffs were punished being locked in the engine room—a small, dark hot room where they could not stand straight—and saw others punished, including for seeking to leave. *Supra* p.3. Plaintiffs were isolated from outsiders, not permitted a phone, kept at their worksites, not permitted medical care, and told they would get cancer and die if they left. *Supra* p.2-3. They worked excessive hours, hardly getting any sleep, and were not provided adequate safety equipment. *Supra* p.2-4. Courts have not hesitated to find § 1589 satisfied in like circumstances. *Abafita v. Aldukhan*, 2019 WL 6735148, at *5 (S.D.N.Y. 2019); *Lagayan v. Odeh*, 199 F.Supp.3d 21, 28 (D.D.C. 2016); *Oak-Jin Oh v. Soo Bok Choi*, 2016 WL 11430442, at *2 (E.D.N.Y. 2016); *U.S. v. Garcia*, 2003 WL 22956917 (W.D.N.Y. 2003). Allegations that a plaintiff continued working to pay debts also constitutes sufficient "serious harm" sufficient to survive motion to dismiss *See*, *e.g.*, *David v. Signal Int'l., LLC*, 37 F. Supp. 3d 822, 832 (E.D. La. 2014); *Sulastri v. Halsey*, 2014 WL 4904527, at *2 (E.D.N.Y. 2014); *Nunag-*

*Tanedo v. E. Baton Rouge Par. Sch. Bd.*, 790 F. Supp. 2d 1134, 1146 (C.D. Cal. 2011). Allegations that, as here, the workers feared their captors in conjunction with difficult employment and living conditions, also demonstrate coercion. *U.S. v. Farrell*, 563 F.3d 364, 373 (8th Cir. 2009). And for a worker "without access to a bank account and not a dollar to her name, a juror could conclude that the failure to pay her – and thus the lack of money to leave or live—was sufficiently serious to compel [her] to continue working." *U.S. v. Dann*, 652 F.3d 1160, 1171 (9th Cir. 2011).

Finally, Defendants turn the concept of "vulnerability" on its head. Congress intended courts to consider the "individual circumstances of victims that are relevant in determining whether a particular type or certain degree of harm or coercion is sufficient to maintain or obtain a victim's labor or services, including the age and background of the victims." H.R. Rep. No. 106–939, at 101 (2000) (Conf. Rep.). Courts find coercion where, as here, indigent plaintiffs with limited education are transported far from home. *E.g.*, *Farrell*, 563 F.3d at 374 (workers arrived with very little money); *Ross*, 325 F.Supp.3d at 1164.

The methods employed on Plaintiffs have nothing to do with religious doctrine. Therefore, the cases cited by FSO (Br. at 16) that concern challenges to defrocking a bishop and a dispute between church branches over the disposition of church property are wholly inapt. So is *Headley v. Church of Scientology*, 687 F.3d 1173, 1180 (9th Cir. 2012), where, on summary judgment, the plaintiffs failed to marshal evidence of coercion: "the Headley's protest very little about their actual day-to-day jobs." *Headley*

does not speak to the sufficiency of Plaintiffs' allegations.

**Counts V & VI, Peonage (§ 1581):** Plaintiffs allege that Defendants are directly liable for peonage, attempted peonage and knowingly benefitting from a venture that they knew or should have known had engaged in acts of Peonage (Count V). Plaintiffs also allege conspiracy to commit peonage (Court VI). In a claim for peonage, "the law takes no account of the amount of the debt, or the means and method of coercion. It is sufficient to allege and prove that a person is held against his will and made to work to pay a debt." *Pierce v. United States*, 146 F.2d 84, 86 (5th Cir. 1944).

FSO challenges Plaintiffs' peonage claim on just two grounds: that Plaintiffs failed to allege (1) that they owed a debt to FSO and (2) that they were working to pay off that debt. FSO at 20. But the alleged debt need not be owed to FSO. "The case law interpreting § 1581 does not require that the alleged debt must be owed to the defendant." *Bucco v. W. Iowa Tech Cmty. Coll.*, 2022 WL 605801, at *10 (N.D. Iowa 2022) (citing *Bailey v. Alabama*, 219 U.S. 219, 242 (1911)); *see also Stein v. World-Wide Plumbing Supply Inc.*, 71 F. Supp. 3d 320, 327–28 (E.D.N.Y. 2014) (upholding peonage claim where debt was owed to only one of, not all, defendants). Second, Plaintiffs have alleged not only that they were working to pay off the debt owed to Defendants, but that they believed they owed a substantial debt, believed they could not leave without paying off that debt and, in fact, were repeatedly reminded by Defendants' agents that they could not leave without paying off the debt. *See* FAC ¶ 245 ("Defendants held Plaintiffs against their will and forced them to perform labor to pay off purported Scientology debts."); *see also* ¶¶ 4, 87 (impossible to walk away due to debt), 90

(regularly reminded of debt); 93 (Baxter believed he was indebted to Defendants).[8] Indeed, in May 2009, when Plaintiff Paris sought to leave, Defendants' agent Mary Jane Reeve reminded her that she would have to repay hundreds of thousands of dollars of debt. FAC ¶ 192. Plaintiffs state a claim of peonage.

