## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

GAWAIN BAXTER et al.,

    Plaintiffs,

    v.                    Case No.: 8:22-cv-00986-TPB-JSS

DAVID MISCAVIGE et al.,

    Defendants.

_____/

**Plaintiffs' Opposition to Church of Scientology International, Inc.'s (CSI) Motion to Compel Arbitration, Dismiss for Lack of Personal Jurisdiction or Dismiss Plaintiffs' First Amended Complaint Pursuant to Rule 12(b)(6), Dkt. 89**

## I.    CSI'S MOTION TO COMPEL ARBITRATION SHOULD BE DENIED.

### A.    The arbitration agreements are unconscionable.

The arguments in Plaintiffs' Opposition to Defendants FSSO's motion to compel arbitration ("Pls. FSSO Br.") are incorporated here, and for those reasons there is no valid or enforceable agreement to arbitrate for CSI to enforce. The arbitration provisions are unenforceable for an additional reason: they are manifestly unconscionable.[1] "A contract is unconscionable if one of the parties lacked a meaningful choice in deciding whether to agree and the contract contains terms that are unreasonably favorable to the other party." *OTO, L.L.C. v. Kho*, 447 P.3d 680, 689

---

[1] To the extent the Court finds that this defense is not available under the Convention on the Enforcement of Foreign Arbitral Awards (CEFAA), it must still address it with regard to the Baxters' Departure Agreement and Laura's Enrollment Agreement, which are not "signed by the parties," CEFAA, art. II, ¶ 2; *see* Pls. FSSO Br., at 7 n.11.

(Cal. 2019). Unconscionability "has both a procedural and a substantive element," both of which are present here. *Id*. at 689-90.

The arbitration agreements are procedurally unconscionable due to their oppressive nature, particularly given the extremely unequal bargaining power between Plaintiffs and their traffickers, and their lack of a meaningful choice whether to sign the contracts.[2] Plaintiffs were pressured to sign the contracts under threat of punishment, and they were not permitted time to read the contracts—which were long and complex—let alone take time to carefully review them or ask questions. *See* Pls. FSSO Br. at 10. Even if they had been given a chance to review the arbitration agreements, Plaintiffs' lack of education or exposure to the world outside Scientology meant that they would not understand what arbitration was without the ability to obtain legal counsel, which they were denied.[3]

The arbitration agreements are also substantively unconscionable,[4] particularly due to their one-sided terms. *See Pokorny v. Quixtar, Inc.*, 601 F.3d 987, 997 (9th Cir.

---

[2] *See OTO, L.L.C.*, 8 Cal. 5th at 127. The circumstances relevant to establishing "oppression" and thus procedural unconscionability are: (1) the amount of time the party is given to consider the proposed contract; (2) the amount and type of pressure exerted on the party to sign the proposed contract; (3) the length of the proposed contract and the length and complexity of the proposed provision; (4) the education and experience of the party; and (5) whether the party's review of the proposed contract was aided by an attorney. *Id.* All those factors strongly point in favor of a finding that the arbitration agreements are procedurally unconscionable.

[3] *See* Declaration of Laura Baxter ("L. Decl.") attached hereto as Exhibit 1, ¶¶ 6, 12, 18, 29, 31; Declaration of Gawain Baxter ("G. Decl.") attached hereto as Exhibit 2, ¶¶ 13-14, 17-18, 27-28; Declaration of Valeska Paris ("V. Decl.") attached hereto as Exhibit 3, ¶¶ 31, 40-41. The Declaration of Michael Rinder ("Rinder Decl.") is attached hereto as Exhibit 4.

[4] The agreements as a whole are also substantively unconscionable because, for example, they require Plaintiffs to unilaterally waive all potential future legal claims, they provide for disproportionate and excessive liquidated damages, and they allow only Scientology to seek certain remedies in court. *See, e.g.*, Weber Decl. Exs. E, F; *see also Nelson v. Dual Diagnosis Treatment Ctr., Inc.*, 292 Cal. Rptr. 3d 740,

2012) ("[M]utuality is the 'paramount' consideration when assessing substantive unconscionability."). The agreements all require that Plaintiffs submit their claims to the Scientology religious dispute procedures, but they allow Defendants to bring claims against Plaintiff in whatever forum they choose, including court. Moreover, to the extent the agreements allow a party to seek a provisional remedy in court, only Defendants are allowed to do so. *See Ali v. Daylight Transport, LLC*, 59 Cal. App. 5th 462, 480 (Cal. Ct. App. 2020) (finding such a provision substantively unconscionable).

