# EXHIBIT A

{00235815 }

KOHN, SWIFT & GRAF, P.C.

1600 MARKET STREET, SUITE 2500

PHILADELPHIA, PENNSYLVANIA 19103-7225

JOSEPH C. KOHN
ROBERT A. SWIFT
ROBERT J. LAROCCA
DOUGLAS A. ABRAHAMS •
WILLIAM E. HOESE
STEVEN M. STEINGARD •
STEPHEN H. SCHWARTZ †
CRAIG W. HILLWIG
BARBARA L. GIBSON †
NEIL L. GLAZER †
ZAHRA R. DEAN ✳
AARTHI MANOHAR
ELIAS A. KOHN

(215) 238-1700
TELECOPIER (215) 238-1968
FIRM E-MAIL: info@kohnswift.com
WEB SITE: www.kohnswift.com

HAROLD E. KOHN
1914-1999
BAYARD M. GRAF
1926-2015

OF COUNSEL
GEORGE W. CRONER
LISA PALFY KOHN

Email: nglazer@kohnswift.com

December 21, 2022

† ALSO ADMITTED IN NEW YORK
• ALSO ADMITTED IN NEW JERSEY
✳ ONLY ADMITTED IN NEW YORK

**<u>Via Certified and Electronic Mail</u>**

William J. Schifino, Jr. Esquire
GUNSTER, YOAKLEY & STEWART, P.A.
401 E. Jackson Street
Suite 1500
Tampa, FL 33602

Re:   *Baxter et al. v. Miscavige et al.*, No. 8:22-CV-00986,
      (M.D. Fla. Apr. 28, 2022)

Dear William J. Schifino, Jr.

This is notice that we have served your client, David Miscavige, in the above referenced action in care of the Florida Secretary of State pursuant to Florida Statute § 48.161. Enclosed are copies of proof of service, the summons, and the First Amended Complaint in this action.

Very truly yours,

Neil L. Glazer

Enclosures

## RETURN OF SERVICE

### UNITED STATES DISTRICT COURT
Middle District of Florida

Case Number: 22-CV-00986-TPB-JSS

Plaintiff:
**GAWAIN BAXTER, LAURA BAXTER, and VALESKA PARIS**

vs.

Defendant:
**DAVID MISCAVIGE (see attached for additional defendants)**



KDY2022034233

For:
KOHN, SWIFT & GRAF, P.C.

Received by PRETIFLAHERTY on the 14th day of September, 2022 at 9:50 am to be served on **DAVID MISCAVIGE C/O SECRETARY OF STATE, 2415 N. MONROE STREET, SUITE 810, TALLAHASSEE, FL 32303.**

I, Christopher Kady, do hereby affirm that on the **14th day of September, 2022 at 12:30 pm, I:**

served a **CORPORATE, PARTNERSHIP, ASSOCIATION OR GOVERNMENT SERVICE** by delivering a true copy of the **COVER LETTER, SUMMONS IN A CIVIL ACTION, AND AMENDED COMPLAINT** with the date and hour of service endorsed thereon by me, to: **YVETTE MCGEE** as **SENIOR WORD PROCESSOR** authorized to accept service, of the within named corporation, at the address of: **2415 N. MONROE STREET, SUITE 810, TALLAHASSEE, FL 32303** on behalf of **DAVID MISCAVIGE**, and informed said person of the contents therein, in compliance with state statutes.

**Description** of Person Served: Age: 50, Sex: F, Race/Skin Color: BLACK, Height: 5'8", Weight: 275, Hair: BLACK, Glasses: N

I certify that I am over the age of 18, have no interest in the above action, and am a Certified Process Server, in good standing, in the judicial circuit in which the process was served. "Under penalties of perjury, I declare that I have read the foregoing document and that the facts in it are true" F.S. 92.525.  NOTARY NOT REQUIRED PURSUANT TO FS 92.525

**Christopher Kady**
Process Server 237

**PRETIFLAHERTY**
P.O. BOX 9546
PORTLAND, ME 04112-9546
(207) 791-3226

Our Job Serial Number: KDY-2022034233

Copyright © 1992-2022 Database Services, Inc. - Process Server's Toolbox V8.1z

AO 440 (Rev. 06/12)  Summons in a Civil Action

# UNITED STATES DISTRICT COURT
for the

Middle District of Florida

GAWAIN BAXTER, LAURA BAXTER,
and VALESKA PARIS

)
)
)
)
*Plaintiff(s)* )
v. )        Civil Action No.   8:22-cv-00986-TPB-JSS
)
DAVID MISCAVIGE )
(see attached for additional Defendants) )
)
)
*Defendant(s)* )

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*   David Miscavige
c/o Florida Secretary of State, Pursuant to Fla. Stat. § 48.161
The Centre of Tallahassee
2415 N. Monroe Street, Suite 810
Tallahassee, FL 32303

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:

Neil L. Glazer
Kohn, Swift & Graf, P.C.
1600 Market Street, Suite 2500
Philadelphia, PA 19103-7225

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

*CLERK OF COURT*

Lisa Silvia

Date:   September 12, 2022

*Signature of Clerk or Deputy Clerk*

**Summons 2nd Page**

**Additional Defendants:**

CHURCH OF SCIENTOLOGY INTERNATIONAL, INC.;

RELIGIOUS TECHNOLOGY CENTER, INC.;

IAS ADMINISTRATIONS, INC.;

CHURCH OF SCIENTOLOGY FLAG SERVICE ORGANIZATION, INC.;

and

CHURCH OF SCIENTOLOGY FLAG SHIP SERVICE ORGANIZATION, INC.

AO 440 (Rev. 06/12)  Summons in a Civil Action (Page 2)

Civil Action No.  8:22-cv-00986-TPB-JSS

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)* _____

was received by me on *(date)* _____ .

❏ I personally served the summons on the individual at *(place)* _____

_____ on *(date)* _____ ; or

❏ I left the summons at the individual's residence or usual place of abode with *(name)* _____

_____ , a person of suitable age and discretion who resides there,

on *(date)* _____ , and mailed a copy to the individual's last known address; or

❏ I served the summons on *(name of individual)* _____ , who is

designated by law to accept service of process on behalf of *(name of organization)* _____

_____ on *(date)* _____ ; or

❏ I returned the summons unexecuted because _____ ; or

❏ Other *(specify):*



My fees are $ _____ for travel and $ _____ for services, for a total of $ 0.00 .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc:

# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

| | | |
|---|---|---|
| GAWAIN BAXTER, LAURA BAXTER and VALESKA PARIS, | : : : : | CIVIL ACTION |
| Plaintiffs, | : : : | NO. 8:22-cv-00986 |
| v. | : : | |
| DAVID MISCAVIGE; CHURCH OF SCIENTOLOGY INTERNATIONAL, INC.; RELIGIOUS TECHNOLOGY CENTER, INC.; IAS ADMINISTRATIONS, INC.; CHURCH OF SCIENTOLOGY FLAG SERVICE ORGANIZATION, INC.; and CHURCH OF SCIENTOLOGY FLAG SHIP SERVICE ORGANIZATION, INC., | : : : : : : : : : : : : | |
| Defendants. | : : | |

## FIRST AMENDED COMPLAINT

**<u>TABLE OF CONTENTS</u>**

I.    INTRODUCTION ........................................................................ 1

II.   JURISDICTION AND VENUE................................................ 4

III.  MISCAVIGE IS CONCEALING HIS WHEREABOUTS TO EVADE SERVICE OF PROCESS ................................................ 4

IV.  THE PARTIES ........................................................................ 11

    A.   The Plaintiffs........................................................... 11

    B.   The Defendants ...................................................... 12

V.   FACTUAL BACKGROUND ................................................ 19

    A.   SCIENTOLOGY ..................................................... 19

          1.   Defendants' Organization and Management .................... 19

          2.   The Freewinds ............................................. 27

          3.   Psychological Theory ........................................ 30

          4.   Membership ................................................ 32

          5.   Coercive Control............................................ 32

               a.   Auditing................................................. 32

               b.   Isolation of Children .................................. 36

               c.   Crime and Punishment ............................. 39

          6.   The Consequences of Defecting........................... 44

          7.   The Abusive Formal Process for Leaving Sea Org ........... 48

    C.   FACTS SPECIFIC TO PLAINTIFFS ......................... 51

          1.   Plaintiff Gawain Baxter ................................... 51

          2.   Plaintiff Laura Baxter ..................................... 63

          3.   Plaintiffs Gawain Baxter and Laura Baxter Meet and Marry ................................................... 69

          4.   Plaintiff Valeska Paris ..................................... 78

VI.  CLAIMS FOR RELIEF........................................................ 110

VII. DEMAND FOR JURY TRIAL............................................ 116

VIII. PRAYER FOR RELIEF ..................................................... 116

## I.   <u>INTRODUCTION</u>

1.      Plaintiffs bring this action against Defendants pursuant to the
Trafficking Victims Protection Reauthorization Act ("TVPRA"), 18 U.S.C.
§§1581-1597.  As children, all three Plaintiffs grew up in, and were raised by
Scientology.[1]  This was not a peaceful or loving environment; instead, it was a
world filled with abuse, violence, intimidation, and fear. Defendants
considered Plaintiffs to be possessions, void of any rights, whose sole purpose
was to serve Defendants.  Plaintiffs were placed on a ship they could not
leave and routinely punished by being humiliated, interrogated, and
imprisoned, for the sole purpose of ensuring Plaintiffs would continue to
perform back-breaking free labor for the Defendants.

2.      Defendants in this action are David Miscavige, Church of
Scientology International, Inc., Religious Technology Center, Inc., IAS
Administrations, Inc., Church of Scientology Flag Service Organization, Inc.,
and Church of Scientology Flag Ship Service Organization, Inc. (together,
"Defendants").  Plaintiffs allege Defendants violated the TVPRA by
committing, attempting, and conspiring to commit, and/or by participating in
a trafficking venture that committed, attempted, and conspired to commit,

---

[1] "Scientology" and "Church of Scientology" are umbrella terms used to refer to the
entire universe of entities and organizations affiliated with Defendants.
"Scientologist" refers to any person who is a member of any constituent entity or
organization of Scientology, including members of Sea Org.  Scientologists who are
not members of Sea Org are often referred to as "public" members.

forced labor and other human trafficking offenses against Plaintiffs in violation of Chapter 77 of Title 18 of the United States Code. Defendants, directly and through the venture, coerced persons, including Plaintiffs, to join the Defendants' "Sea Org" and provide unpaid labor and services for a decade or longer on Defendants' ocean going cruise ship vessel, the "Freewinds."[2] Defendants knowingly obtained valuable benefits, including but not limited to financial enrichment, and free labor and services, like construction work, landscaping, and food preparation at "Flag Base," in Clearwater, Florida, and aboard the Freewinds. The receipt of money and unpaid labor also enabled David Miscavige to maintain a façade of legitimacy, a luxurious lifestyle, power over every aspect of the organization's global operations, and influence over members, including celebrities who joined and promoted Scientology publicly. Persons working under Miscavige also benefitted from their participation, financially and/or by obtaining the enhanced status, power, and authority that he bestowed on them. As a result, all Defendants knew or should have known about the venture's offenses, and all participants in the venture are jointly and severally liable for the physical, emotional, psychological, and economic harm caused to the Plaintiffs.

---

[2] All Scientology-affiliated entities and organizations alleged herein are managed and controlled exclusively by members of Sea Org, described *infra*, ¶¶ 16, 20, 21.

2

3.     This action concerns abusive practices within Defendants' Sea Org and its subsidiary organization for young children known as "Cadet Org."[3]  Through the highly-regimented Cadet Org and Sea Org, children raised in Scientology are indoctrinated, manipulated, and pressured into coercive circumstances from a young age, in which they are compelled to provide age-inappropriate labor and services to Defendants with little or no preparation or training, safety precautions, or compensation, and from which there are no reasonable means of escape.  Because Scientology's distinction between children and adults is fuzzy, at best, children are informed that they are considered adults and that they must behave and expect to be treated as adults.  There is thus no acknowledged transition from childhood to adulthood; rather, minors transition from Cadet Org to Sea Org in their mid-teens and continue to labor away in Defendants' coercive environment without ever comprehending that they may have a legal right to their own agency.

4.     Plaintiffs seek compensatory and punitive damages against Defendants under 18 U.S.C. §1595(a) for the injuries inflicted upon them by Defendants, directly and through their venture, in violation of 18 U.S.C. §§1581, 1589 and 1590.

---

[3] Unless otherwise specified, references to Sea Org herein include Cadet Org.

3

## II.   **JURISDICTION AND VENUE**

5.   The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §1331 and 18 U.S.C. §1595(a).

6.   Venue is proper in this Judicial District pursuant 28 U.S.C. §§1391(b)(2) or (3).  A substantial part of the events or omissions giving rise to the claims alleged herein occurred in this District, and Defendants are subject to general and/or specific personal jurisdiction in this District.

## III.   **MISCAVIGE IS CONCEALING HIS WHEREABOUTS TO EVADE SERVICE OF PROCESS**

7.   Plaintiffs have diligently attempted to locate Miscavige to effect service of process on or deliver a waiver request to him:

   a.   Plaintiffs have employed a private investigation firm since June 2022.  The investigator conducted comprehensive proprietary database and open-source intelligence research. Plaintiffs' investigator also conducted surveillance at 551 N. Saturn Ave, Clearwater, Florida (Miscavige's suspected residence) and 215 S. Ft. Harrison Avenue, Clearwater, Florida (Miscavige's suspected primary place of business) on multiple dates and times. The investigator also observed and documented the process server attempt personal service at multiple locations on multiple dates.

   b.   Plaintiffs' counsel conducted public records database searches on Westlaw and Lexis.  Those services compile and generate reports

based on a wealth of information, including records from telephone service providers, credit bureaus, driver's license and voter registration records, asset registration and property title records, bankruptcy filings, criminal history records, and lawsuits;

      c.    Plaintiffs' counsel also researched addresses and related information in public filings in other litigation involving Miscavige, searched media and other public sources, and searched social media platforms;

      d.    Plaintiffs' counsel called phone numbers listed in public record databases as numbers likely associated with Miscavige;

      e.    Plaintiffs' counsel reviewed corporate filings accessible through, among other sources, the California, Florida, and Delaware Secretary of State's business records databases for Religious Technology Center, Church of Scientology Flag Service Organization, Inc., Church of Scientology Flag Ship Service Organization, Inc., Church of Scientology International, and International Association of Scientologists Administrations, Inc.;

      f.    Plaintiffs' counsel spoke with former Sea Org members living in the Clearwater area to ascertain Miscavige's whereabouts;

      g.    Plaintiffs' counsel also requested Miscavige's address from RTC's Counsel on May 17, 2022 and asked counsel for all Corporate Defendants for a business or mailing address for Miscavige on June 30, 2022.

Defense counsel stated they do not have any of that information and that their clients would not be authorized to provide it;

      h.    Based on their conscientious investigation, Plaintiffs' counsel have concluded that 551 N. Saturn Avenue, Clearwater, Florida, a guarded, gated compound, is most likely where Miscavige's current residence is located, and the "Flag Building," at 215 S. Ft. Harrison Avenue, Clearwater, Florida, is most likely where Miscavige's primary office is located, situated atop one of the building's turrets and guarded both inside and out with security guards.

    8.    Plaintiffs have undertaken diligent efforts to attempt personal service on David Miscavige, so far making fourteen attempts to personally serve him from May 31 through August 2, 2022:

      a.    Plaintiffs attempted to personally serve Miscavige at 551 N. Saturn Avenue, Clearwater, Florida on July 5, and July 12. Security prevented the process server from entering the gated compound, stated that Miscavige does not live there, and refused to provide any additional information;

      b.    Plaintiffs attempted to personally serve Miscavige at FSO's Fort Harrison Building, located at 210 S. Ft. Harrison Avenue in Clearwater, on May 6, May 31, and July 12. Security prevented Plaintiffs' process server from entering the building at each attempt, stated Miscavige does not live

6

there, could not be found there, and they refused to provide additional
information regarding Miscavige's whereabouts;

      c.     Plaintiffs attempted to personally serve Miscavige at the
Scientology "Flag Building," also referred to as the "Super Power Building,"
located at 215 S. Ft. Harrison Avenue in Clearwater, where sources have
informed Plaintiffs that Miscavige maintains his primary office, on July 5,
July 12, and July 26. Each time, security guards stopped the process server
outside the building, stated Miscavige did not live or work there, and refused
to provide any additional information;

      d.     Plaintiffs' process server attempted personal service at 200
N. Osceola Avenue, Clearwater, Florida, which is the Scientology "Sandcastle
Religious Retreat" building used for Scientology training. On information
and belief, this is one of a number of Clearwater buildings where Defendant
RTC maintains offices. On July 5, the process server was in the parking lot
when he was immediately stopped by a security guard who came from the
side of the building. Security refused to answer any questions and told the
process server he was on private property and asked him to leave. The
process server had similar results on July 12, except a second security guard
also arrived and parked behind the process server's vehicle;

      e.     Plaintiffs' process server attempted personal service on
Miscavige at Defendant CSI's corporate headquarters at 6331 Hollywood

7

Boulevard, Los Angeles, California, which public records databases indicate may have been a recent residential address for Miscavige, on July 14 and July 21. Security did not allow the process server inside the building, told the process server over the intercom that there is no one by the name of David Miscavige at the location, and would not provide any additional information;

        f.    Plaintiffs' process server attempted personal service at RTC's headquarters (also listed in public records databases as a likely recent residential address for Miscavige) at 1710 Ivar Avenue, Suite 1100, Los Angeles, California.  That address is part of the same attached building as Defendant CSI's headquarter at 6331 Hollywood Boulevard, and the two building entrances are about 223 feet apart. On July 21, the process server dialed the intercom, waited several minutes, and received no answer.  As set forth below, prior attempts in other lawsuits to personally serve Miscavige at these addresses have been the subject of motions in which Miscavige (and RTC) challenged service of process;

        g.    Plaintiffs' process server attempted to effect personal service at 118 N. Ft. Harrison Avenue, Clearwater, Florida, on July 26. RTC's website lists the address as the "Religious Technology Center Flag Ship Service Organization Office."  When Plaintiffs' process server approached the location, a security guard immediately stopped him outside the main entrance. The process server asked about the whereabouts of David

Miscavige. The guard stated he did not know where Miscavige is currently living or where he works and refused to provide any additional information. The guard refused to even confirm whether RTC had offices there.

