**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

|  |  |  |
|---|---|---|
| | : | |
| GAWAIN BAXTER, LAURA BAXTER and VALESKA PARIS, | : | CIVIL ACTION |
| | : | |
| *Plaintiffs,* | : | |
| | : | NO. 8:22-cv-00986 |
| *v.* | : | |
| | : | |
| DAVID MISCAVIGE; CHURCH OF SCIENTOLOGY INTERNATIONAL, INC.; RELIGIOUS TECHNOLOGY CENTER, INC.; IAS ADMINISTRATIONS, INC.; CHURCH OF SCIENTOLOGY FLAG SERVICE ORGANIZATION, INC.; and CHURCH OF SCIENTOLOGY FLAG SHIP SERVICE ORGANIZATION, INC., | : : : : : : : : : | |
| | : | |
| *Defendants.* | : | |
| | : | |

**PLAINTIFFS' MOTION FOR RECONSIDERATION**
**UNDER FED. R. CIV. P. 54(B)**

## Table of Contents

I.  Background ...................................................................................................2

II.  Legal Standard ..........................................................................................11

III.  Argument ..................................................................................................11

    a.  New Evidence Shows that the Purported Arbitration Agreements Are Unenforceable Prospective Waivers of Plaintiffs' Statutory Rights................................................................................................12

    b.  New Evidence Shows that Scientology Arbitration Procedures Are So Unfair that Plaintiffs Cannot Vindicate Their Rights and the Purported Arbitration Clauses are Unconscionable.......................15

    c.  New Evidence Demonstrates that the Scientology Proceeding Is Not "Arbitration" Within the Meaning of the FAA. ..........................18

    d.  Defendants Cannot Enforce the Arbitration Agreements Because They Breached Them. ................................................................24

    e.  Alternatively, the Court Could Compel Arbitration in AAA or JAMS................................................................................................24

IV.  Conclusion ................................................................................................25

## Table of Authorities

**Cases**                                                                                                        **Page(s)**

*Advanced Bodycare Sols., LLC v. Thione Int'l, Inc.*,
   524 F.3d 1235 (11th Cir. 2008) ......................................................... 19, 20, 21, 23

*Aguila v. Becton & Dickinson*,
   No. 5:22-cv-06670, 2023 WL 5988601 (N.D. Cal. Sep. 13, 2023) ...................... 18

*Am. Express Co. v. Italian Colors Rest.*,
   570 U.S. 228 (2013) ..................................................................................... 13

*Armendariz v. Found. Health Psychcare Servs., Inc.*,
   24 Cal. 4th 83, 99 Cal. Rptr. 2d 745, 6 P.3d 669 (Cal. 2000) .............................. 19

*Blueskygreenland Env't Sols., LLC v. Georgas*,
   No. 12-81234-CIV, 2014 WL 12515259 (S.D. Fla. Feb. 25, 2014) ...................... 16

*Cannon v. S. Atlanta Collision Ctr., LLC*,
   No. 1:11-CV-1030, 2012 WL 1004914 (N.D. Ga. Feb. 27, 2012) ...................... 17

*Carbajal v. CWPSC, Inc.*,
   245 Cal. App. 4th 227 (2016) .......................................................................... 16

*Cheng-Canindin v. Renaissance Hotel Assocs.*,
   50 Cal. App. 4th 676 (1996) ........................................................................... 24

*Cole v. Burns Int'l Sec. Servs.*,
   105 F.3d 1465 (D.C. Cir. 1997) ....................................................................... 16

*Dillon v. BMO Harris Bank*,
   856 F.3d 330 (4th Cir. 2017) .......................................................................... 15

*Dunn v. Global Tr. Mgmt., LLC*,
   2024 WL 4379966 (11th Cir. 2024) ................................................................ 14

*Flores v. N.Y. Football Giants, Inc.*,
   150 F.4th 172 (2d Cir. 2025) .......................................................... 16, 19, 20, 21

*Garcia v. Church of Scientology Flag Serv. Org.*,
   No. 18-13452, 2021 WL 5074465 (11th Cir. 2021) ........................................... 12

*Gingras v. Think Fin., Inc.*,
   922 F.3d 112 (2d Cir. 2019) ........................................................................... 14

*Hayes v. Delbert Servs. Corp.*,
    811 F.3d 666 (4th Cir. 2016) ...................................................................... 14, 15

*Heckman v Live Nation Ent., Inc.*,
    120 F.4th 670 (9th Cir. 2024) ........................................................................ 19

*Hengle v. Treppa*,
    19 F.4th 324 (4th Cir. 2021) .......................................................................... 14

*Hooters of Am., Inc. v. Phillips*,
    173 F.3d 933 (4th Cir. 1999) ...............................................................20, 23, 25

*Hornady v. Outokumpu Stainless USA, LLC*,
    118 F.4th 1367 (11th Cir. 2024) .................................................................... 11

*Inetianbor v. CashCall, Inc.*,
    768 F.3d 1346 (11th Cir. 2014)................................................................. 24, 25

*King v. Baker Petrolite LLC*,
    No. B321248, 2023 WL 4246784 (Cal. Ct. App. June 29, 2023) ........................ 17

*Lucas v. Gund, Inc.*,
    450 F. Supp. 2d 1125 (C.D. Cal. 2006)............................................................ 18

*Parm v. Nat'l Bank of Cal., N.A.*,
    835 F.3d 1331 (11th Cir. 2016)...................................................................... 26

*Sheelit v. AmeriSave Mortg. Corp.*,
    754 F. Supp. 3d 995 (C.D. Cal. 2024) ............................................................ 17

*Toole v. Baxter Healthcare Corp.*,
    235 F.3d 1307 (11th Cir. 2000)...................................................................... 11

*United Steel, Paper & Forestry, Rubber, Mfg., Energy, Allied Indus. & Serv.*
    *Workers Int'l Union AFL-CIO-CLC v. Wise Alloys, LLC*,
    807 F.3d 1258 (11th Cir. 2015)...................................................................... 11

*Viking River Cruises, Inc. v. Moriana*,
    596 U.S. 639 (2022) ..................................................................................... 13

*Williams v. Medley Opportunity Fund II, LP*,
    965 F.3d 229 (3d Cir. 2020) .......................................................................... 14

In light of new evidence, Plaintiffs respectfully move for reconsideration of the Court's March 31, 2023, order compelling arbitration pursuant to Scientology's arbitration procedures, an arbitration that this Court assumed would apply relevant substantive law and follow neutral and fair procedures.[1] Following the Court's order, Plaintiffs made a good-faith effort to bring their claims under Scientology's arbitration process, but they have learned that Scientology "arbitration" is not an arbitration as the Federal Arbitration Act uses the term. Most importantly, the arbitrators refused to articulate the substantive law they are applying. Instead, the arbitrators explicitly stated they would ***not*** apply the Trafficking Victims Protection Reauthorization Act (the statute Plaintiffs allege Defendants violated) and that they would *not* apply state contract law regarding the validity of the arbitration agreements, denying Plaintiffs the opportunity to vindicate their statutory rights.

