# Exhibit 1

## Declaration of Dennis R. Nolan

1.      My name is Professor Dennis R. Nolan.  I offer this Declaration in the case of *Gawain Baxter, et al. v. David Miscavige, et al.*, now pending in the United States District Court for the Middle District of Florida.  I am over the age of 21, and I have personal knowledge of the facts stated herein, which I declare are true and correct subject to the penalty of perjury. I understand that Plaintiffs are moving the Court to reconsider its order compelling arbitration under the purported arbitration system of Scientology.  In support of the below, I reviewed: (i) Plaintiffs' motion for reconsideration and declarations in support thereof; (ii) the Weber Declaration filed previously in this matter (ECF 67-2), containing the purported arbitration agreements; (iii) Plaintiffs' statement of claim submitted for arbitration and operative complaint; and (iv) this Court's order compelling arbitration (ECF 188).

## I.      QUALIFICATIONS

2.      I have been involved with labor and employment law since my graduation from law school 56 years ago.  For almost all of that time, my focus has been on the arbitration and mediation of employment disputes.  My resume is attached, but here are the main elements relevant to this case.

> a. Before moving to South Carolina in 1974, I practiced labor and employment law in Milwaukee, Wisconsin.  On moving to South Carolina, I noticed that the South Carolina Bar did not have a section devoted to that field.  I founded and served as first chair of what is now the labor and employment law section of the South Carolina Bar.

b. I began teaching at the University of South Carolina School of Law in the fall of 1974. From then until my retirement 34 years later, I taught a variety of courses, the vast majority of which were in the field of labor and employment law, with a special focus on employment dispute resolution. After several promotions, I became the Webster Professor of Labor Law and served in that capacity until my retirement in 2008. While at the University of South Carolina, I held visiting positions in the same field at the University of Washington, George Washington University, and at universities in Ireland, New Zealand, and Australia. Two of those visiting positions were the result of Fulbright grants.

c. While teaching, I also wrote eight books and about 47 articles, primarily involving arbitration and mediation. Among those books are *ADR in the Workplace* (West, 4th ed. 2020) and *Labor and Employment Arbitration in a Nutshell* (West, 4th ed. 2020). I also have lectured widely in the United States and abroad, delivering several hundred talks, mainly on employment law and dispute resolution.

d. While teaching and after my retirement, I served in many offices in relevant professional associations including the Association of American Law Schools (Chair of the Section on Labor and Employment Law); the International Society for Labor and Social Security Law (U.S. National Executive Board); the Labor Law Group Trust (Executive Committee); and the Labor and Employment Relations Association. Most

importantly for this case, in 1985, I was selected for membership in the premier North American association of labor and employment arbitrators, the National Academy of Arbitrators. I held almost every leadership position in the Academy over the subsequent years, culminating in serving as President in 2006-07.

e. Beginning in 1976, I also have practiced labor and employment arbitration and mediation. I have handled over two thousand cases throughout the continental United States, in the United States Virgin Islands, and in Panama. I have served on the arbitration panels of the main appointment bodies, the American Arbitration Association ("AAA"), and the Federal Mediation and Conciliation Service, and on private panels created by many of the most important companies and unions in the country.

f. Additionally, I submitted a declaration similar to this one, opining on whether a purported arbitration procedure comported with the Federal Arbitration Act ("FAA"), as it must. *See Hooters of Am., Inc. v. Phillips*, 173 F.3d 933, 935, 939 (4th Cir. 1999) (Wilkinson, J.) (holding company's dispute resolution process "utterly lack[ed] in the rudiments of even-handedness," in part relying on my declaration that the company's rules "do not satisfy the minimum requirements of a fair arbitration system").

3. My many years of experience in the field qualify me as an expert on dispute resolution systems, including arbitration.

## II.   MY INTEREST IN THE SUBJECT MATTER OF THIS CASE

4.    In all of my professional work in the last half-century, I have tried to advance the use of alternative dispute resolution in employment and related disputes. To do that, however, practitioners, scholars, and judges must guard against systems that use the term "arbitration" to disguise one-sided, sham systems designed to prevent fair decisions. Not every system bearing the label of arbitration deserves the deference reserved for actual arbitration. In my scholarly writing and lecturing, and in my work in professional associations such as the National Academy of Arbitrators, I have emphasized the importance of ensuring that arbitration provides a fair and ethical alternative to litigation. This declaration is another attempt to protect legitimate arbitration by depriving unfair and unethical systems of judicial backing. For this work, I am being compensated at a rate of $600/hour by Plaintiffs' counsel.

