# Exhibit 11

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION


GAWAIN BAXTER, LAURA          .
BAXTER AND VALESKA PARIS,     .
                             .
     Plaintiffs,             . CASE NO: 8:22-CV-986-TPB-JSS
                             .
vs.                          . Clearwater, Florida
                             .
DAVID MISCAVIGE, CHURCH OF   . January 19, 2026
SCIENTOLOGY INTERNATIONAL,   .
ET AL.                       . 7:34 p.m
                             .
     Â Defendants.           .
. . . . . . . . . . . . . . .


DEBRIEFING SWORN STATEMENTS OF

GAWAIN BAXTER

LAURA BAXTER

VALESKA PARIS

Taken by the Plaintiff


Patrice Smith
Digital Reporter
Notary Commission No. HH 648537



APPEARANCES OF COUNSEL

Appearing on behalf of the Gawain Baxter, Laura Baxter, and Valeska Paris:

    GREG HANSEL, ESQUIRE
    ELIZABETH QUINBY, ESQUIRE
    PRETI, FLAHERTY, BELIVEAU & PACHIOS,LLP
    One City Center
    P.O. Box 9546
    Portland, Maine 04112
    207-999-6482
    ghansel@preti.com
    equinby@preti.com

    ZAHRA DEAN, ESQUIRE
    KOHL, SWIFT & GRAF
    1600 Market Street, Suite 2500
    Philadelphia, Pennsylvania 19103
    216-754-9521
    zdean@kohnswift.com

    AGNIESZKA FRYSZMAN, ESQUIRE
    COHEN MILSTEIN
    1100 New York Avenue, Suite 800
    Washington, D.C. 20005
    202-408-4600
    afryszman@cohenmilstein.com

    SHELBY LEIGHTON, ESQUIRE
    PUBLIC JUSTICE
    1620 L Street NW, Suite 630
    Washington, D.C. 20036
    sleighton@publicjustice.net



information about the arbitration in court, and then also the court has retained jurisdiction over this case."

MR. HANSEL:  So what you just corrected was the amendments?

MS. PARIS:  Yes.

MR. HANSEL:  Okay.

MS. PARIS:  That we hand writ on the document.

MR. HANSEL:  Okay.  So did you ask the arbitrators to rule that the amendments were acceptable?

MS. PARIS:  Yes, we did, and they agreed that they were acceptable.

MR. HANSEL:  Thank you.

So did you ask the arbitrators -- did you request that a court reporter be present?

MS. PARIS:  Yes, that is the first thing we did, we requested to have a court reporter present, and they said, no, that violates the policies of Scientology.

MR. HANSEL:  And did you have a court reporter present in the building ready to take down the entire arbitration proceeding who was from Esquire Court Reporting Services here in Florida?

MS. PARIS:  Yes, we did.

MR. HANSEL:  And is that the same court



reporter who is here present taking down your testimony now?

MS. PARIS:  Yes, it is.

MR. HANSEL:  Did security officers of the Church of Scientology not permit her to go into the anteroom of the arbitration hearing?

MS. PARIS:  Correct.  They would not even let her get into the elevator to go up to the location.  And we had to eventually just go in the elevator ourselves.

MR. HANSEL:  Did you request that your attorneys be permitted to attend the arbitration in the arbitration hearing room?

MS. PARIS:  Yes, we did.

MR. HANSEL:  Did the arbitrators make a ruling?

MS. PARIS:  They said, no, you are not permitted in the room.

MR. HANSEL:  Did you ask the arbitrators what law and procedural rules governed the arbitration?

MS. PARIS:  Yes, we asked repeatedly.  The chair, Kathy Fraser, kept saying that we know the policies.  And we stated that we do not, we're not Scientologists, we haven't been for 15 years, and that there are no policies on arbitration.

After repeatedly asking for the procedures and



giving them a copy of a message from in -- their IJC that we could have copies, they finally said that tomorrow morning, we would get copies of the procedures.

And then Laura had a conversation with her that I would like her to relay to you because I did not hear it.

MR. HANSEL:  Okay.  Are you -- I'm speaking to the court reporter.  We're going to hear now from Laura Baxter.

