# Exhibit 19

**UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION**

|  |  |
|---|---|
| GAWAIN BAXTER et al., | : |
|  | : |
|  | : CIVIL ACTION |
| Plaintiffs, | : |
|  | : |
| v. | : NO. 8:22-cv-00986 |
|  | : |
| DAVID MISCAVIGE et al., | : |
|  | : |
| Defendants. | : |
|  | : |
|  | : |

**Declaration Of Gawain Baxter**

1.      My name is Gawain Baxter, I am over the age of 21, and I have personal knowledge of the facts stated herein, which I declare are true and correct subject to the penalty for perjury.

2.      I participated in a Scientology arbitration from January 19, 2026, to February 6, 2026, at the Atrium Building in Clearwater, Florida.

3.      When we entered the building, a Scientology security guard directed us to take an elevator up to the second floor of the building, where the arbitration was going to be conducted. The Scientology security guard told us that the court reporter was not allowed to go upstairs with us.

4.      After we went upstairs, we were told to go through a door where we encountered two more men who informed us that they were private security guards

25447325.5

hired by Defendants' counsel. They showed us a door that led to a room where the arbitration would be held and then several other doors that led to vacant offices where our attorneys and the attorney for Defendants would be located. The offices did not have walls that went up to the ceiling, so it was possible for the security guards and counsel for Defendants to hear conversations that occurred in the room where our attorneys were assigned.

5.      We were told by the Scientology security guard we could enter the arbitration room only without our attorneys. Before we could enter the room, the private security guards used a metal detector and a device that we were told could detect electronic devices to scan our bodies and all the materials we carried into the arbitration rooms. The security guards even scanned my and Laura's four-month-old baby and stroller. Each time we left the arbitration room to take a break or speak with our lawyers in the room next door, the security guards re-scanned us, our documents, and everything with us before we were permitted to reenter the arbitration room. This process was very time consuming.

6.      When we entered the arbitration room for the first time on January 19, we were approached by Catherine Fraser, who told us where to sit. Several other people were also in the room. Valeska asked who they were and what entities they were with. Fraser said they were Philippe Peterson (representing CSI), Chelsea Graves (representing RTC), Peter Mansell (representing FSO), Claudia Abadia (representing FSSO), and Beatric Reichl (representing IASA). Fraser did not tell us anything else about the relationship of these individuals to the Defendants.  We

asked for their titles/positions, and the Defendant representatives and Fraser said it wasn't relevant and refused to tell us.

7.      Valeska asked how Fraser was nominated. Fraser told us that Defendants had nominated her as an arbitrator, and that she had been appointed as the panel chair. Fraser told us that she and Jeannine Van Locke, one of the arbitrators we nominated, had selected Richard Howd to be the third arbitrator.

8.      Valeska asked if our attorneys could participate in the arbitration on January 19, and on every subsequent day of the arbitration. Ms. Fraser told us that our attorneys would not be permitted to participate in the arbitration. As a result, Laura, Valeska, and I, none of whom are trained as attorneys, had to try to argue complex legal concepts like the validity of the arbitration agreements, had to formulate our own questions for Defendants' witnesses on the fly, and had to give our own testimony and answer questions from the Panel while deciding whether to object to any of the questions asked. This was made even more difficult by the fact that we were not provided with Defendants' witnesses or evidence in advance, so we were not able to take time with our attorneys to prepare questions before the arbitration began.

9.      Valeska also asked if the court reporter that was present outside the room where the arbitration was being conducted could attend the arbitration and make a record, but Ms. Fraser said the reporter was not permitted.

10.     Ms. Fraser provided us with a non-disclosure agreement and an agreement to not record the proceedings electronically. She told us that the

25447325.5

arbitration would not proceed unless we signed these documents. We asked for copies to take with us so we could review them in private and confer with our attorneys. Ms. Fraser refused, and told us that we were not permitted to remove these or any other documents from the room where the arbitration was being conducted.