      **Counts III & IV, Trafficking (§ 1590)**: Section 1590 imposes liability on, inter alia, Defendants who recruit, transport, harbor or obtain a person for labor or services in violation of another underlying Chapter 77 offense. Defendants do not challenge the sufficiency of Plaintiffs' § 1590 allegations, except to argue that Plaintiffs have not sufficiently alleged the required Chapter 77 violations of forced labor or peonage. Because Plaintiffs state a claim for both of those violations, as described above, Plaintiffs also state a corresponding § 1590 claim in Counts III and IV. E.g., *Adia v. Grandeur Mgmt., Inc.*, 933 F.3d 89, 94 (2d Cir. 2019); *Lagayan*, 2016 WL 4148189, at *5 (a valid claim under §1589 establishes claim under §1590).

## C.    Plaintiff Valeska Paris's Claims Are Timely

      Dismissal on statute of limitations grounds is appropriate "*only* if it appears beyond a doubt that' a plaintiff 'can prove no set of facts that toll the statute.'" *Sec'y of Labor v. Labbe*, 319 Fed. Appx. 761, 764 (11th Cir. 2008) (quoting *Tello v. Dean Witter Reynolds, Inc.*, 410 F.3d 1275, 1288 n. 13 (11th Cir. 2005)). Furthermore, because "asserting such a bar is an *affirmative defense*," *id*. (citing *Tello* at 1292), a plaintiff is

---

[8] Indeed, although Plaintiffs Laura and Gawain were ultimately able to leave before paying their debut because they took the drastic step of hiding a pregnancy to avoid Defendants' forced abortion/no child policy, they ultimately took out a loan to repay the freeloader debt, confirming the debt was real and that they had been working to pay it off. FAC ¶135.

"under no obligation to anticipate and negate this affirmative defense in the complaint." *Id*. (citation omitted). The FAC does not show beyond a doubt that Valeska can prove no set of facts to toll the statute of limitations. Rather, the allegations demonstrate that tolling is warranted because of extraordinary circumstances that are both beyond plaintiffs' control and unavoidable even with diligence. *See Arce v. Garcia*, 434 F.3d 1254, 1261 (11th Cir. 2006) (citing *Justice v. U.S.*, 6 F.3d 1474, 1475 (11th Cir. 1993) and *Sandvik v. US*, 177 F.3d 1269, 1271 (11th Cir. 1999)). Equitable tolling "is a fact-specific determination," *Cabello v. Fernandez-Larios*, 402 F.3d 1148, 1154-55 (11th Cir. 2005) (citation omitted).

When Valeska Paris escaped from Scientology, she had no formal education, was cut off from her parents, had no money, no home, no legal status, and had experienced decades of abuse that left her traumatized and suffering from PTSD and fearful of the outside world. *Supra* p.1-4; Ex. A, Burke Decl. She feared the Scientologists, as she knew they forbade taking legal action and were, furthermore, capable of severe and swift retaliation. FAC ¶¶ 32 (retaliatory "fair gaming"), 63, (Defendants forbade taking legal action), 161, 199 ("Defendants watched her and maintained a menacing presence, reminding her that if she did or said anything critical of Defendants, she would be subjected to swift and fierce retaliation"), 200. In mid-2011, she reluctantly and fearfully responded to an inquiry from an Australian government labor inspector with the understanding that it was a narrow, confidential investigation. ¶202. Nonetheless, in late 2011, Defendants directly threatened to take action against her if she assisted anyone or disclosed any information hostile to

Scientology. ¶203. This so terrified Valeska that she refrained from speaking publicly about Scientology for more than six years. ¶¶ 203, 206 (Defendants' threats, intimidation and retaliation caused Valeska to refrain for years from seeking legal counsel).[9] When viewed as true and in the light most favorable to Valeska, these allegations are the type of extraordinary facts that warrant equitable tolling. *See Arce*, 434 F.3d at 1259 (fear of reprisals supported equitable tolling); *Chavez v. Carranza*, 559 F.3d 486, 493-94 (6th Cir. 2009); *Jean v. Dorelien*, 431 F.3d 776, 780 (11th Cir. 2005).