The agreements are substantively unconscionable for additional reasons. They require arbitration to be governed by decision-makers that Defendants control. *See* Pls. FSSO Br. at 14-16. And they provide only for application of the Scientology "system of Ethics and Justice," the rules of which are not available to Plaintiffs and that Defendants can unilaterally change.[5] Indeed, as described in Plaintiffs' FSSO Brief, even if they did have access to information about Scientology's Ethics and Justice rules, the fact that there may be multiple arbitration agreements in effect at once makes it impossible to discern which procedures apply. And the agreement does not specify if the arbitrator would apply those rules as they existed "as of the time of contracting, or at the time of arbitration." *Harper v. Ultimo*, 7 Cal. Rptr. 3d 418, 422 (Cal. Ct. App.

---

756 (Cal. Ct. App. 2022) (finding contract substantively unconscionable where it required "a unilateral release of almost any conceivable claim" the plaintiff could assert).

[5] Even though the departure agreements provide for arbitration in the alternative "under the auspices" of either AAA or JAMS, Weber Decl. Exs. E, F, I, those provisions are also unconscionable, including because they lack mutuality, are excessively broad, and fail to include any procedures at all for arbitration, including how an arbitration provider would be selected and who would pay the arbitrator's fee. *See Garcia*, 2021 WL 5074465, at *6 (explaining that an arbitration agreement that contains "*no* procedures to effect arbitration" is unconscionable).

2003). Finally, the agreements are either silent as to the location of arbitration or require arbitration in California, despite that Plaintiffs having never lived in California and in fact live on the other side of the world.[6] Therefore, the agreements are both substantively and procedurally unconscionable, and should not be enforced.

Defendants contend that the Court should not find unconscionability here because the Eleventh Circuit upheld the enforcement of similar provisions over an unconscionability challenge in *Garcia*. But the *Garcia* Court expressly did not decide whether the agreements were substantively unconscionable because they lacked mutuality—Plaintiffs' primary argument for substantive unconscionability here— because it found that the Garcias had waived that argument. *See* 2021 WL 5074465, at *8. And Plaintiffs' other unconscionability arguments are focused on the written terms of the agreements, unlike the Garcias' sole substantive unconscionability argument, which impermissibly asked the Court to wade into the religious beliefs of the arbitrators and the content of Scientology religious doctrine about "suppressive persons." *See id.* at *9. Moreover, *Garcia*'s procedural unconscionability holding is inapposite because none of the circumstances under which Plaintiffs signed the agreements, including highly coercive threats of physical punishment, abuse, and confinement, *see* Pls. FSSO Br. at 5-6, were present in the *Garcia* case. Indeed, the Garcias did not dispute that they voluntarily joined and participated in Scientology, and they even admitted to having taken a course on the Scientology justice system, so

---

[6] *See, e.g.*, Weber Decl. Exs. E, F, I.

4

they were well- aware of what they were agreeing to when they signed the agreements. *See* 2021 WL 5074465, at *1, *7. In contrast, Plaintiffs were forced into labor for Scientology at a young age, and they had very limited education and no knowledge of arbitration. As a result, they would not have understood what they were signing even if they had been permitted to read the agreements, which they were not. *See* Ex. 1, L. Decl. ¶¶ 13, 29; Ex. 2, G. Decl. ¶ 27; Ex. 3, V. Decl. ¶ 41. Given the completely different factual circumstances between the two cases, it is not surprising that the Garcias did not raise—and the Eleventh Circuit did not address—*any* of the arguments about the formation, validity, or enforceability of the agreements that Plaintiffs raise here. *See also* Pls. FSSO Br. at 2-3.