9. On information and belief, Miscavige has intentionally concealed his whereabouts and evaded service by, among other things, the following means:

a. Directing security at his residence and places of business to prevent Plaintiffs' process servers from entering buildings and to refuse to provide or confirm information regarding his possible whereabouts;

b. Using business addresses as residential addresses, business phone numbers as his phone numbers, and avoiding maintaining any residence or phone in his own name;

c. Instructing personnel at corporate offices to refuse to accept delivery of packages addressed to Miscavige;

d. Instructing the Corporate Defendants and their counsel to refuse to confirm or provide any information on his whereabouts, including any business or residential address or mailing address;

e. Challenging attempts at personal service in other lawsuits, despite clearly being on notice of pending litigation, including serial motions to quash affidavits of service;

9

10.　　Miscavige himself, or through his agents, has refused delivery of four requests to waive service, each containing a complete set of the documents required in Fed. R. Civ. P. 4(d), including the waiver form, instructions, and original complaint:

　　　　a.　　On June 2, Plaintiffs sent a waiver package via Federal Express to David Miscavige c/o Religious Technology Ctr., Inc. 1710 Ivar Avenue, Suite 1100, Los Angeles, California, that was delivered on June 6, at 1:01 p.m., but the package was refused and returned on June 8 at 1:11 p.m.;

　　　　b.　　On June 2, Plaintiffs sent a second waiver package via Federal Express to David Miscavige c/o Church of Scientology, Flag Service, 215 S Ft. Harrison Avenue, Clearwater, Florida.  The package was delivered on June 7, at 9:48 a.m., but then refused and returned to Plaintiffs on June 8 at 4:18 p.m.;

　　　　c.　　On June 13, Plaintiffs sent another waiver package via U.S. Postal Service priority mail to David Miscavige c/o Religious Technology Ctr., Inc. 1710 Ivar Avenue, Suite 1100, Los Angeles, California. That package was delivered on June 16 at 12:24 p.m., but then refused and returned to sender on June 23 at 2:47 p.m.;

　　　　d.　　On June 13, Plaintiffs also sent another waiver package via U.S. Postal Service priority mail to David Miscavige, c/o Church of Scientology, Flag Service, 215 S Ft. Harrison Avenue, Clearwater, Florida.

10

The package was delivered on June 17 at 12:25 p.m. but then refused and returned to sender at 4:19 p.m. on June 17 because David Miscavige was allegedly (and implausibly) "not known at the delivery address noted on the package."

11.     Miscavige is on notice because he is regularly informed about and, at least at times, directs Defendants' legal and litigation matters, including periods in the early 2000s when he spent substantial time in Clearwater, Florida.  Miscavige has directly advised settlement negotiations in litigation against various Defendants, negotiated the terms of agreements to sell or purchase real estate, and removed subordinates responsible for managing Defendants' legal affairs and taken over their duties when he was dissatisfied with how those matters were handled.

12.     Plaintiffs' diligent efforts confirm that Miscavige is concealing his whereabouts to evade service.

## IV.    THE PARTIES

### A.    The Plaintiffs

13.     Plaintiff, Gawain Baxter, is a citizen and resident of Australia. In 1982, when Gawain was only a few-weeks-old, his family moved from Australia to the Scientology "Flag Base" in Clearwater, Florida.  Gawain was raised within Scientology.

11

14.     Plaintiff, Laura Baxter, is a citizen of Germany and current resident of Australia.  Laura was raised within Scientology.

15.     Plaintiff, Valeska Paris, is a citizen of France and Switzerland and a resident of Australia.  In 1984, when Valeska was only six-years-old, she signed a Sea Org contract and joined Cadet Org in England. Valeska was separated from her family and lived communally with other Sea Org members in England.  In 1992, Valeska moved from England to the Scientology "Flag Base" in Clearwater, Florida. Valeska was raised within Scientology.

**B.     The Defendants**

16.     Defendant David Miscavige is an individual who resides in or near Clearwater, Florida and maintains a principal office in Defendant FSO's Flag Building in Clearwater.  At all times relevant hereto, Miscavige fully controlled and directed the activities of all Defendant entities herein, and he continues to do so today.  Among other things, Miscavige personally directed and continues to direct the management and operations of Defendants Church of Scientology International, Inc., Religious Technology Center, Inc., IAS Administrations, Inc., Church of Scientology Flag Service Organization, Inc., and Church of Scientology Flag Ship Service Organization, Inc., including the practices and conduct alleged herein.  Referred to as "Captain

of the Sea Org,"[4] Miscavige is also the highest-ranking Sea Org member, and thus all Sea Org members are subordinate to him and must obey his directives without question. Because all Defendant entities and organizations are staffed and run by Sea Org members, Captain Miscavige is effectively the senior-most officer of all of them regardless of whether he is listed as an officer or director in their corporate filings.

17. Defendant Miscavige has operated, conducted, engaged in, or carried on a business or business venture in Florida through the activities and close association with the Defendant entities alleged herein, and the entities, through their association with Miscavige, have served as his agents. Miscavige's business contacts within Florida were continuous and systematic, including but not limited to negotiating and directing the purchase of real property in Florida, while in Florida promoting, fundraising for and directing the management and operations of Defendants worldwide, and while outside of Florida directing the management and operations of Defendants within Florida. Miscavige and the Defendant entities have therefore accepted the privilege to operate, conduct, engage in or carry on a business or business venture in Florida and/or to have an office or agency in the state. Additionally, the actions alleged in this First Amended Complaint arise out of

---

[4] *See, e.g.*, https://www.linkedin.com/in/david-miscavige-791934151 (retrieved July 28, 2022).

transactions or operations connected with or incidental to businesses or business ventures operating in Florida.

18.    Defendant Religious Technology Center, Inc. ("RTC") is incorporated in California and is the principal management, security, and enforcement operation for Scientology.  Pursuant to an assignment agreement with Scientology founder L. Ron Hubbard, RTC owns, administers and enforces certain intellectual property ("IP") rights, including Scientology's trademarks and rights in its so-called "advanced tech," and it receives licensing fees paid for the exploitation of those rights, including their use in Scientology courses and course materials.  Operating under Defendant Miscavige's direction, senior RTC officers, including those in RTC's Office of Inspector General ("OIG"), oversaw and directed the management of Scientology-affiliated entities and organizations, including Defendant entities herein.  RTC and Miscavige also oversaw and directed Defendants' sprawling and pervasive investigative and policing operations, monitored members' behavior, and handled matters concerning discipline and punishment of members throughout all Scientology-affiliated entities, groups, and organizations.

19.    Defendant Church of Scientology International ("CSI") is a California nonprofit corporation, with headquarters in Los Angeles, California.  CSI is controlled and directed by Defendant Miscavige, directly

14

and through RTC's officers and others who report to him. Under Miscavige's direction, CSI, in turn, directs the management of all Scientology-affiliated entities and organizations through, among other means, Scientology's primary "command channels," including its highest-level management organization, the Watchdog Committee, and the Commodore Messenger Organization. CSI is the licensee of Scientology's IP, including trademarks and other IP owned and administered by Defendant RTC.[5] CSI licenses Scientology's IP to numerous Scientology-affiliated entities and organizations, which pay CSI licensing fees that it passes through to the owners of the IP, including Defendant RTC. CSI conducted and still conducts substantial business at its "spiritual headquarters" in Clearwater, Florida, known as Flag Base, which includes the 172,000 square foot Oak Cove, the 267,000 square foot Fort Harrison, and the centerpiece of Flag Base and crown jewel of all Scientology, the 377,000 square foot Flag Building. CSI and Miscavige control a number of trusts, including Flag Ship Trust, which among other things owns the company that owns the Scientology ship, the Freewinds. Miscavige, through CSI, also exerts substantial control of Scientology-affiliated entities and organizations, and current and former

_____

[5] While RTC owns Scientology's trademarks and "advanced tech," copyrights in its other literature are owned by Scientology-affiliated Church of Spiritual Technology ("CST") and licensed to CSI.

Scientologists, through CSI's Office of Special Affairs, which maintains a substantial operational presence in Clearwater, Florida.

20.     Defendant Church of Scientology Flag Service Organization, Inc. ("FSO"), is a licensee of CSI, incorporated and headquartered in Florida. Through RTC, CSI, and individuals reporting to him, Defendant Miscavige controls and directs the management of FSO.  FSO's operations include two primary functions: management and administration of Scientology's auditing process (described in detail below), and ownership, management and operation of Flag Base, Scientology's substantial real property holdings in Clearwater, Florida.  Flag Base is Scientology's global hub of operations and its largest source of revenues, providing (among other things) temporary quarters for visiting Scientologists, facilities for classes and auditing sessions, dining and meeting facilities, and the center where Defendants host large gatherings, including CSI's annual gala.  As with the other Defendant entities, Flag Base is staffed by members of Cadet Org and Sea Org, who live in dormitories at Flag Base.  Scientologists' PC folders[6] (which purportedly are the property of Defendant CSI) are stored in a warehouse at Flag Base that is owned and/or managed by Defendant FSO.  When Scientologists participate in programs on the Freewinds, their PC folders are transferred

---

[6] As described further below, PC folders are extensive, detailed dossiers on individual members used by Defendants' agents, including officers in RTC, OSA and CMO, to manipulate, pressure and coerce Sea Org members both during and, for those who leave, after their time in Scientology.

16

from Flag Base to the ship and then returned to the FSO warehouse by Defendant FSSO's couriers who travel to and from the Freewinds to Flag Base.

21. Defendant Church of Scientology Flag Ship Service Organization, Inc., ("FSSO, Inc.") is a not-for-profit corporation with its principal place of business in Clearwater, Florida. FSSO, Inc., operates the Freewinds. It also recruits and employs Sea Org members to work on its crew, and it collects fees from members of the International Association of Scientologists ("IAS") for courses, services, and programs they participate in on the ship. FSSO, Inc., is controlled and directed by Defendant Miscavige, through RTC, CSI, and individuals who report to him.

22. Defendant International Association of Scientologists Administrations, Inc. ("IASA") is a Delaware corporation headquartered in Los Angeles, California, with offices and operations in Clearwater, Florida, at Defendants' Flag Base. According to annual reports filed with the Florida Secretary of State during the relevant time period, IASA's principal place of business was in Clearwater, Florida from 2005 to 2014. Defendant Miscavige exclusively directs all operations of IASA. IASA is the operating entity for the International Association of Scientologists ("IAS"), an unincorporated membership association that all persons who participate in Scientology are required to join. All Scientologists are members of IAS and are required to

17

pay annual dues to IASA, which administers and transfers those funds (and other payments solicited by IAS) under the exclusive direction of Defendant Miscavige, for his personal enrichment and benefit and for the benefit of Defendants CSI, RTC, FSO, and FSSO, Inc., as well as the Freewinds and other Scientology-affiliated entities, organizations, properties, and enterprises. IASA finances Defendant Miscavige's "war chest," a discretionary fund he and other Defendants' most senior officers utilize to support intelligence gathering and retaliation campaigns against defectors and critics of Defendants. During the period that Plaintiffs were aboard the Freewinds, IASA transmitted funds it collected on the ship to IASA's Clearwater, Florida office via FSSO courier; those funds were then deposited in an IASA bank account or accounts in Florida. IASA's Florida office also provided travel services for Freewinds' guests and crew, either directly or through FSSO's Freewinds Relay Office or Majestic Cruise Lines (a dissolved corporation still listed as a travel agency located in FSSO's Clearwater offices and fully owned by FSSO).

23.    While all Scientologists are required to pay annual membership dues, CSI has no members and receives no membership dues or donations. Annual dues and donations are funneled into Defendant IASA and several CSI-controlled trusts, through which IASA conducts Scientology's financial

affairs, including the acquisition and development of its vast portfolio of real estate holdings and the ship Freewinds.

24.     There is a U.S. office for the Freewinds in FSSO's primary business location in Clearwater, Florida.  Defendant RTC has offices located in that same FSSO operation.

## V.     FACTUAL BACKGROUND

### A.     SCIENTOLOGY

#### 1.     Defendants' Organization and Management

25.     All of the primary Scientology-affiliated entities and organizations, including Defendants RTC, CSI, IASA, FSO and FSO are staffed and managed by members of the Sea Org.  The Sea Org itself is an unincorporated "association" of individuals that, on paper, appears to be virtually non-existent.  Yet, it is the backbone of Scientology, with lower-level members performing all the back-breaking work necessary to keep Scientology's vast operations running, and higher-echelon members managing and directing it all.  Lacking any legally cognizable personhood, and having no assets, the Sea Org is by design immune from civil or criminal liability.  Yet, it is a rigidly hierarchical, paramilitary-like organization and each member is obligated to fully and unquestioningly obey the commands of all Sea Org members who are senior to them in the hierarchy.  At the top is Captain David Miscavige, whose authority is unlimited and absolute.  Thus,

19

every single entity, organization and operation is at all times controlled by Miscavige, who is kept informed about and directs the management of all Corporate Defendants' operations at a considerable level of detail and who rules his dominion with an iron fist.

26.    Scientology is organized and operates through a global network of corporations, trusts, and unincorporated associations and organizations. This structure creates the appearance of a group of affiliated but decentralized and independently managed establishments operating pursuant to general authority bestowed upon them by the "Mother Church," CSI.

27.    While ostensibly decentralized, Scientology's management is fully top-down, with all principal entities and organizations, including Defendant entities herein, controlled and managed under the direction of one man, Defendant Miscavige, whose authority is absolute.  Miscavige receives daily reports on and directs the operations of each Scientology-affiliated entity and organization through "command channels," with built-in redundancies to ensure he receives complete and timely information about all aspects of Defendants' operations, and that his directives are fully carried out without any variance.  Through RTC and other command channels, Miscavige controls the management of Scientology, including by directing the implementation and enforcement of all policies, practices, and procedures for

20

every Scientology-affiliated entity and organization, including each
Defendant entity herein.

28.    RTC is directly controlled by Defendant Miscavige, who holds the
title of Chairman of the Board of RTC.  RTC officers are continually present
at and monitor, control, and direct the management of Defendants CSI, FSO,
and FSSO, Inc., as well as all Rehabilitation Project Force sites, the ship the
Freewinds, primary Scientology sites such as Saint Hill in the United
Kingdom,[7] and Defendant's International Base in California, among many
others.  RTC maintains multiple office locations in Clearwater, Florida,
including sharing offices with FSSO, which operates the Freewinds.  RTC
officers answer only to Miscavige, and they hold command authority in each
organization and at each site to which they are assigned.

29.    Management oversight for all Scientology-affiliated entities and
operations is vested in a Watchdog Committee ("WDC") consisting of upper-
echelon individuals situated within CSI.  Each individual on the WDC is
responsible for overseeing and directing the management of a defined entity,
organization or set of operations, which they accomplish with the assistance
of officers in CSI's Commodore Messenger Organization.   This body was
created by and operated under the direct control of Miscavige's predecessor,

---

[7] Such primary sites are sometimes referred to by Scientology as "Ideal Orgs."

Scientology founder L. Ron Hubbard, and it continued to operate under Miscavige's control after Hubbard's passing. However, the separateness or independence of the WDC and other purported senior managerial structures and functions are a fiction: through a series of purges and personnel actions beginning in the early 2000s, Miscavige has collapsed those management structures, placing all managerial oversight and supervision – and thus the full control of all other Scientology-affiliated entities – directly under his absolute authority. The entire upper echelon of Scientology's management, including within RTC and CSI, as well as the senior officers and managers of other entities such as FSO, FSSO, Inc., and IASA, serve at Miscavige's pleasure and he alone has sole discretion to fire and replace those persons at will, which he has done on a number of occasions.

30. Throughout the relevant time period (and continuing today), Miscavige received frequent detailed reports from his WDC members, CMO officers, RTC and OSA officers, and various persons charged with managing Defendants' many operations. Miscavige communicates with these managers by telephone and meets with them in person, individually and in groups, providing detailed directions for how operations are to be managed, how projects and programs should be designed and executed, property acquisitions and building designs, among many other things. Miscavige also gives performance reviews to numerous senior managers regardless of their

formal reporting lines, critiquing them and personally providing additional training, reconfiguring their duties to ensure everything is run in accordance with Miscavige's specific instructions, even instructing some to be transferred to the Freewinds for "sabbaticals" or to RPF sites for "rehabilitation" when he suspects they are no longer absolutely loyal to him.

31.     Miscavige now controls and directs the operations of the corporate Defendants herein from Clearwater, Florida, where he relocated from Los Angeles in the last several years.  During the past year, Miscavige has been regularly speaking at and presiding over the Scientology "graduation" ceremonies, held weekly at the Fort Harrison building in Clearwater, and Defendant FSO has been publicizing and promoting these appearances in its literature.  In the early 2000s, Miscavige also resided in and managed the Corporate Defendants' affairs from Clearwater when he took over the day-to-day management of Defendants' legal affairs and public relations operations.