Plaintiffs for three weeks participated in an opaque process during which a panel of so-called arbitrators under Defendants' control intimidated and harassed Plaintiffs while denying them a meaningful opportunity to present their case. Despite repeated requests, neither Defendants nor their arbitrators ever communicated to Plaintiffs the procedures or evidentiary rules that would be applied, subjecting Plaintiffs to the seemingly arbitrary whims of the panel. After Plaintiffs—who live in Australia— traveled to Clearwater, Florida, for two weeks of in-person arbitration and, in a good faith effort to conclude the procedure, extended their stay for an unplanned additional

---

[1] This motion includes two changes from ECF 209-1: the Nolan declaration is now sworn, and contemporaneous notes show Plaintiffs were told secular law would not be applied. *See* Exhibit 24.

1

week, even then the arbitrators indefinitely extended the arbitration and refused to issue an award or final decision, depriving Plaintiffs a final award to challenge under 9 U.S.C. § 10. Reviewing the record, Professor Dennis Nolan, former President of the National Academy of Arbitrators, declared that, over his "half-century of research, teaching and practice in this field, I have never encountered a system less worthy of the title of arbitration." Ex. 1 (Nolan Decl.) ¶ 16. Whatever leeway the law grants to arbitrators, Eleventh Circuit precedent is clear that it cannot condone a process that rejects the application of relevant substantive law and does not reach a resolution.

## I.  Background

Plaintiffs filed this lawsuit in 2022, alleging violations of the Trafficking Victims Protection Reauthorization Act ("TVPRA"). Defendants moved to compel Scientology arbitration. *E.g.*, ECF 84. The Court granted Defendants' motions. Relevant here, this Court recognized that "a prospective waiver of substantive federal rights is void," but found that the parties' purported agreements to arbitrate Plaintiffs' claims did not yet amount to a *per se* waiver of Plaintiffs' TVPRA rights. ECF 188 at 11. The Court also held that Plaintiffs lacked evidence showing that they could not receive a fair and neutral arbitration under the Scientology arbitration[2] process. *Id.*

Plaintiffs made an extensive, good-faith effort to arbitrate their claims under the Scientology arbitration process.[3] Scientology arbitration is purportedly administered

---

[2] Plaintiffs use the term "arbitration" and "arbitrator" for convenience because this is the label Scientology uses, not as a concession that the proceeding is indeed an arbitration.

[3] Plaintiffs attempted to initiate arbitration within weeks of the Court's July 31, 2024, order denying their motion for reconsideration in light of new Supreme Court precedent. The arbitration

2

by the International Justice Chief ("IJC"). The IJC is an employee of Defendant Church of Scientology International, Inc. ECF 111-4 (Rinder Decl.) ¶ 25. Beginning October 4, 2024, Plaintiffs repeatedly asked the IJC for information—any information at all—on the rules and procedures that govern the Scientology arbitration process. *E.g.*, Exs. 2–8. Plaintiffs to this day have not received a substantive answer. The IJC repeatedly responded that Plaintiffs "are familiar with Scientology Ethics and Justice Procedures" because they "studied those procedures" when they were Scientologists—about fifteen years ago. Ex. 9. As Plaintiffs have informed the IJC, they have no recollection of receiving such instruction and, if they had, they have no recollection of what they were taught. The IJC eventually agreed that Plaintiffs would "be provided an opportunity to review those procedures prior to commencing the arbitration," *id.*, but that never happened. When Plaintiffs requested the promised overview, the panel chair reverted to the IJC's original refrain—that the Plaintiffs knew the rules and procedures from their supposed instruction at least 15 years ago. Ex. 10 (L. Baxter Dec.) ¶¶ 15–16; Ex. 11 ("Tr."[4]) at 12:18–14:11. Accordingly, Plaintiffs were forced to participate in the arbitration without any understanding of the rules and procedures that governed the arbitration. To date, Plaintiffs have seen no proof that there even were any preexisting rules and procedures governing the arbitration.

Plaintiffs' basic questions about the process went unanswered. Plaintiffs were

---

could not begin until January 2026, due in large part to the IJC's insistence on holding the arbitration in Florida although Plaintiff Laura Baxter was pregnant and could not travel, as well as long correspondence delays due to the IJC's insistence on communicating via U.S. Mail.

[4] At the conclusion of the first day of arbitration, a court reporter transcribed Plaintiffs' recollections.

never told whether they needed to file a statement of a claim, whether Defendants would be entitled to a response, or what the briefing schedule would be. *See, e.g.*, Ex. 12. Without guidance, Plaintiffs filed[5] a statement of claim on October 4, 2024, and provided it simultaneously to opposing counsel, as typical practice requires. Plaintiffs did not learn until January 19, 2026, the first day of the arbitration, that Defendants had filed responses. Plaintiffs were permitted to view Defendants' responses in the arbitration room without their counsel present, but they were not provided with a copy. Ex. 13 (Paris Decl.) ¶ 12; Tr. 15:10–17:13. Plaintiffs' counsel still have not seen Defendants' response. Plaintiffs never received a list of witnesses or documents that Defendants or the arbitrators intended to call or present despite their repeated requests, leaving Plaintiffs unable to prepare a rebuttal case. *See, e.g.*, Exs. 7, 8.

Plaintiffs were provided very little information about the arbitration process. Plaintiffs were told when and where the arbitration would take place. Exs. 14, 15. Plaintiffs were told they needed to nominate a Scientologist in good standing as an arbitrator. Ex. 9. And they were told they would not be permitted to have their attorneys with them during the arbitration. *Id.* Plaintiffs asked, but were not told before the arbitration started, whether the arbitrators would permit a court reporter to make a record (the eventual answer when Plaintiffs arrived with a court reporter on the first day: no). Ex. 4; Tr. 11:14–12:9. Plaintiffs asked if there was a discovery process but did not receive an answer. *See, e.g.*, Ex. 3. Lacking guidance, Plaintiffs served requests

---

[5] Receiving no guidance, Plaintiffs initially mailed hard copy statement of claim to the IJC's purported address, which was rejected in the first instance, without explanation, but subsequently accepted.