## III.   THE PROCEEDINGS IN THIS CASE DO NOT BEAR THE CHARACTERISTICS OF A GENUINE ARBITRATION

### A.    Fair Procedures

5.    Every complete dispute resolution system consists of a set of principles and procedures leading to a binding decision. Court procedures are an obvious example: everyone involved in a lawsuit knows just who has to do what at each stage, and how and when to do so. The crucial steps include a statement of claims and a response by the other party, time limits, discovery rules, evidentiary rules, and so on. It is impossible to imagine a fair judicial system that lacked those rules. To be of any use, the rules must be established before any case is brought and must be available to all parties.

6.      So too with arbitration.   All independent providers of arbitration services, most notably the AAA and JAMS (formerly known as Judicial Arbitration and Mediation Services, Inc.), have extensive rules that are readily available for all users. *Employment Rules, Forms, and Fees*, American Arbitration Association (May 1, 2025),   https://www.adr.org/rules-forms-and-fees/employment/;   *Employment Arbitration Rules & Procedures*,   JAMS   (June   1,   2021), https://www.jamsadr.com/rules-employment-arbitration.

7.      Of course, arbitration systems can vary widely in form and procedure. That is one of its many advantages because parties can design a system that meets their unique needs.  For instance, some use three arbitrators, others one.  But every fair arbitration system includes clear procedures, provided in advance to all parties, that provide for claims and responses, enable participants to obtain evidence and provide their own evidence, and to challenge the other party's evidence.  Almost all of them permit an audio or video record and allow parties to use attorneys.  Any dispute resolution procedure lacking fair procedures, and clear notice thereof, is inadequate.

8.      Plaintiffs' experience in trying to use the Scientology system demonstrates why that system is ruleless.  Most importantly, despite repeated requests by Plaintiffs and their lawyers, Defendants never provided them with the rules under which the system purportedly operated.  *See* Exs. 2–8.  I have never before seen an arbitration where the parties were denied use of attorneys. Lack of meaningful access to counsel makes it impossible for someone to effectively vindicate

their rights in a legal proceeding. Instead, the chair of the proceeding simply asserted various requirements or prohibitions as issues arose, often without any explanation whatsoever. The only conclusion an objective observer can reach is that the Scientology system either has no procedural or substantive rules or refuses to provide those rules, either of which is inconsistent with the basic principles of arbitration.

9. Second, fair arbitration procedures provide both parties with an orderly, convenient way to present testimony and other evidence and to refute the other side's evidence. Here, the Scientology procedure denied Plaintiffs the ability to obtain evidence from Defendants, to schedule their own witnesses, to directly examine their own witnesses or cross-examine Defendants' witnesses, and it refused to take testimony by video. Without the right to schedule their own witnesses—or specification of when the panel would call those witnesses—it was virtually impossible to arrange for and prepare for witnesses. Additionally, the Scientology procedure denied Plaintiffs advance (or even contemporaneous) copies of documentary evidence or records of testimonial evidence, so Plaintiffs could not effectively consult with their lawyers.

10. All of this falls well short of the procedural minimums required for an arbitration system.

**B.   Neutral Decision Maker**

11. There can be no arbitration as the law knows it without a neutral decision maker. A system lacking a neutral decision maker is clearly not an

alternative forum to a court, as such a system obviously could not provide effective vindication of statutory rights.

12.     Plaintiffs' experience using the Scientology system clearly shows that the supposed arbitration panel was not neutral. Unlike normal panels, all members had to be Scientologists in good standing, and thus were subject to pressure through Defendants' channels, including the sole individual Defendant who enjoys plenary power over members of Scientology.   Moreover, two panel members barely participated while the third, the chair of the panel (and Defendants' nominee), acted as an advocate for Defendants rather than as a neutral.   The participants' declarations show that the panel would not permit Plaintiffs to participate effectively. The panel would not permit some questions and required that all others be rephrased by the panel chair; the panel chair misrepresented some of the evidence, called her own son as a fact witness, and more.  Worse, the panel chair berated Plaintiffs and undercut their claims.