Laura, would you like to add to what Valeska said?

MS. BAXTER:  Yes.  Kathy was specifically talking to me, saying that I had studied -- extensively studied the Scientology ethics materials and that I should know what applies.

And I specifically said, I have, and that I have never come across anything that's called a religious arbitration in any of the ethics materials I've ever studied.

MR. HANSEL:  Did anyone in the hearing room contradict that or respond to that assertion?

MS. BAXTER:  She did not.  She said she heard what I said and she understands.

MR. HANSEL:  Did anyone from the respondents object and say that there was some source of law in



arbitration law and ethics -- I mean, in Scientology law and ethics providing for arbitration specifically?

MS. BAXTER:  She did not.  She just kept referring to that what they're applying is Scientology ethics and justice procedures, a very broad statement without any specific procedure named.

MR. HANSEL:  Did any of the respondents point out any provision of Scientology law and ethics with respect to arbitration specifically?

MS. BAXTER:  They did not talk at all, no.

MR. HANSEL:  Thank you.

Turning back to Valeska, did you ask a specific question about applying U.S. law, including the Trafficking Victims Protection Reauthorization Act?

MS. PARIS:  Yes, I did.  I asked if they were applying those laws in our arbitration.

MR. HANSEL:  Could you be specific, please, and sort of try to --

MS. PARIS:  I can tell --

MR. HANSEL:  -- restate --

MS. PARIS:  I can tell you exactly --

MR. HANSEL:  -- how you --

MS. PARIS:  -- what I said.

MR. HANSEL:  -- how you said that?

MS. PARIS:  Yes, I can.  I just have to get



it.

What I said exactly is, "Will you be applying U.S. law, including the Trafficking Victim Protection Reauthorization Act, the law referred to in our statement of claim?"

Their response was, "No, we will not be.  We are not attorneys."

And they also stated that that was not the Scientology procedures of arbitration.

MR. HANSEL:  Did you next make any requests with respect to exhibits of the respondents?

MS. PARIS:  Yes, I did.  I said, please provide us with a list of exhibits from the respondents and copies of those exhibits.  We were not provided with either a list or of copies of the exhibits that you are using as evidence, and we were not given an opportunity prior to today to review them.

MR. HANSEL:  And what was the response to that?

MS. PARIS:  The response was that we know all the policies that they are applying because we were in Scientology.  I told them that we are not Scientologists and we do not apply Scientology and we have not been for years and asked her to ask the respondents for copies.

She continued to say, no, and then I asked her



to ask the respondents, she is the arbitrator, which she did not do.

And then I gave her a copy of a letter from International Justice Chief saying that we had a right to have those documents, at which point she said she would provide them tomorrow morning.

MR. HANSEL:  Laura, do you have something to add?

MS. BAXTER:  Yes.  On the exhibits, we were handed responses from all five parties in a folder, a copy for each of us.  We were told we can only read those in this room, we can't take copies or remove these ones out of the room.  That was the only thing we were given of what the other side has provided.

MR. HANSEL:  So did you understand that those were written responses from each of the five respondent entities to your statement of claim?

MS. BAXTER:  Correct.

MR. HANSEL:  And are those written on some type of letterhead of each of those entities?

MS. BAXTER:  Correct.

MR. HANSEL:  And you were not permitted to take those out of the room?

MS. BAXTER:  No.



MR. HANSEL:  Okay.  Yes, Valeska?

MS. PARIS:  We were given those as soon as we entered the room, not when we asked for the exhibits. That was the first thing that they gave us.

MR. HANSEL:  Okay.  Did you request the opportunity to review that in private and take it with you?

MS. PARIS:  Yes, we did.  We wanted to go over it with our lawyers, and we were not allowed to do that.

MR. HANSEL:  Where were your lawyers?

MS. PARIS:  Outside, across a little hall in a room with the door closed, with a white noise machine in the hallway to make sure they could not hear anything.

MR. HANSEL:  Did you next ask the arbitrators with respect to witnesses to be called by the respondents?

MS. PARIS:  Yes, I did.

MR. HANSEL:  Can you describe how that went?