11.    Because we had no choice but to sign the documents to proceed with the arbitration, we each signed them but with the caveat that the non-disclosure agreement did not prohibit us from discussing what occurred in the arbitration in our court filings. I was not permitted to retain a copy of what I signed.

12.    Ms. Fraser then provided us with copies of the Defendants' responses to our Statement of Claim for the first time. Again, we were not permitted to take the responses out of the room to review or share with our attorneys. I attempted to copy out some of the responses onto my notepad, but I was not able to copy out all the Defendants' responses in the time I had, especially while also keeping track of what was going on in the proceeding.

13.    Valeska asked if the arbitration panel would be applying U.S. law, including the Trafficking Victims Protection Reauthorization Act. Ms. Fraser said "No, we will not be. We are not attorneys."

14.    At the end of the first day of the arbitration, Valeska, Laura, and I gave statements under oath outlining the day's events, including the statements that we each gave concerning our claims. This transcript is attached as Exhibit 11.

15.    On January 20, 2026, Valeska asked the arbitration panel to provide us with the Scientology Ethics and Justice Procedures and any other substantive or procedural law that governed the arbitration proceeding. Valeska provided the arbitration panel with a copy of the letter from the IJC dated November 30, 2024 that stated that we would be provided an opportunity to review those procedures prior to commencing the arbitration. Fraser, the panel chair, refused. She stated that if the panel were to bring in all the data on ethics and justice it would take a week. She said that the applicable law and procedures were all the ethics and justice procedures in Scientology, without going into any more detail. Fraser did not give us copies of any law or procedures and said that none would be provided. Fraser told Laura that she should know what the procedures were since Laura was an "ethics specialist."

16.    I took a Scientology ethics course as part of Sea Org training (during a phase known as Estates Project Force, or "EPF"). There was no mention of Scientology arbitration process or procedure in this course.

17.    Ms. Fraser provided us with copies of several documents that we had signed. I noted that none of the documents that I had been required to sign as a minor were included in these documents. I was familiar with some of these documents because I had seen them attached to Defendants' brief moving the court to compel arbitration. However, I also noted that there were some documents that I had not seen before. Valeska asked if we could have a copy of these documents, or whether our attorneys could be provided a copy of these documents. Ms. Fraser said

that we needed to request these documents from the IJC. We asked her where these documents came from. She said she had received them from the IJC weeks ago.

18.     On January 20, 2026, we wrote a letter to the IJC requesting copies of these documents and other documentary evidence that was provided to the panel. In a letter dated February 3, 2026, the IJC responded that it forwarded documents from Defendants to the arbitrators, but did not retain any copies of the documents, and could not speak to what the arbitrators may or may have not said to us once the arbitration commenced. The IJC copied the arbitration committee on the letter for them to "take the matter up with [us] if they wish[ed]." Neither the IJC nor the arbitration panel provided us or our attorneys with copies of the documents we requested.

19.     The panel first called Lise Cohee as a witness. Valeska asked the panel who gave them Ms. Cohee as a witness. Ms. Fraser said the IJC gave them her name and the panel chose her as a witness. Ms. Fraser then proceeded to ask Ms. Cohee questions about how long she had been in the Sea Org, life on the Freewinds, and the circumstances surrounding an agreement I had signed. Ms. Fraser stopped Valeska from asking Ms. Cohee questions. She said that Cohee's testimony was not relevant to Valeska's claims (even though her testimony concerned life on the Freewinds) and stopped Valeska from asking her questions.

20.     Ms. Fraser chose which witnesses would be called each day. Valeska asked Ms. Fraser every day for a copy of the witness list so that we could prepare. She refused to give us a witness list and refused to give us advance notice of when

25447325.5

Docusign Envelope ID: DDF28986-AA41-4373-9DCA-304C32BA5EAF

witnesses would be called. Fraser repeatedly said she had a list of names, but did not know who she would call yet—giving us the impression someone else was making that decision for her. Defendants began each day with the same witness and document binders as the members of the arbitration panel. Security personnel also told us that the arbitration panel and defendants' representatives ate lunch together during lunch breaks.