FSO asks this court to ignore the operative legal standard by drawing inferences against Valeska and seeks to create a factual dispute by submitting documents (in a companion Request for Judicial Notice) in an effort to show Valeska spoke out against Scientology. FSO at 23-24. But when she did so, Defendants retaliated against her. *E.g*, FAC ¶201 (retaliatory "webpage of defamatory statements calling Valeska a liar"), 204-05 (retaliation caused fear of damage to job prospects and family). The factual allegations in this case are unlike *Abarca v. Little*, 54 F. Supp. 3d 1064 (D. Minn. 2014), and more similar to *Doe v. Siddig*, 810 F. Supp. 2d 127, 133-34 (D.D.C. 2011), which *Abarca* cited as "allowing discovery on equitable tolling because plaintiff was a minor when trafficked into the United States, held captive as a domestic servant for nearly twenty years, not permitted to learn English, and physically and psychologically abused." *Id.* at 1070. The similarity of Valeska's allegations, regarding the fear

---

[9] Now that she has filed this suit, Valeska is experiencing the retaliation she feared. ¶¶ 207, 212. To this day, because "of the ominous presence of strangers following her around, the numerous strange incidents at her workplace, and the attempted intrusions into her home and business … she lives in constant fear that she or her family will be harmed." ¶213.

Defendants instilled in her that prevented her from filing suit earlier, to those in *Siddig*
demonstrate she is entitled to discovery. Further, Defendants' reliance on documents
attached to FSO's Request for Judicial Notice (Dkt. 86) demonstrates this is a factual
issue that cannot properly be decided on a motion to dismiss. *See* Fed. R. Civ. P. 12(d);
*Trustmark Ins. Co. v. ESLU, Inc.*, 299 F.3d 1265, 1267 (11th Cir. 2002). Accordingly,
and for the foregoing reasons, the Court must deny Defendants' motion to dismiss
Valeska's claims as time-barred.

## D.    Leave to Amend

In the event the Court finds any of Plaintiffs' allegations insufficient, Plaintiffs
request leave to amend pursuant to Federal Rule of Civil Procedure 15(a) in order to
present more detailed facts in support of their claims as they have continued their
investigation since filing their Complaint. Leave to amend should be "freely given,"
particularly where, as here, the case is at its inception and there is no cause to believe
an amendment would be futile. *See Foman v. Davis*, 371 U.S. 178, 182 (1962).

## IV.  CONCLUSION

For the above reasons, Defendant's motion should be denied.

Respectfully submitted,

Dated:   September 13, 2022

/s/ Manuel J. Dominguez
Manuel J. Dominguez (Fla. Bar No.
0054798)
Cohen Milstein Sellers & Toll PLLC
11780 U.S Highway One, Suite N500
Palm Beach Gardens FL 33408
(561) 515- 1400
Jdominguez@cohenmilstein.com

Agnieszka M. Fryszman
Brendan Schneiderman
Cohen Milstein Sellers & Toll PLLC
1100 New York Ave. NW ● Fifth Floor
Washington, DC 20005
Tel: (202) 408-4600
Fax: (202) 408-4699
afryszman@cohenmilstein.com
bschneiderman@cohenmilstein.com

Theodore Leopold (Fla. Bar No. 705608)
Cohen Milstein Sellers & Toll PLLC
11780 U.S. Highway One, Suite N500
Palm Beach Gardens, FL 33408
(561) 515- 1400
tleopold@cohenmilstein.com

Warren A. Zimmerman (Fla. Bar No. 652040)
Warren A. Zimmerman, P.A.
4114 Sparrow Ct.
Lutz, FL 33558-2727
(813) 230-1465
warren@wzmimmermanlaw.com

Neil L. Glazer
Joseph C. Kohn
Zahra R. Dean
Aarthi Manohar
Elias Kohn
Kohn, Swift & Graf, P.C.
1600 Market Street, Suite 2500
Philadelphia, PA 19103
(215) 238-1700
nglazer@kohnswift.com
jkohn@kohnswift.com
zdean@kohnswift.cm
amanohar@kohnswift.com
ekohn@kohnswift.com

Gregory P. Hansel (Fla. Bar. No. 607101)
Shana M. Solomon
Elizabeth F. Quinby
Preti Flaherty Beliveau & Pachios, Chartered, LLP
One City Center
P.O Box 9546
Portland, ME 04112-9546
(207) 791-3000
ghansel@preti.com
ssolomon@preti.com
equinby@preti.com

Shelby Leighton
Anita Yandle (pending)
Public Justice
1620 L. St. NW, Suite 630
Washington, DC 20036
Phone: (202) 797-8600
Fax: (202) 232-7203
SLeighton@publicjustice.net
AYandle@publicjustice.net

*Attorneys for Plaintiffs*