Defendants also argue that the Court cannot consider any of Plaintiffs' arguments against arbitration, including unconscionability, because the arbitration provisions are "internal ecclesiastical dispute resolution mechanisms established to decide disputes under religious law and policy." Dkt. 84 at 18. But as the Eleventh Circuit recognized in *Garcia*, "courts are free to resolve legal disputes involving churches and religion so long as their resolution 'involves no consideration of doctrinal matters.'" 2021 WL 5074465, at *9 (quoting *Jones v. Wolf*, 443 U.S. 595, 602 (1979)). Indeed, the court rejected the very same argument that Defendants make here, explaining that the Supreme Court cases that Defendants cite[7] "make clear that civil

---

[7] *See* Dkt. 84 at 18-20 (citing *Watson v. Jones*, 80 U.S. 679, 729-31 (1871); *Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church*, 344 U.S. 94, 116 (1952); *Serbian E. Orthodox Diocese v. Milivojevich*, 426 U.S. 696, 725 (1976)).

courts may not disturb the decisions of ecclesiastical tribunals on matters of church discipline and governance, minister selection, and other matters of faith and doctrine," but that determining the enforceability of Defendants' arbitration award "poses no risk of intruding upon the authority of the Chuch of Scientology in matters of 'ecclesiastical cognizance.'" *Id.* at *10. The Court explained that the question whether the award could be enforced under the FAA could be resolved using "neutral principles of law" because it "requires us to apply our precedents without any need to resolve disputes over Scientology doctrine." *Id.* That argument applies with even greater force here, where Plaintiffs ask the Court to look at the coercive circumstances under which they signed the agreements and the terms of the agreements themselves, not decide "whether any religious law was violated." *Id.*

Relatedly, Defendants contend that the "ministerial exception" applies to prevent judicial review of the arbitration agreements. Dkt. 84 at 20-21 (citing *Hosanna-Tabor Evangelical Lutheran Church and School v. EEOC*, 565 U.S. 171 (2012)). But the ministerial exception is not so broad. *See Hosanna-Tabor*, 565 U.S. at 196 (explicitly limiting application of exception to "an employment discrimination suit brought on behalf of a minister"). Defendants have pointed to no case in which a court declined to decide the arbitrability of a dispute that involved employees of a religious institution. And for good reason: unlike review of the decision whether to hire or fire an employee, the question of whether a valid agreement to arbitrate exists involves applying neutral principles of law and does not require the Court to interfere in "an internal church decision that affects the faith and mission of the church itself." *Id.* at 189. Moreover,

6

Plaintiffs are not "ministers" under the relevant case law because they were forced into Scientology against their will and never voluntarily chose to serve the religion. *Cf. Headley v. Church of Scientology Int'l*, 2010 WL 3157064, at *6 (C.D. Cal. Aug. 5, 2010) (applying ministerial exception at summary judgment because plaintiff "did not submit any admissible evidence that he joined the Sea Org against his will"). In short, Plaintiffs ask the Court to "treat religious and secular arbitrators equally" and invalidate an agreement that would be clearly unenforceable if it involved secular arbitration. *Id.* at 11.

### B.    Non-signatories cannot enforce the arbitration agreements.

To the extent any of the arbitration agreements are determined to be valid, CSI and the other non-FSSO Defendants cannot enforce any of the agreements on the basis that they are third-party beneficiaries. Defendants' assert in a largely conclusory fashion that they are third-party beneficiaries to the agreements signed by Plaintiffs.[8] But Defendants' arguments are so undeveloped that they are waived. *See Mecias v. Comm'n of Soc. Sec.*, No: 6:20-cv-2353-LHP, 2022 WL 3716738, at *4 (M.D. Fla. Aug. 29, 2022). CSI cites only two cases to support its status as third-party beneficiary: one stands for the general proposition that state-law equitable estoppel doctrines apply under the CEFAA, and one holds under Florida law that a party that was admittedly

---

[8] Defendants RTC, IASA, CSI, and FSO do not assert that they are third-party beneficiaries of the arbitration agreements in the Baxters' Covenants contained in Exhibits C and D to the Weber Declaration. And RTC, IASA, FSSO, and CSI do not claim to be third-party beneficiaries of Valeska's 1996 agreement, which is exclusively with FSO. Dkt. 85 at 4-5; Dkt. 87 at 17-18; Dkt. 88 at 16-17; Dkt. 89 at 17-18. Thus, they cannot enforce those agreements.

a third-party beneficiary of a contract was also bound by the arbitration provision in that contract. *See* CSI at 18; RTC at 17. Neither CSI nor any of the other Defendants explain how the general cases they cite provide support for their third-party beneficiary status here. *See NLRB v. McClain of Ga., Inc.*, 138 F.3d 1418, 1422 (11th Cir. 1998) (issues raised "without supporting argument" are waived).