32.     CSI's Office of Special Affairs ("OSA") handles Scientology's internal security and outside legal affairs, and serves as Scientology's intelligence and spying operation.  Through its operatives and agents, OSA tracks, monitors, and directs retaliation campaigns and ruinous litigation against defectors and critics of Scientology.  The head of OSA and other OSA officers report to and take direction exclusively from Miscavige and his senior

23

RTC officers.  OSA maintains a significant presence at Flag Base in Clearwater, where it has recently directed members of the Plaintiffs' families to gather for the purpose of running retaliatory "fair gaming" operations against the Plaintiffs.

33.     CSI's Commodore's Messenger Organization ("CMO") is a group of officers controlled and directed solely by Miscavige that operates outside of the structure and management of Scientology-affiliated entities.  CMO's primary function is to enforce Defendants' policies pursuant to Miscavige's direction, monitoring the management of all Scientology operations, providing reports to Miscavige and his senior officers, including WDC members, and relaying and enforcing directives from Miscavige and his senior officers to operational managers.  For each of Defendants' operations there is a corresponding CMO unit supervised by a Commanding Officer, including at Flag Base, on the Freewinds, and at RPF sites including in Australia.

34.     RTC and CMO are the two "command channels" through which Miscavige exercises his authority and directs Defendants' operations.  CMO members possess and exercise substantial power and authority over management in each entity and at each of Defendants' operations.  CMO officers are at all times considered Miscavige's agents, and their orders are to be obeyed without question as if coming directly from Miscavige himself.

24

Disobedience of CMO orders or any insubordination or disrespect to them is considered a "crime" or "suppressive act" subject to severe punishment. Both RTC and CMO officers are superior to senior managers in all Defendants' operations, including in the operations of Defendants FSO and FSSO, Inc. All senior managers and their subordinates are required to report to and take direction from the RTC and CMO agents assigned by Miscavige to their respective organizations. Because any directive issued by an RTC or CMO agent is on the authority of Miscavige, even the most senior officers and directors of Scientology-affiliated entities have no power to override those commands. No decision of any consequence is made, and no directive is issued, outside of Miscavige's command channels.

35.    These two primary command channels are designed to maximize Miscavige's control, in part by providing redundancy: both RTC and CMO officers monitor and report on management and operations and ruthlessly carry out the directives they are given. This enables an extremely high level of control, ensuring that accurate and complete information is always reported up through the command channels to Miscavige and directives from him executed without fail.

36.    All so-called ethics and justice policies, which rigidly govern every aspect of the behavior and discipline of Sea Org members (including managers), are enforced through these same mutually reinforcing command

channels, the overall effect of which is highly oppressive and coercive. This system operates as a one-way ratchet, rewarding senior personnel who rigidly enforce policies and directives, including through severe mistreatment and punishment of subordinates, and penalizing those who provide or permit any lenience or laxity in their operations, including RTC and CMO officers who are subject to extremely harsh punishment by Defendant Miscavige for anything he perceives as inconsistent with his expectations in the operations under their command.

37.    All persons who are deemed to be potential sources of trouble, including Sea Org members whose behavior deviates from Defendants' rigid policies, defectors who are perceived to present any risk of speaking or taking action against Defendants, and critics of Scientology, are reported to Miscavige on a daily basis by his senior RTC, CMO, and OSA officers. Miscavige then issues directions to RTC, CMO, and OSA for handling, punishing, and controlling each purported offender. Policing and enforcement of Defendants' policies are further enhanced by rules obligating all Sea Org members to report violations of policies by other Sea Org members through written "Knowledge Reports." These reports are submitted to operational managers who provide them to RTC and/or CMO officers, who submit them through the command channels for determination of appropriate punishments. Any Sea Org member who is aware of misconduct

26

and fails to write it up and submit it in a Knowledge Report is subject to harsh consequences.

38.     This paranoid and fear-based environment is further reinforced through Defendants' policy obligating every Sea Org member to self-report deviant thoughts and behavior, including prior failures to self-report.  This process, known as writing up "overts and withholds," ("OWs") is imposed on members starting at a very young age while they are in Cadet Org, so that by the time they are assigned to posts in Sea Org, voluntarily writing up these self-reports or readily doing so when instructed by a superior becomes second nature.

### 2.     **The Freewinds**

39.     The Freewinds is owned by San Donato Properties S.A., a Panama corporation, which is wholly owned by Flag Ship Trust, a trust controlled by Defendants Miscavige and CSI.  The most senior officers and authorities on the Freewinds are senior officers in RTC, CMO, FSSO and IASA who report to and take direction from Defendant David Miscavige, who is the ultimate authority in the ship's chain of command.  Under the direction of Miscavige and the corporate Defendants' senior officers, Plaintiffs were forced to work for years on the Freewinds under highly dangerous and abusive conditions.

27

40.   The Freewinds' home port is in Curacao, an island nation in the South Caribbean.  All Sea Org members assigned to work on the Freewinds crew are transported to Curacao, where they board the ship.  According to both the U.S. State Department and Central Intelligence Agency, Curacao has a significant human trafficking problem, including labor trafficking of undocumented foreign nationals. The Freewinds frequently sails to the other two "ABC islands" of the Antilles, Aruba and Bonaire, where anti-trafficking measures are also weak.

41.   Consistent with Defendants' longstanding policies, the Freewinds never docks at any U.S. port, and it never enters the territorial waters of the United States.

42.   At all times relevant hereto, RTC's senior executive on the Freewinds, Lurie Belotte, reported directly to David Miscavige.  As Miscavige's representative and an RTC executive, Belotte was the ultimate authority on the ship, communicating frequently with Miscavige about the ship's operations, including matters concerning crew work assignments, behavior, and discipline.  Three other officers on the ship had principal responsibility for day-to-day operations, including carrying out Miscavige's and Belotte's directives. Sue Price, a director of Defendant FSSO, Inc., served as Commanding Officer of CMO on the ship, reporting to both Belotte and Miscavige.  Sharron Weber was President of FSSO, Inc., and served as

28

Commanding Officer of the FSSO organization on the ship, reporting to Belotte and Price. The ship's Captain, Mike Napier, had operational command of the Freewinds Service Organization ("FWSO") and he also reported to Belotte and Price.

43. FWSO and FSSO are both operations of Defendant FSSO, Inc., organized into two groups to delineate and separate those operations that are managed day-to-day by the ship's captain from all other operations on the ship. FWSO is responsible for accommodations, food preparation and dining facilities, cleaning, maintenance and engineering, and the ship's medical office. Security also operates within FWSO, including the personnel charged with confiscating crew documents, preventing crew from unauthorized departures from the ship, maintaining surveillance of crew members subject to disciplinary actions, and recovering defectors who escape from the ship.

44. FSSO's organization includes the ship's recruitment, personnel, ethics, and discipline operations, as well as operations for auditing ship crew and correction of crew auditors. FSSO also provides all services and courses to the public Scientologists who are guests on the ship, including Scientology's highest level (and most expensive) course, OT VIII.

45. IASA's operation on the ship is limited and largely public-facing. IASA staff are tasked with promoting Freewinds programs and signing up IAS members for those programs. While IASA signs up members for

29

programs on the ship, FSSO provides auditing services and courses to guests on the ship and FSSO collects the fees for those services. When new guests board the ship, however, IAS staff are required to solicit additional, sometimes very large donations, which are paid into IASA's coffers. Among many other things, when Miscavige hosts celebrity guests on the ship, he uses IASA funds to provide them (and himself) with lavish treatment and luxuries not provided to other guests. Indeed, he occasionally uses the Freewinds as his private yacht, including hosting celebrities when the ship is not occupied by other public members.

### 3.  __Psychological Theory__

46. Scientology rests almost entirely upon the writings of L. Ron Hubbard, a science fiction author who wrote *Dianetics: The Modern Science of Mental Health* (1950), which was for a time a popular volume in the self-help, "human potential" genre. The basic theory of Dianetics is that the human mind can be separated into two spheres: an emotionally reactive mind and an unemotional, analytic mind. Dianetics teaches that the analytic mind is a computer, incapable of error. Human misjudgments, on the other hand, which create social problems and much individual suffering, are attributed to the emotionally reactive mind, which is made up of patterns imprinted on the nervous system in moments of pain or stress. These imprinted patterns may be triggered by stimuli associated by the emotional mind with the original

30

imprinting, which may, in turn, produce unconscious or conditioned behavior which is harmful or irrational.

47.    This psychological theory, which is unquestioningly accepted and applied in Scientology, is not considered to be limited to a description of the mind, but to also offer a basis for a practical science which purportedly can cure many individual and societal problems. Scientology labels ordinary persons, encumbered by their reactive minds, 'preclears,' whose mental computers contain errant code that needs to be deleted. The goal of Dianetics is to render people 'clear' of this errant, emotional code, thereby permitting their unemotional, analytical minds to govern their behavior. Among other things, Dianetics teaches that all mental disorders are caused by these imprinted patterns in the reactive mind, which can be erased, curing the mental illness. This concept is extremely broad and permits Scientology to consider every behavior, feeling or thought that an individual may have, and which is deemed by Scientology to be aberrant or deviant, to have been a result of some error in their reactive mind that can be erased.

48.    This theory is used by Scientology to justify the application of highly abusive, destructive methods that enable it to manipulate, break down and subsequently gain nearly complete coercive control over its subjects, resulting in long-term emotional, psychological, and even physical injuries. This theory is also used to justify odious forms of child abuse and the

covering up of such abuses, including those inflicted upon the Plaintiffs alleged herein.

### 4. **Membership**

So-called "public members" of Scientology typically live in their own homes, earn livings working for businesses not owned by Scientology, and pay annual membership fees to IAS and purchase materials and services such as auditing at a local Scientology center.  In contrast, Sea Org members are required to sign billion-year service contracts, become increasingly indebted to Defendants, live in residences on Scientology bases, and work for low and even no pay as staff members in the various Defendant entities and other Scientology-controlled entities and organizations.

### 5. **Coercive Control**

#### a. **Auditing**

49.    Defendants employ a manipulative process referred to as "auditing," which enables them to attain and exert control over members, including Plaintiffs.  Auditing is conducted by Defendant FSO's operations at Scientology centers around the world, which are required to provide facilities for the procedure.  Pursuant to Defendants' policies, all members, including children, are required to submit to auditing on a regular basis.

50.    The auditing process is conducted by an "auditor," who is trained to lead the subject through interrogation sessions that can last hours. All

audit sessions are thoroughly documented in auditors' notes and audio or video recordings of the sessions, which are compiled in permanent dossiers for each member known as Pre-Clear or "PC" folders that are maintained in the ordinary course of Defendants' operations.  FSO Case Supervisors review PC folders and provide "correction" to auditors who do not achieve expected results.  PC folders are also available to and reviewed by CMO and RTC officers, who enforce Defendants' exacting requirements for how auditors conduct the sessions and monitor members' compliance with their obligations to submit to the process.  RTC's OIG agents and CSI's OSA agents also access and review PC folders to monitor members' behavior and to obtain information that can be used as leverage to control errant members and defectors.

51.     Nothing is out-of-bounds in an auditing session.  Every memory of past experiences, and each thought and aspect of the subject's behavior is explored in minute detail as the auditor repeatedly questions the subject until the auditor is satisfied with the subject's answers.

52.     In an auditing session, the auditor seeks to establish a relationship of trust with the subject. The auditor has absolute authority to guide the questioning, extract desired responses, and decide when the session may be concluded.  Subjects are not permitted to leave the room until the auditor declares the session over.  To reduce subjects' resistance and lower

33

their guards, auditors are trained to remain low-key in their questioning and to avoid reacting to what subjects disclose. Subjects are required to fully answer all their auditors' questions, including deeply personal and compromising information that, if disclosed to others, would embarrass, humiliate, and inflict personal costs on the subject (and, often, the subject's family). Through repeated interrogations of subjects, auditors identify and document vulnerabilities that are used to manipulate, pressure, and coerce members. Subjects are instructed to suppress feelings and emotions connected to the information they are conveying, even when recounting details of past traumas, which they are repeatedly told by their auditors are the subjects' own fault. This induces experiences of dissociation, which is intended to normalize the extremely abusive superior-subordinate dynamic that is central to Defendants' operations.

53. Skilled auditors lead their subjects to admit having errant thoughts or behaviors, or the withholding of such information in prior sessions, which are thus known as "overts and withholds." If a subject does not admit to something sufficiently compromising, she or he is coerced into giving a false confession. Because failing to provide every detail of every thought or experience to an auditor, or failing to self-report errant conduct, is considered serious misconduct, auditors can trip up their subjects by using information gleaned from PC folders to identify some gap or missing detail, or

to elicit a response to a question that might be characterized as inconsistent with a statement in a prior session.  The subject is then required to admit to intentionally withholding information, regardless of whether there was any omission or if it was intentional.  One way or another, once an auditor begins to steer a session towards the objective of extracting admissions of wrongdoing, it is pointless for the subject to resist, even if it means admitting to things they never thought or did.  Once a subject's overts and withholds have been documented, they are weaponized, the threat of disclosure held over the subject's head throughout their lives.

54.    Auditing sessions can have a highly sexualized component, even when the subjects are minors.  Children are interrogated about sexual thoughts and experiences that the children may not comprehend or have experienced, and they often find that the only way out of an auditing session (during which they may be locked inside a room with their auditor) is to provide a false confession, making up stories about sexual conduct based upon leading questions asked by their auditor.

55.    The auditing process thus lays the foundation for Defendants to subjugate and control a large workforce.  Along with the perpetual fear of open disclosure of personal and damaging information, Sea Org members internalize feelings of self-doubt, self-blame, guilt, and shame.  When a senior officer deems a Sea Org member to be insufficiently obedient or in need of

corrective discipline, they do not even need to send the member for auditing: they can simply instruct the member to sit and write up their overts and withholds, true or false, which have been routinized. They can verbally abuse members in private or more open settings, knowing that they will trigger a dissociative process that is useful in breaking members' resistance and will. And the interrogation-admission cycle becomes fully normalized, generating expectations of punishment and acceptance of even more extreme forms of the process whenever RTC or CMO officers impose it.

### b.     Isolation of Children

56.     The children of Sea Org members are separated from their parents when they are infants. Children under six years old are cared for, disciplined, and groomed for the "Cadet Org" by Sea Org members who hold no qualifications to raise children. These Sea Org members discipline and indoctrinate the children into Scientology. When their children are as young as six-years-old, parents relinquish custody to Cadet Org, which prepares them for a lifetime of servitude under Defendants' control. Once their children are in Cadet Org, parents are stripped of their parental rights and responsibilities; they do not make any decisions with respect to their children's living conditions, how their children are educated, what work assignments they are given, how they are disciplined, and even when they can see their children.

57.     Scientology does not permit children of Sea Org parents to have the kinds of early experiences, relationships, and activities that are critical for healthy development. Scientology largely does not differentiate between children and adults.   Instead, children over six-years-old are considered to be and are frequently told that they are adults, and that they should act and expect to be treated as adults.  They are not even called children; rather, they must be referred to as "Cadets."  They are required to work jobs and immerse themselves in Scientology's indoctrination process, which takes priority over their education, playtime, rest, and all other activities.  Children are considered a resource and personnel asset, required to complete various work projects referred to as "Cadet Missions."

58.     Cadet Org is run by a Cadet Coordinator, a senior member of Sea Org who reports to and takes direction from senior RTC and CMO officers. To prevent parents from interfering with children in Cadet Org, except during very limited "family time," parents are not permitted to communicate with their children directly.

59.     Family time for Cadets is limited to one visit per week, which can be cancelled if either the child or parent is being punished for some alleged transgression, or if the parent is assigned to a Scientology position at another base.  Children can be punished and deprived of contact with their parents

37

for offenses as minor as failing a "white glove" inspection of their living quarters (where, if the white glove picks up any dust, the child fails the test).

60.     Children raised in Defendants' Cadet Org do not have any contact with anyone in the outside world, and they are taught from a very young age to distrust outsiders and all outside institutions.  They are frightened into believing that they will perish or suffer if they leave the Sea Org, and stories of Sea Org members who have died or struggled outside the community are held out as examples of this.  From childhood, Sea Org members must refer frequently to written Scientology materials, which explain that people who leave or speak out against Defendants often become sick or die.

61.     Children who grow up in Defendants' Cadet Org are deprived of any meaningful education so that they are easier to manipulate and retain. Sea Org members often have no high school diploma or work experience outside of Scientology to pursue other jobs and earn a living independently. They have grown up deprived of any understanding of their legal rights and society's institutions, which they have been thoroughly indoctrinated to distrust and believe to be dangerous.  Many former Sea Org members thus continue to be dependent on the good graces of Scientologists for work and housing after they leave, because their lack of education, training and life experience leave them with few options.

### c.   Crime and Punishment

62.    All transgressions, no matter how minor, are considered "crimes" against the entire community for which various punishments are meted out. Senior RTC, OSA, and CMO officers regularly meet and communicate with Defendant Miscavige, report in detail on Sea Org members who are in poor standing, or who have left Sea Org, or who have spoken out against Defendants, and receive detailed instructions from Miscavige on how to quiet or punish these individuals.

63.    Defendants' ethics policies strictly forbid any Sea Org member from taking or instigating any legal action against Defendants, any Sea Org member, or any other Scientologist, including filing lawsuits or reporting abuse, assault, or other serious matters to law enforcement or child protective services.  This is done to protect Defendants and their leadership from legal consequences and negative publicity.

64.    A common punishment for what are often vaguely or arbitrarily categorized as crimes is to assign an offending member the status of being in a "lower condition."  In those circumstances, the member is required to confess his or her crime, write up detailed overts and withholds, and make amends to the member(s) with whom he or she has a conflict, the entire group that they are posted to, and to the supervisors of that group.  While in lower conditions, members are physically isolated, subjected to continual

39

surveillance, and prohibited from having contact with anyone else in the organization until they have been deemed rehabilitated and can be readmitted to the organization.