4

for production and interrogatories and requested a response at least 30 days prior to the hearing. Exs. 3-1, 3-2 (interrogatories and requests for production). Plaintiffs never received any responses or productions. Plaintiffs were not told which of the purported arbitration agreements governed this action, despite conflicting provisions among the agreements and Plaintiffs' repeated requests for clarity. *See* Ex. 2.

The IJC made himself difficult to communicate with. He insisted the Plaintiffs only communicate with him via "snail mail." Ex. 9. He also refused to communicate with Plaintiffs' attorneys. *E.g.*, Ex. 16 (letter from defense counsel). Accordingly, to communicate with the IJC, Plaintiffs had to send him a physical letter, wait for the letter to be delivered to the IJC's Los Angeles office, and await the IJC's snail mail response. This inevitably led to delays and missing correspondence.

The IJC repeatedly presupposed the validity of the arbitration agreements (which were disputed in the arbitration), admonished Plaintiffs for bringing this lawsuit in court, and chastised them for use of "secular" counsel. *E.g.*, Exs. 9, 14, 17 (claiming "filing a lawsuit" violates agreements and admonishing against "secular" objections). Plaintiffs repeatedly requested that the arbitration be held in Australia, where they live, or remotely—due to one Plaintiff's pregnancy—but the IJC insisted it occur in Florida. *E.g.*, Exs. 5, 6. When Plaintiffs complained of the procedures employed (or lack thereof) and the IJC's refusal to provide basic information, the IJC suggested Plaintiffs drop their claims. *E.g.*, Exs. 14, 18 ("*You* are the ones who have requested arbitration. You may withdraw your request at any time if you so choose.").

The arbitration panel was composed of three Scientologists in good standing –

5

a criterion determined unilaterally by Defendants.[6] Present at the arbitration were the three arbitrators and four other persons who supposedly represented the entity Defendants, but whose specific roles have never been revealed to Plaintiffs. Ex. 19 (G. Baxter Decl.) ¶ 6. Defendants' chosen arbitrator, rather than the mutually-agreed-upon third arbitrator, served as the panel chair. Paris Decl. ¶ 7. The other two arbitrators appeared to have no active role and hardly spoke during the entire three weeks of proceedings. Ex. 20 (Raghavan Decl.) ¶¶ 14–15 (describing Plaintiffs' nominated arbitrator as "silent"). The panel chair—not the parties—presented evidence and called witnesses from a list the IJC provided her.[7] L. Baxter Decl. ¶ 19. The panel chair—not the parties—conducted nearly all the questioning of the witnesses. Paris Decl. ¶ 26. Defendants' representatives only occasionally added questions and commentary during witness testimony. G. Baxter Decl. ¶ 27. When Plaintiffs attempted to question witnesses, the panel chair frequently cut them off and either completely reoriented their questions or refused to ask the witness the question at all (without articulating any basis for refusing to ask the question). Paris Decl. ¶¶ 19, 26; Raghavan Decl. ¶ 10 (Plaintiffs were "repeatedly denied the opportunity to present their perspective").[8] The panel chair did not permit the Plaintiffs to question some

---

[6] *See* Rinder Decl. ¶ 25 ("in good standing" determination made by entity Defendant CSI).

[7] Plaintiffs presented their statement of claim, which included their documentary evidence, at the opening of the arbitration. The panel chair physically accepted the statement of claim, but it is not clear whether Plaintiffs' evidence was entered into the "record," as there is no record that Plaintiffs have any access to and no rules have been provided to Plaintiffs about how evidence may be presented. The arbitrators asked no questions about Plaintiffs' statement of claim, so it is not clear whether the arbitrators intended to, or are even permitted to, consider the evidence Plaintiffs presented.

[8] Plaintiffs attempted, but were denied the opportunity, to question Defendants. Tr. 35:17–38:1.

witnesses at all. Raghavan Decl. ¶ 25. By contrast, when the Defendants' representatives had questions, they were permitted to directly question witnesses. *Id.* ¶ 28 ("The panel permitted the respondents to speak any time they had something to say."). Plaintiffs were not told when their experts would be permitted to testify; due to the uncertainty, Plaintiffs presented three expert reports in writing and were only able to arrange for one expert, their psychologist, to travel to Florida (even then without any guarantee her testimony would be heard). *See, e.g.*, Tr. 27:5–28:25 (refusing to agree to dates).

The defense witnesses, by contrast, appeared to be presented according to a pre-determined schedule as they were available to testify when called. Paris Decl. ¶ 21. Plaintiffs never received any such schedule. *Id.* ¶¶ 8, 18. Further demonstrating coordination, Defendants began each day with the same witness and document binders as the arbitration panel and shared a separate room with the panel during breaks in the arbitration. Security personnel confirmed the panel and defendants' representatives shared meals together during the arbitration. *Id.* ¶ 20.

The panel chair appeared to act as counsel for Defendants, developing the testimony of Scientology's witnesses as an attorney would on direct examination. G. Baxter Decl. ¶¶ 24, 26; Raghavan Decl. ¶¶ 17–18. When Plaintiffs' expert was finally permitted to testify, the panel chair played the role of an attorney conducting a cross-examination, beginning questioning of the witness by attempting to call into question the scientific acceptance of the expert's opinions. *Id.* ¶ 35. The panel chair introduced documentary evidence in support of Defendants' defenses. Paris Decl. ¶ 17. Plaintiffs

7

were allowed to view the evidence while inside the arbitration room, but they were not provided copies. *Id.* ¶ 18. When Plaintiffs asked about the upcoming witness schedule, the panel chair often responded that she hadn't received one yet, suggesting someone else was determining what witnesses should be called. *Id.* ¶ 20.[9] On January 20, 2026, in response to Plaintiffs' question about where a certain document came from, the panel chair commented that the panel had received documents "weeks ago." *Id.* ¶ 17. Although Plaintiffs do not know exactly what she meant, they understood it to mean that the arbitration panel had been receiving and considering evidence from the defense for weeks before Plaintiffs were allowed to participate.

In response to Plaintiffs' repeated requests that the arbitrators first decide the issue of the validity of the arbitration agreements (Ex. 3), on January 22, 2026, the arbitration chair informed Plaintiffs that the panel had rejected their argument that the arbitration clauses were invalid for duress. L. Baxter Decl. ¶ 29-30. The next day, Plaintiffs asked if the panel had applied state contract law to reach the decision, and the chair responded that it had *not*; rather, the chair said, the panel applied the law of Scientology, with no further explanation. *Id.*; *see also* Ex. 24, Exs. A-D.