13.     The Scientology system did not provide a neutral decision maker and thus prevented Plaintiffs from effectively vindicating their claims.

**C.     Actual Consideration of Rights and Evidence Leading to a Final Decision**

14.     An arbitration is merely a system for the claimant to press their legal rights in a different forum.  It hardly needs saying that a party cannot do so if the designated forum refuses to address the claimant's statutory or constitutional rights. That is the case here.

15.     Defendants and the Scientology panel initially declined to identify the law and procedures it was applying.  They later stated that the panel would apply Scientology law, not federal or state law. *E.g.*, Ex. 10 (L. Baxter Decl.) ¶¶ 29–31. This Court relied on the FAA to defer Plaintiffs' statutory claims to a purported arbitration system with the clear understanding that the Scientology process would consider and rule on all of the Plaintiffs' claims.  The panel's statements demonstrate that the Court's expectation was not fulfilled.  Because the Scientology system does not resolve Plaintiffs' claims under applicable law, Plaintiffs cannot effectively vindicate their statutory rights through it.

## V.    CONCLUSION

16.     I have carefully reviewed the available information about the Scientology dispute resolution procedure to which this Court deferred Plaintiffs' claims.  Over my half-century of research, teaching and practice in this field, I have never encountered a system less worthy of the title of arbitration.  It possesses none of the elements of a classic arbitration and does not provide for basic guarantees of fairness.  It lacks any apparent rules.  It does not provide a fair procedure or a neutral decision maker.  Its own panel clearly stated it would not consider or apply federal or state law.  There is simply no way that system could provide an adequate alternative forum to resolve Plaintiffs' legal claims.


April 9, 2026

*/s/ Dennis R. Nolan*
Dennis R. Nolan
Arbitrator

# Exhibit 1-1

# DENNIS R. NOLAN

*Arbitration & Mediation Services*

162 HARBOR DRIVE NORTH
SAINT HELENA ISLAND, SC 29920-5010
DENNISNOLAN@YAHOO.COM

CELL 803-238-6255
OFFICE 843-838-4878

## Curriculum Vitae

**Education:**

**Legal:** J.D., 1970, Harvard Law School

**Graduate:** M.A. (American History), 1974, University of Wisconsin-Milwaukee

**Under-
Graduate:** A.B. (Government), 1967, Georgetown University

**Employment:**

Proprietor, Arbitration & Mediation Services

University of South Carolina, Columbia, South Carolina
Distinguished Professor of Law and Webster Professor of Labor Law Emeritus (since 2008);
Various other titles, 1974-2008

University of Sydney, New South Wales, Australia
Visiting Professor of Law (1996)

University of Otago, Dunedin, New Zealand
Fulbright Research Scholar (1989)

George Washington University, Washington, DC
Visiting Professor of Law (1987-88)

University College Galway, Galway, Ireland
Fulbright Visiting Professor of Law (1981-82)

University of Washington, Seattle, Washington
Visiting Associate Professor of Law (1979-80)

Foley & Lardner, Milwaukee, Wisconsin
Associate Attorney (1970-71, 1973-74)

Department of the Army, Washington, DC
Legal Assistant to the Deputy Under Secretary for International Affairs (1971-73)

**Professional Activity:**

- Member, Presidential Board of Inquiry on the Work Stoppage in the West Coast Ports (2002)
- American Arbitration Association and Federal Mediation and Conciliation Service Panels of Arbitrators
- Association of American Law Schools Section on Labor Relations and Employment Law (Chair, 1990-91)
- International Society for Labor and Social Security Law (U.S. National Executive Board, 1995-present)
- Labor Law Group Trust (Executive Committee, 2002 - 2010)
- National Academy of Arbitrators (President, 2006-07)
- South Carolina Bar (Associate Member, 1974-2012, and founder and first chair, Section on Labor and Employment Law)
- Wisconsin Bar

**Academic Activities:**

Among the courses I taught were Administrative Law, Alternative Dispute Resolution, ADR in Employment American Legal History, Collective Bargaining and Labor Arbitration, Comparative Labor Law, Contracts, Employment Discrimination, Individual Employment Law, Irish Labour Law, Jurisprudence, Labor and Employment Arbitration Workshop, Labor Law, Labor Law History, Labor Law Problems, and Public Sector Labor Relations.