MS. PARIS:  I asked to be provided with a list of witnesses.  The arbitrator responded, she did not ask the respondents, and she said that they needed to see all of the evidence before they could have any witnesses, because they don't know what that will be, but she didn't even ask the respondents, she just responded.



MR. HANSEL:  Did you ask also for the topics for the witnesses on --

MS. PARIS:  Yes.

MR. HANSEL:  -- which each witness would be speaking?

MS. PARIS:  Yes.  I can read you exactly what I said.

"Please provide us with a witness list and the topics that the witnesses are going to give testimony about.  We were not provided with either a list of witnesses or the topics that they will testify about. We were not given an opportunity prior to today to review the witness list."

MR. HANSEL:  And was it after that that you had a response from the arbitrator, as you testified a moment ago?

MS. PARIS:  Correct.

MR. HANSEL:  And did you also just testify that the arbitrator did not even ask the respondents for a witness list or their topics?

MS. PARIS:  That is correct.

MR. HANSEL:  Laura, do you have something to add?

MS. BAXTER:  Yes.  I specifically remember her saying that she doesn't know yet and that we -- I don't



know if that was before she agreed to ask them for a list and that we would get to know on a need-to-know basis from day to day who would be coming.  Yeah, she wouldn't know for now who would be on the witness list or be a witness for the other side.

MR. HANSEL:  Okay.  Gawain, do you have something to add?

MR. BAXTER:  Yes.  Just there was something else she said, which was it was not part of the action. That was one more statement she made as a response to the question, is it was not part of the action, yeah.

MR. HANSEL:  What was not part of the action?

MR. BAXTER:  The witness list.

MS. BAXTER:  To provide the witness.

MR. BAXTER:  Yeah, to provide the witness list from the -- from the court -- the respondents, right.

MR. HANSEL:  Okay.  Thank you.

Did you also want to review any witness list and topics with your attorneys outside the room privately?

MS. PARIS:  Yes, we did, but they didn't give us one.

MR. HANSEL:  Okay.  At this point in the proceedings, did you present a threshold issue to the arbitrators about whether the arbitration agreements



regarding arbitration as Exhibit 3 to this transcript?

MS. PARIS:  Yes.

(Plaintiffs' Exhibit 3 was marked for identification.)

MR. HANSEL:  At this point in the proceedings, Valeska, did you speak to the arbitrators on behalf of the claimants with regard to expert witnesses?

MS. PARIS:  Yes, I did.

MR. HANSEL:  And what did you say?

MS. PARIS:  I just said, "We prefer the following experts and the dates they are available."

MR. HANSEL:  Do you mean proffer?

MS. PARIS:  Yeah, sorry.  I'm French.

"We proffer the following experts and the dates they are available.  Please confirm that you will permit them to appear in person and give evidence on the following dates."

And then I asked for the economist with the dates that she was available, the expert psychologist with the dates that she was available, and our vocational experts with the dates that she was available.

MR. HANSEL:  That he was available?

MS. PARIS:  He was available.

I also made it clear that they all had



demanding schedules and that we would need to know today which days they could appear as witnesses.

MR. HANSEL:  At any point during the day, did the arbitrators tell you what dates were acceptable for your three expert witnesses to attend?

MS. PARIS:  No, they did not.

MR. HANSEL:  Did you refer to a letter from the IJC on that point?

MS. PARIS:  Yes, I did.  I gave them a letter from the IJC, and I also read out the expert -- where it said that we were free to present any evidence that we wish to the arbitration with the names and any individuals who we believe have relevant information that the arbitrators can call forward and --

MR. HANSEL:  Did you then speak to the arbitrators about exhibits, Claimants' exhibits?

MS. PARIS:  Yes.

MR. HANSEL:  Laura, do you have something to add?

MS. BAXTER:  As to the experts and dates given, they -- we were first told that she can't give us dates because she has to have all evidence in from both sides so she can question our experts on both sides of evidence.  That was the first statement we got before she said that she would have more information tomorrow.



MR. HANSEL:  Okay.  Thank you.

So, Valeska, did you speak to the arbitrators about pleadings that the claimants wished to submit to the arbitrators?

MS. PARIS:  Yes, I did.

MR. HANSEL:  And what did you say?