21.     It appeared that the panel had given the Defendants advance notice of what witnesses would be called on what date because the Defendants' witnesses were able to make travel arrangements in advance so that they could appear when called by the panel (for example, Ms. Fraser referenced needing to work around other witnesses' flight schedules, including Defendants' witnesses Roberto Toppi and Damien Anderson). However, the panel refused to give us dates when they would hear testimony from our witnesses. At the beginning of the arbitration, we provided the dates that our witnesses would be available and asked for confirmation of when they would be called so that they could make travel arrangements to appear. The Panel refused to give us an answer. Instead, Ms. Fraser kept insisting that the panel wanted all the evidence to come in but wouldn't give us an estimate of when that would be so we could make travel arrangements for our witnesses. She kept saying she wasn't giving us dates for our witnesses because she had to go through other testimony and evidence first so she knew what to ask our witnesses, but that did not appear to be a problem with scheduling Defendants' witnesses. By the end of the first week of arbitration, we still did not have an answer as to when

25447325.5

our witnesses would be called to testify. Since our witnesses had other professional obligations that they could not cancel on short notice to travel to Florida, we offered to make them available by Zoom, but the panel refused that as well. Therefore, we asked the panel to accept their written reports and declarations in lieu of their live testimony. During the second week of the arbitration, Ms. Fraser said that if our witnesses weren't able to appear and give testimony and be questioned, their evidence would be worth significantly less.

22.    Over the course of the first two weeks of the arbitration, Ms. Fraser called thirty-four Defendant witnesses who provided nearly identical testimony. Each witness that was or purported to be a signatory to one of the agreements we had signed was asked about our demeanor at signing and whether they had threatened us with any consequences for refusal to sign. Defendants' witness Damien Anderson testified that he witnessed me signing an agreement, but this was not true. Each witness was asked about what life on the Freewinds was like when we were on the ship and each witness' answer described the schedule for work, meal breaks and sleep; awards; times we were permitted to leave the ship including Christmas; and whether or not they had photos of the times we had some time off such as Christmas day. Ms. Fraser asked if we asked to leave the Freewinds or the Sea Org or whether we appeared happy to be there.

23.    Several of Defendants' witnesses lied about me in their testimony. For example, Daniella Merin testified that I went paintballing with her and even taught her how to paintball. This was simply not true. Callie Lekas also testified that she

25447325.5

thought I went paintballing with them, leading me to believe they had both been prepared or coached to say this. Sean Mossing also lied that I could leave the "QI" (where I stayed as a minor when I was in the Cadet Org) whenever I wanted. This also was not true. Additionally, Shawn Mossing's testimony about living and working conditions in the Cadet Org was not truthful, and was contradicted by subsequent testimony from other witnesses and Defendants' exhibits, but since we had no notice of subsequent witnesses or exhibits we could not confront the witness with the testimony and exhibits.

24.    Sometimes Ms. Fraser would add to a witness's testimony. For example, Fraser added on to Claudia Wollitzer's testimony and said that being sent to the engine room was "not punishment."

25.    Fraser also misrepresented facts in our Complaint and Statement of Claim to witnesses. Fraser told Damien Anderson and Callie Lekas that we claimed we never had a day off.