But even if Defendants' arguments are sufficiently developed, they are not third-party beneficiaries. Defendants IASA and FSO rely on *Robinson v. NBC Universal Cable*, No. 17-cv-81324, 2018 WL 8620154, at *4 (S.D. Fla. Apr. 23, 2018), which found that a non-signatory was a third-party beneficiary because the agreement listed it among enumerated "Released Parties" and then required arbitration "between me, on the one hand, and one or more of the Released Parties, on the other hand." Here, the agreements are not so clear. *See, e.g.*, Weber Decl. Exs. E, F (applying to disputes "concerning my experiences as a member of the Sea Org or as voluntary religious worker for the Church or any Scientology Entity" but not specifying which party the provision applied to). Thus, the provisions do not evince a clear intent to benefit the other Defendants.

## II.    THE COURT HAS PERSONAL JURISDICTION OVER CSI

The legal basis for jurisdiction over CSI is the same as for jurisdiction over IASA, and the arguments made in Plaintiffs' Response to IASA's Motion are incorporated herein by reference. Jurisdiction is proper under the long-arm statute because CSI has a "spiritual headquarters" in Clearwater, and via OSA maintains a substantial operational presence in Clearwater. FAC ¶¶ 19, 32; Ex. 4, Rinder Decl. ¶¶

8, 10, 14, 25. And CSI has contacts with Florida that are related to Plaintiffs' claims: after her mother left Sea Org, Valeska was surveilled by CSI's OSA in Florida. FAC ¶ 200. OSA also directed Plaintiffs' families to gather in Florida for retaliatory operations against Plaintiffs.[9] FAC ¶ 32. These were tortious acts by CSI, committed in Florida, as part of the course of unlawful conduct alleged in the Complaint.

The due process requirements for personal jurisdiction are also met:  RTC purposefully availed itself of the privilege of doing business in Florida by maintaining a spiritual headquarters and operational presence there, FAC ¶ 19; the conduct just described by CSI's OSA constitutes claim-related contacts with the state; and the fair play/substantial justice analysis is the same for CSI as for IASA. *See* Pls. IASA Br. at 10.

The Court also has jurisdiction over CSI as a co-conspirator. *See* Pls. IASA Br. at 10-12, Pls. RTC Br. at 6-7. Plaintiffs have alleged that CSI participated in a conspiracy touching Florida. *Id*. The leader of the conspiracy, Defendant Miscavige, is subject to personal jurisdiction in Florida, as he lives and has his principal place of business here. FAC ¶¶ 16, 17. And Plaintiffs have alleged overt acts in Florida by co-conspirator Defendants RTC and IASA in furtherance of the conspiracy: when Gawain wrote to RTC officer Javier Martinez at Flag Base in Florida requesting permission to leave Sea Org to escape abusive and intolerable conditions, Gawain was verbally abused by Danny Light, a high-ranking IASA officer from the Freewinds,

---

[9] And Gawain and Valeska lived at Scientology's Flag Base in Clearwater, which is CSI's "spiritual headquarters" where it conducts substantial business. *Id*. ¶¶ 13, 15, 19, 88, 155.

then at Flag Base, who demanded that he call Martinez and falsely confess to fabricating the claims he made in the letter. FAC ¶ 93. In addition, Plaintiffs have alleged that Laura was transported from England to the Freewinds via Florida by her IASA guardian. FAC ¶ 116. And everything that was done to Plaintiffs by any of the Defendant entities was done under the control and at the direction of Florida-based Miscavige. FAC ¶¶ 16, 27; *see infra*. The Court may exercise personal jurisdiction over CSI on a co-conspirator theory.

Jurisdiction over CSI is also proper just based on the Florida contacts of Miscavige. CSI is directly controlled by Miscavige. FAC ¶¶ 27-29, 32-34, 37. Miscavige uses CSI to direct the management of all Scientology-affiliated entities and organizations. FAC ¶ 19. CSI's OSA handles Scientology's internal security, and its head reports to and takes direction exclusively from Miscavige and his agents. FAC ¶ 32. CSI (via OSA and CMO) reports potential critics and defectors like Plaintiffs to Miscavige on a daily basis, who then instructs CSI on how to control and punish them. FAC ¶ 37. Because CSI is controlled by Miscavige, its actions should be deemed to have been taken from Florida.