65.     Members put in lower conditions often have their sensitive personal information, derived from auditing sessions, written overts and withholds, or other processes, posted in common areas where all Sea Org staff on site can see it.  This tactic is employed by Defendants' officers to encourage other Sea Org members to shun persons in lower conditions and to subject them to humiliation and scorn.

66.     Speaking negatively about or criticizing Defendants and their officers, even in a private conversation with a fellow Sea Org member, is considered a serious violation of Defendants' "ethics" policies.  Expressing a desire to leave is an even more serious offense.  Reporting mistreatment by another Sea Org member results in a rapid response from RTC or CMO officers, who coerce the reporting member into (falsely) admitting to having fabricated the matter, which then results in severe punishment.

67.     Defendants' abusive, punitive system is intended to and frequently results in absolute obedience and silence.  Lower ranking members, including children, quickly learn that reporting mistreatment by higher ranking members will result in punishment.  If someone – including a child – reports having been aggrieved or harmed by another Sea Org

40

member, no matter how severe the harm, the complaining individual is pressured into accepting responsibility.

68.    Sea Org members who violate Defendants' ethics policies are punished with "ethics handlings," during which they are severely interrogated, scolded, verbally abused, and systematically debased and broken down until they accept responsibility for the problem and write a confession of their "crimes."  Detailed records of ethics handlings are maintained in ethics folders that are kept along with PC folders for every member who has been subjected to a "handling."  The information and confessionals in those folders are utilized by Defendants' officers to exert pressure on and coerce members (and former members) into submitting to and complying with Defendants' demands. Ethics handlings can last many hours, and offenders can be subjected to days or even weeks of handlings, until RTC or CMO officers deem the member to have been rendered adequately submissive.

69.    A more severe form of punishment, usually reserved for those who have been subjected to lower conditions, ethics handlings, and other abusive treatment and who still do not perfectly comply with all the demands placed upon them, is to be transferred to one of Defendants' Rehabilitation Project Force ("RPF") sites.  RPF sites are labor camps, heavily guarded, often with fenced perimeters. Sea Org members may be sent to an RPF site

for a defined period, but more typically assignment to an RPF site is for an indefinite period that can last months or even years, where members are held and subjected to brutal conditions until Defendants deem them sufficiently "rehabilitated" to return to their former post or be placed in a new post.

70.    In addition, Cadet Org and Sea Org members can be forced to submit to lengthy, intensive, scripted interrogations called "security checks." Ostensibly intended to ferret out individuals who may pose a risk to the integrity of the organizations, security checks are highly abusive sessions of indeterminate length in which subjects are repeatedly interrogated about their thoughts and conduct, including about their sex and sexuality, purported criminality, contacts with law enforcement and other government agencies, and other thoughts and behaviors deemed errant by Defendants.

71.    The design and effect of these sessions is to break the members' will and achieve absolute compliance by altering their perception of their thoughts and experiences, instilling deep feelings of guilt, shame, self-doubt, and fear, even for things they have never really thought or done.  Security checks also reinforce Defendants' demands for absolute secrecy regarding all internal matters.  For example, the security check script for children includes, among its 99 questions, the following: "Have you ever spoiled things for somebody?" "Who have you made feel guilty?" "Have you ever tried to make others believe that your parents, or teachers, were cruel to you?" "Have

42

you ever offered as an excuse for something you have done wrong that you are only a child, or that you haven't grown up yet?" "Have you ever been a coward?" "Have you ever made too much fuss over a little hurt?" "Have you ever made out that you were more badly damaged than you were in order to make someone stop picking on you?" These hours-long sessions, in which interrogators focus repeatedly on the same question until they get the answer they want, are designed to establish complete dominance over members, including children.

72.    Years of intensive auditing, ethics handlings, security checks, and the many other punishments meted out for alleged "crimes" cause serious psychological harm. Having to live day-to-day in fear of punishment for the often-false confessions members are coerced into providing is itself traumatic. Existing in this intentionally fear-inducing environment throughout their childhoods and formative years leaves them broken, unable to fend for themselves, or defend against the continued abuses inflicted on them even after they reach adulthood. That deep, primal fear is Defendants' objective, and it never dissipates. Believing the world to be even more dangerous than Sea Org, many members accept their subjugation and continue to acquiesce to even the most outrageous and unreasonable demands. Even those who leave cannot escape the pervasive fear of consequences for anything Defendants consider to be in violation of their extremely coercive policies.

43

This causes many former members to refrain from seeking help from lawyers or legal authorities, often not even recognizing that what was done to them was illegal or that they have suffered emotional or psychological harm as a result. Many defectors do not even seek counseling or therapy for many years, if ever, because they have been thoroughly indoctrinated to believe those professions to be among the most dangerous and destructive in the world.

### 6.     The Consequences of Defecting

73.     Miscavige and high-ranking RTC and CMO officers direct the enforcement and implementation of the stringent and abusive policies dictating how Sea Org members may leave the organization. All Defendants are aware of the aforementioned policies and support their implementation and use. The result is that very few members are able to safely leave. Among other things, defecting from Scientology can mean being declared a "Suppressive Person" and cut off from all contact with family members, friends, and employers, because anyone within Scientology who maintains any contact with a Suppressive Person is deemed guilty of a crime and subject to punishment. For people who have been raised in Scientology, being shunned is devastating and untenable; it means being completely cut off from the only community they have known, including in many cases their family, as well as their source of meals, housing and necessities.

74.     Miscavige and the corporate Defendants, through RTC, OSA, and CMO, closely monitor defectors and persons they have declared to be Suppressive Persons, and frequently harass, intimidate, and terrorize them, should they criticize Defendants in any manner.  OSA is, among other things, Defendants' intelligence and black ops arm, coordinating spying on and retaliating against Sea Org defectors and other purported enemies of Defendants.  In addition to the detailed information already possessed by Defendants in defectors' PC and ethics folders, investigators working for Defendants go through defectors' garbage looking for "dirt," monitor their movements and communications, and dig into the backgrounds of defectors' relatives, friends, and co-workers, searching for vulnerabilities that can be used to pressure and manipulate defectors.

75.     In one widely reported case, a private investigator working for Defendants was arrested near a defector's house after a neighbor reported a suspicious person loitering and looking into the window of a house.  A search of his vehicle turned up multiple firearms, large amounts of ammunition, an illegal silencer, GPS tracking devices, cameras, and other surveillance equipment.  The investigator admitted to the police that he and his son had been working for Defendants for two years, tracking the defector's every move, listening in on his conversations, and even recruiting persons to befriend the defector to monitor him more closely.  He told police that he was

45

required to report hourly to one of Defendants' agents on the defector's

moves, every person the defector met, and every conversation that the

defector had if anything was said that might be of interest to Defendants.

When the police informed the defector and checked his car, they found a GPS

tracking device that the investigator had planted.

76.     Similar to the redundant structure of RTC and CMO, Defendants

have even employed investigators to monitor the investigators tracking

defectors.

77.     In addition to being spied on, defectors can face harsh retaliation

that can preclude building and maintaining a life outside of Scientology.  For

example, Defendants direct the creation of defamatory websites using the

defector's name, thus ensuring that a Google search of the defector brings up

the site.  These websites accuse defectors of lying about their experiences in

Scientology, post photos of the defector smiling and the positive testimonials

she or he made during coercive auditing sessions prior to their escape from

Scientology, as well as declarations of other members attesting to the positive

experience the defector had.  Defendants, through their members, maintain

such a website targeting Plaintiff Valeska Paris:

http://www.valeskaparis.com/.

78.     Defendants' retaliation tactics can escalate, aiming to damage

defectors' reputations; agents of Defendants will picket defectors' places of

46

employment, residences, and neighborhoods with posters falsely accusing the defector of crimes of moral turpitude, such as child molestation, to humiliate and destroy the lives of those defectors.  Defendants' agents have confronted defectors outside their homes, workplaces and even in airports, yelling and accusing them of wrongdoing.  These tactics are well known among members of Sea Org as part of the arsenal of weapons Defendants can deploy, and that knowledge alone intimidates many Sea Org members from ever leaving.

79.     Additionally, Defendants' leaders and most zealous adherents proclaim that "Suppressive Persons," are "fair game," meaning that there are no limits to the magnitude of retaliation visited upon that person. Defendants' policy on "Counter-Attack Tactics" dictates that defectors' post-Scientology employment is a particularly significant vulnerability and that retaliation should aim to cause the defector to lose his or her job.  If the job is not perceived as being sufficiently valuable to the defector, or if Defendants through their members fail to cause the person to lose their job, anything important to that defector should be targeted.

80.     Defectors who have taken legal action against Defendants and their members have been subjected to extreme forms of retaliation.  Very recently, several defectors who had reported rapes and subsequent coverups, and at least one person close to them, have accused Defendants of poisoning their pets, breaking into their homes, fraudulently re-registering one of their

47

vehicles and reporting it stolen, and even arson. After filing a lawsuit against Defendants for these acts, they suffered additional retaliation.

81. There are also consequences for the family members of a defector who are still in Scientology; if a defector is declared a Suppressive Person, the remaining family may be deemed "Potential Trouble Sources," which can result in around-the-clock surveillance, traumatic ethics handlings and security checks until Defendants are satisfied that these persons have fully disavowed and disengaged from the defector.

82. These tactics and events are well-known to people who leave Scientology. As a result, many defectors go into hiding or even change their names. Most struggle for years before they can summon the strength and courage necessary to seek medical services, mental health counseling, or to speak with attorneys or law enforcement about what they experienced while living in Scientology. Many struggle silently for the remainder of their lives, fearful of the consequences they will face if they take any action against Defendants.

### 7. The Abusive Formal Process for Leaving Sea Org

83. The only way to leave Sea Org without immediately exposing oneself and one's family to the consequences of being declared a Suppressive Person is to suffer a litany of abuses in a process called "routing out," which includes weeks, months, or years of auditing sessions, ethics handlings and

48

security checks to stamp out any thoughts or designs counter to Scientology. During this period, the subject is isolated and placed under twenty-four-hour surveillance. At Flag Base, individuals who express the desire or intent to leave, and those who have attempted to leave without routing out, are detained in a bare room in a parking garage, where they are guarded around the clock and permitted to leave the area only with an escort to attend hours-long ethics handling and security check sessions. The routing out process is not intended to provide a means for departure, it is intended to break a member's will to depart and to agree to submit to rehabilitation, often at one of Defendants' RPF sites.

84. Members who manage to resist this coercion are only permitted to complete the process once they have been psychologically broken and physically weakened. The last step in routing out is for the member to be placed in a room where high-ranking officers compel him or her to sign documents, which is required to obtain permission to leave. No explanation is provided concerning the contents of the documents, and the member has no opportunity to review them, seek advice from any outside persons or even keep copies of the documents.

85. Departing Sea Org members who grew up in Scientology have little ability to understand the documents or the consequences of signing them. Having endured a lifetime of abuse and weeks, months, or years of

49

routing out mistreatment designed to break their will, departing members have no meaningful choice other than to sign the documents to be permitted to leave the room and leave Scientology.

86.     Sea Org members know that if they leave without permission, Scientology security will comb airports, train stations, bus stations, and hotels, track their credit cards, and scour their PC and ethics folders for clues as to where the person who escaped might be found.  Security will then force the person to return to their base for routing out. People confined to the Freewinds have an additional obstacle: security confiscates their passports when they board the ship, so even if they escape from the ship and from security situated at the ship's exit, they are unable to travel freely.  Security has been known to chase down people who escape the Freewinds, force them to return to the ship, and confine and place them under constant surveillance.

87.     For an individual who grew up in Scientology and who is impoverished, in debt, and without meaningful education or life skills, it is nearly impossible to simply walk away. Many members linger for years, accumulating trauma on top of trauma, until finally mustering the courage to slowly, and very quietly, allow for some distance between themselves and Scientology.  This process can take years.  When children who grew up in Sea Org find the strength and courage to quietly leave, they are still operating

under a set of beliefs inculcated in them since childhood, including that anything done to them or wrong with them is their fault. Because they are raised to believe that psychology and psychiatry are the most dangerous elements in society, it can be years before they understand that they have been traumatized and require mental health counseling or therapy. Due to their deep distrust of authorities and the legal system, and no understanding at all of the concept of legal rights, it can also take years for survivors to appreciate that Defendants caused injuries warranting the seeking of legal advice or reporting to authorities. Defendants' possession of each person's voluminous PC and ethics folders gives them added leverage, because those files contain coerced "confessions," as well as valuable information regarding each person's fears and vulnerabilities. The ever-present threat of retaliation is almost always sufficient to prevent defectors from ever taking any action against Defendants.

### C.     FACTS SPECIFIC TO PLAINTIFFS

#### 1.     <u>Plaintiff Gawain Baxter</u>

88.     At two months-old, Gawain Baxter's parents placed him in Cadet Org nursery in Clearwater, Florida. In or around 1988, at age six, Gawain became a member of Cadet Org and was required to sign a contract pledging to serve Sea Org, in essence the Defendants, for one-billion years. As a member of Cadet Org, Gawain had minimal schooling; time most children

51

spend in school learning reading, writing, arithmetic, critical thinking, civics, and developing basic life skills was instead devoted to providing labor and services for various Scientology-affiliated groups, organizations, and entities, including Defendants.

89.     Gawain was separated from his parents and forced to live in a dormitory, a repurposed Quality Inn, with around one hundred other children, sleeping on bunk beds in crowded shared rooms. Cadet Org was overseen by Cadet Coordinator, Rusty Hilton, who reported to Victor Sanchez, the FSO senior executive on Flag Base in charge of Flag Crew and Flag Service Organization operations. Initially, Gawain was permitted to visit his parents every evening at dinner.  But at approximately age ten, Gawain was permitted to visit his parents only once a week for about three hours and was often limited to a single monthly visit if he was in "lower conditions," such as after a negative cleanliness inspection or if he had tried to overstay his allotted time with his parents on a previous visit.   Sea Org parents lived in quarters a twenty to thirty-minute drive from the Cadet Org dormitory.  Children were bussed to and from parents' quarters and had no means to independently visit their parents outside of this highly controlled system.

90.     From the ages of six to fourteen, Gawain was not permitted to attend any accredited public or private school.  Instead, schoolwork consisted

of two to three hours per day of basic reading, writing, and math in a classroom of thirty other children, under the supervision of Linda Hilton, Cadet Coordinator's spouse. Beginning when Gawain was age ten, he was also required to spend one to two hours daily in Scientology indoctrination courses. The cost of each course was recorded as a monetary debt that Gawain was told he would owe if he ever left Cadet Org or Sea Org. As he grew up, and throughout his life in Scientology, he was regularly reminded that he would be responsible for paying this mounting debt should he ever leave Sea Org.

91.     Following daily schoolwork and Scientology indoctrination, Gawain was forced to provide five to ten hours a day of unpaid work at Flag Base, including food preparation, trash removal, landscaping, and clerical work. During staff shortages, Gawain was made to work full-time and skip his schoolwork entirely. At age thirteen, Gawain was provided a stipend of eight dollars per week, which was contingent on his completing his training courses and performing his work to the satisfaction of Cadet Coordinator. Gawain used this paltry amount to purchase necessities, including his toiletries and shoes.

92.     When Gawain was age fourteen, he was transferred from Cadet Org to Sea Org. A prerequisite to joining Sea Org was the completion of the Estates Project Force ("EPF"), a bootcamp at Flag Base. Without informing

the Cadets about where they were going, or the purpose, Jim Sedeko, Cadet Coordinator at the time, put Gawain and a group of other children on a bus from their dormitory to Flag Base, where Victor Sanchez and another individual filled out an intake form and demanded that Gawain sign it and start working on the EPF. Gawain did not want to join the EPF but had no choice, because if he resisted or disagreed, he would be punished with lengthy and abusive security checks, ethics handlings, and possible expulsion and homelessness. He was also aware that his parents would be punished for his resistance, as was common practice in Sea Org. For the three-month period that he was on the EPF, Gawain was required to perform physical labor, including renovating a building, cleaning other facilities, and landscaping for twelve or more hours per day, and to spend an additional five hours each day immersed in Defendants' indoctrination programs. During this entire period, Gawain was sleep-deprived, given inadequate time to eat, and verbally abused by his adult supervisors, including the senior officer in charge of EPF, Dave Englehart, the Commanding Officer of Flag Crew, Laurie Englehart, and the CMO Commanding Officer, Angie Blankenship.

93.     After three months working on EPF, Gawain transitioned to Sea Org. Shortly thereafter, Gawain wrote a letter to Javier Martinez, a senior RTC officer at Flag Base, requesting permission to leave Sea Org because he was continually subjected to verbal abuse and intolerable living conditions.

54

Shortly thereafter, Danny Light, a high-ranking IASA officer from the Freewinds who was at the time located at Flag Base, verbally abused and screamed at Gawain for having sent the letter and demanded that he call Martinez and falsely confess to fabricating the allegations of mistreatment in the letter.  Gawain was frightened by threats of serious punishment and complied.  Light and others thereafter punished Gawain for writing to Martinez, forcing him to write up confessions to "crimes," make amends to those about whom he wrote his letter by doing work for them, and complete intensive security checks. Gawain wanted to leave Sea Org, but he knew he would be punished and possibly put out on the street, so he had no meaningful choice but to stay.  At only age 15, with little education, no money or support system, the belief he was indebted to the Defendants, and no life skills, Gawain feared being declared a Suppressive Person, permanently separated from his family (who would also be punished for his alleged transgressions) and from the Scientology world, and cast into the frightening outside world where he had been taught former Sea Org members met awful fates, including death.

94.     After Gawain completed his punishments for writing the letter, he was informed that he would be assigned to work on the Freewinds.  As a prerequisite to being sent to the Freewinds, Defendants subjected Gawain to additional abusive security checks.  During the sessions, an FSO officer,

Natalie Galbiatti, and another individual, interrogated Gawain about every aspect of his life, including explicit questions about his sexual experiences, affiliations with intelligence and law enforcement agencies, past criminal behavior, and drug use. In each session, his interrogator prohibited him from leaving the room until he provided answers to his interrogator's satisfaction. Even though Gawain had engaged in none of the conduct he was being questioned about, Moxin and Galbiatti required him to undergo dozens of these interrogations, each lasting up to twelve hours.