On January 19, 2026, Plaintiffs asked if the panel would apply the TVPRA to resolve the merits of their claims and the chair responded that it would only apply the law of Scientology, *not* any state or federal law. L. Baxter Decl. ¶ 31; Tr. 14:12–15:9;

---

[9] Plaintiffs have previously presented evidence that the arbitrators' decisions are subject to review by the IJC (who, again, is an employee of a Defendant and writes his letters on Defendant's letterhead), and that the IJC has the power to order the arbitrators be punished should he disagree with their findings. Rinder Dec. ¶ 25.

8

Ex. 24, Exs. A-D; *see also* Tr. 36:12-37:1.

The first two weeks of the arbitration consisted of a long string of witnesses called by the panel chair who provided nearly identical testimony, seemingly read from the same script. Paris Decl. ¶ 22. At one point, the arbitration chair called her own son as a witness, though she did not disclose that she was related to him until one Plaintiff asked her about the relationship. *Id.* ¶ 33. Plaintiffs asked the chair to recuse herself, but her sole response was "noted," and she proceeded to conduct the arbitration.[10] Paris Decl. ¶ 35. When Plaintiff Valeska Paris attempted to question the panel chair's son, the panel chair "screamed at the top of her lungs" that Ms. Paris's questions were irrelevant and continued to yell at Ms. Paris "for nearly five minutes." Paris Decl. ¶ 33; *see also* Raghavan Decl. ¶ 15 (recalling hostile and contemptuous questioning).

Plaintiffs presented their case in a total of two days and formally rested their case after their expert was permitted to testify on January 28. G. Baxter Decl. ¶ 37. The vast bulk of the second week was spent going through giant binders of photos of Plaintiffs during their time as *Freewinds* crewmembers. Plaintiffs stated that they would not object to the photographs being considered, but that the hundreds of photographs were cumulative, cherry-picked and not probative, and that the panel should stop delaying—but the panel forced them to go through every picture in every binder.

Although the arbitration had initially been scheduled to last two weeks (Ex. 22),

---

[10] In their request that the panel chair recuse herself, Plaintiffs cited other allegations undermining her impartiality, including that she had submitted a declaration in support of some of the same Defendants' motion to compel arbitration in another matter involving similar claims. *See id.* ¶ 35; Ex. 21 (CSI, RTC, and David Miscavige as defendants).

at the end of the second week, the arbitration chair informed the Plaintiffs that they would need another week to conclude the arbitration, though by that point the panel had already called a staggering *thirty-four* fact witnesses. L. Baxter Decl. ¶ 22. Plaintiffs scrambled to arrange for childcare and additional time off work, incurring expense in changing their flights home to Australia, but agreed to return for a third week. *Id.* ¶ 37.[11]

During the third week, the arbitration chair turned the process into a "full-blown inquisition into [the Plaintiffs'] personal lives." G. Baxter Decl. ¶ 39. The arbitration chair did not present any testimony or evidence relevant to Plaintiffs' claims. *Id.* Rather, she spent the entire week questioning Plaintiffs about social media posts, interactions with other former Scientologists, and other personal matters unrelated to their claims. *Id.* She asked Plaintiffs improper questions about their confidential communications with their attorneys and with each other. *Id.* ¶ 48. Plaintiffs refused to answer those questions on grounds of attorney-client, common-interest, and spousal privilege, though the arbitration chair informed them that there were no such privileges under the law of Scientology. *Id.* (telling Plaintiffs "you have no privileges"). The arbitration chair also attempted to split the Plaintiffs up so each could be interrogated separately—despite the IJC having previously said they would proceed together (Ex. 15)—but Plaintiffs refused to participate without each other present. Paris Decl. ¶ 49.

At the end of the third week, the panel chair informed Plaintiffs that the

---

[11] Defendants' repeated previous representations suggested the arbitration would last only a few days. *See, e.g.*, Ex. 14 (proposing windows of 4-5 days total).

arbitration was still not concluded and they would be required to resume the following week. *Id.* ¶ 51. Plaintiffs asked the panel for a list of the witnesses and documents they still wanted to call, but the panel did not have an answer. Instead, they responded that those details "will come" and the arbitration will take "as long as it takes." Plaintiffs told the panel they could not continue the next week and returned home to Australia. G. Baxter Decl. ¶ 51. The arbitration panel elected to leave the arbitration open instead of entering a decision that Plaintiffs could challenge in court. Ex. 23.

## II. Legal Standard

Under Federal Rule of Civil Procedure 54(b), the Court's interlocutory order compelling arbitration may be revised at any time before the entry of final judgment. Fed. R. Civ. P. 54(b); *see also United Steel, Paper & Forestry, Rubber, Mfg., Energy, Allied Indus. & Serv. Workers Int'l Union AFL-CIO-CLC v. Wise Alloys, LLC*, 807 F.3d 1258, 1270 (11th Cir. 2015) (order compelling arbitration and staying the case pending arbitration is interlocutory, not final). Rule 54(b) grants the court "plenary authority 'to reconsider, revise, alter or amend' a non-final order before the entry of final judgment." *See Hornady v. Outokumpu Stainless USA*, 118 F.4th 1367, 1379–80 (11th Cir. 2024) (quoting *Toole v. Baxter Healthcare Corp.*, 235 F.3d 1307, 1315 (11th Cir. 2000)).

## III.    Argument

New evidence disproves three key assumptions that supported the Court's order compelling arbitration: (1) that a Scientology arbitration would assess Plaintiffs' claims under the TVPRA and other relevant substantive law; (2) the procedures provided in the arbitration agreements created a process containing basic levels of fairness and

11

protections to Plaintiffs; and (3) that a Scientology arbitration was actually an "arbitration" under the Federal Arbitration Act ("FAA").[12] As a result, it is now apparent that the arbitration clauses are unenforceable. Additionally, Defendants have breached their obligation under the agreements to develop fair procedures for Scientology arbitration.[13]

### a. New Evidence Shows that the Purported Arbitration Agreements Are Unenforceable Prospective Waivers of Plaintiffs' Statutory Rights.