**Public Lectures and Seminars:**

I have lectured widely in this country and abroad, including delivery of papers and participation in professional seminars at La Trobe, Melbourne, Monash and Sydney Universities (Australia); Durham, Leeds, Leicester, London, and Newcastle Universities (England); the University of Athens (Greece); Queen's University Belfast, Trinity College Dublin, University College Dublin, and University College Galway (Ireland); and Auckland, Canterbury, Otago, and Victoria Universities (New Zealand).

**Publications:**

**Books:**

(1)    LABOR ARBITRATION LAW AND PRACTICE IN A NUTSHELL (West Publishing Company 1979).

(2)    READINGS IN THE HISTORY OF THE AMERICAN LEGAL PROFESSION, editor and contributor (Michie Bobbs-Merrill Company, Inc. 1980).

(3)      LABOR ARBITRATION:  A COURSEBOOK (West Publishing Company 1994) (with Laura Cooper).

(4)      THE NATIONAL ACADEMY OF ARBITRATORS: FIFTY YEARS IN THE WORLD OF WORK (BNA Books, paperback, 1997; hardbound, 1998) (with Gladys Gruenberg and Joyce Najita).

(5)      THE AUSTRALASIAN LABOUR LAW REFORMS:  AUSTRALIA AND NEW ZEALAND AT THE END OF THE TWENTIETH CENTURY, editor and contributor (Sydney, New South Wales, Australia:  Federation Press 1998).

(6)      ADR IN THE WORKPLACE (West Group 2000); Second Edition (Thompson West 2005), both with Laura Cooper and Richard Bales; Third Edition (West Academic Publishing 2014), with Laura Cooper, Richard Bales, and Stephen Befort; Fourth Edition (West Academic Publishing 2020), with Laura Cooper, Richard Bales, Stephen Befort, Lise Gelernter, and Michael Z. Green.

(7)      LABOR AND EMPLOYMENT ARBITRATION IN A NUTSHELL (West Group 1998); Second Edition (Thomson West 2007); Third Edition (West Academic Publishing 2016), with Richard Bales; Fourth Edition (West Academic Publishing 2020) with Richard Bales.

(8)      LABOR LAW:  COLLECTIVE BARGAINING IN A FREE SOCIETY and STATUTORY SUPPLEMENT TO LABOR LAW: COLLECTIVE BARGAINING IN A FREE SOCIETY (West, Fifth Edition (West 2002), with Walter Oberer and Timothy Heinsz; Sixth Edition (West 2009), with Richard Bales; Seventh Edition (West 2018), with Richard Bales and Rafael Gely; Eighth Edition and Teacher's Manual (West 2024), with Richard Bales, Rafael Gely, and Brad Areheart.

**Articles and Chapters:**

(1)      *The Effect of the Revolution on the Bar:  The Maryland Experience*, 62 VIRGINIA LAW REVIEW 969 (1976).

(2)      *Sir William Blackstone and the New American Republic:  A Study of Intellectual Impact*, 51 NEW YORK UNIVERSITY LAW REVIEW 731 (1976).  An earlier version of this article was published in 6 The Political Science Reviewer 283 (1976).

(3)      *Textile Unionism in the Piedmont, 1901-1932*, in ESSAYS IN SOUTHERN LABOR HISTORY 48 (Gary M. Fink and Merl E. Reed, eds., Greenwood Press, 1977) (with Donald Jonas).

(4)     *Public Employee Unionism in the Southeast:  The Legal Parameters*, 29 SOUTH CAROLINA LAW REVIEW 235 (1978).

(5)     *Public Sector Collective Bargaining:  Defining the Federal Role*, 63 CORNELL LAW REVIEW 419 (1978).