MS. PARIS:  "We respectfully request that the First Amended Complaint and the Statement of Claim be admitted into the record.  These documents were properly filed and served in this proceeding and set forth the factual allegations and legal claims at issue.  Admission of these pleadings will provide context for the evidence presented and assist you in understanding the scope and nature of the claims before you.  We offer them not for the truth of every allegation asserted, but to establish the claims issues and procedural history of this arbitration.  Thank you."

MR. HANSEL:  And what was the chair's response to that proffer?

MS. PARIS:  She accepted the binders and then took note of every single document again and read it out so that the respondents could write every single document on a piece of paper, as well as the other two arbitrators.

MR. HANSEL:  Is it your understanding that the



800.211.DEPO (3376)
EsquireSolutions.com

chair of the arbitration panel accepted those into evidence and logged them and considered them to be lodged by the claimants into the record?

MS. PARIS:  Yes, it is, and she stated so.

MR. HANSEL:  Did you then speak to the arbitrators about expert reports?

MS. PARIS:  Yes, I did.

MR. HANSEL:  And what did you say?

MS. PARIS:  "We respectfully request that the expert reports be admitted as evidence.  For the record, the experts are qualified in their respective fields, and the opinions offered are based on reliable methods and information.  The reports address issues that are central to the claims and defenses in this matter. Admission of the expert reports will assist you in understanding the technical and factual issues before you and will promote an efficient and fair resolution of this arbitration.  Thank you."

MR. HANSEL:  And what was the chair's reaction to that statement?

MS. PARIS:  She accepted the documents.

MR. HANSEL:  Did you understand that -- well, which documents did she accept?

MS. PARIS:  The expert reports from the -- from the psychologist, the economist, and the vocational



expert.

MR. HANSEL:  Did she log those, describe them to the respondents, accept them into evidence, and did you understand that you had successfully lodged them in support of your claim and the claims of Laura and Gawain?

MS. PARIS:  Yes, I did.  I also did give her the -- before, the letter from IJC stating that we have a right to do that.

MR. HANSEL:  And did she -- did the chair of the panel confirm that she had accepted those reports into evidence?

MS. PARIS:  Yes, she did.

MR. HANSEL:  Did you then address fact witnesses with the panel?

MS. PARIS:  Yes, I did.  Before doing that, I also brought up the fact of their witnesses, because we realized that she never addressed the -- what are they called, defendants or --

MR. HANSEL:  The respondents.

MS. PARIS:  She never addressed the respondents, so I asked her to ask them directly for the witnesses, which I had to ask a few times before she -- well, at first, she was going to ask them without us present, and I asked that she do it with us present,



because they are supposed to be impartial, so she asked them and apparently we will get that list tomorrow of their witnesses.

I then read, "We respectfully request that the written statements of the fact witnesses be admitted into the record.  These witnesses have personal knowledge of the events at issue, and their statements describe facts relevant to the claims and defenses in this arbitration.  Admission of these statements will assist you in understanding the factual record and will promote an efficient presentation of the evidence.  Thank you.  We prefer the following fact witnesses and the date she is available.  Please confirm that you will permit her to appear in person and give evidence on the following dates.  Our" --

MR. HANSEL:  Before you go further, did you mean, we proffer the following fact witnesses?

MS. PARIS:  Yes, I did mean that.

MR. HANSEL:  Thank you.  Go ahead.

MS. PARIS:  "Our fact witness, Melissa Vaughn, is available to testify on January 20 to 23rd.  Ms. Vaughn is -- has a demanding full-time work schedule.  We need to decide today which day she will appear as a witness."

MR. HANSEL:  Did the arbitrators decide today



which day she could appear as a witness?

MS. PARIS:  No, they did not.

MR. HANSEL:  Did you remind the arbitrators of the letter from the IJC stating that the claimants are free to present evidence?

MS. PARIS:  Yes, I did, and I handed it to her.  And it was a little bit thick, so I said, I can read you the section, if that makes it easier.  And I said, you are free to present any evidence, and then she cut me off and said she found it.

And apparently, we will know tomorrow morning what day she can be a witness.

MR. HANSEL:  So let's go off the record for a minute.

THE REPORTER:  All right.  We are now off the record at 8:14 p.m.