26.    All subsequent witnesses were called by Ms. Fraser and were asked questions by Ms. Fraser. Ms. Fraser did not permit Laura, Valeska, or me to ask witnesses questions directly. Every question we asked had to first be cleared by Ms. Fraser. If Ms. Fraser did permit our question, she would usually rephrase the question to the witness to elicit information helpful to the Defendants. Often she would object to our questions outright and say our questions were not pertinent or relevant and tell the witness not to answer. Sometimes, Fraser would tell us that the person we were trying to question was not our witness, and that therefore we

25447325.5

could not question them. For example, Defendants' witness Evelyn Politakes testified about the safety of the engine room and there was not a harmful level of blue asbestos exposure on the Freewinds. Valeska attempted to ask Evelyn Politakes, "isn't it true you're not a trained engineer?" Fraser did not allow the question. I asked, "what is a safe amount of exposure?" Fraser wouldn't permit the question. Sometimes Fraser answered questions herself that we had directed toward a witness.

27. The Defendants did not have this same restriction. Ms. Fraser permitted Defendants to directly ask both their and our witnesses questions and would permit witnesses to answer the questions as asked. When Defendants asked questions, Ms. Fraser did not rephrase their questions unless it was to guide them to phrase questions in a way to elicit information helpful to Defendants. She did not restrict the kinds of questions they asked.

28. Due to the lack of advance notice required to make advance travel arrangements for our witnesses to testify in person, only one of our witnesses (Dr. Chitra Raghavan) was able to travel to Clearwater to testify in person. During her testimony, Defendants were permitted to directly ask Dr. Raghavan questions, even though we were not permitted to directly ask any witnesses questions. These questions were often irrelevant and inflammatory. For example, Philippe Peterson (CSI) asked Dr. Raghavan if Laura, Valeska, and I could have just gotten together and made up the facts forming the basis of this lawsuit because we wanted to bring a false lawsuit and make money. Even though Dr. Raghavan was our witness, we

25447325.5

were not allowed to engage in any sort of direct examination or ask Dr. Raghavan any questions directly. We were allowed to ask her questions through Fraser for only approximately 10 minutes.

29.     Ms. Fraser verbally summarized previous witness testimony for Dr. Raghavan before asking Dr. Raghavan questions. Her summary of the previous testimony was cherry picked and inaccurate, and did not contain exact quotes. Ms. Fraser only included testimony in her summary that could help Defendants. For example, Ms. Fraser relayed to Dr. Raghavan that Tina Fugen testified that Valeska was "really happy" to be on the Freewinds, even though Tina Fugen had actually testified that she remembered Valeska saying that she did not want to be on the Freewinds.

30.     On January 22, 2026, Ms. Fraser informed us that the panel had rejected our argument that the arbitration clauses were invalid for duress. They did not rule on whether there was fraud in the execution of the arbitration clauses, despite our repeatedly asking them to do so.

31.     The next day, we asked if the panel had applied state contract law to reach the decision, the chair responded that it had not; rather, the chair said, the panel applied only the law of Scientology. The arbitrators provided no other explanation for their decision.

32.     We later asked if the panel would apply the TVPRA to resolve the merits of our claims and Ms. Fraser again responded that it would only apply the law of Scientology and would not apply any state or federal law.

33.     At one point, the arbitration chair called her own son Corwin Desimone as a witness. She did not disclose her relationship to Mr. Desimone or that she was related to a fact witness until Valeska pointed it out. Valeska was able to ask Mr. Desimone a few questions through Ms. Fraser until she stopped allowing her to question him. Valeska then tried to ask Mr. Desimone a question going to his credibility as a witness, and Fraser screamed at the top of her lungs that her question was irrelevant. She yelled at Valeska for nearly five minutes. The other two arbitrators, Ms. Van Locke and Mr. Howd, told Ms. Fraser to calm down.

34.     Fraser also added on to the testimony Mr. Desimone provided. For example, Valeska asked Mr. Desimone if it was true that Defendants took her and Corwin's identification documents when they went to RPF (Rehabilitation Project Force, a program for members of the Sea Org who have committed violations of Scientology's policies) in Australia. Mr. Desimone testified that it was true. Fraser added to his answer that "as his mother, she has spoken with Corwin about how much he's benefitted from the RPF."