CSI claims it "does not have any business facilities, officers, employees, representatives, or agents," or "offices," in Florida. (Farny Decl. ¶¶ 9, 11). CSI also disputes that the actions and contacts of OSA may be ascribed to CSI. *Id.* at ¶ 12. Absent from CSI's affidavit is a response to Plaintiffs' allegation that CSI has a "spiritual headquarters" in Clearwater. FAC ¶ 19. Instead, Farny narrowly denies that CSI has "business facilities" or "offices" in the state, or "officers, employees,

10

representatives, or agents . . . ." Farny Decl. ¶¶ 9, 11. Given that CSI views itself as something other than a "business," Farny Decl. ¶ 5 ("CSI . . . is committed and dedicated to the advancement and dissemination of the Scientology religion in accordance with Scientology Scripture"), the claim that it does not have "business facilities" or "offices" there is not responsive to Plaintiffs' "spiritual headquarters" allegation.

CSI acknowledges that it has *some* presence in the state when it dismisses as insufficient "CSI's negligible *activities in Florida*." Dkt. 89 at 11. As "negligible" activities are not *no* activities, it must not be true that CSI has "no employees, representatives, or agents" in the state.

As for the argument that "none of the post-2002 conduct happened in Florida," Dkt. 89 at 12, this ignores OSA's directive that Plaintiffs' families gather in Florida for retaliatory operations against Plaintiffs. FAC ¶ 32. And even if events that happened before 2002 could not themselves support liability under the statute, CSI cites no authority to support its position that such events do not count as relevant jurisdictional contacts, particularly in a case in which Plaintiffs were subjected to forced labor for many years.

As for CSI's assertion that it "has never ordered, demanded, requested or otherwise required Plaintiffs to do anything," Farny Decl. ¶ 16, that conclusory denial of liability is insufficient to defeat jurisdiction. *See Don't Look Media v. Fly Victor Ltd.*, 999 F.3d 1284, 1292 (11th Cir. 2021) (defendants may shift the burden back to

plaintiffs by submitting "*non-conclusory* affidavits to controvert the allegations in the complaint . . . .") (emphasis added).

CSI is also subject to general jurisdiction for the reasons given in Plaintiffs' response to IASA's motion.

At a minimum, the Court should permit jurisdictional discovery for the reasons given in Plaintiffs' response to IASA's motion.

## III.    THE COMPLAINT PLAUSIBLY ALLEGES TVPRA CLAIMS

Defendant CSI's motion to dismiss the First Amended Complaint ("FAC") for failure to state a claim under Fed. R. Civ. P. 12(b)(6) is meritless. As is set forth in Plaintiffs' Memorandum of Law in Opposition to Defendant RTC's Motion to Dismiss ("Pl. RTC Mem."), and Plaintiffs' Memorandum of Law in Opposition to Defendant FSO's Motion to Dismiss ("Pl. FSO Mem."), both of which Plaintiffs fully incorporate by reference herein, the FAC is not an impermissible shotgun pleading. The FAC alleges considerable detail supporting Plaintiffs' claims for § 1595(a) venture liability and conspiracy against all Defendants, including CSI. Contrary to its suggestion, CSI was more than a distant observer or mere licensor of intellectual property. Dkt. 89 at 23. It played a significant role in the venture, and it benefitted from Sea Org labor.

CSI's role in the venture was significant, because it is one of two entities that controls the management of FSO and FSSO, its enforcers oversee and direct operations in those entities, including on board the Freewinds, as well as at the ANZO site in Australia where Valeska was sent, and another group of enforcers within CSI

are responsible for, among other things, intelligence, and retaliation campaigns against outside dissidents. FAC ¶ 33.

CSI is situated in the Scientology hierarchy just below Miscavige, and it is fully controlled by him. Management oversight for all Scientology-affiliated entities and operations is vested in CSI. FAC ¶ 29. Corporate management structures are a fiction; Miscavige solely controls and directs the entire upper echelon of management in all entities, including CSI. FAC ¶ 29. At least with respect to the most relevant CSI components for this litigation, Miscavige directs their operations fully. Within CSI, there is a group of personnel known as the Commodore's Messenger Org or "CMO." FAC ¶ 33. This is one of the two principal "command channels" within Scientology, its chain of command running directly from Miscavige to the local operations of various entities and organizations, including Defendants FSO and FSSO. FAC ¶¶ 19, 34. CMO's primary function is to enforce Defendants' policies pursuant to Miscavige's direction, monitoring the management of all Scientology operations, providing reports to Miscavige and his senior officers, and relaying and enforcing directives from them to operational managers. FAC ¶ 33. For each of Defendants' operations, there is a corresponding CMO unit supervised by a Commanding Officer. FAC ¶ 33.