95.     Eight months later, after completing the security checks and the EPF program to the satisfaction of the EPF senior officer, Dave Englehart, Gawain was transported from Clearwater to Tampa and flown to Curacao, where he was forced onto the Freewinds.  Once aboard, Freewinds' security confiscated Gawain's passport, immigration, and identification documents to prevent him from escaping and to force him to provide free labor and services. When Gawain arrived on the Freewinds he saw that Heidi Pirak had been forced to clean the Freewinds' decks and live in a cabin monitored by security cameras for over a year as punishment for wanting to leave, so Gawain was afraid to ask for his documents, fearing extreme punishment.

96.     Gawain asked if he could retain possession of his green card, but security refused. Several months later, Gawain asked to be permitted to leave the ship and return to the United States so that he would not lose permanent

resident status, but his requests were denied. The Freewinds' Port Captain, Ludwig Alpers (who also served as Secretary on FSSO's board of directors (and was understood by the crew to serve as the ship's local legal advisor) lied to Gawain, telling him not to worry about losing his U.S. immigration status because Defendants would obtain a religious worker visa for him if he needed to go to the United States.

97.     During his time on the ship, Gawain was forced to perform arduous physical labor and menial tasks, and punished for any failure to fully comply with the commands of higher-ranking Sea Org members. Gawain suffered from sleep deprivation and was always anxious and fearful that anything he said, asked, or did might be interpreted as rebellious and result in physical or mental punishment.

98.     On the ship, Gawain worked between sixteen and twenty-four hours per day performing manual labor such as repainting pipes, cleaning the ship's deck, preparing food in the kitchens, serving as a steward for the crew, as well as doing administrative work for Defendant IASA.

99.     Work assignments on the Freewinds were often dangerous. In Gawain's first year on the ship, Janet McLaughlin, the senior most IASA officer on the ship, ordered him to squeeze into fuel tanks and clean them by lantern in the dark, without a respirator or other protection from fumes.  The

tanks were a meter high by a meter wide and a meter deep, and Gawain had to crawl from tank to tank.

100.   Around eight months after boarding the Freewinds, Gawain again expressed a desire to leave Sea Org (and thus the ship).  Scientology policy and the policy on Suppressive Acts state that merely informing fellow staff members of wanting to leave is a suppressive act. People who want to leave are punished, subjected to security checks and other handling until they confess their "crimes," and this generally prevents people from leaving or even mentioning it.

101.   In response to Gawain saying he wanted to leave, Ken Pirak, an Executive Officer in IASA, ordered Gawain into a room where he screamed and repeatedly kicked him in the shins.  Gawain was then sent to the engine room for the first of many times and ordered to write up his OWs.  The engine room was extremely hot (more than 100 degrees), dirty, and very loud.  There was so little room to move that it was difficult in some parts to stand up straight.  Bilges and fuel tanks had to be cleaned by hand, which required crawling into extremely tight spaces.  People assigned to the engine room were provided no protective clothing or equipment, no training to safely work around mechanical equipment, and became covered in grease that had to be washed off with diesel fuel because no other cleaning agents were provided.

58

102.    Many times after being sent to the engine room, Gawain was forced to write false "success stories," describing the ways in which he supposedly benefitted from it.

103.    As a result of Gawain's desire to leave, Ewa Ronnquist, a senior officer on the ship, also placed him under severe restrictions on Janet McLaughlin's orders.  Officers now considered him a security risk and did not allow him on any part of the Freewinds not monitored by cameras.

104.    Gawain understood that these conditions would continue until he forcibly conceded that he did not want to leave. Ronnquist told Gawain that since he did not have any education or skills to live in the real world, his leaving would mean homelessness and a life on the streets, where he would get sick with cancer and die. Ewa also told Gawain that if he were to leave, he would be disconnected from his parents. If Gawain were declared a Suppressive Person, everyone Gawain had ever associated with in Scientology, including his own parents, would believe that he was a disgraceful, degraded being. Believing this was his potential future, Gawain accepted that his only option was to stay on the Freewinds.

105.    Gawain's supervisors also physically abused him.  For instance, Raymond Feneck ("Feneck"), the kitchen manager, struck Gawain hard on both sides of his head.  When Gawain reported the assault, Feneck wrote a negative report about Gawain, resulting in Gawain being assigned to lower

59

conditions and required to write a confession of his "crimes," including taking responsibility for causing Feneck to assault him.

106.   From time to time while on the ship, Gawain was instructed to sign documents. He did not understand them but knew he had no option to refuse, and that asking questions about them could have severe repercussions. In 2001 Lisa Cohee, legal director of IASA demanded that Gawain sign a document stating that he was never an executive in IASA and never had any authority.  In 2003, the Freewinds crew was ordered to form a line and sign a document. Gawain, like the other crew members, had to comply with the order or face punishments. Gawain lined up, and when he got to the front of the line Christer Nielson provided him with a document. Gawain was not permitted to read the document, seek any advice, or retain a copy of the document. He signed it because he knew that he would be put in lower conditions if he refused.

107.   In 2008, the Freewinds underwent extensive renovations. During this time, Gawain worked more than eighteen hours per day and was exposed to blue asbestos[8] and concrete dust. He soon became ill, coughing up

---

[8] "Crocidolite asbestos, also known as blue asbestos, is considered the most hazardous type of asbestos in the amphibole family. Crocidolite is made up of extremely fine sharp fibers that are particularly easy to inhale. Studies show that crocidolite is so hazardous, it may be responsible for more illnesses and deaths than any other type of asbestos."  https://www.pennmedicine.org/cancer/types-of-cancer/mesothelioma/asbestos-cancer/types-of-asbestos

blood. Gawain was not provided with a mask or protective equipment, and he was not permitted to see a doctor or seek medical care. Gawain was granted a brief rest period and ordered to resume working once he ceased coughing up blood. Gawain knew that any additional time he spent on bedrest meant that other Sea Org members would have to make up for his work in his absence. Numerous other Sea Org members were also sick and on bedrest. Gawain has experienced respiratory problems ever since.

108. After the ship's renovations in 2008, there was a substantial push on the Freewinds to sell sets of expensive Scientology "basics books" to all public Scientologists (and to ask them to purchase additional sets that could, among other things, be donated to every library in the world). Gawain, along with most of the ship's crew, was required to cold-call Scientologists every night after he completed his work as crew steward. Lurie Belotte, the RTC executive on the Freewinds, gave Gawain a target for how many books he was required to sell every night. Gawain was only permitted to make sales calls after he finished the work assigned to him on his post, and he was only permitted to sleep when he met his targets or was otherwise relieved of his duty by Bill Brag, the chief officer of FWSO. Gawain was also required to purchase and begin reading the basics books each night until he had finished reading the number of pages assigned to him as his reading quota. As a result, Gawain slept two hours per night, and on Wednesday nights he was

not be permitted to sleep at all if he had not met his sales and reading quota for the week. As with many of his fellow FWSO crew members, Gawain never met his sales quota and was severely sleep-deprived for several years. Gawain began to fall asleep when he was working in the kitchen, which was highly dangerous, or in the bathroom. This led to Security requiring him to only use one bathroom and to notify them whenever he had to use it so they could make sure he did not fall asleep. Gawain was also punished repeatedly for failing to meet his sales and reading quotas. This continued for several years, after which Gawain's sales target was eliminated. Even after that, he was still required spend several hours per night making sales calls after his steward work was complete.

109.   Gawain's punishments in the years after the renovations often included being forced to spend yet more time working in the engine room.

110.   In or around 2011, an incident convinced Gawain that leaving the ship was impossible. Colm McLaughlin, husband of former IASA President Janet McLaughlin (who was herself removed from her post and placed in the "hole" at Int Base by Miscavige for suspected disloyalty), had been sent to the Freewinds under Miscavige's orders as punishment. When Colm attempted to physically leave the Freewinds, ship Security Officers physically dragged him back to the ship and confined him to the engine room for prolonged periods of time. When that didn't persuade Colm to decide to stay, he was isolated from

the crew by being moved to the Diana, a small yacht docked in Curacao where he was imprisoned under full time watch. Gawain was aware that Colm had spent three years unsuccessfully attempting to leave the ship. The public punishment and restraint of such a senior Sea Org member instilled fear in Gawain and further deterred him from attempting to leave the ship.

111. For his round-the-clock labor, Gawain was supposed to be paid fifty dollars per week, out of which he purchased toiletries and other personal items. Gawain was rarely given full pay, at times going weeks without compensation, sometimes because his shipmates had failed to meet their own performance targets. Gawain was also required to make annual contributions out of his meager pay towards birthday presents for David Miscavige and other executives on the Freewinds. Those contributions typically amounted to multiple weeks' worth of his full pay.

## 2. **Plaintiff Laura Baxter**

112. Laura Baxter grew up in Scientology, serving on the staff of a local Scientology organization in Germany. At age seven, when she first learned to read and write, Laura's mother signed her up to take Scientology courses for up to three hours per course, twice a week. At age fifteen, Laura became a staff member at Defendants' local organization in Stuttgart. As a condition of being on staff, Laura was required to undergo auditing and other checks.

113.   When Laura was sixteen, FSSO Sea Org recruitment officers began to visit her every night, manipulate, pressure, and coerce her to sign a contract pledging to serve Scientology for life within Sea Org.  Even after years of indoctrination, Laura resisted.  She told them she always imagined her future to include being a wife and raising a family, which she knew would not be permitted if she joined Sea Org.  The FSSO recruiters would not take no for an answer, and continued to show up nightly, spending an hour each visit lecturing and cajoling her on how important and prestigious membership in Sea Org was, that it was the highest honor that could be conferred on a Scientologist, and that it was ethically problematic for her to refuse.  Eventually, they wore Laura down and when she submitted, the FSSO officer instructed her to sign a contract pledging her life to Sea Org. Laura did not understand the contract, but she understood that she had no choice but to sign any document that any executive directed her to sign.

114.   Laura was forced to travel to the United Kingdom to start the EPF as a prerequisite to joining Sea Org.  Because she was a minor, Laura's mother signed over guardianship of Laura to Freddie Hunkeler, a Sea Org member and senior IASA officer at the UK site where Laura was sent.  For the period that Laura was on the EPF, she was required to spend eight to ten hours per day performing arduous physical labor, including digging trenches, cleaning toilets and dumpsters, and landscaping under the supervision of the

64

senior officer in charge of EPF.  Laura was paid the equivalent of twenty-five dollars per week.  During this time, Laura was denied adequate time to eat proper meals or take breaks.

115.   After one-month, Laura transitioned from the EPF to Sea Org and she was told she would work for Defendant IASA on the Freewinds under IAS President Janet McLaughlin.  As a prerequisite to being sent to the Freewinds, Laura was subjected to a series of intense, manipulative, and emotionally abusive security checks.  During these interrogation sessions, Laura was repeatedly asked a series of sexually explicit questions, as well as questions about her affiliations with law enforcement or intelligence agencies, past criminal behavior, and drug use.  Laura was forced to undergo dozens of these interrogations, each of which lasted for up to twelve hours, during which she could not leave the room except to eat or use the bathroom.

116.   Accompanied by her IASA guardian, Hunkeler, Laura was then transported from England to Miami, Florida, and then to Curacao, where she boarded and began working on the Freewinds in IASA files administration.  She was forced to work long hours, was given no days off, and was paid twenty-five dollars per week.

117.   At age seventeen, Laura was told her experience in Sea Org was inadequate and that she required more training.  She was removed from the Freewinds and sent to Defendants' European Base in Copenhagen as a

65

member of the IASA staff. Laura was forced to work as many as eighteen hours a day, cleaning offices, making travel arrangements for staff members, soliciting recruits for staff, and soliciting donations to the IASA. Laura was paid the equivalent of fifty dollars per week.

118. After approximately two years, Laura was informed she would be transferred back to the Freewinds. Prior to her transfer, although Laura was a healthy weight, she was forced to overeat until she gained seven kilograms (more than ten percent of her normal weight) in a short period of time. Once she was returned to the ship, security confiscated Laura's passport, immigration, and identification documents, preventing her from escaping and coercing her into providing free labor and services.

119. Once aboard the ship, Laura was required to work between twelve to fifteen hours per day as a file administrator.

120. In 2004, a celebrity actor celebrated his birthday aboard the Freewinds at Miscavige's invitation. Janet McLaughlin (who knew Laura had been instructed by other officers to be present at the gathering) falsely accused Laura of trying to monopolize the actor's attention and ordered a senior officer, Ken Pirak, to take her into a small room where MacLaughlin, Pirak, and two other IASA officers, Lise Cohee and Karleen De Simone, screamed abusively at her. Laura was then confined to the extremely hot engine room for three days, allowed to leave for only a few minutes at a time

66

for meals and to return to her room for a few hours of sleep. This was the first of a number of times she would be sent to that horrific space.

121.   As a result of the alleged incident at the party, for the next two months, Laura was subjected to handling sessions, assigned to a lower condition, forced to confess to alleged crimes against Scientology, and to make amends under the direction of Colm McLaughlin (this was during a period when he served as a senior IASA officer on the ship alongside his spouse, Janet, who was IASA's president). During this period, Laura was not paid. She was confined to an office during the day and to her room at night, kept under twenty-four-hour surveillance, and only permitted to leave her room for interrogations or when she was accompanied by another Sea Org member. Laura was not permitted to leave her room unaccompanied even to use the bathroom. On one occasion, she had no choice but to urinate in a trash can. Additionally, Laura was forbidden from communicating with anyone except the specific Sea Org members who were her handlers at the time, including Ken Pirak. For the following four months, Laura was confined to her room and only permitted to leave to study Defendants' ethics policies for up to 14 hours per day, with fifteen-minute meal breaks and bathroom breaks.

122.   Following this period of punishment, Laura was deemed unfit to work in IASA, and she was demoted to a position as crew steward in the FWSO, where she was forced to work twelve to eighteen hours per day

unloading deliveries of food to the ship, organizing and cleaning the food storage rooms and walk-in fridge and freezer, preparing food, and cleaning the kitchens.

123. During Laura's entire time on the ship, until she left in 2012, she suffered from sleep deprivation and was constantly fearful that anything she said might result in punishment. Among other things, she was punished by being put to work in the engine room on numerous occasions.

124. Throughout her time on the ship, Laura's pay was fifty dollars per week for her labor, out of which she purchased clothing and other personal items. But Laura rarely saw her full pay and often went weeks without compensation, which her superiors justified by claiming that she was guilty of unnamed and unsubstantiated transgressions, or that her shipmates failed to generate a required level of revenues.

125. During the 2008 renovations of the Freewinds, Laura was exposed to blue asbestos and concrete dust, but she was not provided with a respirator or any other protective equipment. Sea Org members were afraid to say anything to any officers on the ship, because even raising the concern would have been a "high crime" for which they would have been severely punished.

126. After the renovations, in or around mid-2008, Laura was required to spend each night making cold-calls to sell the newly revised sets of

Scientology's Basics Books, after completion of her work as chief crew steward. As with Gawain, Laura was never able to meet her impossible sales quotas, resulting in various punishments. This lasted for several years. During these years, after Laura and Gawain married, Laura was also punished whenever Gawain was punished, whether for falling asleep on his post or in the bathroom, or for any other reason, because she was supposedly responsible for his conduct as his supervisor and spouse. Laura's punishments during the years after the renovation included being forced back to work in the engine room.

### 3. Plaintiffs Gawain Baxter and Laura Baxter Meet and Marry

127. Gawain met Laura on the Freewinds, and they wanted to have a relationship, but ship officers, including Janet McLaughlin, Colm McLaughlin, Melissa Deness, Rob Napier, Ken Pirak, Lucia Keating, and even ship Captain Mike Napier systematically interfered. So long as they were single, Gawain and Laura were easy targets for manipulation and could be kept apart for significant periods through changes in job assignments, restrictions, and punishments for purported transgressions. Knowing that married staff were far less likely to experience such interference, Gawain and Laura decided to get married. Ship staff were not permitted to marry without the permission of the Captain of the Freewinds. Obtaining

69

permission typically took one to two weeks. But when they informed senior officers that they wanted to get married, Gawain and Laura were forced to wait three months before being given consideration and, when they were finally allowed to marry, they were prohibited from living together for another six months.

128.   In 2011, Gawain began to consider the possibility of a different and better life in the world that Scientology had taught him to distrust. But simply disembarking and walking away was not an option: Defendants considered even communicating the intent to leave Sea Org a high crime, punishable by the most severe repercussions, including assignment to arduous physical labor, confinement to the engine room, and even possible rendition to an RPF site for "rehabilitation."   Eventually, Gawain discussed this with Laura, and they decided they wanted to leave the ship and Sea Org. But they needed to figure out a way to accomplish this departure without enduring the tremendous consequences they would suffer if they attempted to leave without the Defendants' permission.

129.   In 2012, Laura and Gawain came up with a plan. Defendants had enacted a ban on Sea Org members having children, and pregnant Sea Org members were being forced to terminate their pregnancies.  However, this forced abortion policy was also beginning to receive negative media attention. Gawain and Laura decided that the only way they could leave without

suffering dire consequences would be for Laura to become pregnant in advance of Defendant Miscavige's next visit to the Freewinds. A pregnant Sea Org member would cause Miscavige to direct his wrath towards the senior Sea Org officers. They concluded that, if it were known to senior officers on the ship that Laura was pregnant and refusing to terminate her pregnancy, the senior officers would force Gawain and Laura to leave the ship and Sea Org.