New evidence shows that the purported arbitration clauses are unenforceable because the Scientology arbitration panel would not apply the TVPRA or relevant state law. In its order granting Defendants' motion to compel arbitration, this Court confirmed that "[a] prospective waiver of substantive federal rights is void." ECF 188 at 11 (citing *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth*, 473 U.S. 614, 637 n.19 (1985) and *14 Penn Plaza LLC v. Pyett*, 556 U.S. 247, 273–74 (2009)); *see also, e.g.*, *Viking River Cruises, Inc. v. Moriana*, 596 U.S. 639, 653 (2022); *Am. Express Co. v. Italian Colors Rest.*, 570 U.S. 228, 235 (2013). Nevertheless, the Court concluded that because "an agreement to arbitrate statutory claims does not *necessarily* constitute a prospective waiver of substantive rights," Plaintiffs had not shown that the arbitration clauses they

---

[12] Plaintiffs maintain their prior objections to the agreements, including that they were never formed because they were entered under duress and due to fraud in the execution. And they continue to maintain that the Court, not an arbitrator, must decide those issues. Plaintiffs focus the present motion on the new evidence gathered while attempting to arbitrate their claims.

[13] *Garcia v. Church of Scientology Flag Serv. Org.*, No. 18-13452, 2021 WL 5074465 (11th Cir. 2021), raised entirely different challenges and is not to the contrary. Unlike here, the *Garcia* plaintiffs did not bring federal statutory claims and did not argue that the arbitration clauses there unlawfully waived of their substantive rights. Nor did they argue that the Scientology arbitration proceeding was not arbitration under the FAA, or that the defendants breached their duties under the arbitration clause. *See generally id.* at *6–13.

12

signed constituted such a waiver. ECF 188 at 11 (emphasis added). The evidence now shows that the Scientology arbitration will not apply the TVPRA to Plaintiffs' claims and therefore any agreement to arbitrate statutory claims through Scientology's arbitration *does* necessarily constitute a prospective waiver of substantive rights.

The panel ruled in no uncertain terms that it would not apply the TVPRA or any other federal or state law and would instead apply some unspecified law of Scientology. *Supra* pp. 8-9. It similarly applied some unspecified law of Scientology to resolve Plaintiffs' claims of duress, rather than state contract law. *Id.* Thus, there is no longer any doubt that, when the agreements stated that the arbitration would be governed by the "ecclesiastical rule, custom, and law" of Scientology, it was to the exclusion of applicable federal and state law. Indeed, the IJC even repeatedly admonished Plaintiffs for making "secular legal objections." The arbitration agreements thus "operate as a prospective waiver twice over, waiving not only [Plaintiffs'] right to pursue federal statutory remedies . . . but also the very federal and state defenses to arbitrability that preserve that right." *Hengle v. Treppa*, 19 F.4th 324, 339 (4th Cir. 2021).[14]

Courts of appeals around the country have had no difficulty finding an arbitration agreement that disclaims the application of federal law to be an unenforceable prospective waiver of federal statutory rights. *See, e.g.*, *Williams v. Medley*

---

[14] *Cf. Dunn v. Global Tr. Mgmt., LLC*, 2024 WL 4379966, at *11 (11th Cir. 2024) (acknowledging that, under *Hengle*, a contractual provision that prevented the arbitrator from applying the FAA or state contract law would be unenforceable).

*Opportunity Fund II, LP*, 965 F.3d 229, 241 (3d Cir. 2020) ("By limiting the claims available to borrowers to tribal-law claims, the arbitration agreement here requires a borrower to prospectively waive claims based on any other law."); *Gingras v. Think Fin., Inc.*, 922 F.3d 112, 127 (2d Cir. 2019) (holding unenforceable arbitration agreement that "purports to offer neutral dispute resolution but appears to disallow claims brought under federal and state law"); *Hayes v. Delbert Servs. Corp.*, 811 F.3d 666, 675 (4th Cir. 2016) (arbitration agreement cannot "waive[] a potential claimant's federal rights through the guise of a choice of law clause").

In *Hayes*, for example, the parties' agreement provided that it would be governed only by the law of the Cheyenne River Sioux Tribe. 811 F.3d at 675. The court explained that, though "[a] party to an arbitration agreement may of course agree to waive certain rights as part of that agreement," including selecting the law applicable to the dispute, a party "may not flatly and categorically renounce the authority of the federal statutes to which it is and must remain subject." *Id.* As a result, the court held that the entire agreement was "invalid and unenforceable." *Id.*

The rulings from the panel chair and statements of the IJC demonstrate that Scientology arbitration will not consider or resolve federal legal claims. *Supra* pp. 8-9. Thus, an agreement to arbitrate under Scientology arbitration is inherently a prospective waiver of substantive federal rights. By this reason alone, the purported arbitration agreements are unenforceable. And because the choice of Scientology law over applicable federal and state law "go[es] to the core of the arbitration agreement," it cannot be severed from the agreements, and they are unenforceable in their entirety.

14

*Hayes*, 811 F.3d at 676; *see also Dillon v. BMO Harris Bank*, 856 F.3d 330, 336–37 (4th Cir. 2017).

> **b. New Evidence Shows that Scientology Arbitration Procedures Are So Unfair that Plaintiffs Cannot Vindicate Their Rights and the Purported Arbitration Clauses are Unconscionable.**

The Scientology arbitration process does not provide an opportunity to prepare and present a claim to neutral arbitrators. Thus, even if the TVPRA could apply in Scientology arbitration, it still would not allow Plaintiffs to effectively vindicate their rights, so any purported agreement to arbitrate under Scientology arbitration is void under federal law and unconscionable under state law.[15]

As detailed above, *supra* pp. 3-5, Plaintiffs were forced to arbitrate without any understanding of the procedures or substantive law to be applied. *See Carbajal v. CWPSC, Inc.*, 245 Cal. App. 4th 227, 245 (2016) (collecting cases and holding failure to provide a copy of the arbitration rules to which the litigant would be bound and especially failure to "clearly identify which rules will govern" supports unconscionability finding). Plaintiffs did not have access to "a neutral forum in which to enforce [their federal statutory] protections." *Cole v. Burns Int'l Sec. Servs.*, 105 F.3d 1465, 1482 (D.C. Cir. 1997). The arbitrators were all drawn from a pool of arbitrators defined by Defendants: Scientologists "in good standing." The IJC, who is employed

---

[15] This Court's order rejected Plaintiffs' unconscionability and effective vindication arguments on the grounds there was insufficient evidence that the proceeding would not be fair and that deciding whether the agreements provided for a fair proceeding could require inquiring into Scientology doctrine, which the Court held that it could not do. Now, the Court need not examine Scientology doctrine. It can instead look to what in fact happened: the agreements were unconscionable and prevented Plaintiffs from vindicating their rights.

by Defendant CSI, and the panel chair, who is subject to the IJC's control, were both outwardly hostile to Plaintiffs' claims;[16] the panel chair acted as if she were counsel for Defendants; and the panel chair turned out to be an immediate family member of a fact witness adverse to Plaintiffs. *See Flores v. N.Y. Football Giants, Inc.*, 150 F.4th 172, 186 (2d Cir. 2025) (agreement invalid under effective vindication doctrine where plaintiff would be required "to submit his statutory claims to the unilateral discretion of the executive of one of his adverse parties"); *Blueskygreenland Env't Sols., LLC v. Georgas*, No. 12-81234-CIV, 2014 WL 12515259, at *2 (S.D. Fla. Feb. 25, 2014) (arbitration agreement unconscionable where arbitrator was defendant's alleged co-conspirator); *Cannon v. S. Atlanta Collision Ctr., LLC*, No. 1:11-CV-1030, 2012 WL 1004914, at *5 (N.D. Ga. Feb. 27, 2012) (arbitration agreement unconscionable that "require[d] that two of the three arbitrators" be defendant's employees).