(6)     *Improving NLRB Unfair Labor Practice Procedures*, 57 TEXAS LAW REVIEW 47 (1978) (with Richard Lehr).

(7)     *The Common Law of the Labor Agreement:  Vacations*, 5 INDUSTRIAL RELATIONS LAW JOURNAL 603 (1983) (with Roger Abrams).

(8)     *American Labor Arbitration:  The Early Years*, 35 UNIVERSITY OF FLORIDA LAW REVIEW 373 (1983) (with Roger Abrams).

(9)     *Subcontracting Disputes in Labor Arbitration:  Productive Efficiency Versus Job Security*, 15 UNIVERSITY OF TOLEDO LAW REVIEW 7 (1983) (with Roger Abrams).

(10)    *Resolving Holiday Pay Disputes in Labor Arbitration*, 33 CASE WESTERN RESERVE LAW REVIEW 380 (1983) with Roger Abrams).

(11)    *American Labor Arbitration: The Maturing Years*, 35 UNIVERSITY OF FLORIDA LAW REVIEW 557 (1983) (with Roger Abrams).

(12)    *Buying Employees' Time:  Guaranteed Pay Under Collective Agreements*, 35 SYRACUSE LAW REVIEW 867 (1984) (with Roger Abrams).

(13)    *Time at a Premium:  The Arbitration of Overtime and Premium Pay Disputes*, 45 OHIO STATE LAW JOURNAL 837 (1984) (with Roger Abrams).

(14)    *The Labor Arbitrator's Several Roles*, 44 MARYLAND LAW REVIEW 873 (1985) (with Roger Abrams), reprinted at 8 MONTANA ARBITRATORS ASSOCIATION QUARTERLY No. 3, at 1 (Winter, 1988).

(15)    *Toward a Theory of "Just Cause" in Employee Discipline Cases*, 1985 DUKE LAW JOURNAL 594 (with Roger Abrams).

(16)    *Seniority Rights Under the Collective Agreement*, 2 THE LABOR LAWYER 99 (1986) (with Roger Abrams).

(17)    *The Future of Labor Arbitration*, 37 LABOR LAW JOURNAL 437 (1986) (with Roger Abrams).

(18)   *Delivery of Arbitration Services: The Arbitrator Firm*, 10 NOVA LAW JOURNAL 45 (1986) (with Roger Abrams).

(19)   *Judge Bork's Record on Labor Law,* 3 BENCHMARK 156 (1987) (Part of a symposium on "The Judicial Record of Judge Robert H. Bork:  A Constitutional Inquiry").

(20)   *Federal Sector Labor Arbitration:  Differences, Problems, Cures*, 14 PEPPERDINE LAW REVIEW 805 (1987) (the lead article in a symposium on alternative dispute resolution).   An earlier version appears as the lead chapter in GRIEVANCE ARBITRATION IN THE FEDERAL SECTOR 3 (Dennis K. Reischl & Ralph R. Smith, eds., Federal Personnel Management Institute, Inc., 1987).  The article is reprinted at 9 MONTANA ARBITRATORS ASSOCIATION QUARTERLY No. 2, at 1 (Fall, 1988).

(21)   *The Arbitrator's Immunity from Suit and Subpoena*, 40 PROCEEDINGS OF THE NATIONAL ACADEMY OF ARBITRATORS 149 (1988) (with Roger Abrams).  A revised version of this article was published as *Arbitral Immunity*, 11 INDUSTRIAL RELATIONS LAW JOURNAL 228 (1989).

(22)   *Arbitral Craftsmanship and Competence*, 41 PROCEEDINGS OF THE NATIONAL ACADEMY OF ARBITRATORS 313 (1989) (with Roger Abrams).  A revised version of this article was published as *Final and Binding:  Arbitral Craftsmanship and Opinion Writing*, 5 THE LABOR LAWYER 195 (1989).

(23)   *The Status of American Legal Education*, 1 LEGAL EDUCATION REVIEW [Australia] 183 (1989).

(24)   *Regulation of Industrial Disputes in Australia, New Zealand and the United States*, 11 WHITTIER LAW REVIEW 761 (1990).  A revised version of this article appears in 7 OTAGO LAW REVIEW [New Zealand] 266 (1990).