(Off the record at 8:14 p.m. to 8:16 p.m.)

THE REPORTER:  We are now back on the record at 8:16 p.m.

Counsel, you may proceed.

MR. HANSEL:  After presenting the matters you have described, did the three of you then present statements of your testimony to the arbitrators with regard to trafficking and peonage?

And I'll start with Laura.  Did you do that?



MR. HANSEL:  And may we mark your statement as Exhibit 6?

MS. PARIS:  Yes.

(Plaintiffs' Exhibit 6 was marked for identification.)

MR. HANSEL:  I have nothing further.

Yes, Laura?

MS. BAXTER:  I have one more thing.  At one point, when we were talking about witnesses or the procedure of what happens, Kathy specifically said that any witnesses brought can only be questioned by the arbitrators.

MR. HANSEL:  Okay.  And, Valeska, did you have something?

MS. PARIS:  There was a few things that happened after that, just so you know.

MR. HANSEL:  Okay.  What happened?

MS. PARIS:  So then we each read the statements that we have personal knowledge of the facts presented by each other.  And then I tried to read to them punitive damage questions.

I asked the claimants to call the witness stand the representation of the Church of Scientology International.  I asked to state the name, and the arbitrator told me that he had already stated his name,



but I asked to do it as part of this.

He stated his name.  I then asked the arbitrator to ask the CSI representative, are you the corporate representative of Church of Scientology International?  He said, yes.

I then asked Kathy Fraser, the chair of the arbitration, what are the assets of the Church of Scientology International?  She responded, he doesn't know.  And then --

MR. HANSEL:  Who responded?

MS. PARIS:  The arbitrator, Kathy Fraser.

And I asked her to ask him, and she said that that had nothing to do with this and that they don't have to answer that.  She wouldn't even ask him.

So then I said that legally they need to answer, and I said, these witnesses are here on behalf of the respondent entities who are parties to this claim.  It is their responsibility to testify on their behalf on matters relevant to Claimants' claims.

These questions are relevant to Claimants' claims for punitive damages under the TVPRA and other U.S. law.  A respondent's assets and income are relevant to the amount of punitive damages that will have an impact on the respondents and others.

And she said that this is a Scientology



arbitration and that does not apply.  So I said, so do you refuse to ask the representative of CSI and -- to answer?  And she said, yes.

And then I said, well, I have the same questions for the other entities, so do you refuse to answer that for Religious Technology Center, International Association of Scientology Administration, Church of Scientology Flag Service Organization, Inc., Church of Scientology Flag Ship Service Organization, Inc.?  And she said yes.

So then I said I will not ask questions of the other ones because I know you will not be responding.

MR. HANSEL:  Can you just tell the court reporter what questions you intended to ask each of the representatives that you were not permitted to ask?

MS. PARIS:  "State your name.  Are you the corporate representative of said corporation?  What are the assets of said corporation?  What is the net worth of said corporation?  What is the annual income of said corporation.  No further questions."

MR. HANSEL:  Is it your understanding that those are relevant questions on the issue of punitive damages under the TVPRA and U.S. law?

MS. PARIS:  Correct.  And I even said that this is the -- per the law of the United States of



America.

MR. HANSEL:  Thank you.

MS. PARIS:  I then read out the damages.

MR. HANSEL:  Okay.  And may we mark the Damages Statement that you read out to the arbitrators as Exhibit 7?

MS. PARIS:  Yes.

(Plaintiffs' Exhibit 7 was marked for identification.)

MS. PARIS:  They also requested a copy of it.

MR. HANSEL:  Okay.  And do you agree to provide a copy?

MS. PARIS:  I do agree to provide a copy to -- for the exhibit.

MR. HANSEL:  Do you agree to provide a copy to the arbitrators tomorrow?

MS. PARIS:  Only if my attorneys agree to it.

MR. HANSEL:  Did you show me before --

MS. PARIS:  Only if my attorneys agree to it.

MR. HANSEL:  And do you understand that your attorneys have now agreed to -- recommended to you, the three of you, to provide that?

MS. PARIS:  Yes.

MR. HANSEL:  Thank you.

So I would next like to -- oh, yes, do you