35.     On January 26, after arbitrators Fraser and Howd repeatedly publicly demonstrated an inability to consider our claims impartially, we formally objected to their sitting as arbitrators and requested their recusal. We told the panel that this was based on Fraser calling her own son as a fact witness, a video published by 60 Minutes Australia and a story by CNN's Anderson Cooper in which Fraser publicly called former Scientologists liars, and Fraser's submission of a declaration in support of Scientology's motion to compel arbitration in *Haney v. Scientology,*

(Case Number 19STCV21210 in California Superior Court, County of Los Angeles, dated December 20, 2019), stemming from similar allegations of abuse by Scientology. We shared that our request for Howd to recuse himself was based on that fact that he has publicly referred to former Scientologists in derogatory terms. We provided the arbitrators with links to the referenced news sources and a copy of the declaration. Fraser responded "noted" and proceeded to conduct the arbitration.

36.    Although the arbitration had initially been scheduled to last two weeks, Fraser began hinting at the beginning of the second week that the arbitration may go longer than two weeks. In order to conclude within two weeks, we offered to start as early and end as late in the day as necessary, but Ms. Fraser continued to start the arbitration proceedings at 10 am.

37.    On January 28, we told the arbitration panel that we had entered all our evidence, except for Dr. Raghavan's in person testimony, on the very first day of the arbitration, and had spent time since then hearing Defendants' arguments and witnesses. We told the panel that now that Dr. Raghavan had been called, we rested our case, and that there was plenty of time for the arbitration to be concluded within two weeks.

38.    At the end of the second week, Ms. Fraser informed us that the panel would need at least another week to conclude the arbitration, despite having already heard over a week of the Defendants' case. We offered to continue the arbitration on the weekend or continue with a representative for us in our absence, but Fraser rejected these proposals.  We scrambled to arrange for childcare and

25447325.5

additional time off work, and incurred expense in changing our flights home to Australia and securing additional lodging and transportation, but we agreed to return for a third week of arbitration. We made it clear that in returning for a third week, we would expect the arbitration to conclude. We had presented our case in chief in two days.

39.     The third week, Ms. Fraser turned the process into a full-blown inquisition into our personal lives. During this week, she did not present any testimony or evidence relevant to our claims or Defendants' defenses. Rather, Ms. Fraser spent the entire week extensively questioning us about our social media posts, interactions with other former scientologists, and other personal matters unrelated to our claims.

40.     At the beginning of the third week, the panel reviewed some documents from our ethics folders, the folders that serve as personnel files and disciplinary records in Scientology. We were not permitted to handle and look through these folders ourselves. Instead, Ms. Fraser would only permit one of us at a time to review our ethics folder, and she would turn each page for us when we were done reviewing it. We did not receive copies of these documents in advance, during, or after the arbitration. Having to review documents in this manner was inefficient and wasted time.

41.     Large chunks of documents appeared to be missing from my ethics folder.  Based on my experience in Scientology, I know that documents involving disciplinary actions taken against me would be included in my ethics folder. There

was nothing in my ethics file concerning a letter I sent to Javier Martinez that said I was put in the Sea Org against my will and wanted to leave. I got in trouble with Danny Light for sending this letter. There was nothing in my ethics folder about trying to leave around 1998-1999. There was also nothing in my ethics folder about the time I was sent to the engine room for two months as punishment. Something about these incidents certainly would have been kept in my ethics folder. Fraser admitted that these were not our original ethics folders, and that new, renumbered folders had been made. She said that the ethics folders had come from the IJC.

42.     At the end of the day on Monday, February 2, we again asked for the names of witnesses who would be testifying the next day. We were not given an answer. We objected to any more witnesses testifying, as Ms. Fraser had previously told us that review of the ethics folders would occur at "the end" of the arbitration, after all witnesses had testified. We requested that the arbitration be concluded.

43.     On Tuesday, February 3, the panel continued to slowly review our ethics folders.

44.     At the end of the day, Ms. Fraser said the arbitrators had more questions to ask us and more witnesses to call, but she did not identify those witnesses and said she did not know who those witnesses were.