CMO embeds operatives within other entities and orgs, including FSO's operations at Flag Base, on FSSO's Freewinds, and at the ANZO site in Australia. FAC ¶ 33. Their reporting line is outside of the management structure of those organizations; CMO personnel report only to senior CMO personnel, senior RTC personnel, and Miscavige. They derive their authority from Miscavige, and every Sea

Org member is required to consider all CMO orders as if they come directly from Miscavige, i.e., they must be obeyed absolutely (even if they appear to be incorrect, because this is a no-questions-asked policy). FAC ¶ 34. Failure to obey CMO orders or any disrespect to them is considered a "crime" or "suppressive act," for which the harshest punishments may be imposed. FAC ¶ 34. CMO monitors management and operations in the entities, providing reports up through its "command channel" to the highest echelon CMO officers in CSI, who report to Miscavige. Miscavige and his high echelon senior officers then issue directives to be carried out by CMO personnel, who in turn direct the execution of those orders in the entity's operations. FAC ¶¶ 30, 33, 34.

When Sea Org members' behavior deviates from Defendants' rigid policies, they are reported up through the CMO and RTC command channels to Miscavige and his senior officers, who then issue directives for "handling," punishing and controlling the purported offenders. FAC ¶ 37. CMO and RTC officers regularly meet and communicate with Miscavige, reporting in detail on Sea Org members who are in poor standing or who have left Sea Org, and receive detailed instructions on how to silence or punish those individuals. FAC ¶ 62. Policing of the Sea Org workforce is further enhanced by rules requiring any Sea Org member who knows of violations of Defendants' rigid policies to file reports, which are given to CMO and RTC officers to send up through their respective command channels. FAC ¶ 37. Failure to report any misconduct is subject to harsh consequences. FAC ¶ 37. Yet, reporting being mistreated by other Sea Org members results in rapid response by CMO and RTC,

14

who coerce the member into falsely admitting to having made it up, which then results in severe punishment. FAC ¶ 40. CMO and RTC officers review the detailed files kept on Sea Org members, decide who should be punished and in which way, either directly impose the punishment or oversee someone who does, and decide when the Sea Org member has been sufficiently punished to render them once again fully subjugated. FAC ¶¶ 66, 68. CMO and RTC officers also direct the enforcement and implementation of the stringent and abusive policies dictating how Sea Org members may leave the organization. FAC ¶ 73.

At FSO's Flag Base, CMO and RTC officers were ever-present because Flag Base is Scientology's largest hub of operations, with a large Sea Org workforce. FAC ¶ 20. It is also where Cadet Org and Sea Org members are conditioned for future servitude, which makes the job of CMO and RTC officers even more important. FAC ¶¶ 91-92, 157, 159. CSI's OSA likewise has officers embedded at Flag, from where, among other things, they monitor defectors and critics, directing intelligence and retaliation campaigns to silence them when OSA and Miscavige deem them to be threats to Scientology's image or to present legal risks. FAC ¶¶ 37, 40, 62, 162, 200) Shortly after filing this lawsuit, Gawain's and Laura's families were directed to relocate to Flag Base from their posts around the world, where they have been harassing Gawain and Laura and attempting to pressure them into dropping their claims. FAC ¶ 144.

The CMO Commanding Officer on the Freewinds is one of the two highest authorities on the ship, along with the ship's RTC officer. FAC ¶ 39, 42. Although