130. Thus, Laura deliberately became pregnant. Because the ship crew did not have access to pregnancy tests, and wanting to reduce the chance of being forced to terminate her pregnancy, Laura waited several months to see Marjorie Laughlin, the ship's medical officer, who confirmed the pregnancy and reported it to senior officers on the ship, including the ship's RTC executive, Lurie Belotte, the commanding officer of CMO, Sue Price, a senior FSSO officer, Max DeGroot, Paolo Coccodo, Bill Bragg, and Captain Mike Napier.

131. Max Degroot and another officer then attempted to pressure Laura and Gawain into agreeing to terminate the pregnancy. Laura and Gawain refused and were required to undergo ethics handlings and security checks as punishment. In drawn out interrogation sessions, a ship officer, Jodie Zagary, berated Gawain for getting his wife pregnant and for not forcing her to terminate her pregnancy. In addition to undergoing this series

71

of severe "handlings," Laura and Gawain were isolated from the ship's staff and put under full-time surveillance by ship security, including Peter Ramaker.

132.   After weeks of punishments and isolation, with Defendant Miscavige's visit approaching, it became clear to the ship's officers that Laura was not going to terminate her pregnancy, and Max DeGroot told Laura and Gawain that they would be leaving the ship.  However, before returning Laura and Gawain's passports and identification documents, Krister Nilsson, an officer working under the direction of Port Captain Ludwig Alpers, and Michael Gregor or Alex Cole, a security guard, compelled Laura and Gawain to sign a series of documents while being videotaped. This was a policy and process developed, implemented, and supported by Defendants to create the facade of a voluntary, informed, and consensual process.  Gawain asked if he could have a copy of the documents, but Nilsson refused. Laura and Gawain were not given an opportunity to examine the documents, make copies, or find anyone to help them review and understand them.  If Laura and Gawain refused to sign the documents, they would have been required to undergo additional punitive ethics handlings and security checks and would have been denied their travel and identity documents. They were trapped on the ship, and the only way off was to submit to the demands of the Defendants and sign the documents.  Once they signed the documents, they were largely

72

confined to their room, forbidden from being in the presence of the ship's crew and only permitted to leave their room to eat once all crew had finished eating and exited the mess hall. They had not even been allowed to pack their belongings or make their travel arrangements (through HCO Eurigan Weedman) until after they signed the documents.

133.   Before permitting them to leave, Peter Ramaker, ship security, also confiscated Gawain's computer and deleted photos from the hard drive documenting his time on the ship, because they considered those photos a threat to Defendants. They also had to meet with Ann Marie Norton, who held the Ship's FWSO "Super Cargo" position, who reminded them that they now owed a freeloader debt of around $12,000. She informed them that because they were leaving the ship and Sea Org, they would be in lower conditions until they paid off the debt and took additional courses. Gawain asked Norton if they would receive any type of severance payment and Norton said only American citizens were eligible to receive that.

134.   Since Gawain had lost his permanent residence status in the United States and had no visa, they were not able to return to the United States and instead traveled to Germany, where Laura had family.

135.   After Laura and Gawain relocated the Germany in 2012, they frequently received phone calls from Chad McKevitt, Evelyn Von Rompoy, Hildi Hattenbach, Sue Allcock, all of whom worked in FSSO, demanding

73

payments for the freeloader debt. Eventually, Ann Marie Norton pressured them to obtain a loan to pay off their freeloader debt, after which they were expected to complete their program of lower conditions and begin to receive Scientology services again. Laura and Gawain felt they had no choice but to go along, borrowing money to pay off their freeloader debt because their housing and employment was provided by Scientologists and therefore, they needed to remain in good standing with the Defendants. However, once the freeloader debt was paid (and now owed to a lender), Gawain was told that he was still indebted to Defendant IASA because he purportedly had agreed while he was in Sea Org to purchase an expensive, lifetime IAS membership.

136.   In 2015, Gawain and Laura moved to Australia, so they could help take care of Gawain's elderly and infirm paternal grandmother. Gawain's father told them they could live in Gawain's grandmother's house, and he also told them that if they went to the local Scientology Org, there would be Scientologists who could provide them with employment. They were still completely dependent upon Scientologists for their livelihood and housing, and they understood that a condition of obtaining any assistance from Scientologists, including Gawain's father, was that they continue to appear to want to remain in good standing. This required them to express a desire to work off their lower conditions for leaving Sea Org, including

agreeing to take a remote learning course, which they did not want to take and would not have taken if they had other means to get by.

137.   Living under this pretense also involved tolerating numerous calls from Defendants' agents, including from Flag Base in Florida and the Freewinds, asking them what their status was, seeking to "confirm" their contact information, and suggesting that they agree to more actively participate in Scientology, including by submitting to auditing and developing a program to work off their lower conditions and restore their status as Scientologists in good standing.  These phone calls were part of Defendants' method of intimidating defectors by reminding them that Defendants always knew where they were, and constantly testing people for disloyalty.  Gawain and Laura would always politely answer the callers' questions and look for opportunities to end the calls, ever fearful that if they did not go along to some extent, the harassment could escalate.  Because the calls came from frequently changing, unknown numbers, blocking them would have been pointless, so they simply tried their best to play along.

138.   In 2017, Laura and Gawain decided to proactively signal to Defendants that they were no threat.  Fearing that if they did not take some action, they might be declared suppressive persons, they submitted programs to work off their lower conditions to ship security officer Michael Greggor.

75

However, their program was rejected as insufficient. The frequency of ever-persistent calls at least slowed down a little.

139.   Laura and Gawain Baxter were traumatized because of their experiences in Sea Org and aboard the Freewinds and suffer emotional harm on an ongoing and continuing basis.  Gawain also continues to suffer from the physical injuries he incurred while on the ship.

140.   Until the filing of the Complaint, Laura and Gawain continued to be regularly intimidated by phone calls from Scientologists, purportedly seeking to confirm their contact information and soliciting them to resume participation in Scientology.

141.   Right after the Complaint in this action was filed on April 28, 2022, Claudia Abadia, an HCS staff member on the Freewinds, attempted to view private family photos Gawain had shared with his father via an online service. On May 12, 2022, Gawain received a phone call from his father, Arthur Baxter, mother Vivienne Baxter, and half-sister Genny Mitchell, during which he learned that they had all been required to relocate to Clearwater, Florida from their posts in other parts of the world. Gawain's family yelled at him, attempted to pressure him to admit he was lying and to withdraw the lawsuit. Gawain received a similar call on May 21, 2022, from Genny, and on May 29, 2022 and June 15, 2022 there were two more calls

from his father.  Each call followed a similar script, clearly designed to pressure him into dismissing his claims against Defendants.

142.   Gawain also observed men surveilling him at an airport on June 10, 2022, and at his house on June 16, 2022. On several occasions in June and July 2022, Gawain observed people following him (and on at least one occasion, him and Laura), or sitting in parked cars for hours watching sites where he was working.  Once, in June, there was a man laying with his seat back in his car, as if he did not want to be seen; when Gawain left the job at the end of the day and approached his own vehicle, the man sat up and turned on his car to follow Gawain.  A similar incident occurred in late July. Once in late July, Gawain and Laura were with their children in a public park. There were very few people around, but there was a person in an Isuzu SUV who appeared to be going for a walk.  However, Gawain and Laura were suspicious and decided to leave the park and take their children for ice cream.  As they began to pull away, they observed the woman quickly return to her SUV, and after they parked they noticed the woman in the SUV had parked there as well, and was sitting in her vehicle watching Gawain, Laura and their children.  Gawain walked toward the vehicle to take a photograph, and the woman drove away.

143.   In addition, on at least one occasion, Laura noticed someone who appeared to have been following her around the grocery store.  When Laura

went to move her car to load her groceries, the stranger stood blocking her
vehicle for roughly a half-minute.

144.   Laura learned that her sister, still in Scientology, had been
moved to Clearwater on June 6, 2022, and on June 14, 2022, her mother, also
still in Scientology, who had been relocated to Clearwater from Germany,
attempted to engage her in a heated discussion of the lawsuit and to pressure
her into dismissing it.

### 4.   **Plaintiff Valeska Paris**

145.   Valeska Paris's parents were members of Scientology.  From age
four, Valeska was subjected to a Scientology training routine during which
she was screamed at, verbally abused, and forced to listen to graphic
descriptions of sexual content for hours at a time to condition her not to be
upset or show any visible reaction and retain her composure in the face of
verbal assault.  This abuse continued throughout her childhood and teenage
years.  Once she learned to write, she was often forced to write up false
confessions of Scientology crimes, which would be used against her
throughout her time in Scientology.

146.   At age six, Valeska's father became a member of Sea Org and her
parents enrolled her in Cadet Org.  She was required to sign a contract
pledging to serve Sea Org, and thus the Defendants, for one-billion years.
When Valeska's parents divorced, Valeska's father was granted sole custody

of her and her siblings. Valeska was separated from her mother, who was taken from the family by two Sea Org members and not permitted to say goodbye to her children or tell them when they would see her again.  Initially, Valeska was permitted to visit her father for an hour every evening at dinner.  Beginning when Valeska was age nine or ten, Valeska was rarely permitted to see her father.  Shortly thereafter, Defendants implemented a policy cancelling family time altogether.

147.   Valeska was one of about one hundred children, ranging in age from newborn to fourteen, who lived in the dormitories at Stonelands, in England, near Scientology's UK base, Saint Hill. Valeska spoke only French and felt isolated from the other children and adults who spoke only English, until she learned to speak English.  Valeska was distraught at being separated from her mother, but adult Sea Org members responsible for Cadet Org reprimanded her for being "dramatic" and punished her by forcibly dragging her to the galley and making her wash pots and pans.  Children in Cadet Org were supervised by Dominique Feldmester, Cadet Coordinator, along with other senior personnel including Dominique's husband, Jeremy Feldmester.

148.   As a member of Cadet Org in England, Valeska had minimal schooling; she attended Greenfields, a Scientology run school where the only curriculum is a Scientology check sheet used to apply Scientology

79

indoctrination techniques such as "word clearing."[9] Valeska was also regularly disciplined using Scientology punishments including writing up all of the alleged wrongs and crimes she had been led to believe she committed. Following school, Valeska was required to devote two hours a day to the study of Scientology. The cost of each course was recorded as a debt that she was told she would owe if she ever defected from Sea Org. As she grew up, and throughout her life in Scientology, she was regularly reminded that she would be responsible for paying this mounting debt should she ever leave.

149. Every day, Valeska and the other Cadet Org children performed five hours of unpaid work for Scientology-affiliated entities, including cleaning the premises with harmful chemicals, landscaping, washing dishes and providing childcare for the newborn babies. Defendants' policy was to permit children one day off every two weeks, and only if they were not in lower conditions. Valeska was not trained or provided any protective equipment, resulting in physical injuries.

---

[9] Word clearing is the method Scientology schools employ to teach children reading skills. Children work independently with assigned material, including portions culled from Scientology teachings and the writings of L. Ron Hubbard. They are required to look up and memorize definitions of the words in a given selection, and to recite definitions of words on demand by an instructor. When a child can provide a definition for any word in a selection, she or he is said to have "cleared the words," and moves on to another selection. Unlike traditional, accepted teaching methods, Scientology schools do not teach grammar, writing, reading comprehension, critical thinking, or other analytical skills necessary to do more than perform rote tasks.

150.    Defendants' policy was to routinely deny children in Cadet Org proper medical care; if they became sick, they were excused from working that day and isolated in their dormitory. Valeska was denied medical treatment when she contracted the mumps.

151.    Physical violence and sexual abuse were commonplace in Cadet Org.  On one occasion, Valeska walked in on an adult Sea Org member, who was responsible for the children, masturbating on a boy's bed. Valeska reported the incident to Dominique Feldmester, who reprimanded **her** for making the report.

152.    When Valeska was age eleven, a twenty-year-old male Sea Org member told her that he was trying to hide from Sea Org staff and demanded that she lie on top of him in her bed to conceal him. Valeska, who had been trained to obey the commands of Sea Org members, complied.  When Valeska reported the incident, she was taken to Saint Hill Manor, the former home of Hubbard in England, where a CMO officer, Tony Langley, interrogated her about the incident for four hours without a break and then accused her of having sexual intercourse with the man.  Cadet Coordinator, Dominque Feldmester, and Paula Cronin then punished Valeska by assigning her a lower condition and requiring her to falsely confess to having sex with the man.

81

153.   When Valeska was age 12, Jeremy Feldmester ordered her into a room with him to confess to "crimes" she committed, or alleged sexual acts and thoughts she had, while he stood over her menacingly. When Valeska called Jeremy Feldmester a pervert, Dominque Feldmester put Valeska in lower conditions for a period of six months.  Valeska later learned that Jeremy Feldmester was a sexual predator who had installed cameras in the rooms at Stonelands, so that he could watch female children undress.

154.   When Valeska was thirteen, Janine, the commanding officer, told her that she had accumulated substantial freeloader debt for the courses and auditing she had gone through, and threatened to kick Valeska out of where she lived if she did not join Sea Org.

155.   When Valeska was age 14, she traveled to Flag Base, in Clearwater, Florida.  There, she joined Sea Org, where she was reminded she had signed a lifetime service contract at age six.  Per Defendants' policy, she was threatened that if she did not re-sign Defendants' billion-year service contract and join Sea Org, she would be kicked out of Cadet Org and would become homeless.

156.   A prerequisite to joining Sea Org was the completion of the EPF. Valeska did not want to join the EPF but knew if she resisted, she would be punished with security checks, ethics handlings, or, worse, expulsion and homelessness.  This caused Valeska to experience deep fear because she had

82

experienced sexual abuses as a child and had heard many stories of children who fled or were kicked out and then experienced physical and/or sexual abuse. She was also afraid that Defendants would punish her parents for her "crime" of refusing the assignment to EPF, as it was common for family to be punished for the alleged misdeeds of other family members.

157.   When Valeska arrived at the EPF building in Clearwater, Florida, her passport and identification documents were confiscated. From age fourteen onward, Valeska did not have any schooling. During the three months that Valeska was on the EPF, Defendants made her clean the premises for twelve to eighteen hours per day, including requiring her to climb into and scrub garbage dumpsters with toxic chemicals without protective gear. She was usually paid fifteen dollars per week, out of which she purchased her toiletries and other personal items. After her work shifts ended, Valeska was required to spend an additional five hours immersed in Defendants' indoctrination programs. During this period, Valeska was sleep-deprived, poorly fed, and consistently verbally abused by adult supervisors. She was forced to live in a cockroach-infested room and use communal bathrooms covered in mold and mildew.

158.   While Valeska was on the EPF, Jacob, a nineteen-year-old Scientologist who was also on the EPF, sexually assaulted her. He pushed her against the wall of a swimming pool and rubbed his penis against her

83

vagina, putting his hands down her swimming top and rubbing her breasts. Valeska had been conditioned not to report incidents of abuse because she would be made to take responsibility for causing them, labelled a potential trouble source, and punished.

159.   At age fifteen, upon completing Sea Org EPF, Defendants posted Valeska to the Commodore's Messenger Org (CMO) EPF at Flag Base, where for six months she worked sixteen-hour days preparing food, doing laundry, cleaning offices, and serving as a personal assistant to Scientology executives, including Defendant David Miscavige.  As part of their pattern of manipulation and coercion, Defendants would arbitrarily declare Valeska's work performance or behavior inadequate and place her on lower conditions for extended periods.

160.   Even after moving from England to Florida, Valeska was forced to relive her experiences with sexual abuse in a humiliating manner.  During numerous auditing sessions with an adult male interrogator, Valeska was required to remove her pants and sit with a towel on her lap.  Her interrogator asked her explicit questions about the sexual abuse she had described in the reports that she had written about the individuals who sexually assaulted her.  In these sessions, Valeska would be required to identify how she had "caused" the abuse and accept responsibility for it.  In each session, her interrogator prohibited her from leaving the room until she

provided answers to his or her satisfaction.  During her time in the CMO EPF, Valeska was required to undergo dozens of these interrogations, each of which lasted hours.

161.   During this period, Tyronne Webb ("Webb"), a senior Sea Org member and CMO officer, frequently sexually assaulted her by lifting her from behind and rubbing his erect penis against her genitals.  Valeska was a minor at the time.  Initially, Valeska did not report Webb to anyone in Scientology because she was afraid of being interrogated and punished. She was also aware that Defendants would record any report of abuse or assault in her PC folder and ethics folder, and she was afraid of being labelled a Potential Trouble Source.  After three months, however, Valeska could no longer withstand the abuse and, upon learning that another girl had reported abuse by Webb, Valeska also reported him to Defendants' ethics officer, Tina Fugen, who in turn reported it to Elizabeth "Bitty" Miscavige, David Miscavige's sister-in-law and one of Miscavige's highest echelon of senior officers.  As she had feared, instead of punishing Webb, Julie Ginge-Neilson, Valeska's CMO supervisor, along with her husband Mark Ginge-Nielson, chastised and punished Valeska for causing the abuse.  Valeska was required to do Webb's laundry.  As a result, the abuse continued. On one occasion, Webb pushed Valeska onto a couch and rubbed his erect penis against her, only stopping when another staff member walked into the room. After her

previous experience reporting Webb, Valeska stayed silent about the incident. Valeska did not report Webb to the police because it was a high crime to report another Sea Org member to law enforcement and because she did not understand she had been criminally sexually abused.

162. When Valeska was age seventeen, her mother fled Scientology without authorization and traveled to Switzerland. Defendants believed Valeska's mother intended to testify against them in a legal proceeding, and Annie Morra, a senior officer in OSA, placed Valeska on twenty-four-hour watch, requiring her to spend each day in OSA's offices under strict supervision. Each day during this period, while Morra searched Valeska's mother's PC folders for compromising information that might be used to manipulate her, Valeska was brought into the office of the senior case supervisor at Flag Base, Allen Kardazinski, where she was required under his and Morra's supervision to call her mother, read her Defendants' ethics policies and try to persuade her to return to Flag Base. When the effort failed, Valeska was kicked out of CMO, labelled a Potential Trouble Source, and placed under twenty-four-hour surveillance, after which she was shamed and scorned by her peers and friends in CMO, who refused to speak with her again. Valeska was assigned lower conditions and put to work in the crew dining room for up to twenty-one hours a day, seven days a week for the next six months.