Plaintiffs were denied *any* discovery, not provided copies of briefs and evidence submitted by Defendants to the arbitrators, not provided with a list of Defendants' witnesses, and not permitted to take evidence presented to them during the proceeding outside the room to review. *Supra* pp. 4-5. *See Sheelit v. AmeriSave Mortg. Corp.*, 754 F. Supp. 3d 995, 1010 (C.D. Cal. 2024) ("When an arbitration agreement fails to provide 'adequate discovery,' it is substantively unconscionable" as a de facto frustration of the employee's statutory rights) (quoting *Armendariz v. Found. Health Psychcare Servs.,*

---

[16] *See, e.g.*, Raghavan Decl. ¶¶ 10, 15, 25 (Plaintiffs were "repeatedly denied the opportunity to present their perspective"; Defendants, but not Plaintiffs, could question expert directly; when Plaintiffs tried to correct inaccuracies, they were "told to not speak").

*Inc.*, 24 Cal. 4th 83, 104, 99 Cal. Rptr. 2d 745, 6 P.3d 669 (Cal. 2000)); *King v. Baker Petrolite LLC*, No. B321248, 2023 WL 4246784, at \*14 (Cal. Ct. App. June 29, 2023) (providing only limited discovery is unconscionable). Plaintiffs were also denied (1) a meaningful opportunity to cross-examine the witnesses presented against them; (2) assistance of counsel; and (3) the ability to create a record.[17]

Beyond depriving Plaintiffs of the basic ability to present their case, the process appeared designed to be as cumbersome and emotionally taxing as possible. *See* Raghavan Decl. ¶¶ 10, 27 (process was "highly distress[ing]" "humiliat[ing]" and "intimidat[ing]" for Plaintiffs); *supra* pp. 9-11. Plaintiffs and their witnesses were forced to expend significant costs traveling to Florida to participate in the three-week proceeding. *See Aguila v. Becton & Dickinson*, No. 5:22-cv-06670, 2023 WL 5988601, at \*3 (N.D. Cal. Sep. 13, 2023) ("agreements requiring employees to pursue arbitration in a distant forum often 'impose too great a burden' and are substantively unconscionable."); *Lucas v. Gund, Inc.*, 450 F. Supp. 2d 1125, 1134 (C.D. Cal. 2006) (requiring arbitration in different state than where plaintiff resided "would impose too great a burden" on plaintiff and thus was unconscionable).[18] The panel dedicated an entire week of the arbitration to interrogating the Plaintiffs on irrelevant personal matters, threatening to question them outside the presence of one another, and

---

[17] Plaintiffs and the Court anticipated that Plaintiffs would not be allowed assistance of counsel and that the arbitration pool would be under Defendants' control. Viewed along with the other, new evidence, these facts take on new significance.

[18] Although Plaintiffs filed their lawsuit in Florida despite the burden it would pose on them and their witnesses, conducting a Scientology arbitration in Florida proved more burdensome than litigating in Florida due to the panel's presentation of voluminous cumulative evidence, its refusal to share a schedule of anticipated testimony, and its refusal to conclude the arbitration.

17

attempting to invade the attorney-client privilege. Even the supposedly neutral IJC repeatedly encouraged the Plaintiffs to drop their claims. *E.g.*, Ex. 14. Indeed, despite Plaintiffs' best efforts, the gambit worked to an extent: Plaintiffs went home after three weeks, nearly all of which was spent on Defendants' case, but the IJC is now holding the arbitration open despite Plaintiffs' requests that it issue a final decision. With no guarantee of resolution, Defendants have created an indefinite abeyance from which Plaintiffs cannot readily appeal, unless and until the Court reconsiders its order compelling arbitration. This biased and unduly burdensome process denies Plaintiffs a forum to effectively vindicate their rights under the TVPRA.

Because the procedures applied in the Scientology arbitration demonstrate "a systematic effort to impose arbitration . . . not simply as an alternative to litigation, but as an inferior forum," they are not severable and the arbitration agreements are unenforceable in their entirety. *Armendariz*, 24 Cal. 4th at 124; *see Heckman v Live Nation Ent., Inc.*, 120 F.4th 670, 688 (9th Cir. 2024).

### c.  New Evidence Demonstrates that the Scientology Proceeding Is Not "Arbitration" Within the Meaning of the FAA.

The Court's order compelling arbitration assumed that Scientology arbitration is actually an "arbitration" and thus that the Court had authority to compel arbitration under § 3 of the FAA. New evidence shows that it was not.

The FAA gives courts authority to enforce agreements "to settle by arbitration a controversy." 9 U.S.C. § 2. If an agreement instead provides for dispute resolution through a proceeding that is not an "arbitration" within the meaning of the FAA, this

Court lacks authority under the FAA to enforce it and compel arbitration. *See Advanced Bodycare Sols., LLC v. Thione Int'l, Inc.*, 524 F.3d 1235, 1238–39 (11th Cir. 2008); *Flores*, 150 F. 4th at 183.

Although the FAA does not define "arbitration," the Eleventh Circuit has explained that courts must "consider[] how closely the procedure chosen resembles 'classic arbitration' and whether enforcing it serves the intuited purposes of Congress." *Advanced Bodycare Sols.*, 524 F.3d at 1239 (quoting *Fit Tech v. Bally Total Fitness*, 374 F.3d 1, 6–7 (1st Cir. 2004)). The Eleventh Circuit has identified four "'common incidents' of 'classic arbitration,' including (i) an independent adjudicator, (ii) who applies substantive legal standards (i.e. the parties' agreement and background contract law), (iii) considers evidence and argument (however formally or informally) from each party, and (iv) renders a decision that purports to resolve the rights and duties of the parties, typically by awarding damages or equitable relief." *Id.* New evidence demonstrates that the Scientology "arbitration" process does not contain any of these four characteristics or otherwise resemble "classic arbitration."