(25)   *Does American Labour Arbitration Provide a Model for Australia?*, 16 MONASH UNIVERSITY LAW REVIEW [Australia] 21 (1990).

(26)   *AIDS in Labor Arbitration*, 25 UNIVERSITY OF SAN FRANCISCO LAW REVIEW 67 (1990) (with Roger Abrams), reprinted in 91-3 LOS ANGELES DAILY JOURNAL 24 (March 29, 1991).

(27)   *R.I.P.:  Compulsory Labour Arbitration in New Zealand*, 12 COMPARATIVE LABOR LAW JOURNAL 411 (1991).

(28)   *The United States*, in WORKPLACE JUSTICE:  EMPLOYMENT OBLIGATIONS IN INTERNATIONAL PERSPECTIVE 334 (Hoyt Wheeler & Jacques Rojot, eds., University of South Carolina Press, 1992) (with Hoyt Wheeler).

(29)   *Arbitral Therapy*, 46 PROCEEDINGS OF THE NATIONAL ACADEMY OF ARBITRATORS 269 (1994) (with Roger Abrams and Frances Abrams).  A revised and expanded version of this article was published in 46 RUTGERS LAW REVIEW 1751 (1994)

(30)   *Trends in Private Sector Grievance Arbitration*, in LABOR ARBITRATION UNDER FIRE 42 (Joyce Najita and James Stern, eds., Cornell University Press 1997) (with Roger Abrams).

(31)   *The (Limited and Shrinking) Role of the State in the Regulation of Labour Relations: Private Resolution of Statutory Disputes in the USA*, 2 FLINDERS JOURNAL OF LAW REFORM 147 [Australia] (1997).

(32)   *Examining the Australasian Labour Law Reforms*, in Dennis R. Nolan, ed., THE AUSTRALASIAN LABOUR LAW REFORMS:  AUSTRALIA AND NEW ZEALAND AT THE END OF THE TWENTIETH CENTURY 1 (Sydney, New South Wales, Australia: Federation Press 1998).

(33)   *Change without Labour Law Reform in the USA*, in Dennis R. Nolan, ed., THE AUSTRALASIAN LABOUR LAW REFORMS:  AUSTRALIA AND NEW ZEALAND AT THE END OF THE TWENTIETH CENTURY 72 (Sydney, New South Wales, Australia: Federation Press 1998).

(34)   *An American Perspective on Australasian Labour Law Reform*, in Dennis R. Nolan, ed., THE AUSTRALASIAN LABOUR LAW REFORMS: AUSTRALIA AND NEW ZEALAND AT THE END OF THE TWENTIETH CENTURY 242 (Sydney, New South Wales, Australia:  Federation Press 1998).

(35)   *Labor and Employment Arbitration: What's Justice Got to Do with It?*, 53 DISPUTE RESOLUTION JOURNAL (November 1998), 40.  Reprinted in HANDBOOK ON LABOR ARBITRATION (1st Ed. 2007, 2nd Ed. 2010, 3rd Ed. 2015).

(36)   *The National Academy of Labor and Employment Arbitrators?*, 52 PROCEEDINGS OF THE NATIONAL ACADEMY OF ARBITRATORS 52 (BNA Books 2000).

(37)   *Employment Arbitration After* Circuit City, 41 BRANDEIS LAW JOURNAL (University of Louisville) 853 (2003).

(38)   *Privacy and Profitability in the Technological Workplace*, 24 JOURNAL OF LABOR RESEARCH 207 (2003).  Reprinted as the lead chapter in INFORMATION TECHNOLOGY AND THE WORLD OF WORK 1 (Daphne Taras, *et al.*, eds.) (Transaction Publishers 2004).

(39)    *Standards for Discipline and Discharge*, in THE COMMON LAW OF THE WORKPLACE: THE VIEWS OF ARBITRATORS 169 (Theodore St. Antoine, ed., BNA Books, 1st Ed., 1998; 2d Ed., 2005).

(40)    *The Story of* NLRB v. Gissel Packing:  *The Practical Limits of Paternalism*, in LABOR LAW STORIES 191 (Foundation Press, Catherine Fisk and Laura Cooper, eds., 2005) (with Laura Cooper).