45.     The next day, on Wednesday, February 4, Valeska told the arbitrators that the arbitration needed to finish that day because we had rested our case the previous week and the arbitration panel had failed to identify any more witnesses it intended to call or any more evidence it intended to review. Valeska said that

25447325.5

asking irrelevant or repetitious questions would be an unacceptable attempt to delay the conclusion of the arbitration.

46.     Next, Ms. Fraser spent two whole days going over Valeska's social media posts, comments, and pictures she had posted or been tagged in. She showed Valeska photos of herself as a baby, before she entered the Cadet Org, photos of Valeska with her children, and a Father's Day Facebook post Valeska made saying she missed her Dad. Fraser asked if someone made her or paid her to create that Facebook post. She questioned Valeska extensively about news articles, media, public appearances, and podcasts she had been featured in or interviewed for as well. She asked how Valeska's media statements came about, if she was paid to give any interview or to make any statement, and if anyone talked her into it. Halfway through this, Valeska said that she had never been induced to make a social media post and asked if she could move through this line of questioning faster, but Fraser ignored her.

47.     Ms. Fraser asked me and Laura questions about an interview I did with the Tampa Bay Times after filing this complaint, as well as questions about other articles that used quotes from that interview.

48.     Ms. Fraser also questioned us extensively about attorney-client communications and work product, including questions about how the lawsuit came about, how much money our lawyers said we were going to make, if we discussed the statute of limitations with our lawyers, if Valeska convinced Laura and me to sue, if our lawyers made us give an interview with the Tampa Bay Times, and if our

25447325.5

lawyers told us not to worry about our arbitration agreements and confidentiality agreements that we had signed. We refused to answer these questions on the grounds of attorney client privilege, joint prosecution, and spousal privilege, though Ms. Fraser informed us that there was no attorney-client privilege under the law of Scientology. At one point, she said to us, "you have no privileges." She asserted multiple times that we had no joint prosecution or spousal privileges. This was especially difficult because our attorneys were not in the room and we are not experts in when the attorney-client privilege applies. Fraser also asked if Laura and I spoke about filing the lawsuit.

49.    Ms. Fraser also attempted to split me, Valeska, and Laura up so we each could be interrogated separately about "inducement," but we refused to participate in any proceedings without each other present. She asked us numerous questions on this point, including whether we were paid to bring this lawsuit. During the "inducement" line of questioning, we were not allowed to leave the arbitration room together until the line of questioning was over. During this time, Ms. Fraser asked Laura if she knew her father-in-law was in the FSO, and that since she was suing FSO, she was also suing him. This inducement line of questioning went on for over four hours.

50.    On Thursday, February 5, we again requested that the panel conclude the arbitration at the end of the third week.

51.    At the conclusion of the third week, Ms. Fraser informed us that the "arbitration" was still not concluded and that we would be required to resume the

25447325.5

arbitration the following Monday. We asked Ms. Fraser for a list of witnesses she wanted to call and evidence she wanted to enter into the record, but she did not have an answer. Ms. Fraser also would not give us a date by which the arbitration would end. She responded that these details "will come" and that the arbitration will take "as long as it takes." At this point, with no apparent end in sight, we told the panel that we would not continue the next week. We elected not to subject ourselves to further harassment and returned home to Australia. Our house and pet sitter was unable to stay any further. I had a job to get back to that I had already pushed back once. Our children, who accompanied us to Florida, needed to get back to Australia for school and medical appointments. They had already missed a week of classes and extracurricular activities. We told the arbitration panel that we had already stayed for one additional week beyond the two weeks scheduled by the IJC, on very little notice and at great cost, and that we had to return to our employment and other obligations.

DocuSigned by:

*Gawain Baxter*

21B2547EB0EF4BD...

3/24/2026              Gawain Baxter

25447325.5