FSSO runs the ship's operations, and its president divides operational supervision with the ship captain, both work under the oversight and direction of CMO and RTC, who report to and take direction from Miscavige. FAC ¶ 39. All matters concerning discipline and Sea Org members wanting to leave the ship are reported to CMO and RTC, who decide how to handle those members. FAC ¶¶ 42, 62. CMO was involved in such matters for each of Gawain, Laura and Valeska. FAC ¶¶170, 174, 176, 177. When Valeska was sent to Defendants' ANZO site, she was still considered attached to FSSO's staff on the ship, and was still subject to oversight by the ship's CMO and RTC officers, along with the local CMO and RTC personnel. FAC ¶¶ 178, 180, 187-193, 197, 198. The ship's CMO and RTC officers directed local ANZO officers to psychologically abuse Valeska, including efforts to pressure Valeska's spouse to leave her. FAC ¶¶ 170, 192-193. The ship's CMO even threatened to recall Valeska and send her back to the ship's engine room, and threatened to prevent her from leaving Sea Org and sending her to another RPF site in Los Angeles instead. FAC ¶ 191.  This well-orchestrated campaign led up to CSI's OSA taking over Valeska's handling, deciding when and under what circumstances they would permit Valeska to finally leave the Sea Org, and directed the months of intensive interrogations she had to undergo before that permission was granted. FAC ¶ 197.

CSI, through CMO and OSA was not only a participant in the venture, it was a core participant. While Plaintiffs contend that the FAC plausibly alleges CSI's direct involvement in TVPRA offenses against Plaintiffs, actual participation in the

trafficking act itself is not required to state a claim.  *S.Y. v. Naples Hotel Co.*, 476 F. Supp. 3d 1251, 1256 (M.D. Fla. 2020).

CSI and RTC work in tandem, and their officers and personnel are directly involved in applying and directing the application of the coercive methods by which Defendants subjugate Sea Org members and force them to work under arduous conditions, with little sleep and little to no pay. FAC ¶¶ 91-94, 114-115, 159. They benefit from the labor and services of Sea Org members, and they naturally benefit from the fact that the Scientology-affiliated entities that generate revenues likewise utilize this nearly unpaid workforce, lowering their operating costs and consequently inflating the sums available to support their operations and the amounts they can transmit to or for the benefit of the other Defendants. Indeed, Defendant CSI's "spiritual headquarters" is at Flag Base, staffed by Sea Org, and many events are held at Flag for CSI. FAC ¶ 19-22.  Likewise, the Freewinds is CSI's floating hotel, where the highest level and most expensive courses are offered to Scientologists, and where IASA's Sea Org staff are required to extract additional sums from the ship's guests. FAC ¶ 19. All of this benefits all Defendants. As demonstrated in Plaintiffs' Responses to RTC's and FSO's Motions, the venture committed TVPRA offenses, including forced labor, peonage and trafficking, and from CSI's perch, it had a window into it all. "[K]nowledge, and other conditions of a person's mind may be alleged generally." *S.Y. v. Best W. Int'l, Inc.*, No. 2:20-CV-616-JES-MRM, 2021 WL 2315073, at *5 (M.D. Fla. June 7, 2021) (citing Fed. R. Civ. P. 9(b)). "[T]he civil statute allows a plaintiff to plead that the defendant merely had constructive knowledge." *Doe #1 v. MG Freesites,*

*LTD*, No. 7:21-CV-00220-LSC, 2022 WL 407147, at *11 (N.D. Ala. Feb. 9, 2022)"). *See also*, *Ricchio v. Bijal, Inc.*, 424 F. Supp. 3d 182, 193-94 (D. Mass. 2019) ("The phrase 'knew or should have known,' echoes common language used in describing an objective standard of negligence."). CSI clearly knew or should have known of those offenses, including the ones committed against Valeska, Laura and Gawain. It is thus liable to Plaintiffs as a co-venturer under section 1595(a). *Doe #1 v. Red Roof Inns*, Inc., 21 F.4th 714, 723-726 (11th Cir. 2021).

CSI's activities also give rise to liability for attempt: its intent can be inferred from the substantial steps it took toward commission of acts of forced labor, peonage and trafficking. *U.S. v. Murrell*, 368 F.3d 1283, 1286 (11th Cir. 2004). Further, its direct liability for those offenses is also an independent basis for liability under § 1594(a). *Id.* A complaint that states a claim for an enumerated TVPRA offense also states a claim for attempting those offenses. *See Paguirigan v. Prompt Nursing Emp. Agency LLC*, 286 F. Supp. 3d 430, 439–40 (E.D.N.Y. 2017) ("Because … plaintiff has stated a claim under §§ 1589 and 1590 … plaintiff has stated a claim for the attempted violation of those provisions. 18 U.S.C. § 1594(a).").