86

163.    When Valeska was age eighteen, her mother returned to the United States and was observed by Flag Base security driving by the location where Valeska lived. As a result, a commanding officer deemed Valeska subversive, moved her to a different dormitory and again placed her under twenty-four-hour surveillance. Several days later, Annie Morra informed Valeska that David Miscavige, who was staying at Flag Base at the time, had ordered Valeska to be sent to the Freewinds.  At 6:30 the next morning, Morra came into the room where Valeska was sleeping, ordered Valeska to throw her things in a bag, and placed her in the custody of a security officer, who took Valeska to the airport, boarded a flight with her to Curacao, escorted her onto the ship and handed the ship's security officer Valeska's passport (which Defendants maintained custody of the entire time she was at Flag Base).  Valeska was also required to surrender her other forms of identification.

164.    Valeska was assigned to work in the restaurant on board the ship that served members of Scientology who were not on staff.  Upon telling Mike Napier, the Captain of the Freewinds, Sharron Weber, the FSSO commanding officer, and Jenny Alpers, a senior CMO officer, that she wished to return to Flag Base, Sharron Weber sent her to the engine room as punishment, where she was required to climb under the deck plates into a claustrophobic space between the pipes and clean them with a rag.  After

cleaning those areas, Valeska was covered in grease, and the only cleaning agent she was given to remove the grease was diesel fuel.  She was only permitted fifteen-minute meal breaks in the engine room.  Freewinds staff and the ship's Captain regularly verbally abused Valeska.

165.  During her time on the ship, Defendants required Valeska to perform arduous physical labor and menial tasks and punished her for any failure to fully comply with the commands of higher-ranking Sea Org members. Valeska suffered from sleep deprivation and was always fearful that anything she said might be interpreted as rebellious and result in mental or physical punishment.

166.  For all of this, Valeska was paid fifty dollars per week, out of which, she purchased her toiletries and other personal items from the ship's commissary, though she rarely received her full pay.

167.  For a prolonged period, Valeska was made to clean the ship and wash dishes for sixteen hours per day with only fifteen minute meal breaks. Defendants also assigned her lower conditions, forcing her to confess to her alleged "crimes" against Scientology, make amends for her supposed transgressions, and undergo auditing to the satisfaction of her auditor. During this period, she was not permitted to talk to anyone or make phone calls, and she remained under twenty-four-hour surveillance.  Valeska wrote a letter to Shelly Miscavige, the wife of David Miscavige, describing the

88

abuses and stating that she wanted to leave the Freewinds, but Sharon Weber found the letter, tore it up and punished Valeska to the engine room until she accepted her fate. Six months later, Valeska wrote a second letter to Shelly Miscavige requesting permission to temporarily leave the ship, but Shelly Miscavige reported the letter to security and instructed them to tell her that her request had been denied.

168. During a visit to the Freewinds, Defendant Miscavige asked Valeska how she liked being aboard the ship. In response, Valeska said she did not like it and reminded him that he personally had issued the order that she be put to work on the Freewinds, which he acknowledged.

169. At one point, the ship was renovated and Valeska was assigned to sweep up dust and debris without any protective equipment. Unbeknownst to Valeska, the dust was blue asbestos, causing her to have a persistent cough for many years.

170. After some time on the ship, Valeska began a romantic relationship with Carlos, the ship's Security Chief. Defendants prohibited intimate relationships between unmarried members of Scientology. When Carlos confessed to superiors that he was in the relationship with Valeska, CMO officers Amber O'Sullivan and Kerry Ibert, and a third officer, John Salas, locked Valeska in a room and screamed at her repeatedly to confess what she had done. Salas and Pilar Saldarriaga, a senior CMO officer, then

89

locked Valeska alone in a room for 5 hours until she prepared a legible, handwritten confession providing graphic detail of sexual acts she had performed with Carlos. A summary of the confession extracted from Valeska was then posted on the ship's notice board for the entire crew to read, humiliating Valeska and causing her to be subjected to shame and scorn from the crew. Saldarriaga also threatened to put Valeska in an RPF program on the ship for betraying Miscavige.

171.   After Carlos and Valeska broke up, Carlos began to harass her, accosting her and verbally threatening her. Valeska could not avoid him because they were assigned to work in the same area of the ship. When Valeska reported Carlos, she was again punished and humiliated. She was assigned lower conditions for five months. Another time, Carlos poured a gallon of bleach on the floor of the room where Valeska was sleeping, filling the room with noxious fumes. When she reported him, she was verbally abused for causing it, forced to clean it up, audited, and assigned to additional lower conditions.

172.   In response to Valeska's reporting Carlos's abusive behavior, Saldarriaga issued a "non-enturbulation" order, which meant that Valeska was close to being declared a Suppressive Person. The order, which also summarized Defendants' policy on Suppressive Persons, was then read in

front of the entire ship staff and posted on the notice board, causing Valeska to be subjected to additional shaming and scorn.

173. In another incident, the captain's son, Sean Napier, sexually assaulted Valeska. He locked her in a room and rubbed his erect penis against her until he ejaculated. Valeska reported the incident and Isabel McLernen, a senior ethics officer, screamed at and verbally abused Valeska for allegedly causing Napier to sexually assault her, and she required Valeska write admissions to her alleged crimes.

174. Defendants' complete control over Valeska's life was relentless and merciless. Valeska eventually married Roberto Toppi, a member of Sea Org and an IASA officer, whose job on the ship was fundraising for IASA, but it was not a good relationship and Valeska divorced him. Valeska was punished and assigned lower conditions for supposedly causing Toppi to become less productive. When another Sea Org member expressed a romantic interest in Valeska, she was blamed for seducing him and she was interrogated continuously for forty-eight hours. Lurie Belotte and Sue Price ordered Valeska to confinement in the engine room, forbade her contacting the man, and humiliated her by posting the order on the ship's notice board. Two officers on the ship, Isabel McLernen and Paolo Cocodo mandated that Sea Org members report Valeska's alleged crimes. Sea Org members

91

dutifully wrote numerous reports of Valeska's alleged infractions and Valeska was punished each time.

175.   For one such punishment, Valeska was confined in the engine room for forty-eight hours.  The temperature was over one hundred degrees.  Valeska suffered a panic attack, went numb, and was unable to move or call for help.  When an engineer discovered her an hour later, he carried her to the control room where she was deprived of medical treatment.  Paolo Cocodo berated Valeska for overreacting and sent her back to the engine room.  Two weeks later, when she was again confined as punishment and fell unconscious, she did not seek medical care from the ship's medical officer for fear of being verbally abused and punished again.

176.   Valeska could no longer withstand the abuse and decided she needed to leave the ship and Sea Org.  Valeska confided in another Sea Org member that she wanted to leave, a "suppressive act" which was considered one of Scientology's highest crimes.  Upon learning of this, Isabel McLernen, the senior officer in charge of discipline, informed Valeska she was going to be declared for being "uncooperative," and she removed Valeska from her dorm and escorted her to a cabin monitored by a camera and placed Valeska under twenty-four-hour surveillance.  Lurie Belotte and Sue Price then forced her back to working in the hot confines of the engine room and being security checked daily for the next three months.

177.   Valeska contemplated suicide.  She was desperate to get off the ship.  She knew she would not survive if she stayed.  Lurie Belotte and Sue Price then presented Valeska with a choice: return to the engine room or be sent to an RPF site where she could be "rehabilitated."  Valeska knew she would not survive continued confinement in the engine room, but she also knew that at an RPF site she would be subjected to extremely harsh punitive conditions.  She told Belotte and Price that she did not want to go to an RPF site, and in accordance with Scientology policy, she asked to present her case to an RTC "board of review," because she felt the decision was unjustified under the applicable policies.  When they told her there would be no review, Valeska was sent to an RPF forced labor site in Australia, far from any family or friends.  Before leaving the ship, Ludwig Alpers, the Port Captain and member of the board of directors of FSSO, and Fabian Marty, ship security, instructed Valeska to put on makeup and meet them in a room on the ship, where she was instructed to sit at a table and sign documents in front of a video camera.  She did not understand what the documents were and was given no time to review them.  Nor did she have any choice; she knew that if she did not sign the documents, she would be sent right back to the engine room.  Once she signed the documents, she was given her passport and identity papers, and Marty warned her that if she tried to escape while enroute to the RPF, she would be declared a Suppressive Person.  She was

also reminded that if she left Sea Org, she would be required to pay off hundreds of thousands of dollars of freeloader debt.

178. Leaving the ship did not mean Valeska was relieved of her duties on the Freewinds. During her entire remaining time in Sea Org (from the end of December 2007 through 2009), including during her "rehabilitation" at the RPF site, she was still considered FSSO staff with a post on Freewinds, subject to the continued oversight and command by Freewinds senior officers, including Belotte and Price.

179. On arrival at the RPF site in Australia, security again confiscated Valeska's passport and identification documents. For the next eleven months, Valeska was made to wear black to signify her low status, prohibited from talking to anyone without permission, and required to run everywhere she went on the site.

180. The RPF in Australia, known as "RPF ANZO" (Australia, New Zealand, Oceanea), was Defendants' most geographically distant penal colony, where Sea Org members would be sent when Miscavige and his senior officers in RTC, CMO, and OSA wanted them to be far away from anyone they knew. There were many Americans at RPF ANZO, as well as other Sea Org members from countries around the world. RPF ANZO was run by American Sea Org officers who reported to senior RTC and CMO officers working under Miscavige's direction.

181.   While in the RPF, Valeska was forced to perform arduous physical labor and undergo security checks for fifteen hours a day.  At least ten of those hours were spent doing physical labor, including sanding and refinishing wood floors by hand, sanding and varnishing furniture, mowing large lawns with a hand-pushed lawnmower, and cleaning toilets, showers and large, maggot-infested garbage cans.  She was provided no gloves or other protective clothing or equipment.  If her tasks took longer than the allotted time, she was required to run laps around a field and do pushups.

182.   While assigned to the RPF, Valeska was under the constant threat that further violations of the strict rules, including speaking to persons she was prohibited to speak to, would result in her being assigned to the "RPF's RPF."  This harsh punishment involved being prohibited from speaking with anyone, even others assigned to RPF, put to hard labor all waking hours, and confined to a basement space below the RPF building with mud floors, old bedding and a ceiling so low that a person could not stand up straight.  Valeska knew this was not an idle threat because others who had been subjected to this regime had their names posted on a notice board for all to see.

183.   During Valeska's time on the RPF, she slept in a crowded dorm room with other RPFers, with triple-high bunk beds that had to be shared with others working on different shifts and one small drawer for the limited

95

clothing and personal hygiene items each person was allowed to have.  There was little room to walk between the beds and broken-down dressers.  RPFers were permitted only fifteen minutes for brushing teeth and hygiene, including washing in a limited number of small shower stalls and only sporadic hot water.  Women and men shared six toilets.  Valeska was never permitted to be alone, escorted everywhere, including to the toilet and shower.  There was poor air circulation and no cooling or heating; in the summers, temperatures inside the dorm would exceed 40 degrees centigrade (104 degrees Fahrenheit), and in the winter temperatures would at times be below freezing.  The dorm was in such a state of disrepair that paint was peeling from the walls and when it rained, the ceiling would be completely covered by swarms of large Huntsman spiders.

184.   Although Valeska was entitled to a small stipend while on the RPF, she was not paid and had to ask other women on RPF to share their toothpaste, soap and shampoo, and to even share their meager supplies of tampons because she had none.  Because everyone experienced privation, she felt guilty and humiliated for asking.  At least twice, she wrote to officers on the Freewinds, including Belotte and Price, asking them to send her money and reminding them that because she was still on FSSO staff assigned to a post on Freewinds, Defendants' policies required them to provide funds to

96

meet her basic needs.  They eventually sent her approximately 200 dollars to cover her basic needs for the next five months on the RPF.

185.   Food in the RPF was inadequate.  Valeska subsisted on limited amounts of leftover food, primarily squash, stale bread, and vegemite, and was allowed only fifteen minutes to eat before returning to her assigned tasks.

186.   At least twice while she was in RPF, Valeska wrote to RTC officers, including Belotte, Price, and Miscavige, asking them to allow her case to be presented to an RTC board of review because her assignment to the RPF was unjust, as she had requested while on the ship.

187.   Valeska was finally permitted by senior RTC officers to "graduate" from RPF in or around October or November 2008.  At that time, she was assigned to live in a Sea Org dorm, because she was still in Sea Org, and still assigned a post on the Freewinds.  When work would not be done on that post, she would be assigned lower conditions.

188.   Valeska worked fifteen hours per day at Sea Org ANZO in an administrative office and as an auditor.  Once she completed her shift, around 10-11 p.m., she was required to report to a different station where Sea Org members were put to work without pay selling newly re-issued Scientology "basics books."  This was part of a worldwide push by Defendants to sell these expensive books to all public Scientologists, often pressuring

97

them to purchase additional sets of them to donate to public libraries, which rejected them. In Australia, there were rooms filled with boxes of these books returned to sender from those libraries. When Valeska was not on the phone trying to sell books, she was required to sit in a separate room conducting scripted ethics interviews of Sea Org members failing to meet their sales targets, which was virtually everyone. As a result of having to work the additional shift as part of the basics book selling effort, Valeska only got a few hours of sleep per night and was perpetually sleep-deprived.

189.    While at Defendants' ANZO Sea Org operation, Valeska met and began seeing another Sea Org member, Chris Guider. In March 2009, Valeska and Chris got married without Defendants' permission, by sneaking off the base and getting married in a short roadside ceremony. As a married couple, they were entitled to a private room, but they were punished and given a room with only broken-down furniture and no mattress on the bed. Valeska was also forced by Eran Buccai to clean out the maggot-infested garbage cans again. When she refused, he grabbed her and tried to physically drag her to the garbage, but Valeska struggled and fought him off. He then called a security officer and instructed him to carry her to the garbage but, seeing her in severe distress, the security officer refused.

190.    During her entire time in the RPF and Sea Org at ANZO, Valeska had to go without needed medical and dental care. Health care was

not provided by Defendants, and Sea Org members were told if they needed medical care they had to find and pay for it themselves. Communication at ANZO was also restricted, further limiting Sea Org members' ability to find affordable health care. Only a few computers were connected to the internet, and access to them was restricted. Indeed, security would monitor the use of those computers and punish anyone who searched for or read anything from outside sources concerning Scientology. In addition, Sea Org members were prohibited from having mobile phones, there were few accessible landline phones, permission was required to use one for anything other than Scientology business, and all calls were monitored.

191. In or around spring of 2009, Sue Price sent a message: Valeska's post on the ship had still not been filled, and they were considering sending her back to the ship's engine room until a suitable replacement was found. Lurie Belotte and Sue Price then threatened to send her to the RPF in Los Angeles. It was becoming increasingly clear to Valeska that Defendants were not going to let her leave the Sea Org.

192. In May 2009, Valeska wrote a letter to Eran Bucci, a senior officer in charge of discipline, saying she wanted to leave Sea Org. Bucci's response was, "you don't really want to leave," and Mary Jane Reeve, Senior HAS, screamed at Valeska, telling her she would get cancer and die if she left, and reminded her that she would have to repay hundreds of thousands of

99

dollars of freeloader debt. Anna Tivan, the CMO Commanding Officer for ANZO, was also present and yelling at Valeska. Anna said she had spoken with Sue Price, who did not want Valeska given permission to leave the Sea Org and instead wanted Valeska to go to the RPF in Los Angeles for further "rehabilitation."

193.    During this period, under the direction of Lurie Belotte and Sue Price, senior officers including Eran Bucci and MJ Reeve were pressuring Chris to leave Valeska.  One day, Chris did not return to their quarters in Sea Org housing when she expected, and she could not find him.  Eran Bucci lied to Valeska, informing her that Chris had decided to stay in Sea Org and divorce Valeska, which Valeska knew was not true.  This caused Valeska to panic, because she did not know where Chris was and believed he may have been sent against his will to another location.  She returned to their quarters and was sorting through her possessions, believing at this point that she had to flee, when Chris returned.  Seeing his wife in such a panicked state, he suggested they go for a walk to help her calm down.  When they returned, their quarters had been ransacked and most of their possessions had been seized.

194.    It was evident to Valeska that Defendants were would not permit her to leave Sea Org, and a sense of desperation sank in.

100

195.    Valeska was aware that Sea Org members were not permitted to have children, so she purposely became pregnant.  Defendants also had a policy or practice of forcing women in Sea Org to have abortions, but Valeska refused demands that she terminate her pregnancy, because she knew if she had the abortion she would not be permitted to leave Sea Org.  Valeska was denied any prenatal care and was still required to work long hours and subsist on the squash pies, cereal, stale bread and other poor-quality food fed to Sea Org members.  Because of her forbidden pregnancy, Valeska was shamed; people stopped speaking to her, and she felt compelled to eat in her room.  After six weeks, Valeska began bleeding.  The next day, Valeska went to an emergency room and was finally treated.  She had had a miscarriage.

196.    Because losing the baby put her at risk of being kept in Sea Org, Valeska did not tell anyone other than Chris that she miscarried.

197.    Vicky Dunstan, the Commanding Officer for Australia in CSI's OSA, who reported directly to the senior most OSA officer under Miscavige, then informed Valeska that they would permit her to leave Sea Org, but only once she completed security checks to their satisfaction, which became a four-month ordeal.  After completing an initial round of security checks, two senior officers were sent by Miscavige from the United States to Australia to put her and Chris through a second, even more harsh round of security checks and ethics handlings.