*First*, the Scientology proceeding is not an arbitration because it does not involve an independent adjudicator. "A basic assumption of 'traditional arbitral practice' and 'the norm of bilateral arbitration as our precedents conceive of it' is that, even while arbitration is a matter of contract, an arbitral forum is an *independent* forum that is separate from the parties to the dispute." *Flores*, 150 F.4th at 183. Where the adjudicator is controlled by one of the parties, the proceeding "lacks the requisite

19

independence between parties and arbitrator that is fundamental to the FAA's conception of arbitration." *Id.*; *Hooters of Am., Inc. v. Phillips*, 173 F.3d 933, 940 (4th Cir. 1999) (arbitration is "a system whereby disputes are fairly resolved by an impartial third party" and that a "scheme whereby one party to the proceeding so controls the arbitral panel" is not arbitration, but rather "a sham system").

Here, as in *Flores*, the adjudicators were not "separate" from Defendants. *Supra* pp. 6-8. The IJC is an employee of Defendant CSI. Rinder Decl. ¶ 25. And the panel was selected from a pool controlled by Defendants, as Defendants determine who is a Scientologist in good standing. That resulted in a panel chair who clearly operates on behalf of Defendants, as illustrated by her past declaration in support of their motions to compel in similar matters and her repeated indications that she was taking direction from someone else. *Supra* n.9 (citing Ex. 21). Not surprisingly, based on those connections, she was openly hostile to Plaintiffs, repeatedly encouraging Plaintiffs to dismiss their claims and admonishing them for seeking "secular" legal advice. She even called her own son as a fact witness hostile to Plaintiffs' claims. As a result, the Scientology proceeding "betrays the norm of bilateral dispute resolution." *Flores*, 150 F.4th at 184; *see also* Nolan Decl. ¶ 11 ("A system lacking a neutral decision maker is clearly not an alternative forum to a court, as such a system obviously could not provide effective vindication of statutory rights.").

*Second*, as described above, Scientology arbitration does not apply the substantive legal principles applicable to Plaintiffs' claims, including the TVPRA and the "background contract law" relevant to Plaintiffs' formation challenges to the

20

agreements. *Advanced Bodycare Sols.*, 524 F.3d at 1239; *see* Nolan Decl. ¶¶ 8, 15 ("Because the Scientology system does not resolve Plaintiffs' claims under applicable law, Plaintiffs cannot effectively vindicate their statutory rights[.]"). Likewise, neither the contract(s), nor the IJC, nor the panel of adjudicators would tell Plaintiffs "the procedure to be used in resolving the dispute." *Flores*, 150 F.4th at 184. In *Flores*, the court found that a proceeding had "virtually no resemblance to arbitration agreements as envisioned and protected by the FAA" because it allowed the adjudicator "to unilaterally dictate arbitral procedure." *Id.* The same is true here: because neither the agreement nor the adjudicators provided Plaintiffs with the procedures that would apply, the procedure could be unilaterally dictated by the panel, meaning that this was not an arbitration as envisioned in the FAA. Nolan Decl. ¶ 5 ("To be of any use, the rules must be established before any case is brought and must be available to all parties.").

*Third*, Scientology arbitration does not meaningfully consider evidence and argument. *Id.* ¶¶ 9, 12 ("Plaintiffs' experience using the Scientology system clearly shows that the supposed arbitration panel was not neutral."). Plaintiffs were prohibited from questioning witnesses themselves, with the panel chair deciding which questions could be asked of the witnesses. Plaintiffs were not informed of any process for submitting written argument. They submitted a statement of claim with attached evidence on their own initiative, but it is not clear that the panel considered it, and they were not provided with Defendants' response until the arbitration, when they were prohibited from taking it out of the arbitration room to review and share with

21

their attorneys. Plaintiffs were not permitted assistance of counsel to argue during the arbitration, even as to technical legal issues like arbitrability. Raghavan Decl. ¶ 12. Plaintiffs were provided none of Defendants' evidence or witness lists in advance, and even during the proceeding did not know what witnesses Defendants intended to call. Plaintiffs were only allowed to view the evidence presented against them in the arbitration room, denying them an opportunity to meaningfully review the evidence and make rebuttal arguments. *Supra* pp. 3-4; Nolan Decl. ¶ 10 (finding procedures "fall[] well short of the procedural minimums required for an arbitration system")

*Fourth*, Scientology arbitration does not render a decision that purports to resolve the rights and duties of the parties. Despite Plaintiffs' repeated requests, the panel refused to issue a final decision, instead holding the proceeding "open" indefinitely, even though it had dragged the proceeding out for three weeks with irrelevant, harassing evidence and questions after Plaintiffs submitted their full case in just two days. *Supra* p. 10. Without an award, Scientology arbitration is not arbitration. *See Advanced Bodycare Sols.*, 524 F.3d at 1239 ("[M]uch of arbitration law is predicated on the existence of an award."). Regardless, even if Scientology arbitration *did* render a decision, it would not "purport[] to resolve the rights and duties of the parties." *Id.* As discussed, Scientology arbitration applies no relevant substantive law and thus fails to resolve the parties' legal rights and duties. It adjudicates their conduct only under some other opaque, unwritten principles. This is not FAA arbitration. *See id.* ("The FAA clearly presumes that arbitration will result in an 'award' declaring the rights and duties of the parties."); Nolan Decl. ¶ 14 (a party cannot press their legal rights in a

22

forum that refuses to address their claims).