(41)    *"We Didn't Have Time to Train the Monkeys!"  The 2002 Presidential Board of Inquiry on the Work Stoppage in the West Coast Ports*, 57 PROCEEDINGS OF THE NATIONAL ACADEMY OF ARBITRATORS 55 (BNA Books 2005).

(42)    *Of Work, Family, and Arbitration:  Comments on Williams*, 58 PROCEEDINGS OF THE NATIONAL ACADEMY OF ARBITRATORS 89 (BNA Books 2006).

(43)    *Workplace Justice:  The Incremental Crisis and Its Cures*, 60 PROCEEDINGS OF THE NATIONAL ACADEMY OF ARBITRATORS 1 (BNA Books 2008).

(44)    *Working Group on Chapter 1 of the Proposed Restatement of Employment Law: Existence of Employment Relationship*, 13 EMPLOYMENT RIGHTS AND EMPLOYMENT POLICY JOURNAL 43 (2009) (with Goldman, St. Antoine & Slater).

(45)    *Disputatio:  "Creeping Legalism" as a Declension Myth*, 2010 JOURNAL OF DISPUTE RESOLUTION 1.

(46)    *Four Ways of Looking at an Arbitrator:  Autobiographical Perspectives on the Profession*, 63 PROCEEDINGS OF THE NATIONAL ACADEMY OF ARBITRATORS 367 (2011).

(47)    *Challenging Orthodoxies*, 66 PROCEEDINGS OF THE NATIONAL ACADEMY OF ARBITRATORS 482 (2015).

**Miscellaneous:**

(1)    Review of Herbert F. Storing, ed., WHAT COUNTRY HAVE I?  POLITICAL WRITINGS BY BLACK AMERICANS, 15 MODERN AGE 214 (1971).

(2)    Review of John Kobler, CAPONE, 16 MODERN AGE 99 (1972).

(3)    *The Practice of Employment Law in South Carolina*, 21 THE TRANSCRIPT No.11 (November, 1977) 5.

(4)    *Employment Law Resources in the USC Law Library*, 22 THE TRANSCRIPT No.7 (July, 1978) 6.

(5)    *Comment:  Southern Violence — Regional Problem or National Nemesis?:  Legal Attitudes Toward Southern Homicide in Historical Perspective*, 32 VANDERBILT LAW REVIEW 251 (1979).

(6)    *Negociations Collectives et Conflits du Travail*, FOCUS 10 (Paris, 1982).

(7)    *Legal Education:  The System in Ireland*, 3 CAROLINA LAWYER 2 (1982).

(8)    *The NLRB and Labor Arbitration*, 28 THE TRANSCRIPT No.6 (June, 1984) 11.

(9)    A Guide to USC - Columbia Tenure and Promotion Procedures  (1986) (with Robert Stephenson and Bruce Coull).

(10)   *Discussion*, 42 PROCEEDINGS OF THE NATIONAL ACADEMY OF ARBITRATORS 137 (1989) (comments on a paper by Charles Rehmus, *The Code and Postaward Arbitral Discretion*).

(11)   *The Mechanics of a Private Arbitration System*, Research Centre for Industrial Relations and Labour Studies [Dunedin, New Zealand], Discussion Paper #8902 (1989).

(12)   *Regulation of Industrial Disputes in Australia, New Zealand and the USA*, Research Centre for Industrial Relations and Labour Studies [Dunedin, New Zealand], Discussion Paper #8904 (1989).

(13)   *On Sabbatical*, 1992 THE USC LAWYER 7.

(14)   *Labor Arbitration and the Teamsters' Consent Decree*, THE CHRONICLE (September 1992) 9.

(15)   *Labor and Employment Arbitration: What's Justice Got to Do with It?*, UCLA Institute of Industrial Relations Working Paper (1998).

(16)   *Three Myths and a Non-Slippery Slope:  A Response to Arnold Zack*, THE CHRONICLE (Spring 2000), 17.

(17)   *Using Arbitration to Reach a First Contract*, CCH LABOR LAW REPORTS INSIGHT (May 2007) (written interview on the proposed Employee Free Choice Act (EFCA).

8