CSI's actions also give rise to a strong inference that it "entered into a joint enterprise with consciousness of its general nature and extent." *Stein v. World–Wide Plumbing Supply Inc.*, 71 F.Supp.3d 320, 330 (E.D.N.Y. 2014) (internal quote marks and citations omitted). The FAC contains "'enough factual matter (taken as true) to suggest that an agreement was made.'" *Baxla v. Chaudhri*, 225 F. Supp. 3d 588, 594 (E.D. Va. 2016) (citation omitted). The intra-corporate conspiracy doctrine does not

18

apply here because plaintiffs do not allege that "'a single legal entity . . . conspire[d] with itself.'" *Cosby v. Lee Cnty.*, 55 F. Supp. 3d 1393, 1404 (M.D. Fla. 2014) (citing *McAndrew v. Lockheed Martin Corp.*, 206 F.3d 1031, 1036 (11th Cir. 2000). Moreover, the doctrine does not apply to civil actions predicated upon violation of a criminal conspiracy statute. *McAndrew*, 206 F.3d at 1038–40.

The FAC is also not an impermissible shotgun pleading. It is not "virtually impossible to know which allegations of fact are intended to support which claim(s) for relief." *Inform Inc. v. Google LLC*, No. 21-13289, 2022 WL 3703958, at *4 (11th Cir. Aug. 26, 2022) (*citing* Weiland *v. Palm Beach Cnty. Sheriff's Off.*, 792 F.3d 1313, 1321–23 (11th Cir. 2015)). "The failure to specify a particular defendant is not fatal, however, when '[t]he complaint can be fairly read to aver that all defendants are responsible for the alleged conduct.'" *S.Y. v. Best W. Int'l, Inc.*, 2021 WL 2315073, at *2 (*quoting Kyle K. v. Chapman*, 208 F.3d 940, 944 (11th Cir. 2000)). "A fair reading of the [FAC] is that each of these defendants was involved in the identified conduct attributed to ['Defendants']. While defendants may disagree that such allegations are accurate, that dispute is for another day." *Id*. The First Amended Complaint is more than adequate to enable CSI and the other Defendants to understand the basis for Plaintiffs' claims.

## CONCLUSION

For these reasons, CSI's motion to compel arbitration, dismiss for lack of personal jurisdiction, and dismiss for failure to state a claim under Rule 12(b)(6) should be denied.

Dated:  September 13, 2022                Respectfully submitted,

*/s/ Neil L. Glazer*
Neil L. Glazer
Joseph C. Kohn
Zahra R. Dean
Aarthi Manohar
Elias Kohn
**KOHN, SWIFT & GRAF, P.C.**
1600 Market Street, Suite 2500
Philadelphia, PA 19103
(215) 238-1700
nglazer@kohnswift.com
jkohn@kohnswift.com
zdean@kohnswift.com
amanohar@kohnswift.com
ekohn@kohnswift.com

Gregory P. Hansel
(Fla. Bar No. 607101)
Shana M. Solomon
Elizabeth F. Quinby
**PRETI FLAHERTY BELIVEAU
  & PACHIOS, CHARTERED, LLP**
One City Center
P.O. Box 9546
Portland, ME 04112-9546
(207) 791-3000
ghansel@preti.com
ssolomon@preti.com
equinby@preti.com

Agnieszka M. Fryszman
Brendan Schneiderman
**COHEN MILSTEIN SELLERS
 & TOLL PLLC**
1100 New York Ave., N.W., Fifth Floor
Washington, DC 20005
(202) 408-4600
afryszman@cohenmilstein.com
bschneiderman@cohenmilstein.com

Theodore Leopold
(Fla. Bar No. 705608)
Manuel J. Dominguez
(Fla. Bar No. 0054798)
**COHEN MILSTEIN SELLERS
 & TOLL PLLC**
11780 U.S. Highway One, Suite N500
Palm Beach Gardens, FL 33408
(561) 515-1400
tleopold@cohenmilstien.com
jdominguez@cohenmilstein.com

Shelby Leighton
Anita Yandle
(pro hac application pending)
**PUBLIC JUSTICE**
1620 L St. NW, Suite 630
Washington, DC 20036
Phone: (202) 797-8600
Fax: (202) 232-7203
SLeighton@publicjustice.net
AYandle@publicjustice.net
Warren A. Zimmerman
(Fla. Bar No. 652040)

**WARREN A. ZIMMERMAN, P.A.**
4114 Sparrow Ct
Lutz, FL  33558-2727
(813) 230-1465
warren@wzimmermanlaw.com