198.  At the end of August 2009, Valeska was finally informed that RTC had granted her permission to leave Sea Org because Defendants still believed she was pregnant.  Before returning Valeska's passport and identification documents, pursuant to Defendants' longstanding policies and standard practices, she was required to sign more documents. Consistent with these policies and practices, she was not given an opportunity to examine the documents, make copies, or find anyone to review them with her. She did not understand what she was signing, because, as a product of Defendants' intense, lifelong indoctrination and her lack of education, she had no ability to understand contracts and knew nothing about her legal rights or the law.

199.  Just because Valeska had finally managed to leave Sea Org did not mean she was in a position to start a new life.  When she left Scientology, she had no money, no official identification, and no ability even to open a bank account because she was not legally in the country in which Defendants had sent her for punishment.  Further, Defendants watched her and maintained a menacing presence, reminding her that if she did or said anything critical of Defendants, she would be subjected to swift and fierce retaliation.  Marion Pouw, who worked directly for Miscavige in the U.S. and had the job of attempting to "recover" people who he considered to present some risk to him or the other Defendants because of what they knew, called

102

Valeska every day, haranguing her to travel to LA to undergo more ethics handlings and security checks, reading to her Scientology policies and reports written by Valeska's brother that were critical of her and accused her of being a suppressive person. On one such call, Pouw asked Valeska how her baby was, and Valeska told her that she had lost the baby before being allowed to leave Sea Org. Pouw responded by telling Valeska that this meant she was still in Sea Org and had to report back to her post.

200. Valeska understood that she faced a very real threat of retaliation by Defendants if she took any action against them. Her mother had left Sea Org years earlier and had been subjected to Defendants' retaliatory "fair game" intimidation and harassment tactics ever since. Wanting to reunite with her mother, Valeska traveled to Florida to see her. During that trip, they were put under constant surveillance by OSA. In addition, a woman Valeska's age who was working as an undercover OSA agent befriended Valeska and managed to persuade Valeska and her mother to allow her to stay with them, secretly reporting their moves and conversations back to OSA. After a time, Valeksa's father contacted her and abruptly informed her that he was disconnecting from her; Valeska had not been talking to anyone other than her mother about her experiences and had been keeping a very low profile, so she realized something was terribly wrong.

103

201.   Upset and angry, she contacted a prominent Scientology defector who had been a high-level officer working under Miscavige, to discuss her situation.  He persuaded her to write about her experiences, and then persuaded her to give him permission to publish it on a blog.  Valeska then returned to Australia.  The retaliation followed almost immediately: a webpage of defamatory statements calling Valeska a liar, with photographs of her and false statements from people she knew over the years in Sea Org, was published to a website controlled by Defendants.

202.   In or around the summer of 2011, Valeska was contacted by an investigator with the Australian government who asked Valeska to sit for an interview with an investigator from the Australian government's labor authority, who was looking into inadequate compensation and poor working conditions at Defendants' RPF site in Australia. Valeska had not filed any complaint and had not contacted them, and she did not want to be part of the investigation, but she reluctantly spoke to the investigator, and she was afraid.  She also understood it to be a confidential investigation and interview.  The interview was narrowly focused on the issues of compensation and working conditions at RPF ANZO and, knowing there would be serious repercussions from Defendants if she went any further than was required by the scope of the interview, Valeska did not volunteer to report any of her prior mistreatment on the Freewinds or earlier in her life.

104

203.  In late 2011, Defendants threatened to take action against Valeska if she (among other things) "aid[ed] or assist[ed] any person or organization hostile to or engaged in attacks against the Scientology religion, [or] any of its parishioners . . . [or to] disclose any information, data, or knowledge [she] learned about or relating to [them], their staff or former staff, officers or former officers, directors or former directors . . . [that] has not been authorized for release to the general public." This terrified and silenced Valeska, who had long heard stories of the lengths to which Defendants would go in destroying their perceived enemies, including ruinous civil litigation, false criminal complaints, and defamatory statements to friends, family, neighbors, and employers to ruin people's lives. Valeska did not speak publicly about Scientology again for more than six years.

204.  In early 2018, Valeska made public statements critical of Scientology.  Defendants retaliated quickly, registering the domain name http://www.valeskaparis.com/, and launching a defamatory website, so that an online search for "Valeska Paris" would bring up the website in the search results.  The website contains a photo of Valeska and accuses her of lying about her time in Sea Org. It contains false statements from other Sea Org members supporting this accusation, and letters written by Valeska praising Scientology and speaking positively about her experiences, which Valeska had been forced to send family and friends while aboard the ship to assuage

their concerns about her safety and wellbeing. Around the same time, additional domains were registered containing Valeska's name and that of her spouse.

205. The website with Valeska's name and photos remains on the internet and turns up when someone uses a search engine to search her name. Valeska has lived in continual fear that the website could damage job prospects and personal relationships, and that it could likewise cause her children (who have never been part of Scientology) to experience difficulties as well. The inescapable presence of the website has also constantly served to remind Valeska of the potential for even more serious forms of retaliation if she were ever to violate Defendant's absolute prohibition on initiating any criminal or civil legal action against them.

206. Defendants' threats, intimidation and retaliation also caused Valeska to refrain for years from seeking legal counsel or taking any legal action against Defendants.

207. There has been a nearly constant stream of strange and unsettling incidents since the Complaint was filed, none of which had ever occurred until then. For instance, on April 29, 2022, the day after the complaint was filed, Valeska observed two men following her in a blue car. She tried to evade them, even driving into a post office parking lot, but she could not. On May 11, 2022, someone attempted to hack into Valeska's

106

Instagram account. On May 16, 2022, two people in a blue car like the one that followed Valeska parked outside the house of one of Valeska's employees. She noticed this because one of the car's occupants had knocked on her door and then returned to the car, where they continued to watch her house for some time. On May 18, 2022, someone tried to force open the door to Valeska's beauty salon business, leaving broken plastic under the door. Valeska has regularly observed a male at a café by her business, sitting and watching the salon throughout the day, often without any food or beverages. Valeska recognizes him as the man in the blue car who followed her. There have been individuals lurking near her in the parking lot, or quiet obviously watching it from short distances.

208. One evening after closing the salon, when most of the mall was closed, Valeska went to the bathroom and was followed by a male. As she left the bathroom and entered the hallway, he approached her and yelled "FUCK YOU, WHAT THE FUCK ARE YOU LOOKING AT." This had never happened at that mall before.

209. On June 16, 2022, a white car followed Valeska from the shopping center parking lot to her house, a 30-minute drive with numerous turns. She has been followed around numerous times, even on routes with many turns, and even when she takes evasive maneuvers. At night, sometimes the vehicle following her turns on its high beams. She and her

husband have spotted strange individuals parked and lurking outside the entranceway to their residential community, where there are no parking spaces and no reason for anyone to loiter. There have been two attempts to force open the sliding glass door at the rear of their home.

210. On several occasions, Valeska has taken her young children to a restaurant with an outdoor play space and while she was inside, strangers approached her children, only leaving when Valeska has gone out to check on them. This has disturbed her children.

211. There have also been strange occurrences at her place of business. People who are purportedly new customers make appointments, show up, wait while she is working on other clients, but leave before she is done and don't respond when she contacts them to find out what happened and to reschedule the appointments. Strangers show up without appointments, demanding attention and making unusual requests, including one recently when a man asked Valeska to examine his eye (she refused, telling him she has no qualifications to do such a thing). Once, while her young boy was in the shop with her, two individuals confronted her, asking increasingly hostile and intrusive questions that reminded her of a Scientology security check, and causing her child to cry.

212. None of this suspicious activity has been furtive. To the contrary, it has all been done in a way clearly calculated to be noticeable. This is

consistent with OSA's history of "fair game" intimidation operations, which are not intended as legitimate investigations into matters involving an adverse party in litigation, but instead are intended to cause their victims (and their families and employees) to experience fear and emotional disturbances. That is intended to silence the victims, to pressure them to drop their lawsuits and refrain from reporting their history of abuse to or cooperate with law enforcement authorities.

213. Valeska continues to suffer from the traumas and injuries she experienced in Scientology, including persistent nightmares about being trapped in Sea Org and unable to escape. Because of the ominous presence of strangers following her around, the numerous strange incidents at her workplace, and the attempted intrusions into her home and business, among other things, she lives in constant fear that she or her family will be harmed. Valeska also has to get monthly iron infusions due to what is believed to be the physical damage to her body from years of abuse and inadequate nutrition in Sea Org.

## VI.   CLAIMS FOR RELIEF

### COUNT I

### Forced Labor and Attempted Forced Labor in Violation of the Trafficking Victims Protection Reauthorization Act ("TVPRA"), 18 U.S.C. §§1589 and 1594(a) (All Defendants)

214.   Plaintiffs reallege and incorporate by reference the allegations in paragraphs 1 through 158, as though fully set forth herein.

215.   Plaintiffs bring this claim pursuant to 18 U.S.C. §1595(a).

216.   Defendants knowingly provided or obtained, or attempted to provide or obtain, Plaintiffs' labor or services in violation of 18 U.S.C. §1589 by means of (i) serious harm or threats of serious harm to Plaintiffs or others; (ii) physical restraint or threats of physical restraint to Plaintiffs through retention of their passports, threats of isolation, and other affirmative acts; or (iii) a scheme, plan, or pattern intended to cause Plaintiffs to believe that if they did not perform labor or services for Defendants, that they or others would suffer serious harm or physical restraint.

217.   Defendants knowingly benefitted, financially or by receiving anything of value from participation in a venture which Defendants knew or should have known had engaged in acts in violation of the TVPRA, including violations of 18 U.S.C. §1589.

110

218.    Defendants also attempted to violate 18 U.S.C. §1589 in violation

of 18 U.S.C. §1594(a).

219.    As a direct and proximate result of Defendants' conduct,

Plaintiffs have been harmed.

220.    Plaintiffs are therefore entitled to recover damages in an amount

to be proven at trial, including compensatory and punitive damages, attorneys'

fees, costs, and other relief that the Court may deem proper.

## COUNT II

### Conspiracy to Obtain Forced Labor in Violation
### of the TVPRA, 18 U.S.C. §§1589 and 1594(b)
### (All Defendants)

221.    Plaintiffs reallege and incorporate by reference the allegations in

paragraphs 1 through 158, as though fully set forth herein.

222.    Plaintiffs brings this claim pursuant to 18 U.S.C. §1595(a).

223.    Defendants conspired to violate 18 U.S.C. §1589 in violation of 18

U.S.C. §1594(b).

224.    Defendants intentionally entered into an agreement to obtain

Plaintiffs' labor or services in violation of 18 U.S.C. §1589 by means of (i)

serious harm or threats of serious harm to Plaintiffs or others; (ii) physical

restraint or threats of physical restraint to Plaintiffs through retention of

their passports, threats of isolation, and other affirmative acts; or (iii) a

scheme, plan, or pattern intended to cause Plaintiffs to believe that if they

did not perform labor or services for Defendants, Plaintiffs or others would suffer serious harm or physical restraint.

225.   At least one Defendant committed at least one overt act in furtherance of their conspiracy.

226.   As a direct and proximate result of Defendants' actions, Plaintiffs have been harmed.

227.   Plaintiffs are therefore entitled to recover damages in an amount to be proven at trial, including compensatory and punitive damages, attorneys' fees, costs, and other relief that the Court may deem proper.

## COUNT III

### Trafficking and Attempted Trafficking with Respect to Forced Labor in Violation of the TVPRA, 18 U.S.C. §§1590 and 1594(a) (All Defendants)

228.   Plaintiffs reallege and incorporate by reference the allegations in paragraphs 1 through 158, as though fully set forth herein.

229.   Plaintiffs bring this claim pursuant to 18 U.S.C. §1595(a).

230.   Defendants knowingly recruited, harbored, transported, provided, or obtained, or attempted to recruit, harbor, transport, provide or obtain, Plaintiffs for labor or services in violation of provisions of the TVPRA, including 18 U.S.C. §1589, as alleged herein, thereby violating 18 U.S.C. §1590.

231.   Defendants knowingly benefitted, financially or by receiving anything of value from participation in a venture which Defendants knew or should have known had engaged in acts in violation the TVPRA, including violations of 18 U.S.C. §1590.

232.   Defendants also attempted to violate 18 U.S.C. §1590 in violation of 18 U.S.C. §1594(a).

233.   As a direct and proximate result of Defendants' actions, Plaintiffs have been harmed.

234.   Plaintiffs are therefore entitled to recover damages in an amount to be proven at trial, including compensatory and punitive damages, attorneys' fees, costs, and other relief that the Court may deem proper.

## COUNT IV

### Conspiracy to Traffic with Respect to Forced Labor in Violation of the TVPRA, 18 U.S.C. §§1590 and 1594(b) (All Defendants)

235.   Plaintiffs reallege and incorporate by reference the allegations in paragraphs 1 through 158, as though fully set forth herein.

236.   Plaintiffs bring this claim pursuant to 18 U.S.C. §1595(a).

237.   Defendants conspired to violate 18 U.S.C. §1590 in violation of 18 U.S.C. §1594(b).

238.    Defendants intentionally entered into an agreement to recruit, harbor, transport, provide, or obtain Plaintiffs for labor or services in violation of 18 U.S.C. §1590, as alleged herein.

239.    At least one Defendant committed at least one overt act in furtherance of their conspiracy.

240.    As a direct and proximate result of Defendants' actions, Plaintiffs have been harmed.

241.    Plaintiffs are therefore entitled to recover damages in an amount to be proven at trial, including compensatory and punitive damages, attorneys' fees, costs, and other relief that the Court may deem proper.

## COUNT V

### Peonage and Attempted Peonage
### in Violation of the TVPRA, 18 U.S.C. §§1581 and 1594(a)
### (All Defendants)

242.    Plaintiffs reallege and incorporate by reference the allegations in paragraphs 1 through 158, as though fully set forth herein.

243.    Plaintiffs bring this claim pursuant to 18 U.S.C. §1595(a).

244.    Defendants held or returned Plaintiffs to a condition of peonage in violation of 18 U.S.C. §1581, as alleged herein.

245.    Specifically, Defendants held Plaintiffs against their will and forced them to perform labor to pay off purported Scientology debts.

114

246.   Defendants knowingly benefitted, financially or by receiving anything of value from participation in a venture which Defendants knew or should have known had engaged in acts of peonage in violation of 18 U.S.C. §1581.

247.   Defendants also attempted to violate 18 U.S.C. §1581 in violation of 18 U.S.C. §1594(a).

248.   As a direct and proximate result of Defendants' actions, Plaintiffs have been harmed.

249.   Plaintiffs are therefore entitled to recover damages in an amount to be proven at trial, including compensatory and punitive damages, attorneys' fees, costs, and other relief that the Court may deem proper.

## COUNT VI

### Conspiracy to Commit Peonage
### in Violation of the TVPRA, 18 U.S.C. §§1581 and 1594(b)
### (All Defendants)

250.   Plaintiffs reallege and incorporate by reference the allegations in paragraphs 1 through 158, as though fully set forth herein.

251.   Plaintiffs bring this claim pursuant to 18 U.S.C. §1595(a).

252.   Defendants conspired to violate 18 U.S.C. §1581, in violation of 18 U.S.C. §1594(b).

253.   Defendants intentionally entered into an agreement to hold or return Plaintiffs to a condition of peonage, in violation of 18 U.S.C. §1581.

115

254.  At least one Defendant committed at least one overt act in furtherance of their conspiracy.

255.  As a direct and proximate result of Defendants' actions, Plaintiffs have been harmed.

256.  Plaintiffs are therefore entitled to recover damages in an amount to be proven at trial, including compensatory and punitive damages, attorneys' fees, costs, and other relief that the Court may deem proper.

## VII.  DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury of all issues so triable.

## VIII. PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that the Court:

1.   Find the Defendants liable on all Counts of the Complaint applicable to them and that judgment be entered in favor of Plaintiffs and against Defendants, jointly and severally, on all Counts;

2.   Award Plaintiffs compensatory damages in amounts to be ascertained at trial;

3.   Award Plaintiffs punitive damages in amounts to be

ascertained at trial;

4.   Award Plaintiffs attorneys' fees and costs of suit; and

5.   Award such other and further relief as the Court deems

proper.

Dated:  August 2, 2022

Joseph C. Kohn
Neil L. Glazer
Zahra R. Dean
Aarthi Manohar
Elias Kohn
KOHN, SWIFT & GRAF, P.C.
1600 Market Street, Suite 2500
Philadelphia, PA 19103
(215) 238-1700
jkohn@kohnswift.com
nglazer@kohnswift.com
zdean@kohnswift.com
ekohn@kohnswift.com

Gregory P. Hansel (Fla. Bar No.
607101)
Shana M. Solomon
Elizabeth F. Quinby
PRETI FLAHERTY BELIVEAU &
PACHIOS, CHARTERED, LLP
One City Center
P.O. Box 9546
Portland, ME 04112-9546
(207) 791-3000
ghansel@preti.com
ssolomon@preti.com
equinby@preti.com

117

Theodore Leopold (Fla. Bar No. 705608)
Manuel J. Dominguez (Fla. Bar No. 0054798)
COHEN MILSTEIN SELLERS
 & TOLL PLLC
11780 U.S. Highway One
Suite N500
Palm Beach Gardens, FL 33408
Telephone: (561) 515-1400
tleopold@cohenmilstien.com
jdominguez@cohenmilstein.com

Warren A. Zimmerman
(Fla. Bar No. 652040)
WARREN A. ZIMMERMAN, P.A.
4114 Sparrow Ct
Lutz, FL  33558-2727
(813) 230-1465
warren@wzimmermanlaw.com

118