Accordingly, Scientology arbitration does not contain any of the common incidents of classic arbitration required by the Eleventh Circuit. And it is not an arbitration for the additional reason that the entire process appeared designed to harass and inconvenience Plaintiffs. Such a process does not "serve[] the intuited purposes of Congress" – it makes a mockery of it. *See Hooters of Am., Inc.*, 173 F.3d at 940 (arbitration is "a system whereby disputes are fairly resolved by an impartial third party"). In his half-century of experience in the field, Professor Nolan has "never encountered a system less worthy of the title of arbitration." Nolan Decl. ¶ 16.[19]

Because the Scientology proceeding does not contain the characteristics of classic arbitration identified by the Eleventh Circuit, it was not "arbitration" within the meaning of the FAA, and there is no available forum to which this Court can compel arbitration. As a result, the arbitration agreements are unenforceable in their entirety because "the choice of forum is an integral part of the agreement to arbitrate, rather than an ancillary logistical concern." *Inetianbor v. CashCall,* Inc., 768 F.3d 1346, 1350 (11th Cir. 2014) (citation modified)). Even more so than in *Inetianbor*, here, the choice of the Scientology forum for resolving disputes was a central focus of the purported agreements. *Compare Inetianbor*, 768 F.3d at 1350–51 (forum was integral to arbitration agreement where designation of tribal forum "pervade[d] the arbitration

---

[19] California law applies a similar definition of "arbitration." *See Cheng-Canindin v. Renaissance Hotel Assocs.*, 50 Cal. App. 4th 676, 684 (1996). Like the FAA, when the claimant "is expressly precluded from challenging [the Defendant's] policy, procedure or rules" and "is strongly discouraged from retaining counsel," it is not an arbitration. *See id* at 689-90.

agreement," including selection of arbitrators, and contract was drafted by entity controlled by tribal member), *with, e.g.*, ECF 67-2 at 13–18 (premising arbitration clause "[i]n accordance with the discipline, faith, internal organization, and ecclesiastical rule, custom, and law of the Scientology religion" and requiring "arbitrators be Scientologists in good standing"). Thus, the failure of that forum means the arbitration agreements cannot be enforced.

### d. Defendants Cannot Enforce the Arbitration Agreements Because They Breached Them.

When one party to an arbitration agreement "by contract took on the obligation of establishing" fair arbitration procedures and "fail[s] in performing its contractual duty," that party has breached the arbitration agreement and cannot enforce it.[20] *Hooters of Am.*, 173 F.3d at 940. Defendants here have breached that duty. Defendants do not appear to have established *any* rules or procedures for Scientology arbitration beyond the arbitrator selection process and the disallowance of counsel, court reporters, and "secular law" (none of which were written anywhere). If there *are* procedures, they have *never* been shown or communicated to Plaintiffs. Accordingly, Defendants breached their obligation to develop fair procedures for Scientology arbitration and the agreements should be rescinded. *See Hooters of Am.*, 173 F.3d at 940.

### e. Alternatively, the Court Could Compel Arbitration in AAA or JAMS.

As described above, the flaws that render the purported arbitration agreements

---

[20] Plaintiffs raise this argument in the alternative and do not concede that there was any valid contract formed with Defendants.

here unenforceable—the refusal to apply federal or state law, the unconscionable procedures that prevent Plaintiffs from vindicating their statutory rights, and a forum that is not "arbitration" within the meaning of the FAA—cannot simply be severed from those agreements because they are "integral to the [parties'] agreement to arbitrate." *Inetianbor*, 768 F.3d at 1350–51. As a result, the Court must reverse its order compelling arbitration under those agreements.

If, however, this Court disagrees and finds that the offending provisions are severable, it could compel Plaintiffs to arbitrate under U.S. law in AAA or JAMS arbitration. Some of the purported agreements provide that, if a court decides that the Scientology arbitration procedures are unlawful, the dispute can be resolved "under the auspices of the Los Angeles, California office" of JAMS or AAA. ECF 67-2 at 46, 56. Should the Court find the offending provisions severable, it could thus compel arbitration with JAMS or AAA in Los Angeles, so long as it is clear that those arbitrators would apply applicable U.S. law and the AAA or JAMS rules that provide the basic procedural safeguards that are lacking in Scientology arbitration. *Cf. Parm v. Nat'l Bank of Cal., N.A.*, 835 F.3d 1331, 1338 (11th Cir. 2016) (alternative forum, on its own, could not save arbitration agreement where unlawful waiver of federal rights and unconscionable procedures would still apply).

## IV.  Conclusion

For the foregoing reasons, the Court should grant the Motion.

25

Dated: April 9, 2026

Respectfully submitted,

/s/ Gregory P. Hansel

Gregory P. Hansel
(Fla. Bar No. 607101)
Shana M. Solomon
Elizabeth F. Quinby
**PRETI FLAHERTY BELIVEAU &
PACHIOS, LLP**
One City Center
P.O. Box 9546
Portland, ME 04112-9546
(207) 791-3000
ghansel@preti.com
ssolomon@preti.com
equinby@preti.com

Shelby Leighton
**PUBLIC JUSTICE**
1620 L St. NW, Suite 630
Washington, DC 20036
(202) 797-8600
sleighton@publicjustice.net

Manuel J. Dominguez
(Fla. Bar No. 0054798)
Theodore Leopold
(Fla. Bar No. 705608)
**COHEN MILSTEIN SELLERS & TOLL
PLLC**
11780 U.S. Highway One,
Suite N500
Palm Beach Gardens, FL 33408
(561) 515-1400
tleopold@cohenmilstien.com
jdominguez@cohenmilstein.com

Agnieszka M. Fryszman
**COHEN MILSTEIN SELLERS & TOLL
PLLC**

26

1100 New York Ave., N.W.,
Suite 800
Washington, DC 20005
(202) 408-4600
afryszman@cohenmilstein.com

Brendan Schneiderman
**COHEN MILSTEIN SELLERS & TOLL
PLLC**
88 Pine St., 14th Floor
New York, NY 10005
(212) 838-7797
bschneiderman@cohenmilstein.com

Joseph C. Kohn
Zahra R. Dean
**KOHN, SWIFT & GRAF, P.C.**
1600 Market Street, Suite 2500
Philadelphia, PA 19103
(215) 238-1700
jkohn@kohnswift.com
zdean@kohnswift.com

Warren A. Zimmerman
(Fla. Bar No. 652040)
**WARREN A. ZIMMERMAN, P.A.**
4114 Sparrow Ct
Lutz, FL 33558-2727
(813) 230-1465
warren@wzimmermanlaw.com

27

## LOCAL RULE 3.01(g) CERTIFICATION

In accordance with Local Rule 3.01(g), counsel for Plaintiffs contacted counsel for Defendants on March 2, 2026, regarding Plaintiffs' intent to file this motion and requested a meeting to confer regarding the motion. In that correspondence, Plaintiffs notified defense counsel that its motion was "based on new evidence including the conduct of the purported Scientology 'arbitration' and related evidence." The parties met and conferred in two virtual meetings on March 12 and March 20, each lasting around an hour, during which Plaintiffs provided additional detail on the grounds of the motion and the relief sought. Notwithstanding these efforts to resolve the matter without seeking Court intervention, the parties were unable to reach resolution.

Respectfully submitted,

*/s/* Gregory P. Hansel
Gregory P. Hansel

28